## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| PARTNER REINSURANCE COMPANY LTD.,<br><br>                              Plaintiff,<br><br>              v.<br><br>RPM MORTGAGE, INC. and<br>LENDUS, LLC,<br><br>                              Defendants. | **COMPLAINT**<br><br>Case No.:  1:18-cv-05831 |

### INTRODUCTION

1.      This is a simple breach of contract action brought by Partner Reinsurance Company Ltd. ("PartnerRe") against RPM Mortgage, Inc. ("RPM") and LendUS, LLC ("LendUS") as successor-in-interest to RPM to seek redress for RPM's breach of its agreement to purchase Entitle Direct Group, Inc. (with its subsidiaries, "Entitle"), a title insurance and settlement services business.

2.      In 2016, Entitle was losing money.  Its financial statements clearly showed it was operating at a loss.  Entitle's losses meant it likely had a finite lifespan as a standalone business. But its nationwide platform and licenses for underwriting and issuing title insurance made it a potentially valuable asset for a strategic acquirer that could make it profitable by incorporating it into a larger business.  Among Entitle's interested prospective acquirers were mortgage-related businesses with plans to cross-sell title insurance to their mortgage-borrower customers – offering their customers "one-stop shopping" and increasing the profits they could earn from each mortgage transaction.

3.      RPM is a mortgage originator that had increasingly turned to Entitle for its title

insurance-related needs.  RPM's CEO, Robert Hirt, personally reached out to Entitle, expressing a keen interest in acquiring it.  Hirt was well aware of Entitle's losses and even commented that Entitle's current investors must be "tired of the losses forecasted."  But Hirt touted the business he would bring to Entitle from RPM's mortgage-borrower customers and exuded confidence that the new volume of business RPM could generate by cross-selling its customers would make Entitle hugely profitable.

4.    With the aid of an experienced and expert investment bank as its outside financial advisor and sophisticated, international law firms as its outside legal advisors, RPM had and made use of ample opportunity to examine Entitle's business and its finances during its due diligence process.  RPM ultimately made an offer that was lower on a cash-at-closing basis than other offers Entitle had considered over the previous year, but promised more value to Entitle's shareholders than any other offer then on the table because certain Entitle shareholders would retain 33% of the equity in the company, and thereby the potential to share in the company's recovery.  Accordingly, Entitle accepted RPM's offer, rejecting those of Entitle's other suitors. The parties entered into an Agreement and Plan of Merger (the "Merger Agreement") on February 16, 2017.  The Merger Agreement contemplated that Entitle was anticipated to continue suffering losses from the signing date until closing (which was at that time expected to occur by May 31, 2017).  The Merger Agreement included a formula under which the cash price payable for Entitle at closing would be reduced by an amount equal to 33% of Entitle's pre-closing losses above a certain, negotiated threshold.  Entitle's largest shareholder, PartnerRe, was made a party to the Merger Agreement as an appointed "Stockholder Representative," with responsibility to act on behalf of all of Entitle's shareholders.

5.    Between signing the Merger Agreement and the date for closing, however, RPM

2

apparently came to suffer "buyer's remorse," and changed its mind about wanting to acquire Entitle. When the closing date came, RPM failed even to show up to the closing table. For a time after that, RPM maintained vaguely that it still intended to close "soon," but pretended that it needed more information about Entitle's finances first. This was despite the fact that RPM had already taken advantage of ample opportunity to examine Entitle's finances as part of its due diligence process. This was also despite the fact that Entitle's regulator, the Ohio Department of Insurance ("ODI"), which received regular updates about Entitle's financial position and was responsible for protecting consumers by ensuring that Entitle remained adequately capitalized, had approved the RPM merger unconditionally – meaning that the ODI did not require any infusion of additional capital into Entitle or any other financial accommodations.

6.       RPM then cast about in hopes of finding a way to get out of its commitment, offering a series of different excuses for not closing. Each of RPM's excuses was clearly pretextual. Some were based on blatant falsehoods. RPM even went so far as to accuse Mary Jo Hudson, who was Entitle's regulatory counsel and had previously headed the ODI as Insurance Commissioner for the State of Ohio, of obtaining the ODI's approval of the merger through improper back-room dealings. RPM's own counsel quickly recanted these spurious allegations, thanking Hudson for "setting the record straight" and for her "help on the regulatory side, and for [her] long public service."

7.       None of RPM's excuses permitted it to decline to close under the Merger Agreement's terms; the law does not recognize buyer's remorse or cold feet as defenses for refusal to close a home purchase, let alone a multi-million-dollar merger transaction negotiated among sophisticated parties represented by sophisticated counsel.

