UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| PARTNER REINSURANCE COMPANY LTD.,<br><br>                                        Plaintiff,<br><br>         -v-<br><br>RPM MORTGAGE, INC., and LENDUS, LLC,<br><br>                                        Defendants. | 18 Civ. 5831 (PAE)<br><br>OPINION &<br>ORDER |

PAUL A. ENGELMAYER, District Judge:

Plaintiff Partner Reinsurance Company Ltd. ("PartnerRe") has moved for leave to file an

amended complaint.  The existing complaint brings one claim against defendants RPM

Mortgage, Inc. ("RPM") and LendUS, LLC ("LendUS," and, together with RPM, "defendants"),

alleging breach of contract for defendants' failure to consummate an Agreement and Plan of

Merger (the "Merger Agreement") with Entitle Direct Group, Inc. ("Entitle"), a title insurance

company for which PartnerRe is acting as "Stockholder Representative."  Dkt. 6 ("Compl.").

The proposed amended complaint, Dkt. 102-1 ("PAC"), seeks to pierce the corporate veil of

LendUS (successor in interest to RPM) and join 10 new parties to this action, holding those

additional persons and entities liable for the same breach-of-contract claim asserted in the

original complaint.  For the following reasons, the motion is granted in part.  PartnerRe is

granted leave to file the amended complaint and to join additional defendants Erwin Robert Hirt,

Tracey Hirt, and the Robert Hirt and Tracey Najarian Hirt Revocable Living Trust.  However,

the Court does not find a colorable basis on which to hold the other entities named in the PAC

liable for the breach of contract alleged.  Accordingly, PartnerRe's motion is denied as it relates

to those other proposed defendants.

I.     **Background**

   A.     **Factual Background**[1]

      1.     **Parties and Other Key Entities**

At all relevant times, Entitle, whose acquisition was the subject of the Merger

Agreement, was a Delaware corporation with a principal place of business in Connecticut.  PAC

¶ 15.  Its subsidiary, Entitle Insurance Company, was a Delaware corporation with a principal

place of business in Ohio.  *Id.*  Entitle and its subsidiaries underwrote and issued title insurance

and provided settlement services for real estate transactions.  *Id.* ¶¶ 1–2, 15.

Plaintiff PartnerRe is a Bermuda limited company with a principal place of business in

Bermuda.  *Id.* ¶ 16.  PartnerRe was Entitle's largest shareholder, and executed the Merger

Agreement as Entitle's Stockholder Representative.  *Id.*

Defendant RPM was a California corporation with a principal place of business in

California.  *Id.* ¶ 17.  In October 2017, RPM merged into LendUS, making LendUS the

successor in interest to RPM, and the party entitled to enforce, and subject to liability under, the

Merger Agreement.  Dkt. 60 ("Amended Answer") at 14.  LendUS is a Delaware limited liability

company ("LLC") with a principal place of business in California.  *Id.*  According to the PAC,

each of LendUS's members is a California citizen.  PAC ¶ 18.

---

[1] This account of the underlying facts is drawn primarily from the allegations in PartnerRe's
PAC, which for purposes of this motion the Court accepts to be true.  *See Cano v. DPNY, Inc.*,
287 F.R.D. 251, 256–57 (S.D.N.Y. 2012); *Henneberry v. Sumitomo Corp. of Am.*,
532 F. Supp. 2d 523, 527 (S.D.N.Y. 2007).  In assessing the sufficiency of the PAC, the Court
also considers documents that are integral to or incorporated by reference in the PAC, including
the Merger Agreement and depositions quoted by the PAC.  *DiFolco v. MSNBC Cable LLC*,
622 F.3d 104, 111 (2d Cir. 2010).  Further, for background and context, and to the extent they
bear on questions other than the sufficiency of the PAC's allegations, the Court also draws upon
factual representations in the parties' submissions on the instant motion.

Entitle Direct Holdco, Inc. ("Merger Parent") is a Delaware corporation, wholly owned by RPM and formed for the purpose of effectuating the merger at issue. *Id.* ¶ 18. Entitle Direct Merger Sub, Inc. ("Merger Sub") is a Delaware corporation wholly owned by Merger Parent. *Id.* ¶ 19.

Radian Title Services Inc. ("Radian") is a Delaware corporation with its principal place of business in Pennsylvania, which ultimately purchased Entitle. *Id.* ¶¶ 9, 30.

The following parties are those that the PAC proposes to join in this action:

Erwin Robert Hirt ("Robert Hirt") is the chief executive officer ("CEO") of LendUS and is a California resident. *Id.* ¶ 20.

Tracey Hirt is the chief operating officer ("COO") of LendUS and a California resident. *Id.* ¶ 21.

The Robert Hirt and Tracey Najarian Hirt Revocable Living Trust (the "Hirt Trust") is a trust organized under California law for the benefit of Robert and Tracey Hirt, who are also its trustees. *Id.* ¶ 22.

JAN (Lend USA) Holdings, Inc. ("JAN") is a California corporation with its principal place of business in California. *Id.* ¶ 23.

MM-air, LLC ("MM-air") is an LLC organized under California law with its principal place of business in California. *Id.* ¶ 24. PartnerRe alleges upon information and belief that its membership comprises either LendUS alone or some combination of LendUS's members. *Id.*

RPM Loan Servicing Investments LP ("RPM Loan Servicing") is a limited partnership organized under the laws of Delaware with its principal place of business in California. *Id.* ¶ 25. PartnerRe alleges upon information and belief that its partnership comprises either LendUS alone or some combination of LendUS's partners. *Id.*

RPM Holdings I, LLC ("RPM Holdings") is a Delaware LLC with its principal place of business in California. *Id.* ¶ 26. PartnerRe alleges upon information and belief that its membership comprises either LendUS alone or some combination of LendUS's members. *Id.*

Hirt Management, LLC ("Hirt Management") is a California LLC with its principal place of business in California. *Id.* ¶ 27. Its sole member is the Hirt Trust. *Id.*

Mortgage Management, Inc. ("Mortgage Management") is a California corporation with its principal place of business in California. *Id.* ¶ 28.

TRH Holdings, LLC ("TRH") is a California LLC with its principal place of business in California. *Id.* ¶ 29. Its sole member is the Hirt Trust. *Id.*

### 2.    The Merger Agreement and Failure to Close

The Court has thoroughly reviewed the factual background of this case in prior decisions and repeats here only those facts relevant to the instant motion. *See* Dkt. 59.

In 2016, Entitle, facing an industry-wide slowdown and operating at a loss, sought an acquirer. PAC ¶¶ 2, 35, 47. RPM's CEO, Robert Hirt, reached out to Entitle around that time "expressing a keen interest in acquiring it." *Id.* ¶ 3. RPM provided residential mortgages and was a top-20 U.S. non-bank residential mortgage lender. *Id.* ¶ 37. Despite Entitle's recent losses, Robert Hirt believed that he could bring it substantial business by cross-selling RPM's existing customer base, making the combined business a "hugely profitable" "one-stop shop[]" for mortgage loans and title insurance." *Id.* ¶¶ 3, 39.

On May 31, 2016, Entitle and RPM executed a letter of intent ("LOI") for RPM to acquire Entitle, which they updated on September 30, 2016. *Id.* ¶ 41. Pursuant to that LOI, RPM then commenced due diligence on the transaction. *Id.* While the transaction pended, Entitle was precluded from negotiating with any other party regarding its acquisition. *Id.*

Between May 31, 2016, and February 16, 2017, RPM performed extensive due diligence on Entitle, throughout which time Entitle provided RPM with detailed financial information and updates, including negative ones, regarding its business. *Id.* ¶¶ 43–50.