8.       In discussions with PartnerRe, Hirt tried to re-trade. His message was clear:

RPM would consider closing only if Entitle and its shareholders offered terms that were more favorable to RPM than those to which RPM had already agreed in the Merger Agreement.  Hirt even demanded that PartnerRe extend a loan *to RPM for RPM's own fiscal need* before RPM would close on the agreed acquisition of Entitle.  Refusing to be cowed, Entitle and PartnerRe insisted on the terms to which RPM was already bound.  When RPM still refused to close, Entitle was forced to find another buyer.

9.      After having been stood up at the altar, and after waiting nearly a month during which RPM equivocated about whether and when it would close, Entitle made every effort to find the most attractive alternative buyer.  Ultimately, Entitle was acquired by Radian Group, a mortgage insurance company.  As would be expected, Entitle was damaged goods at this point – like the apple at the supermarket that the shopper next to you has picked up, dropped on the ground, and returned to the shelf.  Moreover, as Entitle continued to operate at a loss while new prospective buyers had to consider, and engage in, their own lengthy due diligence efforts, its accounting "book value" steadily decreased, and it was forced to take on additional debt in order to maintain adequate capitalization.  Unsurprisingly, then, the price Radian paid for Entitle offered significantly less value to Entitle's shareholders than the deal to which RPM had agreed.  Entitle also incurred significant additional expenses in order to complete a transaction with Radian, on top of the amounts it had expended pursuing the merger that RPM chose to abandon.

10.      RPM merged into a successor entity, now known as LendUS, in 2017.

11.      In its capacities both as the Stockholder Representative named as a party to the Merger Agreement and as the exclusive assignee (under the Radian merger agreement) of Entitle's claims against RPM, PartnerRe brings this action to hold RPM to its bargain and recover the damages suffered by Entitle, to its shareholders' detriment, as the direct and

predictable result of RPM's breach of contract.

## PARTIES AND RELEVENT NON-PARTIES

12.     During the time relevant to this Complaint, Entitle's business was operated by parent and subsidiary entities known as Entitle Direct Group, Inc. ("EDG") and Entitle Insurance Company ("EIC").   EDG is a Delaware Corporation with a principal place of business in Connecticut.   EIC is a Delaware Corporation with a principal place of business in Ohio.   EDG was the parent company of EIC.   On March 27, 2018, EDG merged with and into a subsidiary of Radian, surviving that merger as a subsidiary of Radian (with none of Entitle's previous shareholders retaining any interest).

13.     Plaintiff PartnerRe is a Bermuda limited company with a principal place of business in Bermuda.   At the time of the events giving rise to this Complaint, PartnerRe owned the majority of Series B Preferred Stock in EDG (which was the most senior class of EDG's stock), represented the shareholders' interests in the merger negotiations, and was itself a party to the Merger Agreement as the "Stockholder Representative."   PartnerRe subsequently owned the majority of shares in all stock classes, until the Radian merger transaction closed.

14.     Defendant RPM is (or was) a California corporation with a principal place of business in Alamo, California.

15.     Defendant LendUS is a Delaware limited liability company with a principal place of business in Alamo, California.   Upon information and belief, LendUS is the successor entity to RPM.   Its members are JAN (Lend USA) Holdings, Inc., Eva Noack, The Marckwardt Trust, and Lamp2 Associates, Inc., all of whom have California citizenship.   Entitle Direct Holdco, Inc. ("Parent") is a Delaware Corporation, wholly owned by RPM and formed for the purpose of effectuating the failed merger at issue in this litigation.

16.     Entitle Direct Merger Sub, Inc. ("Merger Sub") is a Delaware Corporation, wholly owned by Parent and formed for the purpose of effectuating the failed merger at issue in this litigation.

17.     Radian Title Services Inc. ("Radian") is a Delaware Corporation with a principal place of business in Pennsylvania.

## JURISDICTION AND VENUE

18.     Jurisdiction and venue are proper in this Court because, pursuant to Section 11.2(b) of the Merger Agreement, "[e]ach Party irrevocably submits to the exclusive jurisdiction of the United States District Court of the Southern District of New York . . . any Action arising out of or relating to this Agreement, and hereby irrevocably agrees that all claims in respect of such Action shall be heard and determined in such court."

19.     Entitle and RPM further agreed (in Section 11.2(a)) that the Merger Agreement "shall be governed by and construed in accordance with the Laws of the State of Delaware applicable to contracts executed and to be performed wholly within such State and without reference to the choice or conflict of law principles (whether of the State of Delaware or any other jurisdiction) that would result in the application of the Laws of a different jurisdiction."

20.     PartnerRe is a Bermuda limited company with a principal place of business in Bermuda.  RPM is (or was) a California corporation with its principal place of business in California.  LendUS is a Delaware limited liability company with its principal place of business in California.  LendUS has four members:  JAN (Lend USA) Holdings, Inc. is a California company with its principal place of business in California; Eva Noack is an individual who resides in California; The Marckwardt Trust has its business address listed as a residential address in Danville, California, which upon information and belief is the address of its trustee, a

6

California citizen; and Lamp2 Associates, Inc. is a California corporation with its principal place of business in California, although its registration in California appears to have been suspended.