On February 16, 2017, eight months later, Entitle, PartnerRe, RPM, Parent Sub, and Merger Sub executed the Merger Agreement. *Id.* ¶ 51. Pursuant to that Agreement, Entitle's existing shareholders, including PartnerRe, were to retain an ownership stake of about 36.5% in the surviving entity, while RPM was to gain an ownership stake of about 63.5%. *Id.* ¶¶ 53–54. For that transfer, Entitle's shareholders were to receive cash consideration of roughly $8 million at the time of closing. *Id.* ¶ 79. The Agreement was set to close on May 31, 2017. *Id.* ¶ 4.

But that never happened. PartnerRe alleges that, as the closing approached, RPM "became progressively less cooperative and more evasive." *Id.* ¶ 64. Despite Entitle continuing to meet its obligations under the Agreement, PartnerRe alleges, RPM began to "drag its feet." *Id.* And on June 5, 2017,[2] RPM informed Entitle that it refused to close unless (1) Entitle sent RPM additional financial information and (2) PartnerRe provide RPM with an additional $6 million "lifeline loan" that Robert Hirt proposed would be used to fund the "general operating needs of Entitle *& RPM*." *Id.* ¶ 66 (emphasis in original). Even when Entitle rebuffed these new demands, RPM and Robert Hirt reaffirmed that they intended to conclude the deal. *Id.* ¶¶ 66–67.

Nonetheless, when the closing date arrived on June 9, 2017, and Entitle's representatives came to New York for the closing, RPM, without warning to Entitle, failed to show up. *Id.* ¶ 68. Although negotiations between Entitle and RPM continued through the end of June, RPM raised a number of purported impediments to closing—including that certain conditions had not been

---

[2] By the original closing date of May 31, 2017, the parties still awaited regulatory approval of the transaction by the Ohio Department of Insurance ("ODI"), and extended the closing period to June 9, 2017. *Id.* ¶ 65 n.1. On June 2, 2017, ODI approved the merger. *Id.* ¶ 65.

met, that a "material adverse event" had occurred, that RPM needed new financial information about Entitle, and that Entitle's regulatory counsel had engaged in misconduct—each of which PartnerRe now alleges was false and pretextual.  *Id.* ¶¶ 69–73.

Ultimately, on June 28, 2017, Entitle exercised its right to terminate the Merger Agreement so that it could begin negotiating a replacement deal with another acquirer.  *Id.* ¶ 74. But, as a result of Entitle's continued operating losses, it took time to find another willing buyer. On December 31, 2017, Entitle and Radian, another mortgage company, entered into a merger agreement which closed on March 27, 2018.  *Id.* ¶ 77–78.  At closing, Entitle's shareholders received about $1 million for *all* their equity in the company—far less than the $8 million they would have received from RPM for 63.5% of their ownership stake.  *Id.* ¶¶ 78–79.

### B.   Procedural Background

#### 1.   PartnerRe's Original Complaint

PartnerRe commenced this action on June 28, 2018, and filed a corrected complaint on July 3, 2018.  The Complaint alleged that, despite RPM's longstanding knowledge that Entitle was losing money, it had agreed to purchase Entitle and make it profitable by cross-selling title insurance to RPM's mortgage-borrower customers.  Compl. ¶¶ 2–3, 25–26.  It further alleged that RPM had conducted extensive due diligence before agreeing to purchase Entitle, and that the Merger Agreement contemplated that Entitle would continue to suffer losses between the signing date and the closing.  *Id.* ¶¶ 4, 29–30, 42.  However, the Complaint alleged, RPM later changed its mind and concocted pretextual excuses that it claimed relieved it of its obligations to close the merger.  *Id.* ¶¶ 6–7, 56.  After RPM allegedly refused to close, Entitle eventually was acquired for significantly less money and on substantially worse terms than RPM had promised it, and incurred additional expenses in the process.  *Id.* ¶¶ 8–9, 63–64.

### 2.     Subsequent Proceedings

On September 7, 2018, defendants filed their Answer and asserted a single counterclaim, which alleged breach of contract and attributed the merger's failure to PartnerRe and Entitle's actions and failures to comply with the Merger Agreement.  Dkt. 15.

On October 16, 2018, the Court entered the original case management plan, which required that any motion to amend or join additional parties be filed by November 15, 2018.  Dkt. 25 at 1.

On March 22, 2019, PartnerRe moved for judgment on the pleadings, seeking to dismiss defendants' counterclaim for failure to plausibly allege a breach of contract by PartnerRe.  Dkt. 32.  On August 13, 2019, the Court granted that motion and dismissed the counterclaim without prejudice to defendants' right to file an amended counterclaim.  Dkt. 59.  On August 27, 2019, defendants filed a new answer with an amended counterclaim.  Amended Answer.  On September 11, 2019, PartnerRe filed its answer to the amended counterclaim.  Dkt. 68.  On September 30, 2019, after several extensions, fact discovery closed, although a deposition of LendUS's Rule 30(b)(6) representative is yet to be conducted.  Dkts. 66 at 1, 109 at 2 n.1.

On October 8, 2019, PartnerRe moved for leave to file an amended complaint adding alter ego claims against the 10 additional defendants named in the PAC.  Dkt. 72.  The same day, however, defendants filed a letter motion seeking a conference to discuss their intent to seek dismissal on the basis that PartnerRe lacked standing.  Dkt. 76.  On October 16, 2019, the Court adjourned all deadlines in the case—including briefing on PartnerRe's motion for leave— pending resolution of defendants' standing challenge.  Dkt. 80.

On June 3, 2020, after briefing, the Court denied defendants' motion to dismiss.  Dkt. 97.  The same day, the Court by separate order directed the parties to submit a proposed schedule,

including for PartnerRe's motion to amend its complaint.  Dkt. 98.  On June 8, 2020, the parties

proposed that schedule, which the Court adopted.  Dkts. 103–04.

Also on June 8, 2020, PartnerRe re-filed its motion for leave to amend, Dkt. 100; a

memorandum of law in support, Dkt. 101 ("Pl. Mem."); and the declaration of Amos Friedland,

Esq., Dkt. 102 ("Friedland Decl."), with accompanying exhibits.  On July 2, 2020, defendants

filed their opposition to that motion, Dkt. 110 ("Def. Mem."); and the declaration of Justin H.

Roeber, Esq., Dkt. 111 ("Roeber Decl."), with accompanying exhibits.  On July 9, 2020,

PartnerRe filed a reply, Dkt. 113 ("Pl. Reply"); and another declaration from Mr. Friedland,

Dkt. 114 ("Friedland Reply Decl."), with exhibits.

On September 23, 2020, the Court granted the parties' request to hold in abeyance the

deadlines set in its June 9, 2020 scheduling order pending resolution of PartnerRe's motion.

### C.       PartnerRe's Proposed Amended Complaint

In its PAC, PartnerRe seeks to add claims against numerous persons and entities that it

argues should be held liable for defendants' alleged breach of the Merger Agreement.  Its theory

is that, contrary to RPM's position, discovery has revealed that the true driving force behind

RPM's refusal to complete the acquisition of Entitle was that RPM lacked the cash necessary to

consummate the deal.  PAC ¶ 13 ("RPM's relatively weak cash position in May and June of

2017 was a critical reason for its refusal to close.  The excuses RPM offered were pretexts

calculated to conceal its real motive of preserving cash.").  Despite projecting that it would have

more than $30 million in cash on hand available on May 31, 2017, RPM in fact had only $18.8

million, of which only $16 million was unrestricted.  *Id.* ¶ 87.  And internally, RPM officers

worried that the Entitle purchase would cause a cash crunch for RPM.  *Id.* ¶ 88; *see id.* ¶ 90 ("Pro

for not proceeding: we would preserve cash, which we need until we start earning income.  Con

for not proceeding: substantial reputational harm and potentially loosing [sic] PartnerRe that could be a great ally for us."); *id.* ¶ 92 ("[I]f we undertake Entitle – need additional liquidity – how do we get to it?").