21.     This Court has subject matter jurisdiction over this action to interpret and enforce the Merger Agreement pursuant to 28 U.S.C. § 1332 because there exists complete diversity between the parties and there are millions of dollars in controversy.

## STATEMENT OF FACTS

22.     In 2016, Entitle's business was struggling.  Entitle used a direct-to-consumer model intended to bypass insurance brokers and thereby lower premiums.  Under this model, Entitle was able to build a nationwide platform primarily offering title insurance for customers refinancing their homes.  Unfortunately, even as Entitle was able to expand across the country, it was losing money.  The costs associated with the direct-to-consumer model were substantial, and Entitle was unable to recoup its costs in a slow market.  As interest rates rose, consumers were less likely to take advantage of the refinancing options that made up the bulk of Entitle's business.

23.     In an effort to save the flagging business and realize value from its nationwide platform, Entitle offered itself up for sale.  Although Entitle was struggling as a standalone company, it had value as an acquisition target for a larger company.  Entitle was valuable both for the licenses it had for underwriting and issuing title insurance policies in forty states and the District of Columbia and for its platform (including personnel, an IT platform, and office locations).

24.     RPM, a top-20 U.S. non-bank residential mortgage lender, had increasingly used Entitle's services in the context of its own customer transactions.  RPM's CEO, Robert Hirt, personally engaged Entitle in discussion of an acquisition.  RPM ultimately offered the highest

bid at the time to purchase Entitle (although bids from other interested parties over the previous months had exceeded RPM's bid on a cash-at-closing basis).

25.     In his discussions with representatives of Entitle and PartnerRe at this time, Hirt frankly acknowledged Entitle's losses.  As he commented to a representative of PartnerRe, he was "certain that PartnerRe is tired of the losses forecasted by Entitle."

26.     But Hirt expressed optimism that by cross-selling RPM's mortgage-borrower customers, he would make Entitle profitable.  He said that all he needed was a "factory" – implying that he was unconcerned with Entitle's volume of business.  He would bring the business; what he needed was a platform for issuing title insurance to the customers he could bring to the table if he could offer one-stop shopping for mortgage loans and title insurance. Indeed, Hirt represented to Entitle that RPM had also recently acquired a home appraisal company and that RPM's ultimate goal in its acquisitions was to own every piece of the "value chain."

27.     Part of what made the RPM transaction attractive to Entitle's shareholders was that RPM's bid permitted Entitle's senior shareholders to retain a significant minority ownership stake in Entitle – permitting those shareholders the opportunity to benefit from their retained equity if RPM fulfilled its promise to make Entitle profitable.

28.     On May 31, 2016, Entitle and RPM executed a Letter of Intent ("LOI"), which they updated and replaced on September 30, 2016.  The LOI specified that RPM would promptly commence its due diligence on Entitle and "that Entitle's tangible book value as of today and projected tangible book value roll-forward through closing will be a focus during confirmatory due diligence."  RPM also bargained for, and obtained, an exclusivity period, during which Entitle was precluded from negotiating with any other party, together with a $250,000 "break-up

fee provision" to ensure RPM's right to this "no shop" period while it conducted its due diligence.

29.     After signing the LOI, RPM indicated that it was eager to complete a transaction. As RPM's CFO Ava Noack said in an email to Entitle's CEO Steven Palmer:  "[W]e are now on the 58-day racetrack.  I hope you like to drive fast."  One month later, the parties completed a preliminary draft of a Merger Agreement.

30.     RPM had ample opportunity to, and did, perform extensive due diligence on Entitle.  RPM was aided in its diligence process by its retention of Sandler O'Neill, a reputable investment bank with expertise in the insurance industry.  RPM also engaged two prominent international law firms, K&L Gates and Mayer Brown, to assist in negotiating the Merger Agreement and related transaction documents.

31.     Starting even before the execution of the LOI, Entitle provided RPM with detailed financial information and kept RPM updated regarding developments with its business.  Entitle's cooperation and responsiveness regarding its provision of its financial information to RPM continued throughout the process – even after RPM had breached the Merger Agreement.

32.     Throughout late 2016 and early 2017, RPM consistently asked for and received balance sheets; income statements; reports of orders, closings, premiums, and expenses; monthly financial statements and projections; and other financial information from Entitle.  And in early February 2017, while the parties were negotiating the Merger Agreement, Entitle provided a full set of company disclosures and financials and offered to and did discuss them with RPM.  RPM was able to, and frequently did, ask questions to further RPM's understanding of Entitle's finances.  RPM expressed satisfaction with the explanations Entitle provided.  As Noack wrote to Palmer on March 9, 2017:  "Thank you for the clarifications.  Now the financials make total

sense!"