And, the PAC further alleges, one reason RPM found itself in a "relatively weak cash position" when it came time to close was the "Hirts' withdrawal of RPM funds for their personal use." *Id.* ¶ 13.  In fact, the Hirts allegedly used RPM and the other defendants whom PartnerRe seeks to join "as a collection of personal piggy banks," *id.* ¶ 85, from which the Hirts "habitually siphoned funds as they pleased," *id.* ¶ 56, leaving RPM "undercapitalized and unable to perform its contractual obligations," *id.* ¶ 93.  Accordingly, PartnerRe contends that these defendants, too, are liable for RPM's (and, by extension, LendUS's) failure to close.

In support, PartnerRe includes the following allegations.  First, the Hirt Trust owns 96% of the equity in LendUS, and Robert Hirt "is the ultimate decision maker for LendUS and RPM," including whom to appoint as their officers.  *Id.* ¶ 86(a)–(d).  Similarly, each additional proposed defendant is owned almost entirely by either the Hirts or other entities controlled by the Hirts, and each shares one of two neighboring addresses.  *Id.* ¶ 86(e)–(m).

Second, the Hirts "regularly transferred money from one of the Defendant companies they controlled to another," and saw no difference between "moving money around among companies" and "personally transferring money into RPM."  *Id.* ¶ 86(n).

Third, the Hirts regularly transferred money between themselves to RPM and LendUS at will.  Robert Hirt estimated that they had made contributions to RPM and/or LendUS between 10 and 25 times, in amounts ranging from $500,000 to $10 million and transferred funds out of RPM and LendUS "[s]ometimes monthly; sometimes annually . . . whenever I wanted." *Id.* ¶ 86(o)–(p); *see also id.* ¶ 86(q) (alleging that Tracey Hirt admitted (1) transferring $2 million

out of RPM to buy herself a house in the desert, and (2) that the main consideration for when to pay the Hirts a dividend was "if I wanted to buy real estate or something").

Fourth, decisions concerning those transfers were not made in board meetings or, to Tracey Hirt's knowledge, reflected in board minutes. *Id.* ¶ 86(r).

Last, the Hirts used such transfers for improper ends. For example, RPM and LendUS had covenants with lenders under which RPM and LendUS had to have minimum amounts of cash on hand each month. *Id.* ¶ 86(s). To meet these minimums, the Hirts regularly made personal contributions to the companies before "reversing" those payments 60 days later. *Id.* Further, the Hirts "regularly borrowed money from RPM and LendUS and recorded the loans as receivables on the balance sheet as a strategy for avoiding paying taxes on distributions." *Id.* ¶ 86(t).

In light of these facts, PartnerRe contends that RPM, LendUS, and the other entity defendants are alter egos of the Hirts used "to perpetrate a deceit designed to serve their own personal financial interests." *Id.* ¶ 93. It further alleges that, in light of the Hirts' past practices, "there is a real risk that they will leave LendUS undercapitalized and unable to pay on a judgment" against LendUS. *Id.* ¶ 108. "[I]n order to prevent the injustice that would result if the Hirts were able to hide behind fictional corporate forms in order to evade liability for their own malfeasance," PartnerRe argues that the Court should not respect the corporate form of RPM or LendUS. *Id.* ¶ 109.

Accordingly, PartnerRe argues that the Court should permit it to add allegations seeking to pierce RPM's and LendUS's corporate veils, and give PartnerRe the opportunity to hold the Hirts and Hirt-controlled entities named in the PAC liable for RPM's alleged breach of the Merger Agreement. *Id.* ¶¶ 104–109.

## II.      Applicable Legal Standards

Plaintiff's motion to amend is subject to three Federal Rules of Civil Procedure: 15(a), 16(b), and 21.  Rule 15(a) provides that a court "should freely give leave [to amend] when justice so requires."  Fed. R. Civ. P. 15(a)(2).  "[I]t is within the sound discretion of the district court to grant or deny leave to amend" under Rule 15.  *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007).  "A district court has discretion to deny leave for good reason, including futility, bad faith, undue delay, or undue prejudice to the opposing party."  *Id.* (citing *Foman v. Davis*, 371 U.S. 178, 182 (1962)).  Relevant here, "[a]n amendment to a pleading is futile if the proposed claim could not withstand a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6)."  *Lucente v. IBM Corp.*, 310 F.3d 243, 258 (2d Cir. 2002).  Thus, "[a]s when considering a motion under Rule 12(b)(6), a court must accept all factual allegations in the complaint as true and draw all reasonable inferences in favor of the plaintiff."  *Cano*, 287 F.R.D. at 256.  A court may also properly deny leave to amend under Rule 15(a) upon a showing of undue prejudice or bad faith; "[a]mendment may be prejudicial when, among other things, it would 'require the opponent to expend significant additional resources to conduct discovery and prepare for trial' or 'significantly delay the resolution of the dispute.'"  *AEP Energy Servs. Gas Holding Corp. v. Bank of Am., N.A.*, 626 F.3d 699, 725–26 (2d Cir. 2010) (quoting *State Teachers Ret. Bd. v. Fluor Corp.*, 654 F.2d 843, 856 (2d Cir. 1981)).

Federal Rule of Civil Procedure 21 provides that a court may, upon motion of a party or *sua sponte*, "at any time, on just terms, add or drop a party."  Once an answer has been filed, "the showing necessary under Rule 21 is the same as that required under Rule 15(a)."  *Johnson v. Bryson*, 851 F. Supp. 2d 688, 703 (S.D.N.Y. 2012).

11

Because the present motion to amend was filed after the deadline set in the court-ordered case management plan, *i.e.*, November 15, 2018, it is also subject to Rule 16(b). *See Kassner v. 2nd Ave. Delicatessen Inc.*, 496 F.3d 229, 243 (2d Cir. 2007) ("Rule 16(b) also may limit the ability of a party to amend a pleading if the deadline specified in the scheduling order for amendment of the pleadings has passed."); *Fresh Del Monte Produce, Inc. v. Del Monte Foods, Inc.*, 304 F.R.D. 170, 174–76 (S.D.N.Y. 2014) (discussing interplay between Rules 15 and 16 in motions to amend). Rule 16(b) requires that the Court set a schedule, which "must limit the time to join other parties, amend the pleadings, complete discovery, and file motions." Fed. R. Civ. P. 16(b)(3)(A). Relevant here, Rule 16(b)(4) provides that such a schedule "may be modified only for good cause." Where Rule 16(b) applies, it informs the Court's exercise of discretion under Rule 15(a): Although Rule 15(a) provides that leave to amend is to be freely given "when justice so requires," "a district court does not abuse its discretion in denying leave to amend the pleadings after the deadline set in the scheduling order where the moving party has failed to establish good cause [pursuant to Rule 16]." *Parker v. Columbia Pictures Indus.*, 204 F.3d 326, 340 (2d Cir. 2000); *see also Ramsay-Nobles v. Keyser*, No. 16 Civ. 5778 (CM), 2018 WL 6985228, at *7 (S.D.N.Y. Dec. 18, 2018) ("[T]he 'good cause' standard is permitted but not mandated . . . .").

## III. Discussion

Defendants argue that the Court should deny PartnerRe's motion for leave for two independent reasons. First, they argue that PartnerRe's alter-ego claims could not survive a motion to dismiss under Rule 12(b)(6), and so would be futile to add. Second, they contend that, given the late stage of the litigation, adding 10 new defendants and a second claim for relief would unduly prejudice defendants. The Court addresses each in turn.