33.     During the course of RPM's negotiation of its acquisition of Entitle, RPM

regularly asked Entitle to prepare financial projections based on assumptions that *RPM provided*

about the volume of business that RPM would direct to Entitle.  For example, on March 5, 2016,

Noack requested projections of net income "if RPM were to channel 25%, 50%[,] 75% or 100%

of its refi and purchase business to [Entitle]."  Palmer followed up on March 8, 2016, requesting

RPM's projections to incorporate into projections for Entitle based on the assumption that RPM

would direct business to Entitle, and he prepared a presentation based on these assumptions,

which he provided to RPM on March 14, 2016.  As another example, on April 26, 2016, Palmer

provided "a preliminary pro forma analysis on the combined entity's income statement assuming

various levels of contributions to our volumes from your company," using the code name

"Vinyl" to refer to RPM.  As yet another example, when Palmer made a presentation to RPM on

October 18, 2016, explaining Entitle's business and its finances, the presentation included, in

response to a request from RPM, five-year projections for Entitle based on assumptions about the

business RPM would direct to Entitle following a merger.  These projections were based on

RPM's own projections of its California mortgage originations, as well as the volume of business

RPM projected from its planned acquisitions.  And as still another example, after Entitle's

January 12, 2017, presentation, Noack followed up with requests for amended projections based

on altered assumptions, acknowledging that these assumptions spanned a range from "most

conservative" to "least conservative."

34.     Entitle's presentations and projections provided a transparent picture of its

circumstances and prospects as a standalone business, as well as its uncertain or unlikely

prospects for growing revenue through its own efforts (independent of business that RPM could

generate).  For example, Palmer's January 12, 2017, presentation identified the assumptions on which its projections were based, including new business that, Entitle said, "[w]e *hope* to sign." The presentation offered a sober assessment of challenges Entitle faced, including in particular rising interest rates:  "The 30 year mortgage rate has risen from 3.42% at the end of September to 4.13%, which has adversely affected industrywide refinance originations.  Market analysts and most market participants are expecting mortgage rates to continue to rise leading to a *dramatic reduction of the refinance market in 2017 and beyond.*"  The presentation described planned staffing cuts, explaining that "[t]he only advantage of the reduction in order volume is that it creates an opportunity for the company to dramatically restructure its operations to reduce costs." It detailed Entitle's plans for the year and again offered a sober assessment of Entitle's uncertain future:  "Regardless of how successful these proposed new initiatives will ultimately be, *our volume in the first and likely second quarters will be extremely low*."

35.     Entitle alerted RPM to negative developments, including the loss of business from what had been its largest customer, Cardinal Financial.  As Palmer wrote in a June 10, 2016, e-mail to Noack:  "It was Cardinal Financial who has recently significantly reduced its order flow to us."  Entitle also included, in a disclosure schedule to the Merger Agreement, a specific reference to a dramatic decrease in Cardinal Financial's order volume.

36.     RPM also had an opportunity to, and did, negotiate for representations from Entitle regarding matters relevant to Entitle's financial condition.  In December 2016, RPM requested a full representation and warranty arrangement for compliance, regulatory, underwriting, and settlement transactions.  Each of these became a term of the Merger Agreement, along with a representation and warranty that the financial statements provided to RPM presented the financial position of Entitle fairly as of the date of the statement.

37.     RPM understood and acknowledged Entitle's difficult circumstances.  For example, in a January 19, 2017, email confirming agreement to the basic economic terms of the deal, Noack emphasized that RPM's agreement was "with the understanding that En[t]itle has already started resizing its operations more lined up to current market conditions and a reduced refinance market by eliminating all unnecessary labor and other G&A type of expenses."  And in a January 9, 2017, email, Hirt acknowledged that "[t]he current mortgage market is going to be very challenging in '17."

38.     On February 16, 2017 – after RPM had had over eight months to conduct diligence on Entitle – Entitle, PartnerRe, and RPM, along with Parent and Merger Sub, executed the Merger Agreement.

39.     The Merger Agreement reflected a valuation of the company at approximately $19.5 million.  The parties discussed this valuation during negotiations leading up to the execution of the Merger Agreement, and it was the subject of significant negotiations and joint analyses by the parties' respective accountants and finance teams.

40.     In order to effectuate the transfer of ownership, RPM agreed to form the wholly owned subsidiary, Parent, and its wholly owned subsidiary, Merger Sub.  Merger Sub was to be merged into EDG, with EDG becoming the surviving corporation and a wholly owned subsidiary of Parent.  EDG's stockholders were to receive a 33% interest in Parent and RPM was to receive a 67% interest.  PartnerRe also negotiated with RPM to convert a $1 million loan PartnerRe had made to Entitle into an additional equity interest in Parent of approximately 5% at closing – a conversion that was priced using the same underlying valuation that priced RPM's acquisition of a two-thirds interest in Entitle.