A.      **Futility**

1.      **Choice of Law**

The parties first dispute the appropriate legal framework that applies to PartnerRe's alter-ego claims.  "In a diversity case, we apply the choice of law rules of the forum state—in this case New York—to determine which law governs alter ego or piercing the corporate veil analysis." *Am. Fuel Corp. v. Utah Energy Co.*, 122 F.3d 130, 134 (2d Cir. 1997).  New York choice of law rules provide that generally 'the law of the state of incorporation determines when the corporate form will be disregarded and liability will be imposed on shareholders.'" *Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1456 (2d Cir. 1995).  For an LLC, New York law similarly looks to the LLC's state of registration.  *See A.V.E.L.A., Inc. v. Estate of Marilyn Monroe* ("*A.V.E.L.A. II*")*, LLC*, 241 F. Supp. 3d 461, 474 (S.D.N.Y. 2017) ("Because the Monroe Estate is a Delaware LLC the Court will look to Delaware law to address V. International's argument that the Monroe Estate is ABG's alter ego" (citation omitted)).  Here, RPM is incorporated in California and LendUS is a Delaware LLC.

PartnerRe thus appears to argue that the Court should take a bifurcated approach, assessing its claims as to RPM, which was a California corporation at the time of the relevant events, under California law, but its claims as to LendUS, RPM's successor in interest and a Delaware LLC, under Delaware law.  *See* Pl. Mem. at 9–10 ("The relevant entities are all organized under either California or Delaware law."); *see also* Pl. Reply at 2 n.1.  Defendants maintain that because RPM merged into LendUS, a Delaware entity, in 2017, and PartnerRe now seeks to pierce LendUS's corporate veil, Delaware law exclusively should apply.  *See* Def. Mem. at 4 & n.1.

Because there is no meaningful difference between the standard for alter ego liability in California and Delaware, and because both parties rely on the veil-piercing law of each jurisdiction in their briefs, the Court need not resolve this issue. "Under New York's choice-of-law rules, 'the first step in any case presenting a potential choice of law issue is to determine whether there is an actual conflict between the laws of the jurisdictions involved.'" *Highland CDO Opportunity Master Fund, L.P. v. Citibank, N.A.*, 270 F. Supp. 3d 716, 724 (S.D.N.Y. 2017) (quoting *GlobalNet Financial.Com, Inc. v. Frank Crystal & Co.*, 449 F.3d 377, 382 (2d Cir. 2006)). Where each such jurisdiction "employs substantially the same analysis to determine whether a corporation is an alter ego of an owner or of another corporation," "there is no actual conflict among the law of the states at issue." *LiquidX Inc. v. Brooklawn Cap., LLC*, 254 F. Supp. 3d 609, 616 (S.D.N.Y. 2017). Similarly, when the parties themselves "rely primarily" on one state's body of law, courts may "follow their lead" and apply the law relied upon to the dispute. *Am. Fuel Corp.*, 122 F.3d at 134.

Here, there is no actual conflict. Both Delaware and California law require plaintiffs to make the same showing to impose alter-ego liability. In Delaware, "[a] plaintiff arguing that an LLC is the alter ego of another entity must make two showings: (i) that 'the entities in question operated as a single economic entity,' and (ii) that 'there [is] an overall element of injustice or unfairness.'" *A.V.E.L.A. II*, 241 F. Supp. 3d at 475 (quoting *NetJets Aviation, Inc. v. LHC Commc'ns, LLC*, 537 F.3d 168, 176 (2d Cir. 2008)). Similarly, in California, plaintiffs must show that "(1) there is such a unity of interest and ownership that the individuality, or separateness, of the said person and corporation has ceased, and (2) an adherence to the fiction of the separate existence of the corporation would . . . would sanction a fraud or promote injustice." *SEC v. Hickey*, 322 F.3d 1123, 1128 (9th Cir. 2003) (emphasis omitted) (citation omitted).

Indeed, every court to consider the issue has concluded that "the analysis of alter ego under either California or Delaware law is the same" for purposes of choice of law. *Ratha v. Phatthana Seafood Co.*, No. 16 Civ. 4271 (JFW), 2017 WL 8292391, at *4 n.5 (C.D. Cal. Dec. 21, 2017); *see, e.g.*, *Boeing Co. v. KB Yuzhnoye*, No. 13 Civ. 730 (AB), 2014 WL 12601330, at *2 (C.D. Cal. Feb. 20, 2014); *Walsh v. Kindred Healthcare*, 798 F. Supp. 2d 1073, 1083 n.4 (N.D. Cal. 2011) ("Here, it does not appear as though the laws of Delaware and California are materially different on the issue of alter ego."); *In re Hydroxycut Mktg. & Sales Pracs. Litig.*, 810 F. Supp. 2d 1100, 1121–22 & n.10 (S.D. Cal. 2011); *Trans-World Int'l, Inc. v. Smith-Hemion Prods., Inc.*, 972 F. Supp. 1275, 1291 (C.D. Cal. 1997) ("[T]he tests [in California and Delaware] do not differ in any material way for the purposes of the instant action.  Consequently, the Court finds it unnecessary to engage in a choice-of-law analysis.").  Reviewing the applicable standards, the Court agrees with this consensus view.

Nor have the parties identified substantive differences between the laws.  In its opening brief, PartnerRe stated that "[b]oth States have similar standards for alter ego liability."  Pl. Mem. at 10.  Defendants agreed in their opposition, but argued that Delaware law exclusively applied in any event.  Def. Mem. at 4 n.1.  Although PartnerRe "does not agree that" Delaware law alone applies, it has not articulated any substantive difference between the legal standards and argues that "[t]he issue is moot" because "Plaintiff's claim is viable under either."  Pl. Reply at 2 n.1.  Neither has identified any point on which the two laws diverge, and each has relied primarily on Delaware law while also citing some cases applying California law.  Accordingly, the Court need not engage in a choice-of-law analysis and instead applies Delaware law.  The same result, however, would obtain under California alter-ego principles.

###### 2.        Alter Ego Liability

As noted, under Delaware law, a plaintiff seeking to impose alter ego liability on the owners of an LLC must show that (1) "the entities in question operated as a single economic entity"; and (2) there "[is] an overall element of injustice or unfairness." *A.V.E.L.A. II*, 241 F. Supp. 3d at 475 (quoting *NetJets*, 537 F.3d at 177).  Such a plaintiff faces a "heavy burden," as "Delaware courts . . . take the corporate form very seriously and will disregard it only in the exceptional case." *Nat'l Gear & Piston, Inc. v. Cummins Power Sys., LLC*, 975 F. Supp. 2d 392, 401–02 (S.D.N.Y. 2013) (quoting *Soroof Trading Dev. Co. v. GE Microgen, Inc.*, 283 F.R.D. 142, 150 (S.D.N.Y. 2012)); *see NetJets*, 537 F.3d at 176 (plaintiffs face a "difficult task"); *Cohen v. Schroeder*, 248 F. Supp. 3d 511, 518 (S.D.N.Y. 2017) (veil piercing an "extraordinary equitable remedy" (quoting *Base Optics Inc. v. Liu*, No. Civ. 9803 (VCG), 2015 WL 3491495, at *23 (Del. Ch. May 29, 2015)), *aff'd*, 724 F. App'x 45 (2d Cir. 2018).[3] However, "[t]he alter ego inquiry under Delaware law is a 'fact intensive' one." *McBeth v. Porges*, 171 F. Supp. 3d 216, 233 (S.D.N.Y. 2016) (quoting *Case Fin., Inc. v. Alden*, No. Civ. A. 1184 (VCP), 2009 WL 2581873, at *4 (Del. Ch. Aug. 21, 2009)); *see Blair v. Infineon Techs. AG*, 720 F. Supp. 2d 462, 474 ("The nature and extent of the dominion and control exercised by . . . defendants over the [alleged alter egos] is a question of fact, not subject to resolution on a motion to dismiss."). *But see Fletcher*, 68 F.3d at 1458 ("Although the question of domination is generally one of fact, courts have granted motions to dismiss . . . where there has been a lack of sufficient evidence to place the alter ego issue in dispute.").

---

[3] The same is true in California.  *See, e.g.*, *In re Shapow*, 599 B.R. 51, 75 (Bankr. C.D. Cal. 2019) ("Alter ego is an extreme remedy, sparingly used." (quoting *Sonora Diamond Corp. v. Superior Ct.*, 99 Cal. Rptr. 2d 824, 836 (Ct. App. 2000))).