41.     The combined result of the closing of the merger with RPM and PartnerRe's

conversion of its $1 million note would have been for RPM to have an ownership stake in Entitle of approximately 63.5% and Entitle's other shareholders, including PartnerRe, to have an ownership stake of approximately 36.5%.

42.     Contemplating that Entitle would continue suffering losses prior to closing, the parties negotiated an allocation of the risk of such losses among them.  The Second Letter of Intent addressed the issue of losses relative to management projections, providing that RPM would take on the loss of $208,000 then projected by management and that any further loss would be split, with the merger purchase price being reduced by one-third of the amount of loss in excess of $208,000 suffered between August 1, 2016, and the date of closing.  This allocation of pre-closing losses was proportional to the ownership stakes that RPM on the one hand and Entitle's existing shareholders on the other hand were to have post-closing.  The Merger Agreement's terms implemented that negotiated allocation of risk, providing that the agreed valuation of Entitle, the cash purchase price RPM was to pay for its approximately two-thirds interest in Entitle, and the quantity of equity PartnerRe was to receive for conversion of its $1 million note were all subject to adjustment based on Entitle's financial performance during the period from August 1, 2016, to closing.  If Entitle's losses during this period exceeded the threshold of $208,000, then both the agreed valuation of $19.5 million for the entire company and the purchase price RPM was to pay at closing for its equity interest were to be adjusted downward in proportion to those losses; RPM's purchase price was to be reduced by one-third of the losses suffered in excess of $208,000.

43.     By the time the parties signed the Merger Agreement, it was clear to all that Entitle had suffered losses exceeding the earlier projection of $208,000.  On January 12, 2017, Entitle sent RPM projections for EIC's income that anticipated losses exceeding $700,000 in the

first quarter of 2017 and further losses of almost $150,000 in the second quarter.  On January 13, 2017, responding to a request from RPM to incorporate the most optimistic projections based on initiatives Entitle was considering, Entitle sent RPM a further set of projections that still anticipated losses exceeding $700,000 through the first quarter and losses exceeding $100,000 for the second quarter.  Meanwhile, as part of Entitle's disclosures to RPM in connection with the Merger Agreement, on February 12, 2017, Entitle sent RPM financial statements showing that EDG experienced a net loss of over $2.7 million for 2016.

44.     On February 12, 2017, Entitle sent RPM a draft consideration spreadsheet in a form matching that which, under the Merger Agreement, would be prepared immediately prior to closing.  This draft consideration spreadsheet estimated losses from August 1, 2016, through closing, then anticipated to be in May 2017, to be $1.485 million.

45.     Having received these up-to-the minute disclosures of Entitle's losses well in excess of projections, RPM executed the Merger Agreement on February 16, 2017, and committed to buy Entitle.

46.     The ODI's regulations require a prospective acquirer of an insurer subject to its jurisdiction to complete and file an application for regulatory approval known as a "Form A." Entitle cooperated to advance the process toward RPM obtaining regulatory approval, including though cooperation between Entitle's regulatory counsel, Mary Jo Hudson of Squire Patton Boggs, and RPM's regulatory counsel, Larry Hamilton of Mayer Brown.  Entitle provided information and cooperation to assist RPM in its preparation of the Form A.  It was RPM, however, that had the ultimate responsibility for filing the Form A and for the accuracy of its contents.

47.     When RPM requested additional time to complete the Form A because it was

engaged in an internal reorganization, Entitle consented.  RPM submitted the Form A to the ODI
on March 10, 2017.

48.     In March 2017, RPM approved and Entitle circulated a letter to Entitle's
shareholders that acknowledged Entitle's financial difficulties and explained its need for a
strategic partner.

49.     As time went on in the parties' process to closing, RPM became progressively
less cooperative and more evasive.  As Entitle continued to complete its commitments under the
Merger Agreement, RPM began to drag its feet.  For instance, Entitle had to request necessary,
basic, and ministerial documents for escrow at least three times, and input on a draft IBNR
example (addressing reserves for insured's claims that were "incurred but not reported") at least
five separate times before receiving either, notwithstanding the fact that RPM had retained and
was represented by sophisticated corporate counsel from the respectable law firm K&L Gates.
And RPM never provided executed versions of several otherwise-complete documents necessary
for closing despite Entitle's repeated requests and reminders.