### a.    Single Economic Entity

Factors relevant to the first, "single economic entity" showing include the following:

> [W]hether the corporation was adequately capitalized for the corporate undertaking; whether the corporation was solvent; whether dividends were paid, corporate records kept, officers and directors functioned properly, and other corporate formalities were observed; whether the dominant shareholder siphoned corporate funds; and whether, in general, the corporation simply functioned as a facade for the dominant shareholder.

*Fletcher*, 68 F.3d at 1458 (quoting *Harco Nat'l Ins. Co. v. Green Farms, Inc.*, No. Civ. A. 1131, 1989 WL 110537, at *1 (Del. Ch. Sept. 19, 1989)).[4]  "These principles are generally applicable as well where one of the entities in question is an LLC rather than a corporation." *NetJets*, 537 F.3d at 178 (noting that, for LLCs, courts may place less emphasis on the observation of internal formalities "because fewer such formalities are legally required").

Applying the above factors, accepting PartnerRe's allegations as true, and mindful of the fact-intensive nature of the inquiry, *see McBeth*, 171 F. Supp. 3d at 233, the Court concludes that PartnerRe has plausibly alleged that the Hirts, through the Hirt Trust, so use and dominate RPM and LendUS as to render the Hirts and those companies a single economic entity for purposes of alter-ego liability.

The PAC alleges that those companies "are so dominated and controlled by the Hirts that they do not in fact have separate personalities."  PAC ¶ 86.  In support, relying on information learned through discovery, it specifies the following: between 2009 and 2017, Tracey and Robert

---

[4] California law identifies a similar but more expansive list of potentially relevant factors. *See, e.g.*, *Zoran Corp. v. Chen*, 110 Cal. Rptr. 3d 597, 606–07 (Ct. App. 2010).  Both Delaware and California law deem the factors they list non-exclusive.  *Id.*; *see NetJets*, 537 F.3d at 177; *Nat'l Gear*, 975 F. Supp. 2d at 403.  And the parties have not identified any factors relevant in this case that California courts consider but Delaware courts do not.  Accordingly, the Court considers only those factors that the parties cite and discuss, each of which is drawn from Delaware's case law on the subject.

Hirt alone ran RPM, without the input of any other directors, *see id.* ¶ 86(c)–(e); the Hirts, at their "sole discretion," routinely contributed money into and withdrew money from RPM and LendUS, "[s]ometimes monthly; sometimes annually . . . whenever [Robert Hirt] wanted," *id.* ¶ 86(o)–(p); RPM and LendUS were dependent on temporary cash influxes from the Hirts (which the Hirts would later reverse) to meet contractual minimum-cash requirements imposed by their lenders, *id.* ¶ 86(s); the Hirts routinely borrowed money from RPM and LendUS and recorded such loans as receivables "as a strategy for avoiding paying taxes on distributions," and had one such receivable outstanding—for $12.5 million—in June 2017, *id.* ¶ 86(t); no one beside the Hirts had any input or visibility into the distribution of funds to the Hirts, which were at least sometimes used to buy real estate for the Hirts, *id.* ¶ 86(q)–(r); as a result of the Hirts' frequent draws on their companies' cash, RPM was in a substantially weaker cash position than it had anticipated when it came time to close the Entitle merger, rendering the transaction difficult or impossible and leading RPM ultimately to fail to follow through on its contractual obligations, *id.* ¶¶ 56, 87–91.

In sum, PartnerRe alleges that RPM was dependent on contributions from its dominant shareholders, the Hirts, to carry out its regular business; that the Hirts treated company assets and their personal assets interchangeably; that the Hirts improperly siphoned money from RPM in advance of the planned Entitle merger; that such withdrawals left RPM too cash poor to carry out its contractual obligations under the Merger Agreement; and that RPM failed to meet those obligations when it refused to close in June 2017.  That is enough, at this stage of the litigation, to allege a "single entity."  *See McBeth*, 171 F. Supp. 3d at 234.

In opposition, defendants deny that these facts plausibly allege any relevant factor.  First, they dispute whether the facts alleged are sufficient to plead that RPM was undercapitalized.

They argue that undercapitalization arises only "when a defendant abuses the corporate form by leaving the corporate entity destitute in an effort to avoid personal liability." Def. Mem. at 9 (citing *Gadsden v. Home Pres. Co.*, No. Civ. A. 18888, 2004 WL 485468, at *4 (Del. Ch. Feb. 20, 2004)). But the case they cite for that proposition held merely that such destitution is *sufficient*, not necessary, to find undercapitalization. *Gadsden*, 2004 WL 485468, at *4–5. It also assessed and imposed alter ego liability after a trial and judgment against the corporate defendant—not at the early stage of a motion to dismiss. *Id.* at *1. By contrast, other cases hold that a plaintiff plausibly alleges undercapitalization, at the motion to dismiss stage, when it alleges that defendants "lacked sufficient capital to cover their own reasonably anticipated expenses." *McBeth*, 171 F. Supp. 3d at 234 (quoting proposed second amended complaint); *see Essar Steel Algoma Inc. v. Nev. Holdings, Inc.* ("*Essar Steel II*"), No. 17 Misc. 360 (AT) (RWL), 2020 WL 2539031, at *3 (S.D.N.Y. May 18, 2020) (defendant's "inability to fund its contractual obligations," along with mingling of funds and overlap in officers, plausibly alleged undercapitalization where defendant failed to deliver quantity of coal promised). And here, plaintiffs allege both that RPM lacked sufficient funds to close the Entitle merger and that RPM was dependent on the Hirts to meet monthly minimum-cash requirements imposed by its lenders. *See* PAC ¶ 86(s). Although defendants claim that, factually, plaintiffs' theory is "unsupported by the undisputed evidence," *see* Def. Mem. at 9–12; *but see* Pl. Reply at 6 n.8 (countering defendants' argument with conflicting evidence), that argument prematurely asks the Court to apply the standard for summary judgment, not the standard governing the adequacy of pleadings, which governs the futility inquiry. *See, e.g.*, *Cano*, 287 F.R.D. at 256–57. Accepting all non-conclusory allegations in the PAC as true and drawing all reasonable allegations in PartnerRe's favor, the Court cannot find that its allegations of undercapitalization fail to state a claim.

Second, defendants contend that PartnerRe has failed to adequately allege that the Hirts disregarded corporate formalities.[5] To be sure, some of the PAC's allegations miss this mark. For instance, Tracey Hirt's inability to recall, in a deposition, the composition of LendUS's board does not, contrary to PartnerRe's claim, show that LendUS failed to observe requisite formalities for alter-ego purposes. *See* Pl. Reply at 7. And defendants are correct that the ODI's approval of the RPM-Entitle merger, which the PAC itself describes as entailing the submission of substantial documentation, is in some tension with the notion that RPM ignored corporate formalities. *See* Def. Mem. at 14; PAC ¶¶ 61–62, 65.[6] On the other hand, the PAC does allege that the Hirts avoided regular channels in making decisions regarding distributions to and contributions from them, and that such transfers were not reflected in board minutes. *See* PAC ¶ 86(p)–(t). In sum, although this factor does not weigh heavily in PartnerRe's favor, nor does it demonstrate the futility of amendment.

Third, defendants take issue with PartnerRe's characterization of certain distributions as "siphoning," arguing that the Hirts took "money out of the businesses in the form of dividends," whereas siphoning requires *improper* distributions. Def. Mem. at 15; *see In re Autobacs Strauss, Inc.*, 473 B.R. 525, 557 (Bankr. D. Del. 2012) ("Siphoning suggests the improper taking of funds that the owner was not legally entitled to receive." (citation omitted)); *see also In re Opus E.*,

---

[5] Defendants also argue that PartnerRe has insufficiently alleged insolvency. Def. Mem. at 12. That is correct. PartnerRe has not attempted that showing and has conceded that RPM was solvent at all relevant times, while maintaining that "no single factor is dispositive" in the alter-ego analysis. *See* Pl. Reply at 5 n.6 (quoting *Blair*, 720 F. Supp. 2d at 472–73).