50.     On June 2, 2017, the ODI unconditionally approved RPM's "Form A" application
for regulatory approval of the merger.[1]   The ODI's unconditional approval meant that it did not
require any additional infusion of capital into Entitle, or any other financial accommodations, for
the transaction to proceed.  Upon the ODI's approval of the Form A, all the conditions to closing
were met except for those documents that RPM refused to supply and those conditions that
could, by their nature, be satisfied only at closing.  Under the Merger Agreement, the Parties

---

[1]     Because the parties were still awaiting final regulatory approval (due to the fact that RPM
belatedly finalized financial information and responses it was required to provide to the ODI to
obtain regulatory approval), Entitle – at the request of the ODI, and following discussion with
RPM's regulatory counsel at Mayer Brown – exercised its contractual option to extend the
deadline for closing a short period beyond the initial May 31, 2017, deadline.

were required to close within the next five business days, meaning no later than Friday, June 9, 2017.

51.     On June 5, 2017, however, with the required closing date fast approaching, RPM sent Entitle an email through counsel stating that it would refuse to close unless, among other things, Entitle provided RPM certain newly demanded financial information.  That same day, Hirt sent an email to Entitle and PartnerRe seeking to leverage his threat not to close to rewrite the terms for the deal.  Among other things, RPM demanded as a condition for closing that PartnerRe provide an additional $6 million "lifeline loan," which Hirt proposed would be used to fund "general operating needs of Entitle *& RPM*."  Despite these demands, RPM and Hirt expressed that they still wished to "get to the finish line together" and "get this deal closed later this week or early next week."

52.     Although Entitle did not consent to RPM's last-minute attempt to re-trade, RPM reiterated that it still intended to consummate the deal, and Entitle continued communications with RPM in an attempt to coax RPM to uphold its commitments.

53.     In advance of the June 9, 2017, closing deadline, Entitle sent RPM, through counsel, a reminder of RPM's contractual obligation to close the transaction.  On June 9, 2017, Entitle sent its representatives to New York and set up a closing room in its counsel's New York office.  Yet RPM's representatives never arrived, nor even deigned to inform Entitle that they would not appear.

54.     Despite its failure to close, RPM continued to represent vaguely that it still hoped or intended to close the transaction at some imminent future point – impeding Entitle from taking prompt action to seek an alternate transaction and mitigate the damages RPM was causing the company.  Ignoring repeated reminders from Entitle's counsel, however, RPM and its corporate

counsel from K&L Gates still failed to complete basic ministerial tasks needed to prepare for closing.  For example, RPM failed to provide countersigned signature pages for the Exchange Agent Agreement and the Escrow Agreement, both of which were necessary preconditions for setting up escrow accounts to allow the transaction to proceed.  RPM also failed to place the cash and stock certificates that would have been the merger consideration had RPM closed under the Merger Agreement into escrow.

55.      Entitle worked to salvage the deal by continuing near daily communications with RPM.  While stating its strenuous objections to RPM's behavior, and stressing that RPM's actions were in material breach of the Merger Agreement, Entitle offered RPM access to additional financial information above and beyond that required by the Merger Agreement.  Still, RPM continued to make additional pretextual demands and to defer any closing.

56.      RPM came up with a series of disingenuous excuses for not closing, which were based on demonstrably false premises.  For example:

a.   RPM and its corporate counsel at K&L Gates equivocated that some conditions to closing had not been met, but they could not, in response to demands from Entitle's counsel, specify a single such condition.  RPM and its counsel conceded that it would take several days to "determine" any such conditions it believed had not occurred.  In fact, it was not until June 12, 2017 – ten days after the closing clock had begun to run, and three days after RPM had failed to close as required – that RPM and its counsel even identified any conditions that it claimed had not been met.  Even those conditions it identified, however, were conditions that, by their nature, could be satisfied only at closing and therefore had no contractual effect on the requirement to close.

b.  Thereafter, RPM hesitantly suggested that it did not close because it believed that a Material Adverse Event (MAE) *might* have occurred – admitting, at the same time, that it had no knowledge that such an MAE *had* occurred.  Days after RPM failed even to show up to the closing table (and thus when RPM was already in breach of the Merger Agreement), RPM's counsel admitted:  "We *don't know* whether there was a Material Adverse Effect ('MAE') on June 2 or June 9." Cognizant that it had no basis to claim that an MAE had occurred, RPM instead began to repeatedly insist that Entitle somehow prove the negative and show that an MAE had *not* occurred – even as its corporate counsel from K&L Gates (along with its newly retained Delaware litigator from the same firm) conceded that it was extremely unlikely that RPM would ever be able to meet the hurdles of proving an MAE.  Indeed, RPM's Delaware-based litigation counsel – well apprised of applicable Delaware law – conceded in non-settlement-related discussions with Entitle that the Delaware Chancery Court had stated, in a published decision, *Hexion Specialty Chemicals, Inc. v. Huntsman Corp.*, 965 A.2d 715 (Del. Ch. 2008), "that Delaware courts have *never* found a material adverse effect to have occurred in the context of a merger agreement" and that "[t]his is not a coincidence."  *Id.* at 738.