[6] Defendants also argue that the ODI's approval of the Entitle merger is "effectively dispositive evidence of the legitimacy of Defendant's corporate form." Def. Mem. at 14. But that argument is unavailable on this motion, because it assumes, against the PAC's well-pled allegations, that ODI possessed all information bearing on alter-ego liability, including regarding the sharp decrease in RPM's unrestricted cash between its March 2017 ODI submission and its failure to close in May and June 2017. *See* PAC ¶ 87.

*LLC*, 528 B.R. 30, 64 (Bankr. D. Del. 2015) ("[T]he *regular* payment of dividends . . . is insufficient to cause the Court to pierce the corporate veil . . . , particularly when dividend payments were only made while the Debtor was profitable and did not jeopardize the Debtor's ability to run or grow its business." (emphasis added)).   But defendants' characterization of those payments as mere "regular dividends" warps the PAC's allegations.   Those include that the Hirts withdrew funds "whenever [they] wanted," often when they desired to make a large personal expenditure.   *See* PAC ¶ 86(p)–(q).   They also include that the Hirts made these decisions outside of regular board meetings and failed to record them in board minutes.   *Id.* ¶ 86(r).   The PAC further alleges that "[t]he Hirts regularly borrowed money from RPM and LendUS and recorded the loans as receivables on the balance sheet as a strategy for avoiding paying taxes on distributions."   *Id.* ¶ 86(t).   One such receivable from Robert Hirt, still outstanding just days after RPM failed to attend the Entitle closing, was worth $12.5 million.   *Id.*   Altogether, the PAC alleges that these distributions put RPM in a position that made closing on the Entitle merger difficult or impossible.   *See id.* ¶ 56.   Defendants' argument that the PAC lacks allegations of improper distribution, in sum, is simply incorrect.

The Court agrees, however, with defendants' last point:   Amendment would be futile as to several entities that the PAC seeks to join.   The above-described allegations detail the Hirts' domination and control of RPM and LendUS, and therefore clear the futility standard, allowing PartnerRe to seek to hold the Hirts and the Hirt Trust (through which they own LendUS) liable for the actions of RPM and LendUS.   But PartnerRe does not offer similar factual contentions plausibly alleging that the other Hirt entities[7] are liable for the alleged breach.

---

[7] Those entities are: JAN, MM-air, RPM Loan Servicing, RPM Holdings, Hirt Management, Mortgage Management, and TRH.

21

In particular, the PAC fails to allege that any of those entities holds any ownership interest—typically the fundamental basis for alter-ego liability—in RPM or LendUS. *See, e.g.*, *NetJets*, 537 F.3d at 176 ("[I]n appropriate circumstances, the distinction *between the entity and its owner* 'may be disregarded' to require an owner to answer for the entity's debts." (emphasis added) (quoting *Pauley Petrol. Inc. v. Cont'l Oil Co.*, 239 A.2d 629, 633 (Del. 1968))); *id.* (corporate veil may be pierced where a corporation "is in fact a mere instrumentality or alter ego *of its owner*" (emphasis added) (quoting *Geyer v. Ingersoll Publ'ns Co.*, 621 A.2d 784, 793 (Del. Ch. 1992))).  And it does not allege anything about those entities' capitalization, solvency, or relation to RPM or LendUS—much less that they dominate or control RPM or LendUS. Rather, the PAC focuses on those entities' ownership by the Hirts and Robert Hirt's failure to recall their precise corporate structures at his deposition.  *See* Pl. Reply at 8–9; PAC ¶ 86(f)–(o). But "[a]n overlap in ownership, officers and directors and responsibilities is not uncommon or impermissible."  *In re Ticketplanet.com*, 313 B.R. 46, 71 (Bankr. S.D.N.Y. 2004) (dismissing alter-ego claims).  And PartnerRe's premise that an inability to name corporate officers at a deposition reveals a lack of corporate formality is unpersuasive.  Last, the PAC alleges that the Hirts regularly transferred money between these companies and, as with RPM and LendUS, contributed to and took distributions from them.  PAC ¶ 86(n)–(o).  Such allegations, if expanded, may show that those companies, too, were alter egos of the Hirts.  But they do not plausibly allege that RPM or LendUS were those entities' alter egos.

Accordingly, the Court finds that the PAC plausibly alleges that the Hirts, RPM, LendUS, and the Hirt Trust are a single economic entity.  But because the inclusion of any of the other proposed defendants is not compatible with the alter-ego doctrine, the Court denies leave to join those entities as futile.

>            b.      *Injustice or Unfairness*

PartnerRe has also satisfactorily alleged injustice or unfairness.  To pierce the corporate

veil, PartnerRe must also show "an overall element of injustice or unfairness."  *NetJets*, 537 F.3d

at 177.  To make this showing, "a plaintiff need not prove that there was actual fraud."  *Id.*

at 176; *see Mobil Oil Corp. v. Linear Films, Inc.*, 718 F. Supp. 260, 268 (D. Del. 1989)

("[F]raud, strictly speaking, is not the only basis for finding an alter ego relationship and piercing

the corporate veil.").[8]  Nor must it prove that "the corporation was created with fraud or

unfairness in mind."  *NetJets*, 537 F.3d at 177.  It must show only that it was "so used."  *Id.*

Further, the fraud or injustice to which a plaintiff points to must be more than the

"underlying claim" for which it seeks to hold the corporate owner liable.  *EBG Holdings LLC v.

Vredezicht's Gravenhage 109 B.V.*, No. Civ. A. 3184 (VCP), 2008 WL 4057745, *12 (Del. Ch.

Sept. 2, 2008).  "Any breach of contract and any tort . . . is, in some sense, an injustice.  Obviously

this type of 'injustice' is not what is contemplated" by the alter-ego doctrine.  *Mobil Oil*, 718 F.

Supp. at 268.  Rather, the corporate structure itself must have been used to further the fraud or

injustice or "as a shield for" unjust acts.  *NetJets*, 537 F.3d at 177 (quoting *Martin v. D.B. Martin

Co.*, 88 A. 612, 615 (Del. Ch. 1913)).  In other words, "courts 'look behind the corporate curtain'

generally 'where the facts indicate that the corporate entity has been or is being used by those in

control of it to perpetrate a fraud' or to 'promote injustice.'"  *Id.* at 177 (quoting *Sonne v. Sacks*,

No. Civ. A. 4416, 1979 WL 178497, at *2 (Del. Ch. June 12, 1979)).

---

[8] Defendants suggest that Delaware law requires PartnerRe to prove that RPM and LendUS exist "for no other purpose than as a vehicle for fraud."  Def. Mem. at 6 (quoting *In re BH S & B Holdings, LLC*, 420 B.R. 112, 140 (Bankr. S.D.N.Y. 2009)).  Although some decisions have used such language, the above-cited cases reflect that plaintiffs need not allege actual fraud, let alone that the *sole reason* for the alter ego's existence is to perpetrate actual fraud.