c.  Continuing in this vein, RPM claimed it was "concerned" about financial projections Entitle had provided on June 2, 2017, and needed more information about Entitle's financial condition – but when Entitle agreed to provide this information, Noack said she would not be able to get around to requesting that information for some additional days, since she was vacationing in Europe at the

time.  In fact, although Entitle had repeatedly offered to explain the projections (and reiterated that offer again), RPM *never* took Entitle up on its offer.  In any event, as the definition of "Material Adverse Effect" in Section 1.1 of the Merger Agreement provided, and as Entitle repeatedly explained, "no event, circumstance, development, change or effect resulting from any . . . failure by the Acquired Companies to meet any projections or forecasts or estimates of revenue or earnings for any period" "shall be deemed to constitute, or shall be taken into account in determining whether there has been, a Material Adverse Effect."

d.  RPM suggested that "office closures" and "termination of employees" were "indications of significant financial distress."  RPM's surprise at office closures and termination of employees was disingenuous.  Not only had Entitle apprised RPM of plans to respond to the market downturn associated with rising interest rates by downsizing facilities and staff before RPM signed the Merger Agreement, it had kept RPM apprised of the specific downsizing steps (including the closure of an office in Pittsburgh) and obtained RPM's approval.

e.  RPM even went so far as to hazard that Entitle's regulatory counsel – Mary Jo Hudson, the former Director of the ODI – might have engaged in improper ex parte communications with the ODI and somehow illicitly obtained regulatory approval of the deal.  After Hudson explained that she had at all times been in close contact with RPM's regulatory counsel from Mayer Brown, and Mayer Brown conceded that this was the case, RPM was forced to retract these spurious and defamatory allegations and acknowledge that Hudson had acted at all times with the utmost propriety and integrity, while thanking her for her years of public

service.

    f.    RPM's next gambit was to claim that Entitle had concealed plans Entitle had purportedly made with the ODI to use a $1.5 million loan from PartnerRe for capitalization at closing.  This averment, too, was disingenuous:  in fact, as Entitle pointed out, it was *RPM* and *its* regulatory counsel that had communicated this plan to the ODI.  In addition, the promissory note for PartnerRe's loan acknowledged that the *purpose* of this loan was to capitalize Entitle.

57.    Putting the lie to RPM's professed surprise at a purportedly dramatic change in Entitle's financial performance leading up to the closing date, the agreed-upon formula in the Merger Agreement for reducing Entitle's valuation of $19.5 million based on its pre-closing losses yielded an adjusted valuation of approximately $18 million – a reduction of less than 10%.

58.    Throughout RPM's weeks of stalling, Entitle repeatedly expressed to RPM its concern that the ODI might withdraw its approval if the parties did not close as promised.  Far from assuaging any of Entitle's fears, RPM and Hirt repeatedly threatened to speak to the regulator unilaterally.  Under the circumstances – where RPM had sought regulatory approval to acquire Entitle, had obtained such approval unconditionally, and after obtaining such approval, had declined to close while making wild and unfounded accusations that Entitle had concealed financial information and engaged in back-room dealings with the ODI – such unilateral contacts would have jeopardized the ODI's approval of the transaction.  Indeed, it is a reasonable inference that this is the result RPM was hoping for, so that it could pin its "buyer's remorse" on the ODI.

59.    On June 28, 2017, Entitle made a final attempt to convince RPM to close by offering it until June 29, 2017, to do so.  RPM refused, and Entitle finally exercised its right to

terminate the Merger Agreement so that it could pursue a replacement deal and thus mitigate to the fullest extent possible the damage RPM had inflicted on Entitle and its shareholders.

60.     After Entitle was forced to terminate the Merger Agreement, it diligently set about finding a new buyer.  The EDG board and management returned to parties that had expressed interest before the RPM offer was accepted, but the interest had evaporated.  More than a year had passed since the LOI, in which Entitle first agreed to a "no shop" provision that precluded any negotiations with other potential acquirers.  During all this time, Entitle had been singularly focused on preparing for a merger with RPM and had even allowed RPM to participate in crucial management decisions, including closure of its Pittsburgh office. Meanwhile, as expected, Entitle continued to suffer operating losses, resulting in a steady erosion in its accounting book value over the course of the year.  Having now been left at the altar, Entitle was damaged goods.

61.     Still, Entitle made every effort to return the most value to shareholders under the trying circumstances left by RPM's breach.  Entitle solicited new offers from other strategic players in the mortgage industry.

62.     Entitle engaged in strategic discussions and at least preliminary due diligence with mortgage companies IMPAC, Radian, Finance of America, and a Mortgage Connect-Freedom Mortgage joint venture, along with financial services-focused private equity firm Strandview Capital.  Entitle also engaged in preliminary discussions with several other mortgage-related entities.  Ultimately, Finance of America, Strandview, and Radian made offers to purchase Entitle.  Entitle concluded that Radian's offer was superior based on the combination of the terms Radian offered and its likelihood of closing, and accepted it.