Here, PartnerRe adequately alleges "an overall element of unfairness or injustice." *Id.*
PartnerRe has alleged that the Hirts' misappropriation of funds—in the form of unauthorized,
irregular distributions to Robert and Tracey Hirt—left RPM unable to meet its contractual
obligations to Entitle and PartnerRe. *See* PAC ¶¶ 86–88.  It alleges that the Hirts "regularly
borrowed money from RPM and LendUS and recorded the loans as receivables on the balance
sheet as a strategy for avoiding paying taxes on distributions."  PAC ¶ 86(t).[9]  One such loan, in
the amount of $12.5 million, is alleged to have been outstanding as of June 12, 2017, in the midst
of the failed Entitle merger.  *Id.* (June 12, 2017 email from Noack to Robert Hirt:  "We have
receivable of about $12.5mm from you, how do we explain it?").  And although the PAC does
not specify the purpose of that specific loan, it elsewhere alleges that decisions as to such
distributions were made outside board meetings and principally served the Hirts' personal
interests.  *See, e.g.*, *id.* ¶ 86(q) ("[T]he main consideration for when to pay a dividend to
shareholders (i.e., the Hirts) was 'if [Tracey Hirt] wanted to buy real estate or something.'"); *id.*
(one $2 million distribution funded Tracey Hirt's purchase of a "house in the desert"); *id.* ¶ 86(r)
("The decisions about these transfers were not made in board meetings and, at least to Tracey
Hirt's knowledge, are not reflected in board minutes.").  Even RPM's CFO is alleged to lack
insight into how the Hirts "make these decisions," believing that RPM never held any "formal
meetings" relating to them.  *Id.* ¶ 86(r).

---

[9] As noted, the PAC also alleges that the Hirts made improper personal contributions to RPM
intended to lead RPM's lenders to believe that it met minimum cash requirements in its financial
covenants with those lenders.  *See* PAC ¶ 86(s) (alleging that such contributions were "normally
'reversed' within 60 days"); *see also id.* ¶ 86(o) (Robert Hirt described between 10 and 25
contributions he had made to RPM or LendUS, in amounts ranging from $500,000 to $10
million).

The cumulative effect of these informal payouts to the Hirts, the PAC alleges, was to leave RPM with far less cash than it had projected at the time of the Entitle closing—"a critical reason for its refusal to close." *Id.* ¶ 88; *see id.* ¶ 90 (May 18, 2017 email from Noack to Robert Hirt:  "Pro for not proceeding: we would preserve cash, which we need until we start earning income."); *id.* ¶ 92 (June 12, 2017 email from Noack to Robert Hirt:  "[I]f we undertake Entitle – need additional liquidity – how do we get to it?").  Taken together, these allegations adequately allege, for purposes of Rule 15(b), injustice or unfairness.  *See, e.g.*, *McBeth*, 171 F. Supp. 3d at 234 ("In particular, drawing all inferences in Plaintiff's favor, the allegations regarding the commingling of personal and corporate assets and the insufficient capital to cover expenses plausibly plead an 'inequitable use of the corporate form.'" (quoting *Soroof*, 283 F.R.D. at 151)); *see also Essar Steel II*, 2020 WL 2539031, at *4 (collecting cases holding that "allegations of undercapitalization and siphoning of funds are sufficient to satisfy the 'injustice or unfairness' element" at pleading stage); *id.* (allegations that transfer of "available funds" to corporate owners, leaving company "unable to perform its contractual obligations" and "judgment-proof," sufficiently stated claim for alter-ego liability); *Blair*, 720 F. Supp. 2d at 473 (misdirection of funds, dominating control, and siphoning of funds supported existence of injustice or unfairness under Delaware law); *see also NetJets*, 537 F.3d at 183 (courts may consider evidence relevant to "single economic entity" inquiry in assessing presence of unfairness or injustice).

Defendants' arguments are not to the contrary.  First, they contend that the PAC's failure to include a substantive claim for relief other than the original breach-of-contract claim forecloses alter-ego liability.  In support, they cite the principle that "[t]he underlying cause of action does not supply the fraud or injustice.  To hold otherwise would render the fraud or injustice element meaningless, and would sanction bootstrapping."  Def. Mem. at 6 (quoting

*Mobil Oil Corp.*, 718 F. Supp. at 268).  But PartnerRe does not argue that defendants' breach of the Merger Agreement is the sole evidence of inequity here.  Rather, as noted, its PAC alleges that the Hirts opportunistically disregarded the corporate form and formalities when it suited them, that such misuse of the corporate form was itself unjust, and that such injustice *caused* RPM to breach its obligations to Entitle and RPM under the Merger Agreement.  These claims make its allegations of injustice or unfairness plausible, and therefore not futile.  *See, e.g.*, *McBeth*, 171 F. Supp. 3d at 234.

Second, defendants seize on the PAC's closing allegation that "there is a real risk that the Hirts will continue this pattern by leaving LendUS undercapitalized and unable to pay a judgment," arguing that concerns about a defendant's ability to pay a hypothetical future judgment cannot, alone, support alter-ego liability.  Def. Mem. at 7 (quoting PAC ¶ 93).  On that discrete point, defendants are correct.  Generally, "Delaware courts have held that the possibility that a plaintiff may have difficulty enforcing a judgment is not an injustice warranting piercing the corporate veil."  *Trevino v. Merscorp, Inc.*, 583 F. Supp. 2d 521, 530 (D. Del. 2008).  But that principle does not blunt the force of PartnerRe's other allegations, which plausibly allege injustice or unfairness.  Nor does it mean that the finder of fact, in determining whether alter-ego liability is warranted, can never take into account whether a corporate defendant has left itself judgment-proof.  *See, e.g.*, Def. Mem. at 8 (conceding that, under certain circumstances, failure to pay a judgment owing to abuse of the corporate form may support a claim for alter-ego liability).  Accordingly, the Court finds that the PAC alleges sufficient non-conclusory facts to render amendment plausible, and therefore not futile.

B.      **Undue Prejudice**

Prejudice to the opposing party is arguably "the most important reason for denying a motion to amend." *A.V.E.L.A., Inc. v. Estate of Monroe* ("*A.V.E.L.A. I*"), 34 F. Supp. 3d 311, 317 (S.D.N.Y. 2014) (quoting *Frenkel v. N.Y.C. Off-Track Betting Corp.*, 611 F. Supp. 2d 391, 494 (S.D.N.Y. 2009)). But only *undue* prejudice justifies such denial. *Id.* Undue prejudice results when the proposed amendment would (1) "require the opponent to expend significant additional resources to conduct discovery and prepare for trial"; (2) "significantly delay the resolution of the dispute"; or (3) "prevent the plaintiff from bringing a timely action in another jurisdiction." *Id.* (quoting *Monahan v. N.Y.C. Dep't of Corr.*, 214 F.3d 275, 284 (2d Cir. 2000)).

"[C]entral to this determination" is whether "a party had prior notice of a claim and whether the new claim arises from the same transaction as the claims in the original pleading." *Id.* The procedural posture of the case may also be relevant. *See, e.g.*, *Ruotolo v. City of New York*, 514 F.3d 184, 192 (2d Cir. 2008) ("Undue prejudice arises when 'an amendment [comes] on the eve of trial and would result in new problems of proof'" (alteration in original) (quoting *State Teachers Ret. Bd.*, 654 F.2d at 856)); *Grochowski v. Phoenix Constr.*, 318 F.3d 80, 86 (2d Cir. 2003). However, an "adverse party's burden of undertaking discovery, standing alone, does not suffice to warrant denial of a motion to amend a pleading." *U.S. ex rel. Mar. Admin. v. Cont'l Ill. Nat'l Bank. & Tr. Co. of Chi.*, 889 F.2d 1248, 1255 (2d Cir. 1989); *see A.V.E.L.A. I*, 34 F. Supp. 3d at 317 (quoting *JPMorgan Chase Bank, N.A. v. IDW Grp., LLC*, No. 08 Civ. 9116, 2009 WL 1357946, at *4 (S.D.N.Y. May 12, 2009)) (same). "The non-moving party bears the burden 'of demonstrating that substantial prejudice would result were the proposed amendment to be granted.'" *A.V.E.L.A. I*, 34 F. Supp. 3d at 317 (quoting *Alexander Interactive, Inc. v. Adorama, Inc.*, No. 12 Civ. 6608, 2014 WL 113728, at *3 (S.D.N.Y. Jan. 13, 2014)).