63.     Radian and Entitle signed a merger agreement on December 31, 2017.  Closing

21

occurred as scheduled on March 27, 2017.  At closing, Entitle's shareholders received only approximately $1 million for all of their equity in the company.

64.     The RPM Merger Agreement had offered millions of dollars more in value than what Entitle's shareholders ultimately received.  Under the RPM Merger Agreement, Entitle's shareholders were entitled to cash consideration of approximately $8 million at closing for RPM to acquire a 67% equity interest in Entitle.  In addition to receiving $8 million in cash consideration, shareholders were to retain a 33% equity stake in Entitle – which, under the adjusted valuation for Entitle of approximately $18 million that RPM, Entitle, and PartnerRe had all agreed to under the Merger Agreement, had a proportional valuation of approximately $6 million.  (In addition, as noted above, PartnerRe was to receive an equity stake of approximately 5% in repayment of a $1 million loan to Entitle, through conversion of that debt into equity – according to the same agreed-upon adjusted valuation of approximately $18 million for the entirety of Entitle's equity.)

65.     PartnerRe and the other Entitle shareholders were thus directly harmed by RPM's breach of the Merger Agreement.  Instead of receiving $8 million for 67% of their equity in Entitle and retaining a 33% equity stake accorded a proportional valuation of $6 million under the Merger Agreement, they received only approximately $1 million for *all* of their equity at closing.  As the "Stockholder Representative" under the RPM Merger Agreement, PartnerRe has standing to bring a claim for breach of the Merger Agreement against RPM and to recover damages for the benefit of the shareholders.  In addition, in connection with closing the Radian merger transaction, Entitle assigned to PartnerRe exclusively any rights Entitle had to pursue claims for breach of the Merger Agreement.

66.     Sometime in 2017, RPM Mortgage, along with other mortgage providers

American Eagle Mortgage Corp., Regency Mortgage Corp., and Mortgage Financial, Inc.,

merged into a Delaware limited liability company, LendUS.

67.       LendUS appears to be a corporate structure used by Robert Hirt to acquire and

combine the formerly independent mortgage originators, with Robert Hirt and his wife Tracey

Hirt serving as the directors of the LLC.  Robert Hirt is the CEO of LendUS, which he describes

as "a collaboration between RPM Mortgage, American Eagle Mortgage, Regency Mortgage, and

Mortgage Financial."  LendUS's principal place of business is in RPM's office in Alamo,

California.

68.       In recent federal court filings, RPM has identified LendUS as its successor,

submitting such filings under the designation "RPM Mortgage, Inc., now by merger and name

change LendUS, LLC, formerly known as LendUSA, LLC."

69.       As successor to RPM, LendUS is liable to PartnerRe, as Stockholder

Representative under the Merger Agreement and as the assignee of Entitle's claim, for RPM's

breach of the Merger Agreement.

## CLAIM FOR RELIEF – BREACH OF CONTRACT

70.       Plaintiff realleges each prior allegation herein.

71.       Plaintiff performed its obligations under the Merger Agreement.

72.       All conditions to closing that were capable of being met before the day of closing,

and which RPM did not prevent, were satisfied.

73.       Defendant RPM materially breached the Merger Agreement by refusing to attend

the closing on the required date, and refusing to complete the closing at any point thereafter.

74.       Plaintiff and Entitle terminated the Merger Agreement in response to RPM's

material breach.

75.     Section 11.9 of the Merger Agreement provides:

> The Parties further agree that nothing set forth in this
> Section 11.9 shall require any party hereto to institute any
> Action for (or limit any Party's right to institute any Action
> for) specific performance under this Section 11.9 prior to or
> as a condition to exercising any termination right under
> Article IX (and pursuing damages after such termination).
> [. . .]   [I]n any circumstance in which damages are
> recoverable by the Company hereunder, the Parties hereby
> acknowledge and agree that the Company and the holders
> of Company Capital Stock shall be entitled to receive the
> benefit of the bargain and lost profits damages as redress
> for such failure to perform or breach.

76.     Plaintiff is entitled to money damages, including for the difference in value

between the Merger Agreement with RPM and the ultimate sale to Radian.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff seeks the following relief:

A.  An order awarding Plaintiff compensatory damages in an amount to be determined at

trial;

B.  An order awarding pre-judgment and post-judgment interest;

C.  An order awarding such other and further relief that this Court deems necessary and

appropriate.

Dated:   Armonk, New York
          June 28, 2018

                        Respectfully submitted,

                        **BOIES SCHILLER FLEXNER LLP**

                        /s/ *Edward Normand*
                        Edward Normand
                        Amos Friedland
                        Nathan Holcomb
                        William Harvey
                        333 Main Street
                        Armonk, New York 10504
                        Tel.    (914) 749-8200
                        Fax.    (914) 749-8300