Here, defendants have not demonstrated undue prejudice. Their opposition focuses exclusively on the discovery burdens that amendment might entail. *See* Def. Mem. at 17–20. But that argument is unavailing. As stated, the burdens of increased discovery, standing alone, do not suffice to show undue prejudice. *See, e.g.*, *Cont'l Ill. Nat'l Bank*, 889 F.2d at 1255 (reversing denial of leave to amend where defendant argued new allegations would "lead to vastly increased discovery"). And the cases defendants cite holding that the procedural posture of a case may counsel against granting leave to amend involve circumstances far beyond the mere need for further discovery. *See, e.g.*, *Werking v. Andrews*, 526 F. App'x 94, 96–97 (2d Cir. 2013) (summary order) (plaintiff's attempt to assert new substantive claims "on an entirely different set of operative facts" and add class allegations after defendants had moved for summary judgment would have "changed the entire nature of the case").

To the extent that new discovery can sometimes counsel against granting leave to amend, that is not so here. The discovery germane to the new allegations largely arises from the same operative facts as the allegations against the existing parties, and will overlap substantially with other discovery taken or remaining in this case. *See, e.g.*, Dkt. 109. For this reason, courts have often held that the addition of alter-ego claims or, claims against new defendants that track existing claims, will not unduly prejudice defending parties. *See, e.g.*, *Essar Steel Algoma Inc. v. S. Coal Sales Corp.* ("*Essar Steel I*"), No. 17 Misc. 360 (AT) (RWL), 2018 WL 6332900, at *6 (S.D.N.Y. Oct. 29, 2018); *Mason Tenders Dist. Council of Greater N.Y. v. Phase Constr. Servs., Inc.*, 318 F.R.D. 28, 38–40 (S.D.N.Y. 2016); *A.V.I.L.A. I*, 34 F. Supp. 3d at 318; *Soroof*, 283 F.R.D. at 153; *Michalek v. Amplify Sports & Entm't LLC*, No. 11 Civ. 508 (PGG), 2012 WL 2357414, at *5 (S.D.N.Y. June 20, 2012). The Court does not expect the additional discovery occasioned by the amended complaint to impose undue prejudice on defendants.

Further, the Court views with skepticism defendants' claim that granting leave to amend will require a fresh deposition of "[e]very one of Plaintiff's witnesses." Def. Mem. at 20. That theory assumes that the new alter-ego claims require proof of fraud, to which state-of-mind evidence may be relevant. *Id.* at 19–20. But as explained above, that is wrong. *See, e.g.*, *NetJets*, 537 F.3d at 176. Fraud is sufficient, but not necessary, to show an "overall element of injustice or unfairness." *Id.*[10] And here, PartnerRe does not allege that it was defrauded—only that defendants misused the corporate form in an unjust or unfair manner. To the extent that defendants imagine the need for additional depositions to disprove a nonexistent allegation of fraud, that argument is unpersuasive.

Accordingly, the Court does not find any likelihood of undue prejudice.

### C.      Good Cause

To show good cause, a movant must also demonstrate that it has been diligent. *See Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 582 F.3d 244, 267 (2d Cir. 2009). That means that "despite its having exercised diligence, the applicable deadline could not have been reasonably met." *Sokol Holdings, Inc. v. BMB Munai, Inc.*, No. 05 Civ. 3749 (KMW) (DF), 2009 WL 2524611, at *7 (S.D.N.Y. Aug. 14, 2009). "A party fails to show good cause when the proposed amendment rests on information 'that the party knew, or should have known, in

---

[10] Defendants' cases are not to the contrary. In one, the plaintiff pursued a fraud-based theory of alter-ego liability, alongside a second theory alleging the draining of corporate assets. *See In re Foxmeyer Corp.*, 290 B.R. 229, 237–38 (Bankr. D. Del. 2003) (describing two discrete theories upon which plaintiff pursued alter-ego liability, one of which the court termed the "misleading and reliance" theory). There, the court discussed reliance solely in the context of the fraud theory. *Id.* at 238–43. In the other—a 1971 Texas case—the applicable state law required proof of fraud to pierce the corporate veil. *Paine v. Carter*, 469 S.W.2d 822, 827 (Tex. Civ. App. 1971) ("The cases in Texas have made it clear that in order for the doctrine of alter ego to apply, there must be an attempted use of a corporate vehicle in a fraudulent manner or in a manner which would ordinarily defraud an unsuspecting or good faith third party.").

advance of the deadline.'" *Oscar v. BMW of N. Am., LLC*, No. 09 Civ. 11 (PAE),
2011 WL 6399505, at *2 (S.D.N.Y. Dec. 20, 2011) (quoting *Sokol*, 2009 WL 2524611, at *8).

Here, defendants do not specifically challenge PartnerRe's diligence. However, they do
suggest, in arguing undue prejudice, that PartnerRe "cannot now claim surprise at the existence
of the Hirts' affiliated companies" because it was surely put on notice of such entities through
the detailed negotiation of the Entitle merger. Def. Mem. at 18. But PartnerRe does not argue
that it first learned that the Hirts and their other companies *existed* soon before seeking leave to
amend. Rather, it contends that, through discovery, it learned new information regarding the
Hirts' use and alleged abuse of the corporate form, which it pursued and developed in order to
move promptly to amend its complaint.

Specifically, PartnerRe states that it first became aware of the relationship between
RPM's relatively weak cash position and its distributions of cash to the Hirts through a
July 18, 2019 deposition of RPM's CFO, Ava Noack. Pl. Mem. at 5. There, Noack stated that
the Hirts had funded LendUS with their own cash, regularly took cash out of LendUS, and did so
without observing corporate formalities. *Id.* Soon thereafter, in early August 2019, PartnerRe
sought additional discovery regarding similar transfers and RPM and LendUS's financial condition.
*Id.* at 5–6. Defendants did not produce that discovery until September 13, 2019, when they
produced an excerpted general ledger to PartnerRe. *Id.* at 6. In the meantime, in late August the
Hirts themselves provided additional deposition testimony supporting PartnerRe's alter-ego
theory. *Id.* at 6–7. Robert Hirt testified that he transferred funds out of RPM and LendUS
"whenever [he] wanted." *Id.* Tracey Hirt testified that her main consideration for deciding to
pay herself a dividend was "if [she] wanted to buy real estate or something." *Id.* at 7. She
further testified that the Hirts routinely contributed funds to RPM and/or LendUS "just, like, []

short term, just to meet the cash covenants." Dkt. 114-3 at 250–51.  On October 8, 2019, less

than a month after receiving defendants' general ledger excerpts, PartnerRe filed its original

motion for leave to amend—which was then delayed pending the Court's denial of defendants'

late-made motion to dismiss for lack of standing.  Pl. Mem. at 7–8.

      Defendants have not argued, let alone substantiated, that PartnerRe was on notice of the

above facts at any point before late-summer and fall 2019, including at the time of the original

deadline for amended pleadings in this action.  Accordingly, the Court holds, PartnerRe has

shown good cause for seeking to amend its complaint after the time initially set by the Court.

## CONCLUSION

      For the foregoing reasons, PartnerRe's motion for leave to amend its complaint is granted

in part and denied in part.  The motion is granted with respect to the request to join and add alter-

ego claims against Tracey Hirt, Robert Hirt, and the Hirt Trust.  It is denied with respect to the

request to join and add such claims against JAN, MM-air, RPM Loan Servicing, RPM Holdings,

Hirt Management, Mortgage Management, and TRH.  In all other respects, the Court grants

PartnerRe's motion.

      PartnerRe is directed to file an amended complaint by November 18, 2020.

      In accord with the parties' prior submission and the Court's most recent scheduling order,

Dkts. 118–19, the parties are directed to submit to the Court a joint proposed schedule by

November 18, 2020.

      The Clerk of Court is respectfully directed to terminate the motion pending at docket 100.

      SO ORDERED.

_____
PAUL A. ENGELMAYER
United States District Judge

Dated: November 13, 2020
        New York, New York