UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
                                                                  :
PARTNER REINSURANCE COMPANY LTD.,                                 :
                                                                  :
                    -v-                                           :        18 Civ. 5831 (PAE)
                                                                  :
RPM MORTGAGE, INC. ET AL,                                         :        ORDER
                                                                  :
                    Defendant.                                    :
                                                                  :
------------------------------------------------------------------ X

PAUL A. ENGELMAYER, District Judge:

Attached to and referenced by this Order are the following Court Exhibits:

- Exhibit 1: Plaintiff's PowerPoint presentation used during opening argument.

- Exhibit 2: Defendants' PowerPoint presentation used during opening argument.

- Exhibit 3: The affidavit of Lee Iannarone. Dkt. 165-4.

- Exhibit 4: The affidavit of Basil Imburgia. Dkt. 165-2.

- Exhibit 4a: The supplemental affidavit of Basil Imburgia. Dkt. 181.

- Exhibit 5: The affidavit of Steven Palmer. Dkt. 165-5.

- Exhibit 6: The affidavit of Ava Noack. Dkt. 172.

- Exhibit 7: The affidavit of Bruce V. Bush.

- Exhibit 8: The affidavit of Joshua Fisher. Dkt. 165-3.

- Exhibit 9: The affidavit of Erwin Robert Hirt. Dkt. 174.

- Exhibit 10: The affidavit of Alan Berliner. Dkt. 165-1.

- Exhibit 11: The affidavit of Anthony Spina. Dkt. 175.

SO ORDERED.

PAUL A. ENGELMAYER
United States District Judge

Dated: December 21, 2021
      New York, New York

IN THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK

**Partner Reinsurance Company Ltd.**

*v.*

**RPM Mortgage, Inc., et al.**

Case No. 1:18-cv-05831 (PAE)

**PartnerRe's Opening Statement**

# The Litany of RPM's Pre- and Post-Litigation Arguments

1. Entitle projected it would only lose $208,000.

2. The purchase-price adjustment in the Merger Agreement was insufficient.

3. Whether Entitle was meeting its financial projections was critical for the ODI to know.

4. The ODI must not have known whether Entitle was meeting its financial projections.

5. RPM needed to know what capital contribution the ODI would require.

6. RPM needed clarity from the ODI about restructuring the Hirts' trust.

7. Entitle had to immediately create and send to RPM updated financial projections.

8. Entitle was having improper "ex parte" communications with the ODI, its regulator.

9. RPM and Entitle had to contact the ODI together about Entitle's financial projections.

10. The ODI's decision to approve the Merger must have been uninformed.

11. RPM and Entitle had to contact the ODI together about its decision to approve.

12. Entitle failed to act in good faith in the weeks before the Merger.

13. Entitle may have experienced a MAE.

# The Litany of RPM's Pre- and Post-Litigation Arguments

**Threshold Points:**

▲ RPM's Litany of Arguments is Pretextual

1. Entitle projected it would only lose $208,000.

2. The purchase-price adjustment in the Merger Agreement was insufficient.

3. Whether Entitle was meeting its financial projections was critical for the ODI to know.

4. The ODI must not have known whether Entitle was meeting its financial projections.

5. RPM needed to know what capital contribution the ODI would require.

6. RPM needed clarity from the ODI about restructuring the Hirts' trust.

7. Entitle had to immediately create and send to RPM updated financial projections.

8. Entitle was having improper "ex parte" communications with the ODI, its regulator.

9. RPM and Entitle had to contact the ODI together about Entitle's financial projections.

10. The ODI's decision to approve the Merger must have been uninformed.

11. RPM and Entitle had to contact the ODI together about its decision to approve.

12. Entitle failed to act in good faith in the weeks before the Merger.

13. Entitle may have experienced a MAE.

# RPM Always Intended to Back Out If It Lacked Sufficient Cash

November 30, 2016 Email
**From:** Ava Noack
**To:** Rob Hirt

I do understand the capital shortage issue and agree that if we don't have sufficient cash to execute on EnTitle and the other boutiques. Entitle will have to be let go first.



Source: JX-035 at 1

# RPM Had Significantly Less Cash in June 2017 Than It Expected to Have

Imburgia Affidavit, October 28, 2021

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

PARTNER REINSURANCE COMPANY LTD.,

Plaintiff,

v.                                                    Case No. 1:18-cv-05831-PAE

RPM MORTGAGE, INC., LENUX S, LLC, ERWIN
ROBERT THEO, TRUST, AND THE ROBERT
HIRT AND FRANCES NADEAN HIRT REVOCABLE
LIVING TRUST,

Defendants.

LENDUS, LLC,

Counterclaim Plaintiff,

v.

PARTNER REINSURANCE COMPANY LTD.,

Counterclaim Defendant.

**AFFIDAVIT OF BASIL IMBURGIA**

68.    However, according to its general ledger, RPM as a stand-alone entity had $17.5 million of cash as of January 1, 2017, net of $2.375 million of restricted cash, and $15.6 million of cash, net of $2.375 million of restricted cash, as of January 31, 2017.[108]  Further, RPM's general ledger indicates that its cash balance had reduced to $4.3 million of cash, net of $2.375 million of restricted cash, as of April 30, 2017.[109]  The cash balances of RPM, REG, MFI and AEM as of May 31, 2017, totaled $18.8 million.[110]  This amount is $11.5 million less than the amount of cash projected for LendUSA in RPM's Form A on May 31, 2017.

Source: Affidavit of Basil Imburgia, October 26, 2021, ¶ 68.

# RPM Had Insufficient Cash to Buy Entitle Under RPM's Covenants

Imburgia Affidavit, October 28, 2021

61.     $4,110,154 of non-restricted cash is significantly lower than the minimum liquidity requirements included as covenants in agreements between RPM and its lenders in effect at the time.  Some of the agreements (such as RPM's agreement with Waterfall) include a minimum liquidity requirement of $7,500,000, while others (like RPM's lending agreement with Everbank) include a minimum liquidity requirement of $10,000,000.[99]  Under these agreements, RPM is required to provide financial statements to the lender at least quarterly demonstrating its compliance with all covenants.[100]  As the merger with Entitle was expected to close in June 2017, RPM was required to certify its compliance with all loan covenants by the end of that month and second calendar quarter.

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

PARTNER REINSURANCE COMPANY LTD.,

Plaintiff,

v.

RPM MORTGAGE, INC., LENDER'S LLC, ERWIN ROBERT HIRT, TRACEY HIRT and TRUSTEES OF HIRT AND TRACEY NAVARIAN HIRT REVOCABLE LIVING TRUST,

Defendants.

LENDER'S LLC,

Counterclaim Plaintiff,

v.

PARTNER REINSURANCE COMPANY LTD.,

Counterclaim Defendant.

Case No. 1:18-cv-05831 (PAE)

AFFIDAVIT OF BASIL IMBURGIA

# RPM Was Concerned About Its Cash Position

May 18, 2017 Email
**From:** Rob Hirt | **To:** Ava Noack

I am thinking we should reconsider closing Entitle. It may be too much right now and it's not major to our economics.

May 18, 2017 Email
**From:** Ava Noack | **To:** Rob Hirt

Pro for not proceeding:  we would preserve cash, which we need until we start earning income.

June 12, 2017 Email
**From:** Ava Noack | **To:** Rob Hirt

3.) If we undertake Entitle - need additional liquidity - how do we get to it?  Sell one of the buildings (Orinda?) or take out another loan?

Source: JX-196 at 3; JX-196 at 1; JX-121 at

Source: JX-136 at 1

# RPM Was Happy to Have Avoided the Closing

June 21, 2017 Email
**From: Robert Hirt**
**To: Tracey Hirt**

Its been a short but important trip. We get out of Entitle, out of Fortress and off Waterfall! Its happening!



**EXHIBIT JX-136**

# The Litany of RPM's Pre- and Post-Litigation Arguments

1. Entitle projected it would only lose $208,000.

2. The purchase-price adjustment in the Merger Agreement was insufficient.

3. Whether Entitle was meeting its financial projections was critical for the ODI to know.

4. The ODI must not have known whether Entitle was meeting its financial projections.

5. RPM needed to know what capital contribution the ODI would require.

6. RPM needed clarity from the ODI about restructuring the Hirts' trust.

7. Entitle had to immediately create and send to RPM updated financial projections.

8. Entitle was having improper "ex parte" communications with the ODI, its regulator.

9. RPM and Entitle had to contact the ODI together about Entitle's financial projections.

10. The ODI's decision to approve the Merger must have been uninformed.

11. RPM and Entitle had to contact the ODI together about its decision to approve.

12. Entitle failed to act in good faith in the weeks before the Merger.

13. Entitle may have experienced a MAE.

**Threshold Points:**

▲ **RPM's Litany of Arguments is Pretextual**

▲ **RPM was Reckless in its Failure to Close**

# RPM Was Reckless in Its Failure to Close

- RPM was obviously wrong, reckless in its conclusions, about the supposed difference between how Entitle was projected to perform in the first half of 2017 and how it was performing.

- RPM was obviously wrong, for example, in thinking in May and June 2017 that as of the Merger Agreement, Entitle was projecting its losses from November 2016 to March 2017 to be "$208,000." In fact, Entitle had told RPM that the projected loss was $1.485 million.

- RPM was similarly wrong, for another example, in thinking in May and June 2017 that the Form A projected Entitle's losses over that 5-month period to be "$208,000." There was no estimate for that 5-month period in the Form A.

# The Litany of RPM's Pre- and Post-Litigation Arguments

1. Entitle projected it would only lose $208,000.

2. The purchase-price adjustment in the Merger Agreement was insufficient.

3. Whether Entitle was meeting its financial projections was critical for the ODI to know.

4. The ODI must not have known whether Entitle was meeting its financial projections.

5. RPM needed to know what capital contribution the ODI would require.

6. RPM needed clarity from the ODI about restructuring the Hirts' trust.

7. Entitle had to immediately create and send to RPM updated financial projections.

8. Entitle was having improper "ex parte" communications with the ODI, its regulator.

9. RPM and Entitle had to contact the ODI together about Entitle's financial projections.

10. The ODI's decision to approve the Merger must have been uninformed.

11. RPM and Entitle had to contact the ODI together about its decision to approve.

12. Entitle failed to act in good faith in the weeks before the Merger.

13. Entitle may have experienced a MAE.

## Threshold Points:

▲ RPM's Litany of Arguments is Pretextual

▲ RPM was Reckless in its Failure to Close

▲ RPM's Principals Were Inexperienced and Uninformed

11

## RPM's Principals Were Inexperienced and Uninformed

- In driving RPM's decisions, RPM's principals—primarily Rob Hirt, but also Ava Noack—were acting on their own opinions and inexperienced perspective on what they thought RPM was entitled to do and what they thought Entitle was obligated to do.

- RPM thought that they were entitled to get *anything* they wanted at *any* given time from Entitle, regardless of their motivation in seeking it.

- RPM relies on Mr. Hirt and Ms. Noack in this way because RPM has claimed attorney-client privilege over RPM's communications with counsel in the weeks before and after the failed Merger, so they can't argue that RPM was relying on advice of counsel.

- Mr. Hirt's and Ms. Noack's actions are thus analyzed on their own, as based only on their personal views and personal conclusions regarding the parties' supposed rights and obligations.

12

# RPM's Principals Were Inexperienced and Uninformed



- Rob Hirt nevertheless may claim that his lawyers were telling him he could be liable for not amending his Form A, submitted with the ODI.

- But we know what RPM's *regulatory* lawyer, Larry Hamilton, would have told Mr. Hirt if he had consulted Mr. Hamilton—namely, that Mr. Hirt did *not* face such liability under these circumstances.

# RPM's Principals Were Inexperienced and Uninformed

- After the transaction was approved by ODI, RPM did not seek further advice from regulatory counsel—even though RPM made various claims during that period as to what information needed to be provided to the ODI.

Testimony of Lawrence Hamilton, June 20, 2019

```
                And then he said that he wanted to -- they
were going to exercise the right of the applicant,
call commissioner to set up a meeting on Wednesday,
June 7th.  So that was -- but these were -- I mean,
this is Lars.  This is K&L Gates saying all these
things.  I wasn't -- I wasn't part of it.  In
itself, it was -- I mean, K&L Gates was kind of
venturing into regulatory territory in this
Paragraph 2 of that e-mail, but I have to be honest
and say at that point, my role had receded a
considerable degree because what was -- my job was
to get an approval of a Form A, and at that point
```

- Consistent with Mr. Hirt's evident failure to consult Mr. Hamilton on these issues at the time, RPM has not called Mr. Hamilton as a witness for this trial.

Source: Hamilton Tr. at 217:14-15

# The Evidence Will Show RPM's Litany of Arguments Are Wrong

Entitle projected it would only lose $208,000?

→ **NO**

# Entitle projected it would only lose $208,000?

## RPM was wrong on what the prior projections were

May 30, 2017 Email
From: Rob Hirt
To: Lee Iannarone

When we negotiated the definitive agreement the total projected losses by the close of the transaction were supposed to be $208,000.00, now we're presented with $2.1 million in losses or $3.2 million when the legal fees and Partner Re expenses and interest are included. Based on the projected losses of $208K and the confidence expressed in these numbers we agreed to the purchase price formula whereby we own 2/3 of the losses on top of $208K, but if someone told me we might owe $2mm out of $3mm of additional losses, it would have been a different discussion.

February 11, 2017
**Draft Consideration Spreadsheet**
From: N. Celli
To: Ava Noack

| | A | B | C | D | E | F |
|---|---|---|---|---|---|---|
| 1 | | | | | | |
| 2 | x | Closing Cash Merger Consideration Calculation: | | | | |
| 3 | | Cash Purchase Price | | | | $ 13,125,000 |
| 4 | | Estimated Cash Purchase Price Adjustment | | | | |
| 5 | | Estimated Losses | | | (1,485,000) | |
| 6 | | Losses Fully Assumed by Buyer | | | (208,000) | |
| 7 | | Selling Shareholders Portion of Additional Losses | | | 33.33% | |
| 8 | | Total Estimated Cash Purchase Price Adjustment | | | | (425,667) |
| 9 | | Estimated Cash Purchase Price | | | | $ 12,699,333 |
| 10 | | Indemnification Escrow | | | | (1,000,000) |
| 11 | | Outstanding Indebtedness: | | | | |
| 12 | | Principal Balance | | | (1,500,000) | |
| 13 | | Estimated Accrued Interest | | | (155,750) | |
| 14 | | Total Outstanding Indebtedness | | | | (1,655,750) |
| 15 | | Transaction Expenses: | | | | |
| 16 | | Estimated Legal Costs | | | (350,000) | |
| 17 | | Payment of Outstanding PartnerRe Board Fees | | | (209,141) | |
| 18 | | Transaction Bonus | | | (465,909) | |
| 19 | | Total Transaction Expenses | | | | (1,025,050) |
| 20 | | Closing Cash Merger Consideration | | | | $ 9,018,533 |

Source: JX-094 at 3; JX-054 at...

# The Evidence Will Show RPM's Litany of Arguments Are Wrong

Entitle projected it would only lose $208,000? ⟶ **NO**

The purchase-price adjustment in the Merger Agreement was insufficient? ⟶ **NO**

# The purchase-price adjustment in the Merger Agreement was insufficient?

The Merger Agreement expressly addressed the possibility that Entitle's losses would be larger than projected

**Testimony of Marvin Pestcoe**
**August 27, 2019**

Page 1

```
1
2    UNITED STATES DISTRICT COURT
     FOR THE SOUTHERN DISTRICT OF NEW YORK
3    Case No. 1:18-cv-05831.
     -------------------------------x
4    PARTNER REINSURANCE COMPANY LTD.,
5            Plaintiff.
```

        And so I think the concept

behind this structure was to account for

the fact that the projections weren't

certain and to anticipate the possibility

that there might be -- the actual result

might deviate from those projections and

to pre-agree on how the parties would

share the financial consequences of that

deviation.

---

**May 30, 2017 Email**
**From: Rob Hirt**
**To: Lee Iannarone**

Lee, in order to accept the 90 day extension to get this deal closed we need to clearly be
on the same page:
~ Submit to the Insurance Commission a revised Form A w/ my new Trust and Entitle's
refreshed projected losses for 2017. Need to be clear that my Trust assets and income will
not become public.
~ Clear indication from Commissioner of needed capital based on revised 2017
projections.
~ Revisit purchase price based on current financial condition, which is dramatically
worse than when we signed the Definitive Agreement (Entitle's financials have worsened)

Source: Pestcoe Tr. at 97:10-18; JX.094 at 4

# The Evidence Will Show RPM's Litany of Arguments Are Wrong

Entitle projected it would only lose $208,000? ⟶ **NO**

The purchase-price adjustment in the Merger Agreement was insufficient? ⟶ **NO**

Whether Entitle was meeting its financial projections was critical for the ODI to know? ⟶ **NO**

19

# Whether Entitle was meeting its financial projections was critical for the ODI to know?

- The ODI understood the limits of financial "projections" and could have requested updated projections if it wanted them.

ODI Testimony
November 13, 2021

A.    It is -- it is important that the information in the Form A be accurate, but I would, you know -- we obviously understand that the projections are projections, so.  You're giving us the best information you can, but it doesn't mean it's going to come into -- you know, that that is going to be -- you know, because you say that's what it is today, that's what it's going to be.

Source: ODI Dep. at 190:12-21

# Whether Entitle was meeting its financial projections was critical for the ODI to know?

- In its Form A, RPM had given projections to the ODI that RPM and its related entities would have approximately $30.3 million of cash for the closing.

- As the first half of 2017 progressed, however, RPM's projections changed, to the point where they expected to have only $18.8 million of cash at the time they were to close on their $13 million purchase.

- And, by May 217, RPM's cash position, taken alone, was down to $4.3 million.

- Yet RPM never updated its projections for the ODI. Indeed, RPM says that it never even occurred to them to provide such updated projections to the ODI.

- This fact plainly undercuts RPM's arguments that they supported a policy of "full transparency" with the ODI regarding cash projections, or that they were were genuinely worried about the accuracy of what they had said in the Form A.

21

# The Evidence Will Show RPM's Litany of Arguments Are Wrong

Entitle projected it would only lose $208,000? ⟶ **NO**

The purchase-price adjustment in the Merger Agreement was insufficient? ⟶ **NO**

Whether Entitle was meeting its financial projections was critical for the ODI to know? ⟶ **NO**

**The ODI must not have *known* whether Entitle was meeting its financial projections?** ⟶ **NO**

# The ODI must not have known whether Entitle was meeting its financial projections?

- The ODI had previously determined that Entitle had triggered a "Hazardous Financial Condition" standard (HFC), and therefore was receiving monthly financial reports from Entitle.

- The ODI was thus equipped with all of the information it needed to compare, if it was so inclined, the projections in RPM's Form A with Entitle's ongoing financial performance.

- It is undisputed, moreover, that Entitle expressly disclosed to RPM in connection with the Merger that the ODI "has requested that Entitle Insurance Company provide it with monthly financial reports for its surveillance purposes."

Agreement and Plan of Merger
February 16, 2017

### Compliance with Laws

\* \* \*

**9. Ohio Monthly Financial Reporting.** The Ohio Department of Insurance has requested that Entitle Insurance Company provide it with monthly statutory financial reports for its surveillance purposes.

Source: JX-157 at 145

# The ODI must not have known whether Entitle was meeting its financial projections?

ODI's surveillance team received updates regarding Entitle's financials and there was no "Chinese wall" between the surveillance and Form A teams

- RPM says it thought that there was a "Chinese wall" that prevented ODI's Form A team from receiving updates regarding Entitle's finances, but the evidence will demonstrate otherwise.

Alan Berliner Affidavit
October 28, 2021

**H.   There Were No "Chinese Walls" Between ODI Financial Analysts Conducting Surveillance and Those Reviewing the Form A.**

103.   Mr. Hirt's testimony indicates that he understood there to be a separation between personnel at ODI responsible for surveillance of EIC and personnel at ODI responsible for RPM's Form A, with this separation enforced by a "Chinese Wall." (R. Hirt Dep. 53:3-19.)  My experience, and the record, reflect that the understandings Mr. Hirt has expressed were simply incorrect.  The Risk Assessment area of ODI is responsible both for surveillance and for Form A

# The Evidence Will Show RPM's Litany of Arguments Are Wrong

Entitle projected it would only lose $208,000? ——————→ **NO**

The purchase-price adjustment in the Merger Agreement was insufficient? ——————→ **NO**

Whether Entitle was meeting its financial projections was critical for the ODI to know? ——————→ **NO**

The ODI must not have *known* whether Entitle was meeting its financial projections? ——————→ **NO**

**RPM needed to know what capital contribution the ODI would require?** ——————→ **NO**

25

# RPM needed to know what capital contribution the ODI would require?

- ODI would have told Entitle prior to approving the Form A if a capital contribution was required.

Alan Berliner Affidavit
October 28, 2021

ODI would have communicated any near-term expectations for additional capital

contributions to EIC before approving the Form A. It would have been

inconsistent with ODI's typical practices for it to grant unconditional approval

and then shortly thereafter make a new request for a capital contribution.



Source: Berliner Aff. ¶ 9[d]

# RPM needed to know what capital contribution the ODI would require?

The ODI's approval was unconditional.

The ODI's representative confirmed that it is ODI's practice to communicate its expectations about any near-term capital contribution *before* approving a Form A.

ODI Testimony
November 15, 2021

Q.  Sure.  So if at the time of, that ODI is
    considering a Form A ODI has an expectation as to
    what capital contributions it will request or
    require in the short term, does ODI typically
    communicate its expectations before approving the
    Form A rather than waiting until afterward?

A.  Yes.

Entitle Form A
June 2, 2017

NOW, THEREFORE, IT IS ORDERED:

The acquisition of control of Fireman's Fund Insurance Company of Ohio by Applicants, is hereby approved.

The request for approval for the Insurer to become a party to the General services agreement is also approved.

This Order made and entered into the Journal of the Ohio Department of Insurance this ___ day of ___, 2017.

Jillian Froment
Director

Source: JX-104 at 4; ODI Tr. at 303:9-14

# The Evidence Will Show RPM's Litany of Arguments Are Wrong

Entitle projected it would only lose $208,000? —————————→ **NO**

The purchase-price adjustment in the Merger Agreement was insufficient? —————→ **NO**

Whether Entitle was meeting its financial projections was critical for the ODI to know? ——→ **NO**

The ODI must not have *known* whether Entitle was meeting its financial projections? ——→ **NO**

RPM needed to know what capital contribution the ODI would require? —————————→ **NO**

**RPM needed clarity from the ODI about restructuring the Hirts' trust?** ——————→ **NO**

# RPM needed clarity from the ODI about restructuring the Hirts' trust?

- By May 19, RPM's lawyers had definitively told the ODI that "Rob and Tracey Hirt have decided to postpone making any changes to the trust ownership and take that issue 'off the table' for purposes of the Form A." (JX-78)

- But on May 25, Ava Noack raised the issue of restructuring the trust with PartnerRe and said "[t]his is something new and we need to work through." (JX-82)

- On May 30, Rob Hirt told PartnerRe that the "impending revision" of his trust was one of the "deal points that we need closure on." (JX-94)

# The Evidence Will Show RPM's Litany of Arguments Are Wrong

Entitle projected it would only lose $208,000? ⟶ **NO**

The purchase-price adjustment in the Merger Agreement was insufficient? ⟶ **NO**

Whether Entitle was meeting its financial projections was critical for the ODI to know? ⟶ **NO**

The ODI must not have *known* whether Entitle was meeting its financial projections? ⟶ **NO**

RPM needed to know what capital contribution the ODI would require? ⟶ **NO**

RPM needed clarity from the ODI about restructuring the Hirts' trust? ⟶ **NO**

Entitle had to immediately create and send to RPM updated financial projections? ⟶ **NO**

# The Evidence Will Show RPM's Litany of Arguments Are Wrong

Entitle projected it would only lose $208,000? ⟶ **NO**

The purchase-price adjustment in the Merger Agreement was insufficient? ⟶ **NO**

Whether Entitle was meeting its financial projections was critical for the ODI to know? ⟶ **NO**

The ODI must not have *known* whether Entitle was meeting its financial projections? ⟶ **NO**

RPM needed to know what capital contribution the ODI would require? ⟶ **NO**

RPM needed clarity from the ODI about restructuring the Hirts' trust? ⟶ **NO**

Entitle had to immediately create and send to RPM updated financial projections? ⟶ **NO**

**Entitle was having improper "ex parte" communications with the ODI, *its regulator*?** ⟶ **NO**

32

# Entitle was having improper "ex parte" communications with the ODI, its regulator?

- As RPM's regulatory counsel observed, Entitle's relationship with ODI, its regulator, was critical to Entitle's business, and was much broader than just RPM's Form A application.

- Entitle's communications with ODI during the relevant period were consistent with the customary practices of insurance companies regulated by ODI.

Alan Berliner Affidavit, October 28, 2021

   b.  It is customary for an Ohio-domiciled insurer and its representatives to continue

       to have communications with ODI while a Form A is pending, as the insurer is

       still regulated by ODI.  EIC's communications with ODI while the Form A was

       pending were consistent with the customary practices of insurance companies

       regulated by ODI.

   d.  The communications evidenced in the record between Entitle's regulatory counsel

       and ODI regarding the status of the Form A were consistent with local custom and

       practice, especially in light of the fact that RPM did not have local counsel.



Source: Berliner Aff. ¶¶ 9(b), 9(d)

# Entitle was having improper "ex parte" communications with the ODI, its regulator?

- RPM's *own* regulatory lawyer disavowed the notion that Entitle's communications with the ODI were improper.

Testimony of Lawrence Hamilton
June 20, 2019

So it just seemed natural. I think it just seemed natural to her that when she had these conversations with Tracy Snow that she was continuing to have them, and I'm sure she did what she did in good -- I'm relatively sure that she did everything she did in good faith just based on facts that I have. That's how I would characterize it.

June 12, 2017, Email
**From:** Lawrence Hamilton
**To:** Mary Jo Hudson

Hi, Mary Jo. Thank you again for the call yesterday. I have conveyed the information you shared with me to the K&L Gates and RPM team, and we all appreciate your setting the record straight regarding your involvement in the process leading up to the Form A approval.

EXHIBIT
JX-122

Source: Hamilton Tr. 190:18-25; JX-122 at...

# Entitle was having improper "ex parte" communications with the ODI, its regulator?

- RPM's *own* transactional lawyer at K&L Gates disavowed the notion that Entitle's communications with the ODI were improper.

June 13, 2017, Email
**From: Lars Johansson**
**To: Mary Jo Hudson**

Dear Mary Jo – I also appreciate your setting the record straight in connection with the Form A approval and also conveyed the information to the RPM team. I now hope we can get to the closing soon, in a manner beneficial to everyone. Many thanks for your help on the regulatory side, and for your long public service.

# The Evidence Will Show RPM's Litany of Arguments Are Wrong

Entitle projected it would only lose $208,000? ——————————→ **NO**

The purchase-price adjustment in the Merger Agreement was insufficient? ——————————→ **NO**

Whether Entitle was meeting its financial projections was critical for the ODI to know? ——————————→ **NO**

The ODI must not have *known* whether Entitle was meeting its financial projections? ——————————→ **NO**

RPM needed to know what capital contribution the ODI would require? ——————————→ **NO**

RPM needed clarity from the ODI about restructuring the Hirts' trust? ——————————→ **NO**

Entitle had to immediately create and send to RPM updated financial projections? ——————————→ **NO**

Entitle was having improper "ex parte" communications with the ODI, *its regulator?* ——————————→ **NO**

**RPM and Entitle had to contact the ODI *together* about Entitle's financial projections?** ——————————→ **NO**

# RPM and Entitle had to contact the ODI *together* about Entitle's financial projections?

- The parties' agreement to "cooperate," in the Merger Agreement, simply did not require this.

- Entitle's obligation was to "consider in good faith" RPM's views "in connection with any proposed communication with any Government Entity." (JX-057, Merger Agreement § 5.4(b))

- Entitle *did* consider RPM's views in good faith:



May 28, 2017
**From:** Mary Jo Hudson
**To:** Lawrence Hamilton

During our call, you asked whether EIC had considered restating its pro forma financial statements. I have discussed the matter with EIC and we have determined that it is not necessary at this time, at least from EIC's perspective. As we discussed, EIC is filing monthly financial statements with the DOI, and we understand that this current performance information will be taken into account by the DOI as they review the Form A. Therefore, we believe that the DOI has current financial data to evaluate the pro formas fully. Should the DOI request a restatement of the pro formas, EIC would be happy to work with RPM to put them together.

37

# RPM and Entitle had to contact the ODI *together* about Entitle's financial projections?

- In addition, RPM was ignoring its obligations regarding regulatory approval.

Agreement and Plan of Merger
February 16, 2017

May 30, 2017 Email
**From: Tracey Hirt**
**To: Rob Hirt**

AGREEMENT AND PLAN OF MERGER

by and among

**5.4**   **Efforts**

(a)   Subject to the terms and conditions herein provided, the Parties shall, and each of them shall cause their respective Affiliates to, use reasonable best efforts to promptly take, or cause to be taken (including by their respective officers and directors), all actions and to do, or cause to be done, all things necessary, proper or advisable under this Agreement and applicable Laws to consummate and make effective as promptly as practicable after the date hereof the transactions contemplated by this Agreement, including (i) preparing (and filing or delivering, as the case may be) as promptly as practicable (and, in respect of the Ohio Form A, no later than fifteen (15) Business Days from the date of this Agreement) all necessary applications, notices, petitions, filings, ruling requests, and other documents and to obtain as promptly as practicable all consents, waivers, licenses, orders, registrations, approvals, permits, rulings, authorizations and clearances necessary or advisable to be obtained from any Governmental Entity for, by or on behalf of any Person in order to consummate the transactions contemplated by this Agreement (collectively, the "Governmental Approvals") and (ii) as promptly as practicable taking all other steps as may be necessary to obtain all such Governmental Approvals (including, without limitation, promptly, truthfully and fully responding to requests for information and other inquiries of Governmental Entities and other third parties). No Party shall take or omit to take, or permit or cause an Affiliate of such Party to take or omit to take, any action that the Person taking such action or making such omission should be reasonably aware would have the effect of delaying, impairing or impeding the receipt of any Governmental Approval.

Re: DRAFT email to Lew w/ PRE

they do this? It seems we should also look at getting turned down by the commissioner. Is that a possibility?

EXHIBIT
JX-093

Source: JX-057, Merger Agreement § 5.4(a); JX-093 at [...]

# RPM and Entitle had to contact the ODI *together* about Entitle's financial projections?

- Entitle correctly concluded that the ODI could ask for more information.

Alan Berliner Affidavit, October 28, 2021

f.  Entitle's preference for not submitting revised pro formas to ODI was reasonable and consistent with the typical practices of sellers and their counsel in connection with Form A applications. Should ODI have needed any additional information, it would have asked.  However, notwithstanding Entitle's reasonable objections, it would have asked.  However, notwithstanding Entitle's reasonable objections, RPM could have filed revised pro formas had it chosen to do so.



Source: Berliner Aff. ¶ 9(f)

# RPM and Entitle had to contact the ODI *together* about Entitle's financial projections?

- RPM was free to contact the ODI *itself.*

### Alan Berliner Affidavit, October 28, 2021

131.   If Mr. Hirt had truly been concerned that ODI lacked an understanding of Entitle's financials or that it might pull a "bait and switch," there was nothing in ODI's rules, procedures, customs or practices that prevented RPM from contacting ODI directly to request that meeting.  Based upon past practice, I am confident ODI would have been willing to have a meeting requested by a Form A applicant, whether in-person or by phone.  Indeed,

* * *

Commissioner to set up a meeting on Wednesday, June 7, 14.  To the extent that RPM responded to the concerns Entitle expressed about a proposed meeting by declining to seek the meeting, that was RPM's own choice.

Source: Berliner Aff. ¶ 131

# RPM and Entitle had to contact the ODI *together* about Entitle's financial projections?

○ RPM's own transactional lawyer plainly regarded RPM as having "the right" to contact the ODI on its own:

June 5, 2017 Email
**From:** Lars Johansson
**To:** Bryan Cave

circumstances one might worder.  Unless RPM gets comfortable that the Department does not currently expect RPM to provide additional capital post-closing and that Rob's and Tracey's trust reorg will be accepted by the Ohio Commissioner, RPM will want to know what transpired and was said between Ms. Hudson and the Commissioner's office and to what extent Entitle's financial condition was discussed.  Accordingly, unless RPM has sufficient comfort by end of Tuesday, it will exercise its right as the applicant and call the Commissioner to set up a meeting on Wednesday, June 7. Ms. Hudson will be invited to listen or participate in the meeting.

EXHIBIT
JX-109

# RPM and Entitle had to contact the ODI *together* about Entitle's financial projections?

- There is no evidence that these contacts would have changed *anything*.

- Rob Hirt wanted to give the ODI information they already had.

- In particular, Mr. Hirt wanted to flag merely that Entitle was not meeting its projections—which is information the ODI already had.

- Mr. Hirt had never changed his view, moreover, that RPM would make Entitle a profitable company—and therefore would not have told the ODI otherwise.

# The Evidence Will Show RPM's Litany of Arguments Are Wrong



Entitle projected it would only lose $208,000? ⟶ **NO**

The purchase-price adjustment in the Merger Agreement was insufficient? ⟶ **NO**

Whether Entitle was meeting its financial projections was critical for the ODI to know? ⟶ **NO**

The ODI must not have *known* whether Entitle was meeting its financial projections? ⟶ **NO**

RPM needed to know what capital contribution the ODI would require? ⟶ **NO**

RPM needed clarity from the ODI about restructuring the Hirts' trust? ⟶ **NO**

Entitle had to immediately create and send to RPM updated financial projections? ⟶ **NO**

Entitle was having improper "ex parte" communications with the ODI, *its regulator?* ⟶ **NO**

RPM and Entitle had to contact the ODI *together* about Entitle's financial projections? ⟶ **NO**

**The ODI's decision to approve the Merger must have been uninformed?** ⟶ **NO**

# The ODI's decision to approve the Merger must have been uninformed?

- All of the evidence is to the contrary.

- The ODI had specifically accounted for Entitle's financial condition.

EXHIBIT
JX-329

May 28, 2017
**From:** Mary Jo Hudson
**To:** Lawrence Hamilton

During our call, you asked whether EIC had considered restating its pro forma financial statements. I have discussed the matter with EIC and we have determined that it is not necessary at this time, at least from EIC's perspective. As we discussed, EIC is filing monthly financial statements with the DOI, and we understand that this current performance information will be taken into account by the DOI as they review the Form A. Therefore, we believe that the DOI has current financial data to evaluate the pro formas fully. Should the DOI request a restatement of the pro formas, EIC would be happy to work with RPM to put them together.

Source: JX-329 at 1

44

# The Evidence Will Show RPM's Litany of Arguments Are Wrong

Entitle projected it would only lose $208,000? → **NO**

The purchase-price adjustment in the Merger Agreement was insufficient? → **NO**

Whether Entitle was meeting its financial projections was critical for the ODI to know? → **NO**

The ODI must not have *known* whether Entitle was meeting its financial projections? → **NO**

RPM needed to know what capital contribution the ODI would require? → **NO**

RPM needed clarity from the ODI about restructuring the Hirts' trust? → **NO**

Entitle had to immediately create and send to RPM updated financial projections? → **NO**

Entitle was having improper "ex parte" communications with the ODI, *its regulator?* → **NO**

RPM and Entitle had to contact the ODI *together* about Entitle's financial projections? → **NO**

The ODI's decision to approve the Merger must have been uninformed? → **NO**

**RPM and Entitle *had to* contact the ODI *together* about its decision to approve?** → **NO**

# RPM and Entitle *had* to contact the ODI *together* about its decision to approve?

- ODI *unconditionally* approved the Form A.

- RPM's refusal to accept this approval was "highly irregular" and apparently unprecedented:

  For the parties to contact ODI after approval was "highly irregular" and in his "decades of experience," Mr. Berliner could not "think of an example of a Form A applicant doing anything comparable." (Berliner Aff. ¶ 125)

- RPM was thus *not* using its best efforts regarding government approval.

  "No party shall take or omit to take . . . any action that the Person taking such action or making such omission should be reasonably aware would have the effect of delaying, impairing or impeding the receipt of any Governmental Approval." (JX-057, Merger Agreement § 5.4(a))

# The Evidence Will Show RPM's Litany of Arguments Are Wrong



Entitle projected it would only lose $208,000? ⟶ **NO**

The purchase-price adjustment in the Merger Agreement was insufficient? ⟶ **NO**

Whether Entitle was meeting its financial projections was critical for the ODI to know? ⟶ **NO**

The ODI must not have *known* whether Entitle was meeting its financial projections? ⟶ **NO**

RPM needed to know what capital contribution the ODI would require? ⟶ **NO**

RPM needed clarity from the ODI about restructuring the Hirts' trust? ⟶ **NO**

Entitle had to immediately create and send to RPM updated financial projections? ⟶ **NO**

Entitle was having improper "ex parte" communications with the ODI, *its regulator?* ⟶ **NO**

RPM and Entitle had to contact the ODI *together* about Entitle's financial projections? ⟶ **NO**

The ODI's decision to approve the Merger must have been uninformed? ⟶ **NO**

RPM and Entitle *had* to contact the ODI *together* about its decision to approve? ⟶ **NO**

**Entitle failed to act in good faith in the weeks before the Merger?** ⟶ **NO**

# Entitle failed to act in good faith in the weeks before the Merger?

- *RPM's* own regulatory lawyer supports Entitle's good faith.

Testimony of Lawrence Hamilton
June 20, 2019

So it just seemed natural. I think it just seemed natural to her that when she had these conversations with Tracy Snow that she was continuing to have them, and I'm sure she did what she did in good -- I'm relatively sure that she did everything she did in good faith just based on facts that I have. That's how I would characterize it.

# The Evidence Will Show RPM's Litany of Arguments Are Wrong

Entitle projected it would only lose $208,000? ——————————→ **NO**

The purchase-price adjustment in the Merger Agreement was insufficient? ——————————→ **NO**

Whether Entitle was meeting its financial projections was critical for the ODI to know? ——————————→ **NO**

The ODI must not have *known* whether Entitle was meeting its financial projections? ——————————→ **NO**

RPM needed to know what capital contribution the ODI would require? ——————————→ **NO**

RPM needed clarity from the ODI about restructuring the Hirts' trust? ——————————→ **NO**

Entitle had to immediately create and send to RPM updated financial projections? ——————————→ **NO**

Entitle was having improper "ex parte" communications with the ODI, *its regulator?* ——————————→ **NO**

RPM and Entitle had to contact the ODI *together* about Entitle's financial projections? ——————————→ **NO**

The ODI's decision to approve the Merger must have been uninformed? ——————————→ **NO**

RPM and Entitle *had* to contact the ODI *together* about its decision to approve? ——————————→ **NO**

Entitle failed to act in good faith in the weeks before the Merger? ——————————→ **NO**

**Entitle may have experienced a MAE?** ——————————→ **NO**

# Entitle may have experienced a material adverse effect?

- The Merger Agreement provides that a failure to meet projections does not support a finding of a Material Adverse Effect:

Agreement and Plan of Merger, February 16, 2017

"Material Adverse Effect" means an event, circumstance, development, change or effect that (a) materially impairs the ability of the Company to consummate the transactions contemplated by this Agreement or (b) is materially adverse to the Acquired Companies or their financial condition or results of operations, taken as a whole; provided, however, that no event, circumstance, development, change or effect resulting from any of the following shall be deemed to constitute, or shall be taken into account in determining whether there has been, a Material Adverse Effect: (i) changes in global or national economic, monetary, or financial conditions,

* * *

Principles or the interpretation thereof (vi) any failure by the Acquired Companies to meet any projections or forecasts or estimates of revenue or earnings for any period, or changes

Source: JX-057 at 14

# Entitle may have experienced a material adverse effect?

- Whether a material adverse effect occurred was not a significant concern for Rob Hirt, who we expect will acknowledge that did not even recall the issue arising in 2017.

- RPM did not even ask its financial expert to analyze whether a material adverse effect occurred.



Testimony of Bruce Bush
March 18, 2021

Q      Were you asked to conduct
any analysis on that issue?

A      No.

Source: Bush Tr. at 32:13-15

# The Evidence Will Show RPM's Litany of Arguments Are Wrong

Entitle projected it would only lose $208,000? ⟶ **NO**

The purchase-price adjustment in the Merger Agreement was insufficient? ⟶ **NO**

Whether Entitle was meeting its financial projections was critical for the ODI to know? ⟶ **NO**

The ODI must not have *known* whether Entitle was meeting its financial projections? ⟶ **NO**

RPM needed to know what capital contribution the ODI would require? ⟶ **NO**

RPM needed clarity from the ODI about restructuring the Hirts' trust? ⟶ **NO**

Entitle had to immediately create and send to RPM updated financial projections? ⟶ **NO**

Entitle was having improper "ex parte" communications with the ODI, *its regulator?* ⟶ **NO**

RPM and Entitle had to contact the ODI *together* about Entitle's financial projections? ⟶ **NO**

The ODI's decision to approve the Merger must have been uninformed? ⟶ **NO**

RPM and Entitle *had* to contact the ODI *together* about its decision to approve? ⟶ **NO**

Entitle failed to act in good faith in the weeks before the Merger? ⟶ **NO**

Entitle may have experienced a MAE? ⟶ **NO**

# RPM's Litany of Arguments Used to Be Even Longer

- RPM previously argued that Entitle did not have the right to extend the closing on its own—but RPM doesn't press that argument anymore.

- RPM previously argued that Entitle could not sue for damages at all, but rather only had the remedy of specific performance—but RPM doesn't press that argument anymore.

- RPM waited over 18 months into this litigation to argue that PartnerRe supposedly lacks standing in this case—and then proceeded to lose that argument twice.

# RPM Profited From Its Efficient Breach

R. Hirt Affidavit, October 28, 2021

5. Currently, we have 93 offices in 24 states. LendUS employs approximately 900 employees across the country, including 131 in our largest office in Alamo, California. We issued approximately 20,000 mortgages last year, with an approximate value of $8.2 billion in the aggregate. We issue government-backed loans such as FHA and VA loans, and we are regulated by a number of agencies including state regulators, the Consumer Financial Protection Bureau, and the Department of Housing and Urban Development.



Source: Affidavit of Robert Hirt, October 28, 2021, ¶ 5

54

# Partner Reinsurance Company Ltd.

## v.

## RPM Mortgage, Inc., et al.

### Defendants' Opening Statement

December 9, 2021

# Genesis of Dispute

- **May 25, 2017: Entitle's Financial Bombshell**
  - LendUS demands transparency
  - Entitle refuses to be transparent

- **June of 2017: PartnerRe called for a Closing**

- **LendUS refused to close without:**
  - Section 5.3 – Access to Books and Records
  - Section 5.4 – Cooperation with ODI Communications
  - Section 3.7 – Absence of "MAE"

- **June 29, 2017: PartnerRe terminated the Merger Agreement**

# ■ Core Legal Questions

**To prevail, PartnerRe must prove:**

**1** All of the closing conditions in Article VIII of Merger Agreement were satisfied

**2** LendUS improperly failed to consummate a closing

**3** LendUS' conduct amounted to a "Willful Breach" as required by Section 9.3 of the Merger Agreement

# Key Merger Agreement Provisions

- **Obligation to close conditioned on satisfaction of all representations, warranties, and covenants (Section 8.2(a-b))**

- **Representations, Warranties, and Covenants included:**

  - Section 5.3 - Access to books and records

  - Section 5.4 - Cooperation in communications with ODI

  - Section 3.7 - No obligation to close if Material Adverse Event exists

4

# Non-Compliance With Covenant in Section 5.3



**From:** Lee Iannarone </O=PARTNERRE/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=LEE IANNARONE01F>

**To:** Tim Dwyer

**Sent:** 5/31/2017 9:35:45 PM

**Subject:** RE: Record-shattering year for title industry

Tim

I have no idea what you are talking about with respect to "Greenwich Plaza" being so committed to Palmer. I don't know how many times I (and Marvin) have said that if the Board thought there was a better alternative, that we would consider it. The Board did nothing about it with years of opportunities.

Rob has always been very complimentary of Steve and I believe he is using this "frustration with him not getting updated financials" as another way to delay things (and by the way, Steve has what he is looking for but we (as a Transaction Committee) agreed not to send the financials to RPM at this time).

# Non-Compliance With Covenant in Section 5.4

- Palmer conceals improper promise on behalf of LendUS to contribute $1.5M in capital

| From: | Steven Palmer </O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=010BF7CDFB6A4406B2A9F8750004D7E4-STEVEN.PALM> |
|---|---|
| To: | Jennifer.Turner@insurance.ohio.gov; Maryse Jean-Pierre |
| CC: | Michele.Sheets@insurance.ohio.gov; Lee.Iannarone@partnerre.com; Lee Baskey (LBaskey@EnTitleIns.com) |
| Sent: | 5/24/2017 8:45:30 PM |
| Subject: | RE: Hazardous Financial Condition |

* * *

Per the pending Merger Agreement, RPM has the right to compel PartnerRe to fund $1.5 million of its proceeds at closing into a note at EDG. EDG intends to then immediately downstream those proceeds to EIC the way that we have for the other three most recent capital injections by PartnerRe. Therefore, at RPM's request at closing, there will be an additional $1.5 million in Surplus at EIC.



JX-199

- May 24, 2017 text message between Iannarone and Palmer

I would hold off on calling Rob. Even if they are having second thoughts let's give the ODI time to approve. Once that happens it's harder for them to escape.



JX-436

- Mr. Palmer's email was not given to LendUS until June 19th

6

# Non-Compliance With Covenant in Section 5.4

- Entitle refused to jointly contact the ODI



**From:** Lee Iannarone <lee.iannarone@partnerre.com>
**To:** Rob Hirt <rhirt@rpm-mtg.com>
**Cc:** Ava Noack <anoack@rpm-mtg.com>
**Date:** Wed, 31 May 2017 14:26:51 -0400

Hi Rob

I have spoken with our lawyers and the Transaction Committee and we believe there is no current factor which would require the Form A to be refiled or otherwise communicate with the ODI other than in response to specific queries from them. I would expect that any communication with the ODI would be done cooperatively with us as provided in the merger agreement.

JX-351

# Non-Compliance With Covenant in Section 5.4

- Entitle refused to allow RPM to contact ODI



I also need to emphasize, on the strongest possible terms, that while Entitle is considering the matters asserted in your letter, RPM (contrary to your bald assertions in your previous correspondence) has absolutely no "right to contact the ODI directly" except in strict compliance with the Agreement.[1]

# ■ PartnerRe Concedes Non-Compliance With Covenants and Representations

- ■ **Concede they refused to:**
  - · Provide financial transparency (Section 5.3)
  - · Permit transparency with ODI (Section 5.4)
  - · Permit transparency with MAE (Section 3.7)

- ■ **Only attempted justification is that LendUS' concerns were "disingenuous"**

- ■ **Subjective intent *irrelevant* if parties are exercising valid contractual rights/obligations**

# Subjective Intent Critical Time Frame

## May 25, 2017

LendUS receives negative financial information:
- A Closing Consideration Spreadsheet (JX-204)
- Actual financials January-April 2017 (JX-81)

## June 29, 2017

Entitle terminated Merger Agreement (JX-447)

# CRITICAL EVENTS

May | 2017 | June

10

# Entitle's Financial Collapse

- ## Feb. 11, 2017 Closing Statement (JX-331)

| A | B | C | D | E | F |
|---|---|---|---|---|---|
| 1 | | | | | |
| 2 | x Closing Cash Merger Consideration Calculation: | | | | |
| 3 | Cash Purchase Price | | | | $ 13,125,000 |
| 4 | Estimated Cash Purchase Price Adjustment | | | | |
| 5 | Estimated Losses | | | (1,465,000) | |
| 6 | Losses Fully Assumed by Buyer | | | (208,000) | |
| 7 | Selling Shareholders' Portion of Additional Losses | | | 33.33% | |
| 8 | Total Estimated Cash Purchase Price Adjustment | | | | (425,667) |
| 9 | Estimated Cash Purchase Price | | | | $ 12,699,333 |

- ## May 25, 2017 Closing Statement (JX-204)

| Closing Cash Merger Consideration Calculation: | | |
|---|---|---|
| Cash Purchase Price | : : | $ 13,125,000.00 |
| Estimated Cash Purchase Price Adjustment | : : | |
| Estimated Losses | : : | (2,355,674.00) |
| Losses Fully Assumed by Buyer | : : | (208,000.00) |
| Selling Shareholders' Portion of Additional Losses | : : | 33.3333% |
| Total Estimated Cash Purchase Price Adjustment | : : | (715,891.33) |
| Estimated Cash Purchase Price | : : | $ 12,409,108.67 |

Losses increase by ~60% in three months

11



# Entitle's Financial Collapse (January 2017 Projections)

Source: JX-42 at 8

# Entitle's Financial Collapse (Actuals through April 2017)



Actual Losses in first four months of 2017: ~$1.3 million

Sources: JX-42 at 8; JX-81 (April 2017 Financials) at 3

# The Aftermath of May 25, 2017

- **Unexpected financial collapse causes LendUS to:**
  - Exercise its rights under Section 5.3 and 5.4
  - Demand to understand causes of Entitle collapse
  - Demand transparency with ODI
  - Seek information related to possible MAE

- **Demands for transparency were justified**

14



**Conflict With Form A Projections**

2017 Net Operating Income (Loss)

| | |
|---|---|
| (1,019,000) | (2,319,000) |
| 5/1/17 Projection Submitted to the ODI | 5/28/17 Revised Projection |

0
(500,000)
(1,000,000)
(1,500,000)
(2,000,000)
(2,500,000)

Sources: JX-402; JX-186

# Decrease in Projected Capital Reserves



### 2017 Capital & Surplus

8,994,000 — 5/1/17 Projection Submitted to the ODI

6,194,000 — 5/28/17 Revised Projection

Sources: JX-402; JX-186

# Decrease in Capital Triggers Severe HFC Violation



## 2017 Capital & Surplus

| | 5/1/17 Projection Submitted to the ODI | 5/28/17 Revised Projection |
|---|---|---|

8,994,000 — 1,019,000 Loss (11.3%)

6,194,000 — 2,319,000 Loss (37.4%)

Sources: JX-402; JX-186

18



# Capital Necessary to Maintain 20% Loss Ratio (Section 5.4(d) Burdensome Condition)



Sources: JX-402; JX-186

# ODI States Capital Necessary to Cure Hazardous Financial Condition

**From:** Jennifer.Turner@insurance.ohio.gov
**Sent:** Wednesday, June 28, 2017 9:10 AM
**To:** Steven Palmer; Maryse Jean-Pierre
**Cc:** Michele.Sheets@insurance.ohio.gov; Lee.Iannarone@partnerre.com; Lee Baskey
**Subject:** RE: Hazardous Financial Condition

Steve,

As we discussed at the end of May, a capital contribution is needed to prevent further HFC failures. In your e-mail, you indicate that if/when the deal closes with RPM, PartnerRe could be compelled to contribute $1.5M. Based on the information we have been provided by Mary Jo Hudson, it appears there is no longer confidence in the deal closing.

Since June 30th is this Friday I wanted to remind you of the need for a capital contribution. ODI does not prefer to approve subsequent events on a regular basis. As of the first quarter statement it would take $5.5M to cure all of the HFC violations. Depending on second quarter results, there could be more HFC failures and/or take additional capital to cure the violations.

EXHIBIT
JX-145

# ▊ Section 9.3 Exculpatory Provision

9.3     Effect of Termination.   In the event of termination of this Agreement pursuant to Section 9.1, this Agreement shall terminate and become void and have no effect, and there shall be no liability on the part of any Party to this Agreement, except that Section 5.2 (Confidentiality), Section 5.7 (Public Announcements), Section 9.4 (Expenses) and Article XI (General Provisions) shall survive any termination of this Agreement; provided, however, that nothing in this Agreement shall relieve any Party hereto from liability for: (a) failure to perform the obligations set forth in Section 5.2 (Confidentiality); (b) any fraud; or (c) the taking of any action or the failure to take any action with the knowledge or reckless disregard that such act or failure to act would be a material breach of this Agreement.

JX-57

# Breach Requires Willful Conduct

- You must *know* your conduct = a breach

- Not a willful act but a willful breach required

- A good faith belief you are correct precludes liability
  - E.g. – withhold payment because you believe the package was damaged by Amazon

**LendUS had ample justification for its position**

21

**Plaintiff Confirmed LendUS Was Right**



## Strategy & Business Development
2017 Q4 Operations Report

JX-398

# Plaintiff Confirmed LendUS Was Right



PartnerRe

Strategy & Business Development
2017 Q4 Operations Report

## Entitle

SBD Operations Report
2017 Q4

10

| Year | Cost | Realized | Unrealized | Total Value |
|---|---|---|---|---|
| 2012 | $24.6m | $0.00m | $6.4m | $6.4m |

| FD Own % | Sponsor | Strategic | Financial |
|---|---|---|---|
| 66% | LI | ◐ | ◐ |

| GAAP Financials ($'000s) | Q1 | Q2 | Q3 | LTM |
|---|---|---|---|---|
| **INCOME STATEMENT** | | | | |
| Premium & Fee Revenue | 2,331 | 3,010 | 3,499 | 12,884 |
| Loss & LAE Incurred | (127) | (294) | (344) | (956) |
| Agent Commissions | (752) | (1,177) | (1,429) | (4,275) |
| Seach & Settlement Fees | (367) | (369) | (395) | (1,785) |
| Employee Costs | (1,340) | (1,214) | (1,367) | (5,391) |
| Other Operating Expenses | (1,077) | (1,141) | (1,230) | (4,925) |
| Operating Income/(Loss) | (1,332) | (1,185) | (1,266) | (4,649) |
| Net Investment Income | 3 | 11 | 16 | 33 |
| Net Income/(Loss) | (1,328) | (1,174) | (1,250) | (4,616) |
| **BALANCE SHEET** | | | | |
| Total Assets | 14,960 | 13,911 | 12,762 | |
| Reserves | 3,284 | 3,230 | 3,372 | |
| Debt | 2,500 | 2,500 | 2,500 | |
| Total Equity | 7,950 | 6,776 | 5,526 | |

**Summary of Activity**
- Order volume has fallen to an unsustainable level due to key customer losses and a drop in refinancing
- Entitle has decrease headcount and closed its CT office in an attempt to reduce the $1m plus quarterly losses
- To preserve operational optionality for potential buyers, the company has kept its OH, PA, and CA offices open
- PRE has guaranteed Entitle's balance sheet, agreed to reinsure all reserves at closing, and funded debt of $1m in Q4 to support the business and reach a sale

**Outlook**
- Successful signing of a Merger Agreement with Radian provides a path towards trading our entire stake at approximately carrying value (est. closing in March)

PartnerRe

● On or exceeding plan    ◐ Moderately behind plan    ○ Significantly behind plan

# LendUS Not Liable Under Section 9.3

- **LendUS did not:**
  - ….leave the closing table
  - …declare a breach
  - …terminate

- **LendUS simply demanded:**
  - Financial transparency under Section 5.3
  - ODI transparency under Section 5.4

- **PartnerRe:**
  - Refused to be transparent
  - Did not seek specific performance (Section 11.9)
  - Terminated Merger Agreement and sued

24

## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| PARTNER REINSURANCE COMPANY LTD.,<br><br>                                        Plaintiff,<br><br>            v.<br><br>RPM MORTGAGE, INC., LENDUS, LLC, ERWIN ROBERT HIRT, TRACEY HIRT, and THE ROBERT HIRT AND TRACEY NAJARIAN HIRT REVOCABLE LIVING TRUST,<br><br>                                        Defendants. | Case No.:  1:18-cv-05831 |

## AFFIDAVIT OF BRUCE V. BUSH

State of Texas                    )
                                  )        ss:
County of Rockwall                )

        Bruce V. Bush, being duly sworn, says as follows:

### PROFESSIONAL QUALIFICATIONS

1.    I am currently employed as a Senior Director in a boutique litigation advisory firm, Fox Forensic Accounting, LLC ("FFA"), with offices in Chicago, Kansas City, and Dallas. I have more than 30 years of accounting experience on projects related to litigation, investigation, audit, accounting, and financial consulting.

2.    My experience includes planning and executing financial statement audits; leading forensic accounting investigations into allegations of financial reporting improprieties and allegations of employee, customer, and vendor fraud and misconduct; conducting financial statement restatement engagements; and consulting with clients and providing expert testimony.

3.    I have been qualified as an expert and testified regarding contract damages, lost profits damages, diminution of value damages, and intellectual property damages in Federal and State courts. Additionally, I have provided testimony concerning damages associated with purchase and sale agreement disputes in several arbitration matters.

1

4.   I have severed as a neutral accountant and arbitrator in disputes involving numerous purchase and sale agreements.

5.   Prior to joining FFA, my experience was with global accounting and consulting firms, including RSM US LLP ("RSM"), KPMG, LLP ("KPMG") and PwC, LLP ("PwC").

6.   At RSM I provided forensic accounting investigations involving allegations of fraud and misconduct, including financial institutions, and expert testimony in purchase and sale agreement disputes and contract disputes.

7.   At KPMG I was a Partner and a member of their national investigative practice where I assisted audit committees, special committees of boards of directors and senior management in investigating alleged fraud and misconduct. I provided consulting services and expert testimony in purchase and sale agreement disputes and contract disputes.

8.   At PwC I provided accounting and auditing services, including financial institutions, real estate companies, technology manufacturing companies and companies involved in wholesale and retail trade. Additionally, I provided consulting services and expert testimony in matters involving bankruptcy and contract disputes.

9.   I earned a Bachelor of Science degree in accounting from Metropolitan State University of Denver and a Master in Business Administration degree, minor in economics, from Texas A&M University – Commerce.

10.  I am a certified public accountant licensed in the states of Texas, Arizona, and Colorado, with reciprocity to practice throughout the U.S. excluding Hawaii.

11.  I am Certified in Financial Forensics through the American institute of Certified Public Accountants ("AICPA"). I have a professional affiliation with the AICPA.

12.  I have authored several white papers and have presented at speaking engagements on matters relating to expert witness testimony, forensic accounting investigations, and post-acquisition disputes.

13.  A copy of my curriculum vitae, which includes the speaking engagements at which I have presented during the prior 10 years, and cases in which I have testified in the prior 10 years is included in Attachment B to this Affidavit.

## SUMMARY OF OPINIONS

### A.    Opinions Regarding Damages

14. Mr. Imburgia states "It is my opinion that the amount of total damages due to Plaintiff is $10.89 million."[1] Mr. Imburgia's damage calculation includes two elements: (i) the Cash Consideration Difference, which consists of the difference in cash consideration that would have been provided under the RPM Mortgage, Inc. ("RPM") deal compared with the cash provided under the subsequent sale of Entitle to Radian Title Services, Inc. ("Radian"); and (ii) the planned Minority Equity Interest, which consists of the alleged value of the minority ownership Plaintiff would have retained under the RPM Merger Agreement, but did not retain under the Radian deal.

15. Mr. Imburgia calculates the Cash Consideration Difference to be $5,950,106.  Mr. Imburgia arrives at this figure by taking his calculation of the cash provided in the Merger Agreement, $7,713,469, and subtracting his calculation of the cash provided in the sale to Radian, $1,763,363 ($7,713,469 - $1,763,363 = $5,950,106).

16. In my opinion, Mr. Imburgia's analysis is flawed because, among other reasons explained below, Mr. Imburgia inappropriately reduces the cash consideration provided in the Radian deal by the increased related-party debt and related-party payables arising subsequent to the failed RPM Merger. Once these errors are corrected, the damages associated with the difference in the cash sales price offered by RPM and the cash sales price offered by Radian is only $3,714,000.

17. Mr. Imburgia calculates the value of the Minority Equity Interest to be $4,939,180.  In my opinion, Mr. Imburgia's opinion on this point is flawed for multiple reasons and significantly overstates the value of the Minority Equity Interest.

18. First, due to the uncertainties around the deterioration in the financial condition of EDG and Entitle, the uncertainties on whether the synergies from the Merger Agreement would create profitable operations, and the uncertainties on what actions ODI's Office of Risk Assessment might take given the deterioration in the financial condition of Entitle, I do not believe it is reasonable to calculate any value of the Minority Equity Interest.

---

[1] Updated Expert Report and Disclosure of Basil Imburgia, January 28, 2021, 4 [JX-221].

3

19.  Second, even if I make favorable assumptions with respect to each of these uncertainties, a cash flow analysis--utilizing the revised financial projections provided by EDG to the Defendants on June 2, 2017--demonstrates that the value of minority equity interest is at most $1.172 million.

20.  The following table compares my damage calculations with those of Mr. Imburgia.

|  | **My Damage Calculations** | **Mr. Imburgia** | **Difference** |
|---|---|---|---|
| Cash Sales Price | $3,714,000 | $5,950,000 | ($2,236,000) |
| Equity Minority Interest | 1,172,000 | 4,939,000 | (3,767,000) |
| **Total** | **$4,886,000** | **$10,889,000** | **($6,003,000)** |

**Opinions Regarding the Cash Sales Price**

21.  Mr. Imburgia compares the cash sales price between the Merger Agreement and the subsequent sale to Radian, but inappropriately reduces the cash sales price in the sale to Radian by the increased amounts of related-party debt and related-party payables. After the Plaintiff cancelled the Merger Agreement, PartnerRe, EDG Shareholders and other related-parties provided additional cash to EDG in exchange for bridge notes. By providing the cash in the form of debt rather than an equity contribution, Plaintiff has artificially increased the alleged damages. The increase in debt after the Merger Agreement was $1,720,000. Mr. Imburgia does not identify this issue in his report.[2]

22.  In addition to treating the additional cash contributions as debt, instead of equity, the bridge notes issued after the termination of the Merger Agreement bore interest at 15.0%, compared to an interest rate for the bridge notes prior to the Merger Agreement of 10.5% to 10.75%. The accrued interest amount on the bridge notes increased to $308,885 from $213,556 at the date of the Merger Agreement, to $522,441 at the date of Radian sale. By increasing the interest rate on the additional bridge notes, the Plaintiff has artificially increased the alleged damages. Mr. Imburgia does not identify this issue in his report.[3]

---

[2] Ibid.
[3] Ibid.

23. In addition to the accrued interest at 15.0%, the bridge notes issued after the Merger Agreement include minimum payments of $77,823.[4] By adding these minimum payments to the bridge notes issued after the Merger Agreement, the Plaintiff has artificially increased the alleged damages. Mr. Imburgia does not identify this issue in his report.

24. The following is my summary of the comparative cash sales price between the Merger Agreement and the sale agreement with Radian, which does not include the inappropriate reductions of the Radian sales price.[5] My calculation of the damages associated with the Cash Consideration Difference is $3,714,000.

| Damage Calculation (Based on Cash Sales Price) | RPM | Radian | Difference |
|---|---|---|---|
| Estimated Cash Sales Price | $12,022,000 | $7,311,000 | $4,711,000 |
| Indemnification Escrow | (1,000,000) | 33,000 | (1,033,000) |
| Bridge Note Paid - Not Converted to Equity | - | (1,000,000) | 1,000,000 |
| Employee Transaction Bonus | (577,000) | - | (577,000) |
| Legal Costs | (510,000) | (273,000) | (237,000) |
| Shareholder Representative Expense | (250,000) | (100,000) | (150,000) |
| **Damage Calculation** | **$9,685,000** | **$5,971,000** | **$3,714,000** |

**Opinion Regarding the Minority Interest Equity Value**

25. As part of the Merger Agreement, the Plaintiff was to receive a minority equity interest equal to 33.0% of the combined entity. In addition, they converted a $1,000,000 bridge note into additional shares representing a 3.52% equity interest for a total minority equity interest of 36.52%. Mr. Imburgia incorrectly suggests that he performed a valuation of the minority equity consideration provided to EDG's stockholders. Mr. Imburgia stated that,

---

[4] Ibid.
[5] Attachment C.

5

"Based on the above, the value of the total equity consideration to EDG stockholders under the planned merger is $6,585,573, or $18,032,652 multiplied by 36.52%. However, since EDG stockholders would control following the merger, the total equity consideration to EDG stockholders must be discounted. Valuation literature suggests a discount for lack of control within the range of approximately 20% to 30%, the average being 25%. As such, a discount of 25% for lack of control is applied."[6]

26.   In my opinion, Mr. Imburgia does not provide a valuation in accordance with professional standards. Mr. Imburgia did not perform an independent, objective valuation analysis relying on either an income-based approach[7] or market-based approach[8] of EDG to confirm the reasonableness of his damages conclusions for the EDG stockholders.

27.   Mr. Imburgia does not provide any relevant data that there were any market participants, other than RPM, willing to pay the potential synergistic value proposed in the deal price in the planned merger between EDG and RPM as of February 16, 2017.

28.   Mr. Imburgia should also have included a deduction for lack of marketability[9] for a minority interest in a closely-held company, which he did not include. According to Valuing A Business – The Analysis and Appraisal of Closely Held Companies, "Since merger and acquisition value analysis usually focuses on market value of invested capital, the value of the debt must be subtracted to reach the value of equity. . .If a noncontrolling interest is being valued, both lack of control and lack of marketability discounts should be considered."[10]

---

[6] Updated Expert Report and Disclosure of Basil Imburgia, January 28, 2021, 6, 8 [JX-221].
[7] Income-based approach is defined as "a general way of determining a value indication of a business, business ownership interest, security, or intangible asset using one or more methods that convert anticipated economic benefits into a present single amount." [SSVS1, Appendix B.]
[8] Market-based approach is defined as "a general way of determining a value indication of a business, business ownership interest, security, or intangible asset by using one or more methods that compare the subject to similar businesses, business ownership interests, securities, or intangible assets that have been sold." [SSVS1, Appendix B.]
[9] Discount for lack of marketability is define as "an amount or percentage deducted from the value of an ownership interest to reflect the relative absence of marketability." [SSVS1, Appendix B.]
[10] Valuing A Business – The Analysis and Appraisal of Closely Held Companies, Fifth Edition, Shannon P. Pratt and Alina V. Niculita, 322-323.

29.   EDG and its subsidiary Entitle had a history of losses prior to the acquisition. The common stockholders, common stock option holders, and common stock warrant holders received no consideration in the Merger Agreement.[11] After incurring over $25 million in losses associated with EDG and its subsidiary Entitle, the current EDG stockholders were unwilling to provide any additional equity.[12]

30.   Due to the continued losses of EDG and Entitle, Mr. Imburgia's value of $6.4 million assigned to the minority common ownership of EDG through the planned merger was completely dependent on the realization of synergies derived through the acquisition of EDG by RPM.[13] These synergies included, but may not have been limited to, the ability of RPM to direct closing business to Entitle and the ability of Entitle to execute that business incurring only marginal costs.

31.   Notwithstanding Mr. Imburgia's arguments that such synergies are reasonable, the damage associated with the minority common ownership of Entitle is flawed.

   a.   Mr. Imburgia does not use all relevant information available up to the date of the intended Merger, including but not limited to the:

      i.   deteriorating financial performance of EDG and Entitle,

      ii.   potential for additional capital requirements imposed by ODI's Office of Risk Assessment in June 2017, and

      iii.   revised and updated financial projections.

   b.   The revised projections indicate a decrease in revenues of 18.8%, 24.3%, and 18.7% for 2017, 2018, and 2019, respectively. More significantly the revised projections indicate a decrease in underwriting gain (loss) of 142.6%, 85.2%, and 14.4% for 2017, 2018, and 2019, respectively.

   c.   The decrease in the financial projections for the 2nd half of 2017, which would have been post-merger, were significant. The original projections indicated that Entitle

---

[11] Merger Agreement, section 2.14(a), 21.

[12] JX-347, at PR00015068.

[13] "As explained below, the damages amount described in the previous section is reasonable because the price at which Entitle was to be sold to RPM under the Merger Agreement, and the price at which Entitle was actually sold to Radian, were both reasonable, based on financial projections available to the parties at the time and expected synergies." Updated Expert Report and Disclosure of Basil Imburgia, January 28, 2021, 10-11 [JX-221].

7

would have an underwriting <u>gain</u> of $401,000 in the 2nd half of 2017. The revised projections indicated that Entitle would have an underwriting <u>loss</u> of $476,000. The difference is $877,000, or 218.6%.

    d.  Given ODI's Office of Risk Assessment concern over the ongoing losses at Entitle and their discussions regarding the need for additional capital contributions, the post-merger projected loss in the 2nd half of 2017 would likely add to ODI's Office of Risk Assessment concerns regarding the violations of the Hazardous Financial Condition statutes.

32.    In my opinion, because of the uncertainties around the deterioration in the financial condition of EDG and Entitle, the uncertainties of whether the synergies from the Merger Agreement would create profitable operations, and the uncertainties on what actions ODI's Office of Risk Assessment might take given the deterioration in the financial condition of Entitle in 2017, I do not believe it is reasonable to calculate a value on the minority equity interest.

33.    However, even if I assume the accuracy of the revised financial projections provided by EDG to the Defendants on June 2, 2017, and I assume that the synergies portrayed in the revised financial projections are realized as of June 9, 2017, the present value of the available cash flow to the minority shareholders, including a terminal value, is $1.172 million on a minority-interest basis. The calculation for this value is set forth on Attachment D.

**B.       Rebuttal Opinions Regarding RPM's Financial Condition Generally and its Liquidity**

34.    Mr. Imburgia states,

> "It is also my opinion that RPM's financial condition generally and its liquidity specifically were highly dependent upon the decisions made by shareholders Robert and Tracey Hirt regarding transactions between them on the one hand and RPM on the other. RPM had regular transactions with its shareholders during 2016 and 2017, which it recorded in an unusual manner and which resulted in millions of

dollars of receivables that the shareholders owed RPM."[14]

35. I offer the following rebuttal opinions:

    a. Mr. Imburgia does not state the accounting basis for his opinion that the transactions were recorded in an "unusual manner." Each of the transactions Mr. Imburgia describes were recorded in the accounting books and records of RPM/LendUS, were subject to the audit procedures of the independent accounting firm and were reported and described in the notes to the audited financial statements of RPM/LendUS.

    b. Mr. Imburgia states that "The general ledger of RPM reflects a write-off of $9,119,915 of receivables recorded on or around October 31, 2017."[15] The receivable of $9,119,915 was not subject to "write-off" as that accounting term is used when a receivable is not collectible. The underlying journal entry does not indicate that the receivable was subject to write-off. Nor does Ms. Noack say the receivable was subject to write-off. Rather as described in the footnotes to the audited financial statement of LendUS, the receivable was settled through the transfer of TRH Holdings LLC to LendUS. In addition to satisfying the amount of the receivable, the transfer resulted in an additional equity contribution.[16]

36. Mr. Imburgia states "It is also my opinion that RPM's declining liquidity in 2017 significantly lessened its ability to acquire Entitle on the terms set forth in the parties' merger agreement."[17] I offer the following rebuttal opinions:

    a. Article IV, Section 4.7 of the Merger Agreement provides that "RPM has available on the date hereof and Parent will have available on the Closing Date funds on hand sufficient to pay the Closing Cash Merger Consideration and each of them will be able to pay or otherwise perform their respective obligations under this Agreement."[18]

    b. RPM's consolidated cash balance on the date of the Merger Agreement, February 16, 2017, was approximately $27.9 million. As such, RPM's cash balance is in

---

[14] Updated Expert Report and Disclosure of Basil Imburgia, January 28, 2021, 4 [JX-221].
[15] Updated Expert Report and Disclosure of Basil Imburgia, January 28, 2021, 25 [JX-221].
[16] JX-159, at LENDUS_00015361-404, page 20.
[17] Updated Expert Report and Disclosure of Basil Imburgia, January 28, 2021, 4 [JX-221].
[18] JX-57, ENT00014084-14453, at ENT00014133.

compliance with the Representations and Warranties of RPM, Parent and Merger Sub as provided for in Article IV of the Merger Agreement as of February 16, 2017.

c.   Mr. Imburgia does not state that RPM or its parent is in violation of Article IV, Section 4.7 of the Merger Agreement or that RPM's liquidity precluded its ability to acquire Entitle on the terms set forth in the Merger Agreement. Mr. Imburgia's own report states that "the cash balances of RPM, REG, MFI and AEM as of May 31, 2017, totaled $18.8 million" including $2.375 million in restricted cash[19]. The net unrestricted cash balance amount, from Mr. Imburgia's calculation, of $16.425 million is in compliance with the Representations and Warranties of RPM, Parent and Merger Sub as provided for in Article IV of the Merger Agreement.

**C.    Opinions Regarding EDG's and Entitle's Deteriorating Financial Performance**

37.   In my opinion, EDG's and Entitle's losses in the first and second quarter of 2017 were significantly greater than the comparable period in the first and second quarter of 2016.

38.   Entitle's net operating loss was $1.4 million and $1.9 million in the first six months of 2016 and 2017, respectively. That represents a comparable period increase in the net operating loss of 42.3% in the first six months of 2017 over 2016. Entitle's net operating loss was $796,000 and $1.0 million in the first three months of 2016 and 2017, respectively. That represents a comparable period increase in the net operating loss of 28.5% for the first three months of 2017 over 2016.

39.   The deterioration in the financial condition of Entitle that began in the first three months of 2017 over the comparable period in 2016 ($796,000 - $1,023,000 = $227,000 increase in net operating loss) accelerated in April, May, and June of 2017 over the comparable period in 2016 ($572,000 - $918,000 = $346,000 increase in net operating loss). This represents a $119,000, or 52%, increase in net operating loss in April, May and June of 2017.

40.   As of March 31, 2017, Entitle was in violation of Ohio's Hazardous Financial Conditions Standards for the previous 12 months, 9 months, and 6 months. As such, the ODI's Office

---

[19] Updated Expert Report and Disclosure of Basil Imburgia, January 28, 2021, 21 [JX-221].

of Risk Assessment communicated to Entitle on May 24, 2017[20] that equity contributions would be required. The full extent of these required equity contributions became known on June 28, 2017 and amounted to $5.5 million.[21]

41.   The increased losses of Entitle in 2017 over 2016 had a significant impact on the financial projections.

42.   A list of the documents I reviewed and relied on to reach my opinions is presented in Attachment A to the Affidavit.

**Timeline of Events**

43.   The Key dates and events I considered in my analysis and opinions include, but are not limited to, the following:

   a.   May 31, 2016: Entitle and RPM executed a Letter of Intent ("LOI");[22]

   b.   September 30, 2016: LOI is updated and replaced;[23]

   c.   February 16, 2017: The parties enter into the Merger Agreement, with a goal closing date by May 31, 2017;[24]

   d.   March 9, 2017: Form A application filed with the Ohio Department of Insurance ("ODI") Form A Review Group;[25]

   e.   March 20, 2017: Entitle sends RPM financial projections through 2019;[26]

   f.   May 1, 2017: Entitle files its Quarterly Statement as of and for the period ending March 31, 2017 with ODI's Office of Risk Assessment;[27]

   g.   May 24, 2017: ODI's Office of Risk Assessment sends information to Entitle informing them of the potential need for additional capital;[28]

---

[20] JX-316, at ENT00098430-31. Email from Jennifer Turner, Ohio Department of Insurance, to Maryse Jean-Pierre and Steve Palmer, Entitle, dated May 24, 2017.
[21] JX-324, at PR00028639-41. Email from Jennifer Turner, Ohio Department of Insurance, to Maryse Jean-Pierre and Steve Palmer, Entitle, dated June 28, 2017.
[22] JX-13, at ENT00112459-112465.
[23] JX-26, atLENDUS_00023780-87.
[24] JX-57, at ENT00014084-14453.
[25] JX-354, at SPB00001341-1358.
[26] JX-63, at MB000968-970.
[27] JX-76, at ENT00088166.
[28] JX-199, at ENT00098430-31.

h.  May 25, 2017: RPM reviewed the "Draft Consideration Spreadsheet" which showed pre-closing losses of $2,355,674, and a projection of over $4,000,000 for the entire year, which was well in excess of the $800,000 that had been projected in the Form A application;[29]

i.  May 30, 2017: Rob Hirt emailed Lee Iannarone asking for additional financial information from Entitle;[30]

j.  June 1, 2017: Rob Hirt emailed Lee Iannarone setting out his concerns regarding the accuracy of the Form A submission and the potential for resubmitting the Form A to account for the losses that Entitle had already sustained in 2017 that were far in excess of what was anticipated;[31]

k.  June 2, 2017: ODI's Form A Review Group approved the Form A application;[32]

l.  June 2, 2017: Entitle sends RPM revised financial projections through 2019, "EIC Projections June 2017";[33]

m.  June 9, 2017: Closing did not occur;[34]

n.  June 28, 2017: ODI's Office of Risk Assessment confirms the need for an additional $5.5 million capital contribution into Entitle, say's more may be necessary based on its review of the Q2 2017 financials;[35]

o.  June 29, 2017: Entitle terminates the Merger Agreement.[36]

A.   **Financial Condition of Entitle Direct Group, Inc. and Entitle Insurance Company**

44.  EDG's and Entitle's financial condition declined from 2015 to 2016 and from 2016 to 2017. The financial condition decline accelerated in 2017. My analysis of EDG's and Entitle's financial condition has been summarized in Tables 1, 2, 3, and 4 below. A more

---

[29] JX-440, at BC_004604.
[30] JX-399, at LENDUS_00000999.
[31] JX-337, at ENT00096157.
[32] JX-105, at SPB00001919-22.
[33] JX-107, at ENT00097792.
[34] First Amended Complaint, pages 19-20.
[35] JX-189, at PR00028639-41.
[36] JX-208, at LENDUS_00023865.

complete analysis of EDG's and Entitle's financial condition can be found in Attachment E-1 and E-2 to my Affidavit.

**45.** As can be seen in Table 1, EDG's net operating income (loss) was $139,747, ($2,673,588), and ($5,446,429) for the years ended December 31, 2015, 2016 and 2017, respectively.

**Table 1**

**Entitle Direct Group Financial Data**

| For the Year Ended December 31st | 2015 | 2016 | 2017 |
|---|---|---|---|
| Revenues | $17,553,054 | $15,569,599 | $11,588,110 |
| *% Year Over Year Decline* | | *(11.3%)* | *(25.6%)* |
| Operating Expenses | 17,413,307 | 18,243,187 | 17,034,539 |
| Net Operating Income (Loss) | $139,747 | ($2,673,588) | ($5,446,429) |
| *% Year Over Year Decline* | | *(2013.2%)* | *(103.7%)* |

**46.** EDG's revenues declined from $17.6 million in 2015 to $15.6 million in 2016 or 11.3%. The revenues further declined from $15.6 million in 2016 to $11.6 million in 2017 or 25.6%. EDG's net operating income of $140,000 in 2015 declined to a net operating loss of $2.7 million in 2016. In 2017 there was a significant (over 100%) increase in the net operating loss over 2016 resulting in a net operating loss for 2017 of $5.4 million. EDG's equity position was $9.7 million on December 31, 2016 and decreased $5.8 million to $3.9 million on December 31, 2017.

**47.** As can be seen below in Table 2, EDG's net operating loss was $1.5 million and $2.5 million in the first six months of 2016 and 2017, respectively. That represents comparable period increase in the net operating loss of 67.3% in the first six months of 2017 over 2016. EDG's net operating loss was $883,000 and $1.3 million in the first three months of 2016 and 2017, respectively. That represents a comparable period increase in the net operating loss of 50.8% for the first three months of 2017 over 2016. The deterioration in the financial condition of EDG that began in the first three months of 2017 over the

comparable period in 2016 ($883,000 - $1,332,000 = $449,000) accelerated in April, May, and June of 2017 over the comparable period in 2016 ($621,000 - $1,185,000 = $564,000).

48.

**Table 2**

**Entitle Direct Group 3 Months and 6 Months Financial Data**

| For the Three and Six Month Periods Ended | March 31, 2016 | March 31, 2017 | June 30, 2016 | June 30, 2017 |
|---|---|---|---|---|
| Revenues | $3,226,310 | $2,330,959 | $ 7,200,888 | $5,341,071 |
| *% Year Over Year Decline* | | *(27.8%)* | | *(25.8%)* |
| Operating Expenses | 4,109,284 | 3,662,533 | 8,704,992 | 7,857,674 |
| Net Operating Income (Loss) | ($ 882,974) | ($1,331,574) | ($1,504,104) | ($2,516,603) |
| *% Year Over Year Decline* | | *(50.8%)* | | *(67.3%)* |

49. Entitle's financial condition had been declining for several years. The decline accelerated in 2017. As can be seen below in Table 3, Entitle's net loss was $312,000, $2,343,000, and $4,241,000 for the years ended December 31, 2015, 2016 and 2017, respectively.

50.

**Table 3**

**Entitle Insurance Company Yearly Financial Data Filed with ODI's Office of Risk Assessment**

| For the Year Ended December 31 | 2015 | 2016 | 2017 |
|---|---|---|---|
| Operating Income | $17,093,716 | $15,309,569 | $11,544,788 |
| *% Year Over Year Decline* | | *(10.4%)* | *(24.6%)* |
| Expenses | 17,405,828 | 17,652,472 | 15,785,270 |
| Net Operating Income (Loss) | $    312,112 | $ 2,342,903 | $ 4,240,482 |
| *% Year Over Year Decline* | | *(650.7%)* | *(81.0%)* |

51. Entitle's revenues declined from $17.1 million in 2015 to $15.3 million in 2016 or 10.4%. The revenues further declined from $15.3 million in 2016 to $11.5 million in 2017 or 24.6%. The decline in Entitle's revenues in 2017 versus 2016 ($3,765,000) was significantly greater than the decline in Entitle's revenues from 2016 versus 2015 ($1,784,000). EDG's net operating loss of $312,000 in 2015 declined to a net operating loss of $2.3 million in 2016. There was a significant (81%) increase in the net operating loss in 2017 over 2016 resulting in a net operating loss for 2017 of $4.2 million. Entitle's capital and surplus position was $8.5 million on December 31, 2016, and decreased $3.1 million to $5.4 million on December 31, 2017. This decline would have been greater had EDG not contributed an additional $1,000,000 in capital.

52. As can be seen below in Table 4, Entitle's net operating loss was $1.4 million and $1.9 million in the first six months of 2016 and 2017, respectively. That represents comparable period increase in the net operating loss of 42.3% in the first six months of 2017 over 2016. Entitle's net operating loss was $796,000 and $1.0 million in the first three months of 2016 and 2017, respectively. That represents a comparable period increase in the net operating loss of 28.5% for the first three months of 2017 over 2016. The deterioration in the financial condition of Entitle that began in the first three months of 2017 over the comparable period in 2016 ($796,000 - $1,023,000 = $227,000 increase in net operating loss) accelerated in April, May, and June of 2017 over the comparable period in 2016 ($572,000 - $918,000 = $346,000 increase in net operating loss).

**Table 4**

**Entitle Insurance Company 3 Months and 6 Months Financial Data Filed with ODI's Office of Risk Assessment**

| For the Three and Six Month Periods Ended | For the 3 Months Ended | | For the 6 Months Ended | |
|---|---|---|---|---|
| | **March 31, 2016** | **March 31, 2017** | **June 30, 2016** | **June 30, 2017** |
| Revenues | $3,187,307 | $2,352,937 | $7,089,478 | $5,346,413 |
| *% Year Over Year Decline* | | *(26.2%)* | | *(24.6%)* |
| Operating Expenses | 3,983,133 | 3,375,788 | 8,461,101 | 7,298,132 |
| Net Operating Income (Loss) | ($795,826) | ($1,022,851) | ($1,371,623) | ($1,937,645) |
| *% Year Over Year Decline* | | *(28.5%)* | | *(42.3%)* |

53. As of March 31, 2017, Entitle was in violation of Ohio's Hazardous Financial Conditions Standards for the previous 12 months, 9 months, and 6 months. As such, the ODI's Office of Risk Assessment communicated to Entitle on May 24, 2017[37] that equity contributions would be required. The full extent of these required equity contributions became known on June 28, 2017 and amounted to $5.5 million.[38]

54. Ms. Noack, in her deposition, expressed concern over the deterioration in Entitle's financial position and its impact on any decision that ODI's Office of Risk Assessment might make regarding additional capital contributions to Entitle. For example:

   a. Page 52 "Okay, so, for example, once we learned that Entitle and the Ohio Commissioners have been discussing financials, Entitle financial situation, and I had also learned that some of the communications were around the financial results of Entitle, and –and the determined or the—the deterioration of Entitle's financial

---

[37] JX-316, at ENT00098430-31. Email from Jennifer Turner, Ohio Department of Insurance, to Maryse Jean-Pierre and Steve Palmer, Entitle, dated May 24, 2017.

[38] JX-324, at PR00028639-41. Email from Jennifer Turner, Ohio Department of Insurance, to Maryse Jean-Pierre and Steve Palmer, Entitle, dated June 28, 2017.

position that the Ohio Commissioner was—was looking for additional capital improvement due to the deterioration of Entitle financials."[39]

55. Mr. Hirt expressed concerns over the deterioration in Entitle's financial position and its impact on any decision that ODI's Office of Risk Assessment might make regarding additional capital contributions to Entitle. For example:

  a. "The financials and the ability to talk to the ODI. And I think their financial situation was worsening far faster than even they had anticipated. And I think they were probably worried that I was getting nervous about the purchase price based on the numbers being so far off."

**EDG Bridge Notes and Entitle Capital Contributions**

56. EDG reflects a total of $3,425,000 in bridge notes due to PartnerRe and a total of $800,000 in bridge notes due to Palmer ($250,000), Zicklin ($400,000), and Sulam ($150,000) as of December 31, 2017.[40] A total of $1,500,000 in bridge notes were issued in 2016 and the remaining balance of $2,725,000 in bridge notes were issued in 2017. Three of the bridge notes due to PartnerRe bear interest at prime plus 7%. All other bridge notes bear interest at 15.0%. The issuance of these bridge notes coincides in part with capital contributions to Entitle by EDG.

57. In partial satisfaction to meet ODI's Office of Risk Assessment equity contribution requirement detailed in the May and June 2017 emails; an additional capital contribution was made by EDG to Entitle in December 2017 in the amount of $1,000,000.

58. Table 5 summarizes the EDG bridge notes by issue date and the additional capital contributed to Entitle by EDG. As can be seen below in Table 5, the total bridge notes issued by EDG were $4,225,000 and the total capital contributed to Entitle was $3,500,000.

---

[39] Deposition of Ava Noack, p. 52-53.
[40] JX-166, at PR00022494.

**Table 5**

**Summary of Bridge Notes[41] and EDG Capital Contributions to Entitle**

| Payee | Date of Bridge Note | Bridge Note $ | Date Capital Contributed by EDG to Entitle Reflected in Entitle ODI Reports | Capital Contributed by EDG to Entitle $ |
|---|---|---|---|---|
|  |  |  | 12/2015 | $1,000,000 |
| PartnerRe Note 1 | 02/29/2016 | $1,000,000 |  |  |
| PartnerRe Note 2 | 08/12/2016 | 500,000 |  |  |
|  |  |  | 12/2016 | 1,500,000 |
| PartnerRe Note 3 | 02/16/2017 | 1,000,000 |  |  |
| PartnerRe Note 4 | 11/09/2017 | 750,000 |  |  |
| Palmer | 11/09/2017 | 250,000 |  |  |
| Zicklin | 11/15/2017 | 400,000 |  |  |
| Sulam | 11/15/2017 | 150,000 |  |  |
| PartnerRe Note 5 | 12/22/2017 | 175,000 |  |  |
|  |  |  | 12/2017 | 1,000,000 |
| Total |  | $4,225,000 |  | $3,500,000 |

59.   It should be noted that the capital contributions are reflected in Entitle's ODI reports for the years ended December 31, 2015 and 2016 for $1,000,000. However, the cash was contributed in February of 2016 and 2017, respectively.

60.   In my opinion, EDG's and Entitle's losses in the first and second quarter of 2017 were significantly greater than the comparable period in the first and second quarter of 2016. The

---

[41] Ibid.

18

increased losses of Entitle in 2017 over 2016 had a significant impact on the financial projections.

**B.    Analysis of the Entitle Direct Group, Inc. Financial Projections**

61.    The increased losses of EDG and Entitle in early 2017 over corresponding period in 2016 had a significant impact on the post-merger financial projections that were prepared in this matter. There were two financial projections prepared by EDG and provided to RPM in 2017 that appear to be relevant for discussion. These include "EIC Form A Projections for RPM FINAL" which appeared to have been prepared by EDG and provided to RPM on March 20, 2017 and "EIC Projections June 2017" prepared by Mr. Palmer and provided to RPM on June 2, 2017.[42]

62.    Table 6 provides information on the financial projections noted in the preceding paragraph as shown below.

---

[42] JX-63, at MB000971-2 and JX-107, at ENT00097792.

**Table 6**

**Summarized Information From the Financial Projections**

| (thousands of dollars) | March 2017 Projections | June 2017 Revised Projections | Difference | % |
|---|---|---|---|---|
| **2017 - Second Half** | | | | |
| Total Revenues | $    9,640 | $    8,096 | $    (1,544) | (16.0)% |
| Total Operating Expenses | 9,239 | 8,571 | (668) | (7.2)% |
| Underwriting Gain (Loss) | 401 | (476) | (877) | (218.6)% |
| | | | | |
| **2017 - Full Year** | | | | |
| Total Revenues | 16,537 | 13,429 | (3,108) | (18.8)% |
| Total Operating Expenses | 17,565 | 15,923 | (1,642) | (9.3)% |
| Underwriting Gain (Loss) | (1,028) | (2,494) | (1,466) | (142.6)% |
| | | | | |
| **2018 - Full Year** | | | | |
| Total Revenues | 23,800 | 18,025 | (5,775) | (24.3)% |
| Total Operating Expenses | 22,763 | 17,872 | (4,891) | (21.5)% |
| Underwriting Gain (Loss) | 1,037 | 153 | (884) | (85.2)% |
| | | | | |
| **2019 - Full Year** | | | | |
| Total Revenues | 26,542 | 21,568 | (4,973) | (18.7)% |
| Total Operating Expenses | 25,311 | 20,515 | (4,797) | (19.0)% |
| Underwriting Gain (Loss) | 1,230 | 1,053 | (177) | (14.4)% |
| | | | | |
| **Totals 2017 - Second Half to 2019** | | | | |
| Total Revenues | 59,981 | 47,689 | (12,293) | (20.5)% |
| Total Operating Expenses | 57,313 | 46,958 | (10,356) | (18.1)% |
| Underwriting Gain (Loss) | 2,668 | 731 | (1,937) | (72.6)% |

63. The March 2017 financial projections for EDG indicate $60.0 million of revenue from July 1, 2017 through December 31, 2019. The revised financial projections for EDG indicate $47.7 million of revenue from July 1, 2017 through December 31, 2019 a decrease in revenue of 20.5%.

64. The March 2017 financial projections for EDG indicate $2.7 million of underwriting gain from

   July 1, 2017 through December 31, 2019. The revised financial projections for EDG indicate $731,000 of underwriting gain from July 1, 2017 through December 31, 2019, a

decrease in the net operating income of 72.6%. If this amount is distributed to the common shareholders, it represents only $267,000 ($731,000 x 36.52%) available to the minority equity common shareholders.

65.   The revised projections indicate underwriting gain of $1.1 million for the full year ended December 31, 2019. Assuming this amount can be distributed to the shareholders, the amount available for the minority shareholders is $402,000 ($1,100,000 x 36.52%). Based on annual distributions of $402,000 beginning in 2020, it would take over 12 years (2032) on an undiscounted basis to recover Mr. Imburgia's assigned value of $4.9 million ($4.9 million/ $402,000 = 12.2 years). On a discounted basis the period would be much longer.

66.   If the synergies incorporated in the revised financial projections, which were based on increased revenues rather than cost reductions, are not realized to their full potential as assumed by Mr. Imburgia, the distributions in the above paragraphs would be further reduced and the recovery of the minority equity interest value calculated by Mr. Imburgia would take longer and possibly never occur.

67.   There is nothing in the Merger Agreement that stipulates that distributions must be made to the shareholders. There is nothing in the Merger Agreement that would allow the minority shareholders to compel the sale of Entitle after the acquisition by RPM.


C.   **My Rebuttal Analysis of Mr. Imburgia's Opinions on RPM's Cash Position During the Period Leading up to the Expected Merger**

68.   Mr. Imburgia states "It is also my opinion that RPM's declining liquidity in 2017 significantly lessened its ability to acquire Entitle on the terms set forth in the parties' merger agreement."[43]

69.   Additionally, Mr. Imburgia states, "Following the anticipated merger with Entitle for which RPM would have paid approximately $12 million, all of these entities were collectively forecast to have only $4,110,154 of non-restricted cash... is significantly lower than the minimum liquidity requirements included as covenants in agreements between RPM and its lenders in effect at the time."[44]

---

[43] Updated Expert Report and Disclosure of Basil Imburgia, January 28, 2021, 4 [JX-221].
[44] Updated Expert Report and Disclosure of Basil Imburgia, January 28, 2021, 19 [JX-221].

21

**RPM's Consolidated Cash Position**

70.  Article IV, Section 4.7 of the Merger Agreement provides that "RPM has available on the date hereof and Parent will have available on the Closing Date funds on hand sufficient to pay the Closing Cash Merger Consideration and each of them will be able to pay or otherwise perform their respective obligations under this Agreement."[45]

71.  The caption title of section VII(A) of Mr. Imburgia's report states, "Over the first five months of 2017, RPM's available (non-restricted) cash on hand decreased from $17.5 million to only
$3.0 million, significantly impacting its ability to close the merger with Entitle on the terms set forth in the Merger Agreement."[46]

72.  Mr. Imburgia appears to be implying in the caption title of his report section VII(A) that cash on-hand at RPM Mortgage, Inc., as a stand-alone entity, is the only cash that should be considered as available for the purchase of Entitle, and not including that of RPM's consolidated subsidiaries. The caption title is <u>misleading</u> because Mr. Imburgia ignores the cash held at RPM's subsidiaries.

73.  As Mr. Imburgia was well aware at the time of issuance of his report, and even acknowledges such in his report[47], the consolidated financial statements of RPM/LendUS consisted of more than only the RPM Mortgage, Inc., stand-alone entity. As detailed above in my report section IV(A) – RPM / LendUS Mortgage's Operations and Background, RPM Mortgage, Inc., LendUS, LendUSA, AEM, MFI, Regency and MM-Air, were all consolidated into the RPM/LendUS financials as of
December 31, 2016, and after, and the cash available to these entities would all be available for the purchase of Entitle. I refer in this affidavit to the combined cash balances of all these entities as "consolidated cash balance."

74.  I reviewed and analyzed general ledger details produced by the Defendants, which provides cash and cash equivalents journal entry activity and derived balances, for RPM (stand-alone entity), LendUS (stand-alone entity), AEM, and MFI, from December 31, 2016 to

---

[45] JX-57, at ENT00014084-14133.
[46] Updated Expert Report and Disclosure of Basil Imburgia, January 28, 2021, 17 [JX-221].
[47] Updated Expert Report and Disclosure of Basil Imburgia, January 28, 2021, 19, paragraph 54 [JX-221].

October 31, 2017.[48,49,50] Chart 1 below provides the consolidated cash and cash equivalents that would have been available to RPM at various dates between the Merger Agreement and June 30, 2017. The blue line represents the Estimated Cash Purchase Price, $12,021,768, required for RPM to have available at the date of the intended merger.



75. As shown in Chart 1, RPM had sufficient available cash to purchase Entitle at all times between the Merger Agreement date of February 16, 2017, through June 30, 2017, including at the intended merger date of May 31, 2017, and the scheduled merger date of June 9, 2017.

76. RPM's consolidated cash balance on the date of the Merger Agreement, February 16, 2017, was approximately $27.9 million. As such, RPM's cash balance is in compliance with the

---

[48] JX-155, at LENDUS_00046126 (RPM); JX-156, at LENDUS_00053390 (LendUS); JX-216, at LENDUS_00053544-56078 (AEM); JX-40, at LENDUS_00053543 (MFI).
[49] Excludes general ledger accounts for restricted cash.
[50] My understanding is that cash may have also been available from Regency and MM-Air prior to merger into LendUS; however, the general ledger detail was not provided, and thus I have conservatively excluded any potential cash balances held at these two subsidiaries from my analysis.

Representations and Warranties of RPM, Parent and Merger Sub as provided for in Article IV of the Merger Agreement.

77.   Mr. Imburgia does not state that RPM or its parent is in violation of Article IV, Section 4.7 of the Merger Agreement or that RPM's liquidity precluded its ability to acquire Entitle on the terms set forth in the Merger Agreement. Mr. Imburgia's own report states that "the cash balances of RPM, REG, MFI and AEM as of May 31, 2017, totaled $18.8 million" including $2.375 million in restricted cash.[51] The net unrestricted cash balance amount, from Mr. Imburgia's calculation, of $16.425 million is also in compliance with the Representations and Warranties of RPM, Parent and Merger Sub as provided for in Article IV of the Merger Agreement.

78.   Mr. Imburgia's own admission that RPM had sufficient cash available for the purchase of Entitle, and the cash analysis provided in Chart 1, are contrary to Mr. Imburgia's opinion that "declining liquidity in 2017 significantly lessened its ability to acquire Entitle on the terms set forth in the parties' merger agreement." In actuality, RPM had the consolidated cash balance available to acquire Entitle on the terms set forth in the parties' Merger Agreement.

**RPM's Ability to Comply with Loan Covenants**

79.   Aside from Mr. Imburgia's misleading section VII(A) caption title, it appears that Mr. Imburgia's main point about "declining liquidity in 2017 significantly lessened its ability to acquire Entitle" is his concern that in the event that RPM did pay the $12.0 million Cash Merger Consideration, that RPM would potentially have failed to meet loan covenant requirements.

80.   Mr. Imburgia points out two loan agreements with minimum liquidity requirements: "Some of the agreements (such as RPM's agreement with Waterfall) include a minimum liquidity requirement of $7,500,000, while others (like RPM's lending agreement with Everbank) include a minimum liquidity requirement of $10,000,000."[52]

---

[51] Updated Expert Report and Disclosure of Basil Imburgia, January 28, 2021, 21 [JX-221].
[52] *See*, *e.g.*, JX-3, LENDUS_00026518-6626 at 6548 and JX-161, LENDUS_00056373-6396 at 6380.

a. Mr. Imburgia acknowledges that the loan covenants are only required to be complied with at the end of each quarter, by stating, "Under these agreements, RPM is required to provide financial statements to the lender at least quarterly demonstrating its compliance with all covenants. As the merger with Entitle was expected to close in June 2017, **RPM was required to certify its compliance with all loan covenants by the end of that month** and second calendar quarter."[53] [emphasis added]

81. RPM/LendUS has, in the past, not met loan covenant requirements; however, RPM/LendUS have been able to obtain a waiver from its lenders. This is evidenced in the Audited Financial Statements of RPM/LendUS for December 31, 2015, 2016 and 2017, each of which is noted by the independent external auditors as "the Company failed to meet certain financial covenants… As a result, a financial covenant waiver was issued…"

82. Ms. Noack stated in her deposition, "if we would have been short, then the shareholders would immediately have to step in, just like what they always do and would have bring in more -- more capital."[54]

83. Based on the aforementioned points, my opinion is that the risk of failing to meet financial covenant requirements would not have been a factor as an RPM liquidity concern.


**D.   My Rebuttal Analysis of Mr. Imburgia's Opinions on RPM/LendUS Transactions with Shareholders**

84. Mr. Imburgia states "It is also my opinion that RPM's financial condition generally and its liquidity specifically were highly dependent upon the decisions made by shareholders Robert and Tracey Hirt regarding transactions between them on the one hand and RPM on the other. RPM had regular transactions with its shareholders during 2016 and 2017, which it **recorded in an unusual manner** and which resulted in millions of dollars of receivables that the shareholders owed RPM [emphasis added]."[55]

85. Mr. Imburgia does not state the accounting basis for his opinion that the transactions were recorded in an "unusual manner." Each of the transactions Mr. Imburgia describes were

---

[53] Updated Expert Report and Disclosure of Basil Imburgia, January 28, 2021, 19 [JX-221].
[54] Deposition transcript of Ava Noack, July 18, 2019, 306.
[55] Updated Expert Report and Disclosure of Basil Imburgia, January 28, 2021, 4 [JX-221].

recorded in the accounting books and records of RPM/LendUS, were subject to the audit procedures of the independent accounting firm and the effects of those transactions were reported and described in the notes to the audited financial statements of RPM/LendUS.

86. Mr. Imburgia fails to provide any basis or facts as to why the receivables owed by the Hirts' to RPM/LendUS were concerning, especially since he had evidence to consider showing that the Hirts settled their debt, in entirety, to LendUS.

87. I have prepared Attachment F, which provides a detail of 'Other Receivables' journal entry activity associated with receivables due from the Hirts', from December 31, 2015 to October 31, 2017.[56] In summary, I observed the following from the analysis performed in creating Attachment F:

   a. 30 individual transactions creating an increase or decrease to the 'Other Receivables' balance due from the Hirts' to RPM/LendUS;

   b. $17,502,745 in increases to 'Other Receivables';

   c. $19,011,915 in decreases to 'Other Receivables';

   d. Net balance in 'Other Receivables' due from the Hirts', as of October 31, 2017, had a credit balance of $1,509,170. This infers there is a remaining balance due from LendUS to the Hirts'; and

   e. $4,850,000 of debits to Other Receivables that had offsetting credits to Additional Paid in Capital (an equity account).

**Credits to Additional Paid in Capital**

88. Regarding the journal entries that resulted in an offset to Additional Paid in Capital, Mr. Imburgia states, "To record each of these transactions, RPM debited its Other Receivables account, which increased assets, and **credited its Additional Paid capital account**, which increased equity. RPM's general ledger does not reflect any cash payments to or from RPM

---

[56] For the period of December 31, 2015 to December 31, 2016, I was provided only with the 'Other Receivables' journal entry lines from the general ledger (not the full general ledger incorporating the offsetting journal entry lines of the 'Other Receivables' entries). For the period of January 1, 2017 to October 31, 2017, I was provided with full general ledger journal entry data, incorporating both sides of each journal entry, including those of 'Other Receivables'.

in connection with these transactions and as such, **the recording and timing of these transactions in this manner is unusual** [emphasis added]."[57]

a. In addition to Mr. Imburgia's failure to acknowledge LendUS's independent external auditor's acceptance of such journal entries, Mr. Imburgia also failed to point out in his report that **Entitle also posted journal entries with this exact debit and credit combination**. This is evidenced in the Audited Statutory Financial Statements of Entitle Insurance Company for December 31, 2015 and <u>again</u> for December 31, 2016, stating:

   i. Audited Financial Statements for December 31, 2015, "The Company **recorded a note receivable** of $1,000,000 as of December 31, 2015, which was approved by the ODI, **as a result of a capital contribution** from EDG satisfied in cash during February 2016 [emphasis added]."[58]

   ii. Audited Financial Statements for December 31, 2016, "The Company **recorded a note receivable** of $1,000,000 as of December 31, 2016, which was approved by the ODI, **as a result of a capital contribution** from EDG satisfied in cash during February 2017 [emphasis added]."[59]

b. Mr. Imburgia is alone in the idea that transactions of such a nature are unusual and has thus painted a completely inaccurate and misleading picture that RPM/LendUS have unusual accounting practices. The following parties involved in this Matter have all considered transactions of this nature to be an appropriate accounting practice:

   i. Entitle's accounting department;

   ii. Entitle's fiscal year 2015 independent external auditors, Cohen & Company;

   iii. Entitle's fiscal year 2016 independent external auditors, CliftonLarsonAllen LLP;

   iv. RPM/LendUS's accounting department;

   v. LendUS's independent external auditors, Moss Adams LLP; and

   vi. The Ohio Department of Insurance.

---

[57] Updated Expert Report and Disclosure of Basil Imburgia, January 28, 2021, 26 [JX-221].
[58] JX-448, ENT00077456-86, at 77481.
[59] JX-131,  LENDUS_00007497-7540, at 7522.

27

**Other Receivables Balances Owed by the Hirts**

89.  Mr. Imburgia makes several statements in his report alluding to the lack of timely
     promissory notes between the Hirts to RPM/LendUS to be abnormal. For instance, Mr.
     Imburgia makes the following statements:

     a.  "no promissory note was executed between RPM and the Hirts [for the 2016
         transactions] until the note dated December 31, 2016…"[60]

     b.  "no promissory notes have been produced in this matter to support these receivables
         [from the transactions crediting Additional Paid in Capital] or the Hirts' promise to
         repay the net outstanding principal amount with interest."[61]

     c.  "no promissory note has been produced in this matter to support this [January 5,
         2017, $4,025,000, crediting Cash] transaction or the Hirts' promise to repay the
         outstanding principal amount with interest."[62]

90.  As Mr. Imburgia points out in his report, "On or around December 31, 2016, Robert Hirt
     executed a promissory note in which he promised to pay RPM '…the principal sum of
     $3,056,744.89, together with interest on unpaid principal at the rate of five percent (5%)
     per annum' from the date of the promissory note."[63] This amount corresponds to the
     December 16, 2016, Hirts-related Other Receivables remaining balance shown on my
     Attachment F. All receivables owed by the Hirts to RPM were accounted for by this
     promissory note as of December 31, 2016. As noted in Attachment F, there was no
     remaining balance owed by the Hirts as of October 31, 2017.

**The Hirts' Transfer of TRH Holdings**

91.  Mr. Imburgia states that "The general ledger of RPM reflects a write-off of $9,119,915 of
     receivables recorded on or around October 31, 2017."[64] The receivable of $9,119,915 was

---

[60] Updated Expert Report and Disclosure of Basil Imburgia, January 28, 2021, 24 [JX-221].
[61] Updated Expert Report and Disclosure of Basil Imburgia, January 28, 2021, 26 [JX-221].
[62] Updated Expert Report and Disclosure of Basil Imburgia, January 28, 2021, 27 [JX-221].
[63] Updated Expert Report and Disclosure of Basil Imburgia, January 28, 2021, 24 [JX-221].
[64] Updated Expert Report and Disclosure of Basil Imburgia, January 28, 2021, 25 [JX-221].

not subject to "write-off" as that accounting term is used when a receivable is not collectible. The underlying journal entry does not indicate that the receivable was subject to write-off. Nor does Ms. Noack say the receivable was subject to write-off. Rather as described in the footnotes to the audited financial statement of LendUS, the receivable was settled through the transfer of TRH Holdings to LendUS. In addition to satisfying the amount of the receivable the transfer resulted in an additional equity contribution.[65]

92.   The Audited Financial Statements of LendUS for December 31, 2017, states "In connection with this [TRH Holdings] transfer, the Company settled its outstanding receivables due [from] owners in the amount of $8,687,464. The aforementioned transactions between controlled affiliates were reflected as contributed capital transactions of $1,863,221 in the consolidated statement of members' equity as of and for the year ended December 31, 2017."[66]

93.   Further, the LendUS general ledger journal entry associated with this transaction did not reflect an increase to a bad debt expense as would be expected from a write-off, but rather provided an increase to assets of $10,550,685 ('Investment in Partner') and an increase to equity of $1,438,770 ('Additional Paid in Capital').[67]

94.   I noted that there is a difference in amounts between the Audited Financial Statements of LendUS for December 31, 2017, and the provided journal entry activity made available through October 31, 2017. There is a difference of $432,451 for both 'Other Receivables' and 'Additional Paid in Capital' between the financial statements and journal entries[68]. This difference could be related to activity after October 31, 2017, which I do not have. The difference does not impact the opinions I make in this matter.

---

[65] JX-159, at LENDUS_00015361-404, page 20.
[66] Ibid.
[67] JX-156, at LENDUS_00053390, Journal Entry ID 'JE-010170', dated October 31, 2017.
[68] Audited financial statements show Other Receivables as $432,451 less and Additional Paid in Capital as $432,451 more as compared to the journal entry on October 31, 2017.

E.   **Damages Calculation**

**Opinions Regarding the Cash Sales Price**

95.   Mr. Imburgia inappropriately compares the cash sales price between the Merger Agreement
and the subsequent sale to Radian. The following table is an analysis of the comparison of
the cash sales price as prepared by Mr. Imburgia.[69],[70]

| | RPM | Radian | Difference |
|---|---|---|---|
| **Base Price** | $13,125,000 | $ 7,310,573 | $5,814,427 |
| **Cash Purchase Price Adjustment Amount** | (1,103,232) | - | (1,103,232) |
| **Estimated Cash Purchase Price** | 12,021,768 | 7,310,573 | 4,711,195 |
| | | | |
| **Indemnification Escrow** | (1,000,000) | 33,237 | (1,033,237) |
| | 11,021,768 | 7,343,810 | 3,677,958 |
| | | | |
| **Indebtedness - Related Party** | (1,971,384) | (5,207,694) | 3,236,310 |
| *Bridge Notes PartnerRe (Principal)* | *(1,500,000)* | *(3,425,000)* | *1,925,000* |
| *Bridge Notes - Zicklin (Principal)* | *-* | *(400,000)* | *400,000* |
| *Bridge Notes - Sulam (Principal)* | *-* | *(150,000)* | *150,000* |
| *Bridge Note - Palmer (Principal)* | *-* | *(250,000)* | *250,000* |
| *Accrued Interest on Bridge Notes* | *(213,556)* | *(522,441)* | *308,885* |
| *Minimum Repayment on Bridge Notes* | *-* | *(77,823)* | *77,823* |
| *Partner Re Board Fees* | *(257,828)* | *(292,448)* | *34,620* |
| *Broken Deal Legal Costs* | *-* | *(89,982)* | *89,982* |
| **Transaction Expenses** | (1,086,915) | (272,753) | (814,162) |
| *Estimated Legal Costs* | *(510,006)* | *(272,753)* | *(237,253)* |
| *Employee Transaction Bonus* | *(576,909)* | *-* | *(576,909)* |
| **Stockholder Representative Expense - Related Part** | (250,000) | (100,000) | (150,000) |
| **Sub-total** | (4,308,299) | (5,547,210) | 1,238,911 |
| | | | |
| **Cash Consideration** | $  7,713,469 | $ 1,763,363 | $5,950,106 |

96.   Mr. Imburgia inappropriately reduces the cash sales price in the sale to Radian by the
increased amounts of related-party debt and related-party payables. After the Plaintiff
cancelled the Merger Agreement, PartnerRe, EDG Shareholders and other related-parties
provided additional cash to EDG in exchange for bridge notes. A substantial portion of

---

[69] Attachment C.
[70] All of Mr. Imburgia's input into his analysis of the cash sales price between RPM and Radian
come directly from the Plaintiff. See JX-166, at PR00022494.

these bridge notes were used to make an additional $1,000,000 capital contribution to Entitle in the period after the merger. By providing the cash in the form of debt rather than an equity contribution, Plaintiff has artificially increased the alleged damages.

97. The increase in debt after the Merger Agreement was $1,725,000. This represents additional bridge notes from PartnerRe of $925,000, from Zicklin $400,000, from Sulam $150,000, and from Palmer $250,000. These bridge notes represent financing after the termination of the Merger Agreement and should not be included in the reduction of the cash provided in the sale to Radian. Mr. Imburgia does not identify this issue in his report.[71]

98. In addition to treating the additional cash contributions as debt, instead of equity, the bridge notes issued after the termination of the Merger Agreement bore interest at 15.0%, compared to an interest rate for the bridge notes prior to the Merger Agreement of 10.5% to 10.75%. The accrued interest amount on the bridge notes increased to $308,885 from $213,556 at the date of the Merger Agreement, to $522,441 at the date of Radian sale. By increasing the interest rate on the additional bridge notes, the Plaintiff has artificially increased the alleged damages. The additional interest after the termination of the Merger Agreement should not be included in the reduction of cash from the sale to Radian. Mr. Imburgia does not identify this issue in his report.[72]

99. In addition to the accrued interest at 15.0%, the bridge notes issued after the Merger Agreement include minimum payments of $77,823.[73] By adding these minimum payments to the bridge notes issued after the Merger Agreement, the Plaintiff has artificially increased the alleged damages. These minimum payments on the bridge notes should not be included in the reduction of cash from the sale to Radian. Mr. Imburgia does not identify this issue in his report.

---

[71] Ibid.
[72] Ibid.
[73] Ibid.

100. The following is a summary of the comparative cash sales price between the Merger Agreement and the sale agreement with Radian.[74] My calculation of the damages associated with the cash sales price is $3,714,000.

| Damage Calculation (Based on Cash Sales Price) | RPM | Radian | Difference |
|---|---|---|---|
| Estimated Cash Sales Price | $12,022,000 | $7,311,000 | $4,711,000 |
| Indemnification Escrow | (1,000,000) | 33,000 | (1,033,000) |
| Bridge Note Paid - Not Converted to Equity | - | (1,000,000) | 1,000,000 |
| Employee Transaction Bonus | (577,000) | - | (577,000) |
| Legal Costs | (510,000) | (273,000) | (237,000) |
| Shareholder Representative Expense | (250,000) | (100,000) | (150,000) |
| **Damage Calculation** | **$9,685,000** | **$5,971,000** | **$3,714,000** |

## Opinion Regarding the Minority Interest Equity Value

101. Mr. Imburgia calculates the value of the Minority Equity Interest to be $4,939,180. In my opinion, Mr. Imburgia's opinion on this point is flawed because he fails to consider all relevant information available prior to the planned Merger.

102. Due to (1) the uncertainties around the deterioration in the financial condition of EDG and Entitle, (2) the uncertainties on whether the synergies from the Merger Agreement would create profitable operations, and (3) the uncertainties on what actions ODI's Office of Risk Assessment might take given the deterioration in the financial condition of Entitle; I do not believe a valuation of the Minority Interest Equity can meet the "Reasonable Certainty" threshold[75].

---

[74] Attachment C.

[75] Forensic & Valuation Services Practice Aid, Attaining Reasonable Certainty in Economic Damages Calculations, 2018.

103. Even if I make favorable assumptions with respect to each of these uncertainties, a cash flow analysis--utilizing the revised financial projections provided by EDG to the Defendants on June 2, 2017--demonstrates that the value of minority equity interest is at most $1.172 million.

104. The following information is relevant to my valuation of the minority equity ownership in EDG resulting from the Merger Agreement:

   a. Business Name: Entitle Direct Group, Inc. (which is parent company for Entitle Insurance Company)

   b. Proposed Transaction: Agreement and Plan of Merger by and among RPM Mortgage, Inc. ("RPM"); Entitle Direct Holdco, Inc. ("Parent"); Entitle Direct Merger Sub, Inc. ("Merger Sub"); Entitle Direct Group, Inc. (the "Company"); Partner Reinsurance Company Ltd. (the "Stockholder Representative") dated as of February 16, 2017. At closing, RPM agreed to pay cash consideration of $13.12 million (as adjusted) for 66.67% equity interest in Entitle Direct Group. Right after closing $1,000,000 of debt was to be converted into equity resulting in a 36.52% equity interest to stockholders of Entitle Direct Group, Inc.

   c. Ownership Interest: 36.52% Planned Equity Interest in Entitle Direct Group, Inc.

   d. SIC Code #: 6361-Title Insurance

   e. Valuation Date: June 9, 2017

   f. Standard of Value: Fair Market Value[76]

   g. Methodology: Discounted Future Cash Flow Method

   h. Premise of Value: Going Concern

   i. Level of Value: Non-Controlling, Non-Marketable

105. I have concluded that the fair market value of a 36.52% planned minority equity interest in Entitle Direct Group, Inc. to be approximately $1.172 million on a non-controlling, non-

---

[76] Fair market value is defined as the price, expressed in terms of cash equivalents, at which property would change hands between a hypothetical willing and able buyer and a hypothetical willing and able seller, acting at arms length in an open and unrestricted market, when neither is under compulsion to buy or sell and when both have reasonable knowledge of the relevant facts. [SSVS1, Appendix B.]

marketable basis assuming that the synergies portrayed in the revised financial projections are realized as of June 9, 2017.

### *Economic and Industry Factors Affecting the Company*

106. One of the factors to consider in a valuation is the economic outlook in general and the condition of the specific industry. Although individual economic factors may or may not have a direct impact on a particular industry or business, the overall economy (and the outlook for it) strongly influences the actions of investors and the assessment of investment opportunities. All businesses are impacted in some way by the economy.

107. I have examined industry reports available to create an informed opinion regarding the general direction and scope of the demand determinants that influence the subject company. In general, the economy creates the environment within which the business must operate. It influences the size of the available market and company's growth potential.

108. The summary below provides an overview of some selected economic factors that prevailed near the date of the intended acquisition, as well as a discussion of the factors that are crucial over an extended period of time. The following narrative includes excerpts of the Economic Outlook Update™ 2Q 2017 and of IBISWorld's September 2017 Industry Report of Title Insurance in the US (NAICS: OD4784). The full narrative is contained in our work files.

109. Overview of the Current U.S. Economy as of Q2 2017 and Outlook

   a. The U.S. economy—as indicated by GDP—grew at an annual rate of 2.6% in the second quarter of 2017, which is faster than the 1.2% revised rate reported for the first quarter of 2017. The growth from the current quarter is due to an increase in consumer spending, which comprises about 70% of the economy. Consensus forecasters predict Real GDP to grow at 2.4% and 2.2% over 2018 and 2019, respectively.

   b. The quarter ended with the economy in the third longest economic expansion in U.S. history. Private fixed investment, which includes residential and business spending, increased 2.2%. This marks the fifth consecutive quarter of increases.

   c. Builder confidence declined 2.0 points in June but remains at levels that indicate that homebuilders continue to be positive about the housing market. The report noted

builders' confidence levels have remained consistently sound in 2017, reflecting the gradual recovery of the housing market.

d. Existing-home sales slipped in June, following their rise in May. Sales declined 1.8% for the month, as low supply kept potential buyers at bay. However, over the past 12 months, existing-home sales are up 0.7%. Despite the slowdown, the sales pace for 2017 is still running slightly above last year's pace, despite these persistent market challenges.

110. Overview of the Title Insurance Industry as of September 2017

a. The Title Insurance industry has grown substantially as a result of strengthening macroeconomic conditions and a healthier domestic consumer. Strong growth in existing home sales and the house price index have supported the growth in the industry.

b. As a result, Industry revenue in 2017 is expected to be 5.3% at the end of the year, which is higher than the five years to 2017 average of 4.6%.

c. Over the five years to 2022, industry revenue is forecast to rise at an annualized rate of 3.3%. This strong growth is primarily a result of anticipated increases in key housing market variables, including the number of existing home sales and access to credit. The following IBISWorld chart provides the actual and estimated annual revenue changes between 2009 to 2022.

## Annual Change

| Year | Revenue (%) |
|------|-------------|
| 2009 | -7.1 |
| 2010 | 0.4 |
| 2011 | -4.0 |
| 2012 | 19.4 |
| 2013 | 10.0 |
| 2014 | -12.7 |
| 2015 | 14.8 |
| 2016 | 7.7 |
| 2017 | 5.3 |
| 2018 | 4.5 |
| 2019 | 3.3 |
| 2020 | 2.5 |
| 2021 | 3.3 |
| 2022 | 2.8 |

35

d.  Moreover, the industry's average gross profit margin is forecast to continue rising as a result of real estate market improvements.

e.  Industry revenue was sourced by the following products and services segments in 2017:



f.  The following key external drivers apply to the Title Insurance market:

i.  Existing homes sales - The provision of title insurance is predicated on the closing of a real estate transaction. Consequently, a rising volume of sales of existing single-family homes, condos and co-ops increases the need for mortgage lenders and buyers of real estate to be protected from loss or damage resulting from title defects. The number of existing home sales is expected to increase in 2017, representing a potential opportunity for the industry.

ii.  House price index - According to Fidelity National Financial, Inc., premiums derived from title insurance policies are highly correlated with the value of the underlying property. As a result, increases in the prices of residential property tend to benefit the industry through rising title insurance premiums. The house price index is expected to increase in 2017.

iii.  Access to credit - Access to credit is measured by the borrowing capacity advanced by commercial banks. Aggregate increases in credit access increase the likelihood of additional real estate transactions and chances for title insurers to collect premiums. Access to credit is expected to increase in 2017.

iv.  30-year conventional mortgage rate - As the most common type of loan for home purchases in the United States, changes in the 30-year conventional mortgage rate affect the willingness of consumers to take out mortgages. More specifically, increases in this key interest rate make purchasing a home more expensive, damaging the level of real estate transactions in the domestic market. The 30-year conventional mortgage rate is expected to increase substantially in 2017, posing a potential threat to the industry.

### *Historical Financial Analysis of EDG*

111.  I have analyzed the historical financial statement of EDG for the years ended December 31, 2014, through December 31, 2016, and for the quarter ending March 31, 2017. The financial statements are presented in Table 7 and Table 8, as shown below.[77]

---

[77] Industry data is sourced from The Risk Management Association ("RMA"), 2017 Annual Statement Study, for Industry 524127 – Direct Title Insurance Carriers.

### Table 7 – EDG Balance Sheets[78]

| (in thousands) | 12/31/2014 | | 12/31/2015 | | 12/31/2016 | | 3/31/2017 | | Industry |
|---|---|---|---|---|---|---|---|---|---|
| **Assets** | | | | | | | | | |
| Bonds | $3,030 | 15.0% | $4,172 | 25.4% | $3,663 | 23.6% | $3,658 | 24.5% | |
| Cash and Cash equivalents | 11,225 | 55.4% | 10,547 | 64.3% | 10,310 | 66.5% | 10,101 | 67.5% | 49.5% |
| Investment Inc Due and Accrued | 4 | 0.0% | 7 | 0.0% | 6 | 0.0% | 5 | 0.0% | |
| Premiums Receivable | 669 | 3.3% | 438 | 2.7% | 472 | 3.0% | 261 | 1.7% | |
| Reinsurance Recoverable | 80 | 0.4% | 14 | 0.1% | 0 | 0.0% | 0 | 0.0% | |
| Other Assets | 478 | 2.4% | 474 | 2.9% | 408 | 2.6% | 343 | 2.3% | |
| Deferred Tax Asset | 4,473 | 22.1% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | |
| Property and Equipment | 248 | 1.2% | 719 | 4.4% | 592 | 3.8% | 550 | 3.7% | |
| Title Plants | 43 | 0.2% | 43 | 0.3% | 43 | 0.3% | 43 | 0.3% | |
| | $20,250 | 100.0% | $16,414 | 100.0% | $15,493 | 100.0% | $14,960 | 100.0% | |
| **Liabilities and Equity** | | | | | | | | | |
| Known Claims and IBNR Reserve | $3,458 | 17.1% | $3,387 | 20.6% | $3,517 | 22.7% | $3,284 | 22.0% | |
| Accounts Payable | 72 | 0.4% | 180 | 1.1% | 139 | 0.9% | 218 | 1.5% | |
| Note Payable | 0 | 0.0% | 0 | 0.0% | 1,500 | 9.7% | 2,500 | 16.7% | |
| Accrued Expenses | 349 | 1.7% | 801 | 4.9% | 1,059 | 6.8% | 1,008 | 6.7% | |
| | $3,879 | 19.2% | $4,369 | 26.6% | $6,214 | 40.1% | $7,010 | 46.9% | 53.9% |
| **Equity** | | | | | | | | | |
| Series B Convertible Preferred Stock | $263 | 1.3% | $263 | 1.6% | $263 | 1.7% | $263 | 1.8% | |
| Series A Convertible Preferred Stock | 168 | 0.8% | 168 | 1.0% | 168 | 1.1% | 168 | 1.1% | |
| Common Stock | 158 | 0.8% | 158 | 1.0% | 158 | 1.0% | 158 | 1.1% | |
| Additional Paid-In Capital | 37,605 | 185.7% | 37,605 | 229.1% | 37,605 | 242.7% | 37,605 | 251.4% | |
| Accumulated Deficit | (21,823) | (107.8)% | (26,148) | (159.3)% | (28,914) | (186.6)% | (30,243) | (202.2)% | |
| | $16,371 | 80.8% | $12,045 | 73.4% | $9,279 | 59.9% | $7,950 | 53.1% | 46.1% |
| | $20,250 | 100.0% | $16,414 | 100.0% | $15,493 | 100.0% | $14,960 | 100.0% | |
| *Source* | *ENT00217602* | | *ENT00231588* | | *ENT00231588* | | *PRO0022494* | | *RMA* |

---

[78] *See* JX-448, at ENT00077456-7486, JX-422, at ENT00015682-15709, JX-166 at PR00022494.

112. Total assets have declined from $20.2 million on December 31, 2014 to $15.0 million on
March 31, 2017. This decrease primarily results from the write-off of the deferred tax asset
of $4.5 million in 2015. Notes payable has increased from $0.0 on December 31, 2014 to
$2.5 million as of
March 31, 2017. Equity has decreased from $20.2 million on December 31, 2014 to $14.9
million on March 31, 2017.

**Table 8 – EDG Income Statements[79]**

| (in thousands) | 12/31/2014 | | 12/31/2015 | | 12/31/2016 | | 3/31/2017 | | Industry |
|---|---|---|---|---|---|---|---|---|---|
| **Revenues** | | | | | | | | | |
| Agent premiums | $3,933 | 34% | $4,422 | 25% | $4,846 | 31% | $913 | 39% | |
| Direct premiums | 4,586 | 39% | 7,832 | 45% | 6,964 | 45% | 909 | 39% | |
| Escrow and settlement services | 3,148 | 27% | 5,299 | 30% | 3,760 | 24% | 509 | 22% | |
| | $11,666 | 100% | $17,553 | 100% | $15,570 | 100% | $2,331 | 100% | 100% |
| **Operating Expenses** | | | | | | | | | |
| Losses and loss adjustment exp | 835 | 7% | (364) | (2)% | 884 | 6% | 127 | 5% | |
| Agent commissions | 3,186 | 27% | 3,588 | 20% | 3,961 | 25% | 752 | 32% | |
| Search and settlement fees | 2,404 | 21% | 3,498 | 20% | 2,664 | 17% | 367 | 16% | |
| State license and permit fees | 83 | 1% | 103 | 1% | 104 | 1% | 41 | 2% | |
| Premium taxes | 221 | 2% | 328 | 2% | 338 | 2% | 49 | 2% | |
| Salaries and employee benefits | 4,392 | 38% | 6,106 | 35% | 5,861 | 38% | 1,340 | 57% | |
| Consulting fees | 158 | 1% | 447 | 3% | 649 | 4% | 98 | 4% | |
| Marketing and advertising | 340 | 3% | 492 | 3% | 320 | 2% | 60 | 3% | |
| Professional fees | 292 | 3% | 356 | 2% | 446 | 3% | 195 | 8% | |
| Bank fees | 159 | 1% | 285 | 2% | 237 | 2% | 51 | 2% | |
| Rent and facilities expense | 663 | 6% | 617 | 4% | 631 | 4% | 151 | 6% | |
| Depreciation and amortization | 102 | 1% | 124 | 1% | 198 | 1% | 43 | 2% | |
| General, administrative and other | 2,021 | 17% | 1,836 | 10% | 1,951 | 13% | 389 | 17% | |
| | $14,860 | 127% | $17,413 | 99% | $18,243 | 117% | $3,663 | 157% | 81.4% |
| **Net Operating Income (Loss)** | ($3,193) | (27)% | $140 | 1% | ($2,674) | (17)% | ($1,332) | (57)% | 18.6% |
| Net Investment Income (Expense) | 14 | 0% | 8 | 0% | (93) | (1)% | 3 | 0% | (1.4)% |
| Profit Before Tax | ($3,179) | (27)% | $147 | 1% | ($2,766) | (18)% | ($1,328) | (57)% | 19.9% |
| Deferred Income Tax Expense | 0 | 0% | (4,473) | (25)% | 0 | 0% | | 0% | |
| **Net Income (Loss)** | ($3,179) | (27)% | ($4,326) | (25)% | ($2,766) | (18)% | ($1,328) | (57)% | |
| *Source:* | *ENT00200130* | | *ENT00231589* | | *ENT00231589* | | *PRO0022494* | | *RMA* |

113. Revenues were $11.7 million, $17.6 million, and $15.6 million in 2014, 2015, and 2016,
respectively. In the first quarter of 2017 revenues were $2.3 million. On an annual basis it
appears that total revenues in 2017 will decline substantially from 2016. There was some
growth in direct premium revenue in 2015 and 2016, increasing to 45% of total revenue in

---

[79] *See* JX-448, at ENT00077456-7486, JX-422, at ENT00015682-15709, JX-166 at PR00022494.

those years versus 39% in 2014. After growing in 2015 versus 2014, revenues are now declining.

114. Operating expenses were $14.9 million, $17.4 million, and $18.2 million for the years ended December 31, 2014, 2015, and 2016, respectively. This represented 127%, 99%, and 117% of revenues over the same three years. In the first quarter of 2017, operating expenses were 157% of revenues.

115. Most of the expense categories remain fairly constant over the three years of 2014, 2015 and 2016 except for losses and loss adjustment expense. In 2014, 2016 and the first quarter of 2017 the losses and loss adjustment expense was 7%, 6% and 5% of revenues, respectively. In 2015 the losses and loss adjustment expense was a reduction in total expense of $364,000 (2.0% of revenues). This reduction in total expense is the only reason EDG had operating income of $140,000 in 2015.

116. From 2014 through 2016, EDG incurred $5.7 million of operating losses and an additional $1.3 million of operating losses in the first quarter of 2017. The total net loss from 2014 through 2016 was $10.3 million, which included $4.5 million in deferred income tax expense. The net loss excluding the deferred income tax expense was $5.8 million. EDG incurred an operating loss of $3.2 million on revenues of $11.6 million in 2014, $4.3 million on revenues of $17.5 million in 2015, $2.8 million on revenues of $15.6 million in 2016, and $1.3 million on revenues of $2.3 million in the first quarter of 2017.

### *Valuation Methodology*

117. I have considered the income (income-based), asset (asset-based), and market (market-based) approaches for determining the value of the 36.52% minority equity interest in EDG after the Merger Transaction.[80]

118. After considering all three approaches, I have concluded that the best approach for determining value is to use a discounted cash flow method, which is an income-based approach. This method captures the potential future cashflows that could be available to the minority equity interest.

---

[80] Statement on Standards for Valuation Services ("SSVS1"), 10.

119. I have not utilized a market-based approach. EDG's uneven revenue trends and historical losses render the implementation of a market-based approach difficult. Additionally, it would be difficult if not impossible to capture the potential synergies, if any, in the merger with RPM. Finally, market transactions and market multiples unique to EDG and Entitle size are not readily available.

120. I have not utilized an asset-based approach because the minority stockholders cannot compel the sale of the sale of EDG assets or EDG. Additionally, EDG's wholly owned subsidiary is regulated entity and is subject to regulatory surveillance at the time of merger with RPM. As with the market-based approach, the asset-based approach would likely not capture potential synergies, if any, in the merger with RPM.

### *Determination of Value*

121. The discounted cash flow method encompasses the following steps:[81]

   a. Prepare or use an existing financial forecast

   b. Adjust the financial forecast for any excess assets or shortage of assets

   c. Compute state and federal income taxes

   d. Consider any additional adjustments that might affect the cash flow

   e. Estimate the discount rate applicable to the cash flow

   f. Estimate the terminal value of the company during the terminal year

   g. Estimate the current operating value of the company by discounting the cash flow and the terminal value using the determined discount rate

122. As a starting point for my discounted cash flow analysis, I utilized the EIC June 2017 Financial Projections prepared by EDG and provided to RPM. Information on the above steps is set forth on Attachment D to this Affidavit. Significant assumptions regarding my discounted cash flow analysis are summarized below.

   a. Revenues in the financial projections grow from $13.2 million in 2017 to $21.5 million in 2019 (62.9%) due to anticipated synergies from RPM ownership. Revenues

---

[81] Thomson Reuters – Guide to Business Valuation, Chapter 5 Capitalization and Discounted Cash Flow Methods, paragraph 502.8

are computed using an industry growth rate of 4.3% after 2019 through 2026. Expenses after 2019 through 2026 are equal to a percentage of sales based on 2019. This represents an operating profit margin of approximately 5%.

b. Based on the analysis of depreciation and amortization and property, plant, and equipment for 2013 through 2014, I note that the average depreciation is $139,000 per year and the average cost of new property, plant, and equipment is $224,000 per year. In my financial projections I have assumed that depreciation and amortization are equal to the cost of new property, plant, and equipment and have not made any additional adjustments to cash flow.

c. Revenue growth is sufficient to finance any additional needs pertaining to working capital.

d. There is no debt and corresponding interest expense.

e. The projections incorporate a combined state and federal tax rate of 25%. Taxable income has been reduced for preacquisition net operating losses. The preacquisition net operating losses have been limited based on a conservative fair market value of equity of $18.0 million times the June 2017 Long-Term-Tax-Exempt Rate of 2.09%.

f. Based on communications from the ODI's Office of Risk Assessment, I have limited the payment of cash flows to equity until the $5.5 million additional capital requirement has been met.

g. Cash flows and the terminal value have been discounted using a discount rate of 14.43%. This rate is comprised a of risk-free rate of 3.5% + equity premium rate of 5.5% - industry risk equity premium adjustment of (0.16%) + size risk premium of 5.59%.[82]

123. As set forth on Attachment D, the present value of cash flows to ownership, including the terminal value of ownership is $4.278 million. The present value of the cash flows, including the terminal value available to the 36.52% minority equity interest is $1.562 million. Utilizing a lack of marketability discount of 25.0%, the present value of the

---

[82] Duff & Phelps Cost of Capital Navigator™ U.S. Cost of Capital Module, Industry: SIC 63 - Insurance Carriers, Valuation Date 6/9/2017.

36.52% minority equity interest on

June 9, 2017 is approximately $1.172 million on a non-controlling, non-marketable basis.

**F.    Significant Deficiencies of Mr. Imburgia's Damage and Valuation Opinions**

124. Mr. Imburgia incorrectly suggests that he performed a valuation of the minority equity

consideration provided to Entitle's stockholders. Mr. Imburgia stated that,

> "Based on the above, the value of the total equity consideration to EDG
> stockholders under the planned merger is $6,585,573, or $18,032,652 multiplied by
> 36.52%. However, since EDG stockholders would control following the merger, the
> total equity consideration to EDG stockholders must be discounted. Valuation
> literature suggests a discount for lack of control within the range of approximately
> 20% to 30%, the average being 25%. As such, a discount of 25% for lack of control
> is applied."[83]

125. In my opinion, Mr. Imburgia does not provide sufficient relevant data that there were any

market participants, other than RPM, willing to pay the potential synergistic value

proposed in the deal price in the planned merger between EDG and RPM as of February

16, 2017.

   a.   Mr. Imburgia's presumption is that the proposed deal price between EDG and RPM is
        the best and only indicator of the value of EDG.

   b.   Mr. Imburgia does not include any analysis of the evaluation of synergistic value
        from revenue enhancements, cost savings, and capital optimization.

126. Mr. Imburgia does not analyze the financial impact to EDG for the lost merger and

acquisition deals with other potential buyers due to the planned merger between EDG and

RPM not being consummated to the terms initially agreed in the merger agreement.

127. According to Valuing A Business – The Analysis and Appraisal of Closely Held

Companies, "Merger and acquisition prices often, to some extent, reflect synergies and/or

strategic advantages between acquirer and target. To the extent that this true, a transaction

---

[83] Updated Expert Report and Disclosure of Basil Imburgia, January 28, 2021, 6, 8 [JX-221].

may be more reflective of investment value[84] (value to that particular buyer) than fair market value[85] (the value to a hypothetical buyer). For this reason, the circumstances and details of the merger and acquisition transactions must be carefully analyzed."[86] Mr. Imburgia did not sufficiently analyze the details with other potential buyers of EDG.

128. Mr. Imburgia should also have included a deduction for lack of marketability[87] for a minority interest in a closely-held company, which he did not include. According to Valuing A Business – The Analysis and Appraisal of Closely Held Companies, "Since merger and acquisition value analysis usually focuses on market value of invested capital, the value of the debt must be subtracted to reach the value of equity. . .If a noncontrolling interest is being valued, both lack of control and lack of marketability discounts should be considered."[88]

129. EDG had a history of losses prior to the acquisition. The common stockholders, common stock option holders, and common stock warrant holders received no consideration in the Merger Agreement.[89] The damage value of $4.9 million assigned to the minority common ownership of Entitle through the planned merger was completely dependent on the realization of synergies derived through the acquisition of EDG by RPM.[90] These synergies

---

[84] Investment value is defined as "the value to a particular investor based on individual investment requirements and expectations." [SSVS1, Appendix B.]

[85] Fair market value is defined as the price, expressed in terms of cash equivalents, at which property would change hands between a hypothetical willing and able buyer and a hypothetical willing and able seller, acting at arms length in an open and unrestricted market, when neither is under compulsion to buy or sell and when both have reasonable knowledge of the relevant facts. [SSVS1, Appendix B.]

[86] Valuing A Business – The Analysis and Appraisal of Closely Held Companies, Fifth Edition, Shannon P. Pratt and Alina V. Niculita, 323.

[87] Discount for lack of marketability is define as "an amount or percentage deducted from the value of an ownership interest to reflect the relative absence of marketability." [SSVS1, Appendix B.]

[88] Valuing A Business – The Analysis and Appraisal of Closely Held Companies, Fifth Edition, Shannon P. Pratt and Alina V. Niculita, 322-323.

[89] JX-347, at PR00015068. See also Merger Agreement section 2.6.

[90] "As explained below, the damages amount described in the previous section is reasonable because the price at which Entitle was to be sold to RPM under the Merger Agreement, and the price at which Entitle was actually sold to Radian, were both reasonable, based on financial projections available to the parties at the time and expected synergies." Updated Expert Report and Disclosure of Basil Imburgia, January 28, 2021, 10-11 [JX-221].

included but may not have been limited to, the ability of RPM to direct closing business to Entitle and the ability of Entitle to execute that business incurring only marginal costs.

130. Notwithstanding Mr. Imburgia's arguments that such synergies are reasonable, the damage associated with the minority common ownership of Entitle is flawed.

    a.   Mr. Imburgia's minority equity damage calculation relies primarily upon a single data point, the estimated cash consideration RPM offered in exchange for the controlling interest in Entitle at the date of the merger.

    b.   Mr. Imburgia does not use all relevant information available up to the date of the intended Merger, including but not limited to, financial performance of EDG and Entitle, the potential for additional capital requirements imposed by ODI's Office of Risk Assessment in May and June 2017, and revised and updated financial projections. The revised projections indicate a decrease in revenues of 18.8%, 24.3%, and 18.7% for 2017, 2018, and 2019, respectively. More significantly the revised projections indicate a decrease in net operating income of 143.5%, 82.6%, and 12.8% for 2017, 2018, and 2019, respectively.

    c.   The decrease in the financial projections for the 2nd half of 2017, which would have been post-merger, were significant. The original projections indicated that Entitle would have a net income of $407,000 in the 2nd half of 2017. The revised projections indicated that Entitle would have a net loss of $466,000. The difference is $873,000.

    d.   Given ODI's Office of Risk Assessment concern over the ongoing losses at Entitle and their discussions regarding the need for additional capital contributions, the post-merger projected loss in the 2nd half of 2017 would likely add to ODI's Office of Risk Assessment concerns regarding the violations of the Hazardous Financial Condition statutes.

**Mr. Imburgia's Damages and Valuation Conclusions Are Not In Compliance With SSFS1 and SSVS1**

131. Despite Mr. Imburgia not representing his damages conclusions as a valuation opinion, the term, "value," is referred to in 32 instances in the Updated Imburgia Report. Some examples of the different contexts used by Mr. Imburgia for "value" and "valuation" include the following.

    a.  Total value for Entitle[91]

    b.  Implied value of Entitle[92]

    c.  Value of the total equity / current equity value[93]

    d.  Target firm's value / values of the target firm[94]

    e.  Estimating overall synergy value / value of the synergies[95]

    f.  Combined firm's enterprise value[96]

    g.  Book value of equity[97]

    h.  Pre-merger value[98]

    i.  Premium over book value[99]

    j.  Acquired firm's value[100]

    k.  Valuation literature suggests a discount for lack of control[101]

132. Mr. Imburgia does not include any definition of the level of value in his damages/valuation analysis. The standard of value is defined as "the identification of the type of value being utilized in a specific engagement; for example, fair market value, fair value, investment value."[102]

133. Mr. Imburgia's damages and valuation conclusions are subject to the American Institute of Certified Public Accountants ("AICPA") Statement on Standards for Forensic Services No. 1 ("SSFS1") effective for engagements accepted on or after January 1, 2020 and Statement on Standards for Valuation Services ("SSVS1") for engagements accepted on or after January 1, 2008. In my opinion, Mr. Imburgia's damages and valuation conclusions are not in compliance with SSFS1 and SSVS1.

---

[91] Updated Expert Report and Disclosure of Basil Imburgia, January 28, 2021, 8 [JX-221].

[92] Updated Expert Report and Disclosure of Basil Imburgia, January 28, 2021, 9-10 [JX-221].

[93] Updated Expert Report and Disclosure of Basil Imburgia, January 28, 2021, 9, 16 [JX-221].

[94] Updated Expert Report and Disclosure of Basil Imburgia, January 28, 2021, 11 [JX-221].

[95] Updated Expert Report and Disclosure of Basil Imburgia, January 28, 2021, 15-16 [JX-221].

[96] Updated Expert Report and Disclosure of Basil Imburgia, January 28, 2021, 15 [JX-221].

[97] Updated Expert Report and Disclosure of Basil Imburgia, January 28, 2021, 15, 17 [JX-221].

[98] Updated Expert Report and Disclosure of Basil Imburgia, January 28, 2021, 15 [JX-221].

[99] Updated Expert Report and Disclosure of Basil Imburgia, January 28, 2021, 16 [JX-221].

[100] Updated Expert Report and Disclosure of Basil Imburgia, January 28, 2021, 16 [JX-221].

[101] Updated Expert Report and Disclosure of Basil Imburgia, January 28, 2021, 9 [JX-221].

[102] SSVS1, Appendix B.

a. **SSFS1**: Mr. Imburgia's work is not in compliance with general standard as to sufficient relevant data. Obtain sufficient relevant data to afford a reasonable basis for conclusions or recommendations in relation to any professional services performed."[103]

b. **SSVS1**: Mr. Imburgia did not comply with these standards as identified in the following paragraphs.

134. SSVS1 applies to Mr. Imburgia's opinions in this Matter involving estimates of value.

135. As described in SSVS1, "the term engagement to estimate value refers to an engagement or any part of an engagement (for example, a tax, litigation, or acquisition-related engagement that involves estimate the value of a subject interest. An engagement to estimate value culminates in the expression of either a conclusion of value or calculated value (see paragraph .21)."[104]

136. SSVS1 paragraph .12 states that the valuation analyst should consider, at a minimum, the following: [105]

a. Subject entity and its industry

b. Subject interest

c. Valuation date

d. Scope of the valuation engagement

    I. Purpose of the valuation engagement

    II. Assumptions and limiting conditions that apply to the valuation engagement

    III. Applicable standard of value (for example, fair value or fair market value) and the applicable premise of value (for example, going concern)

    IV. Type of valuation report to be issued, intended use and users of the report, and restrictions on the use of the report

137. Mr. Imburgia did not comply with SSVS1 paragraph .12.

## Mr. Imburgia's Flawed Attempt of Purported Market Approach

---

[103] SSFS1, 3.
[104] SSVS1, 2.
[105] SSVS1, 4.

138. Mr. Imburgia improperly relied on market data from two studies published by Boston
Consulting Group ("BCG") and S&P Capital IQ, which were not relevant to his valuation
analysis of Entitle as of June 9, 2017 (the date of alleged breach by the Defendants). These
two studies' information on valuation multiples were not comparable in operations to
Entitle.

139. Mr. Imburgia stated in paragraph 43 of the Updated Imburgia Report that "Based on a
dataset of the 1,000 largest public-to-public merger and acquisition deals between 2008 and
2017, the Boston Consulting Group ('BCG') found that:

> "Synergy estimates have increased to a new high every year since 2013, exceeding
> the ten-year average of 1.6% of combined sales during each year. The most recent
> peak of 2.1% in 2017 is almost double the low of 1.1 in 2011."[106, 107]



140. The Boston Consulting Group survey data shown above is not relevant to the valuation of a
small, unprofitable privately-held title insurance company as of June 9, 2017. This survey
data is based on 1,000 public-to-public merger and acquisition transactions from 2008
through 2017 with a majority stake acquired by a non-financial buyer. Furthermore, the

---

[106] Updated Expert Report and Disclosure of Basil Imburgia, January 28, 2021, 15 [JX-221].
[107] https://image-src.bcg.com/Images/BCG-Synergies-Take-Center-Stage-Sep-2018_tcm9-202243.pdf

size of the average transaction in this survey data had a run-rate equivalent of more than $400 million.

141. Mr. Imburgia stated in paragraph 45 of the Updated Imburgia Report that "Annualizing Entitle's $12,468,565 in revenue for the eleven months ended June 2017 yields $13.6 million, 2.1% of which would amount to approximately $286,000 in anticipated synergy value, in EBITDA terms. Multiplying that $286,000 by the *average* recorded acquisition multiple for the general insurance industry in 2017 – 8.0 times EBITDA – yields an estimated synergy-based increase to Entitle's pre-merger value of $2.29 million." Furthermore, the 8.0 times EBITDA multiple was derived from S&P Capital IQ Company Screening Report ("S&P Capital IQ-CSR") for Insurance (Primary). Values range from 5.0 to 12.5 for six transaction from 2013 through 2018.[108]

142. The S&P Capital IQ-CSR for Insurance (Primary) data in the prior paragraph is not relevant to the valuation of a small, unprofitable privately-held title insurance company as of June 9, 2017. This transaction data was for six insurance companies (primary) from 2013 through 2018. Mr. Imburgia should have relied on guideline transactions of similar title insurance companies to Entitle in his valuation analysis as of June 9, 2017. None of Mr. Imburgia's selections were title insurance companies, and only two were from dates prior to June 9, 2017[109]. Further, only one was from the United States, all other were international[110]. The single company from the United States does not write any insurance policies, rather they investigate, manage, and control the claims process and serve the restaurant, bar, and tavern industries.

143. Mr. Imburgia does not appear to understand that title insurance companies have different profile than general insurance company.

    a. "Title insurance provides protection to mortgage lenders and buyers of real estate from potential loss or damage resulting from defects in the title they intend to acquire. Potential defects covered by title insurance include adverse ownership claims, liens, and encumbrances. Industry operators rely extensively on both the volume and value

---

[108] Updated Expert Report and Disclosure of Basil Imburgia, January 28, 2021, 15 [JX-221].
[109] 1 from 2020, 2 from 2018, 1 from November 2017, 1 from 2015 and 1 from 2003.
[110] 2 from Madrid, Spain, 1 from Latin America, 1 from Brazil, 1 from Canada, and 1 from Pennsylvania.

of domestic real estate transactions, given that the issuance of a title insurance policy requires a real property purchase to take place."[111]

b. "Since title insurance usually involves the acceptance of prior transaction-related risk rather than future risk, the underwriting process in the title insurance industry differs markedly from the typical property/casualty underwriting process. The title underwriting process is designed to limit risk exposure through a thorough search of the recorded documents affecting a particular property. The insurance component of a title product only indemnifies for existing - but unidentified, or specifically underwritten - defects in the condition of a property's title. In other words, title insurance - unlike typical property/casualty insurance - usually does not respond to future occurrences but only to past defects that were in place at the time the property was sold, and not recognized as a problem until after the property was transferred or was insured over."[112]

c. "The title industry is highly dependent on real estate markets, which, in turn, are highly sensitive to mortgage interest rates and the health of the overall economy. Typically, there is an inverse relationship between mortgage rate changes and real estate activity, and therefore, operating revenue for title insurers."[113]

d. "The demand for title insurance products is largely dependent on the demand for real estate transactions, which are, in turn, critically dependent on the financial factors described above, as well as on a healthy labor market characterized by low or decreasing unemployment rates and generally increasing wages. In addition, a stable inflation environment helps to ensure market stability and consumer purchasing power."[114]

---

[111] "Title Insurance in the US," IBISWorld Industry Report of OD4784, September 2017, 4.
[112] http://www.ambest.com/title/fundamentals.html
[113] http://www.ambest.com/title/fundamentals.html
[114] http://www.ambest.com/title/fundamentals.html

142. It appears that there was title insurance acquisition data involving 15 deals between 2002 and 2015.[113] It does not appear that Mr. Imburgia considered guideline acquisition transactions of small, unprofitable privately-held title insurance companies to Entitle.

143. Mr. Imburgia did not rely on market data of guideline title insurance transactions and publicly-traded title insurance companies in his purported valuation analysis. Instead, Mr. Imburgia improperly relied on one generic market study involving publicly traded company acquisitions of the top 1000 largest companies and general insurance company acquisition (not specific to title insurance companies).

Dated: *October 28, 2021*

October 28, 2021

*Bruce V. Bush*

Bruce V. Bush

Sworn to before me
*28* day of October, 2021

*Erika Minjarez*

NOTARY PUBLIC

ERIKA MINJAREZ
NOTARY PUBLIC
STATE OF TEXAS
ID # 130043629
My Comm. Expires 12-05-2022

---

[113] LENDUS_00041404.

**Attachment A**

**Partner Reinsurance Company, Ltd v. RPM Mortgage, Inc. et al**

**Documents Received**

| Bates Begin | Bates End | Bates Begin | Bates End | Bates Begin | Bates End |
|---|---|---|---|---|---|
| BC_000879 | BC_000901 | ENT00038540 | ENT00038540 | ENT00089907 | ENT00089937 |
| BC_004604 | BC_004605 | ENT00038541 | ENT00038545 | ENT00096157 | ENT00096158 |
| BC_005121 | BC_005122 | ENT00038546 | ENT00038566 | ENT00097792 | ENT00097792 |
| BC_010010 | BC_010010 | ENT00038567 | ENT00038568 | ENT00098430 | ENT00098431 |
| BC_013885 | BC_013885 | ENT00038569 | ENT00038601 | ENT00158331 | ENT00158331 |
| BSF00000086 | BSF00000088 | ENT00038602 | ENT00038610 | ENT00159666 | ENT00159666 |
| DEN00000002 | DEN00000669 | ENT00038611 | ENT00038622 | ENT00159998 | ENT00159998 |
| DEN00000501 | DEN00000513 | ENT00038623 | ENT00038623 | ENT00160007 | ENT00160007 |
| DEN00004622 | DEN00004637 | ENT00038624 | ENT00038624 | ENT00161563 | ENT00161563 |
| DEN00004869 | DEN00004871 | ENT00038625 | ENT00038639 | ENT00165442 | ENT00165442 |
| DEN00005120 | DEN00005148 | ENT00038640 | ENT00038674 | ENT00165489 | ENT00165489 |
| ENT00000663 | ENT00000821 | ENT00038675 | ENT00038715 | ENT00170974 | ENT00170974 |
| ENT00000889 | ENT00000916 | ENT00038716 | ENT00038755 | ENT00170998 | ENT00170998 |
| ENT00001890 | ENT00001893 | ENT00038789 | ENT00038790 | ENT00193384 | ENT00193384 |
| ENT00001925 | ENT00001973 | ENT00038791 | ENT00038808 | ENT00194440 | ENT00194440 |
| ENT00002091 | ENT00002092 | ENT00041079 | ENT00041235 | ENT00198504 | ENT00198504 |
| ENT00002141 | ENT00002186 | ENT00048378 | ENT00048378 | ENT00198512 | ENT00198512 |
| ENT00002296 | ENT00002323 | ENT00051478 | ENT00051500 | ENT00198830 | ENT00198830 |
| ENT00002538 | ENT00002584 | ENT00053572 | ENT00053573 | ENT00199425 | ENT00199425 |
| ENT00002683 | ENT00002834 | ENT00053783 | ENT00053783 | ENT00199879 | ENT00199879 |
| ENT00002835 | ENT00002883 | ENT00054312 | ENT00054312 | ENT00200130 | ENT00200130 |
| ENT00003141 | ENT00003293 | ENT00055825 | ENT00055827 | ENT00200199 | ENT00200199 |
| ENT00003294 | ENT00003343 | ENT00056175 | ENT00056175 | ENT00202521 | ENT00202521 |
| ENT00004286 | ENT00004336 | ENT00058068 | ENT00058437 | ENT00205841 | ENT00205841 |
| ENT00007848 | ENT00007853 | ENT00060213 | ENT00060213 | ENT00205898 | ENT00205898 |
| ENT00008861 | ENT00008861 | ENT00060637 | ENT00060637 | ENT00205906 | ENT00205906 |
| ENT00008912 | ENT00008963 | ENT00060766 | ENT00060773 | ENT00205925 | ENT00205925 |
| ENT000110235 | ENT000110235 | ENT00062249 | ENT00062249 | ENT00205934 | ENT00205934 |
| ENT00011699 | ENT00011700 | ENT00062728 | ENT00062734 | ENT00205950 | ENT00205950 |
| ENT00011745 | ENT00011745 | ENT00063490 | ENT00063491 | ENT00206194 | ENT00206194 |
| ENT00011758 | ENT00011758 | ENT00064326 | ENT00064326 | ENT00209315 | ENT00209316 |
| ENT00011766 | ENT00011766 | ENT00064399 | ENT00064400 | ENT00209978 | ENT00209982 |
| ENT00014081 | ENT00014081 | ENT00064436 | ENT00064437 | ENT00215887 | ENT00215887 |
| ENT00016913 | ENT00016964 | ENT00064455 | ENT00064455 | ENT00215889 | ENT00215889 |
| ENT000202141 | ENT000202160 | ENT00066116 | ENT00066116 | ENT00215893 | ENT00215893 |
| ENT00024457 | ENT00024458 | ENT00067359 | ENT00067360 | ENT00215991 | ENT00215991 |
| ENT00024473 | ENT00024474 | ENT00070639 | ENT00070640 | ENT00216001 | ENT00216001 |
| ENT00026564 | ENT00026564 | ENT00070641 | ENT00070641 | ENT00216005 | ENT00216005 |
| ENT00026755 | ENT00026755 | ENT00071802 | ENT00071803 | ENT00216311 | ENT00216311 |
| ENT00027746 | ENT00027746 | ENT00071831 | ENT00071835 | ENT00217602 | ENT00217603 |
| ENT00027810 | ENT00027810 | ENT00072956 | ENT00072999 | ENT00217611 | ENT00217611 |
| ENT00028611 | ENT00028611 | ENT00073998 | ENT00073998 | ENT00217613 | ENT00217613 |
| ENT00029701 | ENT00029701 | ENT00074271 | ENT00074272 | ENT00217737 | ENT00217737 |
| ENT00031402 | ENT00031453 | ENT00074739 | ENT00074739 | ENT00218518 | ENT00218518 |
| ENT00032910 | ENT00032911 | ENT00076120 | ENT00076121 | ENT00218650 | ENT00218650 |
| ENT00034689 | ENT00034689 | ENT00076644 | ENT00076644 | ENT00218780 | ENT00218780 |
| ENT00035098 | ENT00035148 | ENT00076963 | ENT00076963 | ENT00218891 | ENT00218891 |
| ENT00036077 | ENT00036077 | ENT00077060 | ENT00077061 | ENT00219282 | ENT00219282 |
| ENT00037856 | ENT00038788 | ENT00077746 | ENT00077772 | ENT00219289 | ENT00219289 |
| ENT00037925 | ENT00037952 | ENT00078801 | ENT00078801 | ENT00220796 | ENT00220796 |
| ENT00038166 | ENT00038167 | ENT00078904 | ENT00078906 | ENT00220799 | ENT00220799 |
| ENT00038168 | ENT00038537 | ENT00088166 | ENT00088166 | ENT00221450 | ENT00221450 |
| ENT00038538 | ENT00038538 | ENT00088167 | ENT00088167 | ENT00224143 | ENT00224143 |
| ENT00038539 | ENT00038539 | ENT00088168 | ENT00088171 | ENT00224145 | ENT00224145 |

**Attachment A**

**Partner Reinsurance Company, Ltd v. RPM Mortgage, Inc. et al**

**Documents Received**

| Bates Begin | Bates End | Bates Begin | Bates End | Bates Begin | Bates End |
|---|---|---|---|---|---|
| ENT00224147 | ENT00224147 | LENDUS_00039415 | LENDUS_00039415 | SANDLER-000008757 | SANDLER-000008774 |
| ENT00224249 | ENT00224249 | LENDUS_00039726 | LENDUS_00039726 | SBP00001341 | SBP00001358 |
| ENT00224684 | ENT00224684 | LENDUS_00040050 | LENDUS_00040050 | SBP00004847 | SBP00004854 |
| ENT00227470 | ENT00227470 | LENDUS_00040158 | LENDUS_00040158 | WAM0000120 | WAM0000125 |
| ENT00227498 | ENT00227498 | LENDUS_00040203 | LENDUS_00040203 | WAM0000664 | WAM0000665 |
| ENT00231067 | ENT00231067 | LENDUS_00040946 | LENDUS_00040946 | WAM0002173 | WAM0002354 |
| ENT00231588 | ENT00231607 | LENDUS_00041404 | LENDUS_00041407 | | |
| ENT00234075 | ENT00234075 | LENDUS_00041449 | LENDUS_00041449 | | |
| ENT00235290 | ENT00235290 | LENDUS_00041596 | LENDUS_00041606 | | |
| ENT00235470 | ENT00235470 | LENDUS_00043848 | LENDUS_00043888 | | |
| ENT00236143 | ENT00236143 | LENDUS_00044992 | LENDUS_00045032 | | |
| ENT00236146 | ENT00236146 | LENDUS_00046120 | LENDUS_00046123 | | |
| ENT00236155 | ENT00236155 | LENDUS_00046126 | LENDUS_00046126 | | |
| ENT00236426 | ENT00236426 | LENDUS_00050908 | LENDUS_00050908 | | |
| ENT00236436 | ENT00236436 | LENDUS_00053369 | LENDUS_00053376 | | |
| ENT00236441 | ENT00236441 | LENDUS_00053377 | LENDUS_00053377 | | |
| ENT00236448 | ENT00236448 | LENDUS_00053390 | LENDUS_00053390 | | |
| ENT00236456 | ENT00236456 | LENDUS_00053542 | LENDUS_00053542 | | |
| ENT00236595 | ENT00236595 | LENDUS_00056079 | LENDUS_00056079 | | |
| ENT00236618 | ENT00236618 | LENDUS_00056373 | LENDUS_00056396 | | |
| ENT00244397 | ENT00244420 | LENDUS_00056589 | LENDUS_00056589 | | |
| LENDUS_00034134 | LENDUS_00034134 | MB000678 | MB000680 | | |
| LENDUS_00000999 | LENDUS_0001003 | MB000891 | MB000892 | | |
| LENDUS_00002397 | LENDUS_00002429 | MB000968 | MB000969 | | |
| LENDUS_00005195 | LENDUS_00005195 | MB000971 | MB000972 | | |
| LENDUS_00007877 | LENDUS_00007877 | ODI_0000001 | ODI_0000670 | | |
| LENDUS_00011346 | LENDUS_00011346 | PR00000462 | PR00000463 | | |
| LENDUS_00011498 | LENDUS_00011498 | PR00000556 | PR00000557 | | |
| LENDUS_00013538 | LENDUS_00013539 | PR00001696 | PR00001697 | | |
| LENDUS_00014907 | LENDUS_00014916 | PR00002421 | PR00002421 | | |
| LENDUS_00014931 | LENDUS_00014931 | PR00008258 | PR00008258 | | |
| LENDUS_00015317 | LENDUS_00015360 | PR00009197 | PR00009242 | | |
| LENDUS_00015361 | LENDUS_00015404 | PR00009380 | PR00009403 | | |
| LENDUS_00015424 | LENDUS_00015468 | PR00010451 | PR00010453 | | |
| LENDUS_00017619 | LENDUS_00017619 | PR00013114 | PR00013561 | | |
| LENDUS_00018226 | LENDUS_00018227 | PR00013920 | PR00013920 | | |
| LENDUS_00022452 | LENDUS_00022453 | PR00015068 | PR00015072 | | |
| LENDUS_00023865 | LENDUS_00023866 | PR00017412 | PR00017413 | | |
| LENDUS_00026518 | LENDUS_00026626 | PR00018057 | PR00018057 | | |
| LENDUS_00027198 | LENDUS_00027198 | PR00019227 | PR00019229 | | |
| LENDUS_00027555 | LENDUS_00027556 | PR00019281 | PR00019650 | | |
| LENDUS_00028261 | LENDUS_00028261 | PR00020777 | PR00020778 | | |
| LENDUS_00028559 | LENDUS_00028740 | PR00022494 | PR00022494 | | |
| LENDUS_00029164 | LENDUS_00029172 | PR00022516 | PR00022516 | | |
| LENDUS_00029185 | LENDUS_00029186 | PR00022667 | PR00022667 | | |
| LENDUS_00030476 | LENDUS_00030476 | PR00028639 | PR00028641 | | |
| LENDUS_00030620 | LENDUS_00030623 | PR00036661 | PR00036755 | | |
| LENDUS_00030624 | LENDUS_00030627 | PR00037220 | PR00037220 | | |
| LENDUS_00034125 | LENDUS_00034129 | RDN000608 | RDN000639 | | |
| LENDUS_00034133 | LENDUS_00034133 | RDN000864 | RDN000867 | | |
| LENDUS_00037540 | LENDUS_00037574 | SANDLER-000000623 | SANDLER-000000659 | | |

| Attachment A | | | | | |
|---|---|---|---|---|---|
| **Partner Reinsurance Company, Ltd v. RPM Mortgage, Inc. et al** | | | | | |
| **Documents Received** | | | | | |
| | | | | | |
| LENDUS_00038424 | LENDUS_00038433 | SANDLER-000000824 | SANDLER-000000825 | | |
| LENDUS_00038697 | LENDUS_00038705 | SANDLER-000001406 | SANDLER-000001406 | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| **Documents Without Bates Numbers** | | | | | |
| First Amended Complaint | | | | | |
| Answer and Counterclaim | | | | | |
| Expert Report and Disclosure of Basil Imburgia, January 18, 2021 | | | | | |
| Updated Expert Report and Disclosure of Basil Imburgia, January 28, 2021 | | | | | |
| Expert Report of Alan F. Berliner, Esq., dated January 18, 2021 | | | | | |
| Robert Eick Deposition | | | | | |
| Fred Matera Deposition | | | | | |
| John Hendrix Deposition | | | | | |
| Robert Hirt Deposition | | | | | |
| Tracey Hirt Deposition | | | | | |
| Harold Lee Deposition | | | | | |
| Marvin Pestcoe Deposition | | | | | |
| Noack Ava Deposition | | | | | |
| PartnerRe-Iannarone Deposition | | | | | |
| Holly Kons Deposition | | | | | |
| Steven Palmer Deposition | | | | | |
| Timothy Dwyer Deposition | | | | | |
| IRS Recv. Rul. 2017-12 Table 3 Rates Under Section 382 for June 2017 | | | | | |
| https://www.accountingtoday.com/opinion/valuation-considerations-relating-to-nol-limits-under-cares-act-and-tcja | | | | | |
| The Analysis and Appraisal of Closely Held Companies - Fifth Edition - by Shannon Pratt and Alina Niculita | | | | | |
| Business valuation post-Tax Cuts and Jobs Act  from RSM | | | | | |
| AICPA Statement on Standards for Valuation Services | | | | | |
| AICPA Statement on Standards for Forensic Services | | | | | |
| AICPA Forensic & Valuation Services Practice Aid, Attaining Reasonable Certainty in Economic Damages Calculations, 2018 | | | | | |
| https://www.businesswire.com/news/home/20190618005254/en/EnTitle-Insurance-Company-Becomes-Radian-Title-Insurance-Inc | | | | | |
| Thomson Reuters - Guide to Business Valuation | | | | | |
| Duff & Phelps Cost of Capital Navigator US Cost of Capital Module, Industry: SIC 63 - Insurance Carriers, Valuation Date 6/9/2017 | | | | | |
| https://image-src.bcg.com/Images/BCG-Synergies-Take-Center-Stage-Sep-2018_tcm9-202243 | | | | | |
| "Title Insurance in the US", IBIS World Industry Report OD4784, September 2017 | | | | | |
| The Risk Management Association ("RMA"), 2017 Annual Statement Study, for Industry 524127 – Direct Title Insurance Carriers | | | | | |
| http://www.ambest.com/title/fundamentals.html | | | | | |



**Attachment B**

214-507-2329
bruce@foxforensicaccounting.com
www.foxforensicaccounting.com



## Bruce V. Bush, CPA, CFF

**Senior Director**
Fox Forensic Accounting, LLC
Dallas, TX

### Summary of Experience

Bruce has more than 30 years of experience in financial statement audits and assisting clients with allegations of financial reporting improprieties, investigating employee fraud and misconduct, resolution of post-acquisition and contract disputes, and minimizing the risk of fraud through the development and implementation of prevention, detection and response controls.

Prior to joining Fox Forensic Accounting, Bruce had leadership roles at several international accounting firms where he was a member of their national forensic accounting and dispute services practices. He has assisted audit committees, special committees of boards of directors and senior management in investigating fraud and misconduct. He has assessed the financial impact and reputational risks associated with allegations of noncompliance with auditing standards, accounting principles and government regulations. His experience includes interfacing with regulators and reporting the facts surrounding the fraud and misconduct. Bruce has served as a court-appointed special master.

Service specialization in the following:

- Financial statement investigations
- Fraud and misconduct investigations
- Dispute advisory and litigation support
- Assessment of fraud and regulatory risk
- Regulatory and compliance audits

Bruce has the following expertise in accounting and finance:

- Investigating transactions and disclosures for compliance with company policies accounting policies and procedures, generally accepted accounting principles and associated regulatory standards;

- Conducting research on a wide range of accounting topics and advising companies on compliance with accounting principles and SEC regulations;

- Analyzing positions and options in connection with purchase agreement disputes, including net working capital adjustments, breech of representations and warranties, calculation of earnouts and other asset acquisition related disputes;

- Evaluating financial statements, financial results, financial forecasts, and financial projections to determine the damages associated with contract disputes and provided objective analysis to assist in the resolution of the disputes through mediation, arbitration and legal remedies; and,

125 S. Wacker Drive, Suite 300, Chicago, IL  60606
107 W. 9th Street, Suite 200, Kansas City, MO  64105
100 Crescent Court, 7th Floor, Dallas, TX  75201

- Applying retrospective data analysis in assessing and detecting financial misconduct and internal control deficiencies.

Bruce's financial statement and fraud and misconduct investigations include the following:

- Financial institutions and financial services;
- Technology manufacturing;
- Construction and commercial real estate development;
- Oil and gas exploration and development;
- Retail;
- Web hosting and internet portal; and,
- Casinos.

## Testimony in the past 10 years

- *Citizens State Bank, and America Southwest Mortgage Funding Corp. v. Heard, McElroy, &Vestal, LLC, United States District Court for the Western District of Oklahoma, deposition testimony*
- *Federal Deposit Insurance Corporation v. Crowe Horwath LLP,* United States District Court for the Northern District of Illinois, deposition testimony
- *Robert O. Schachter, HTS Capital, LLC and Clearwaters Capital, LLC v. Twin Cities Power, LLC, Timothy Krieger and Michael Tufte*, American Arbitration Association, testimony
- *Network Engines, Inc. v. Jonathan Shapiro, as Shareholder Representative of the Company Shareholders of Alliance Systems, Inc.,* American Arbitration Association, testimony

## Presentations and seminars in the past 10 years

- "Key Considerations in Calculating Damages in Post-Acquisition Disputes," January 21, 2021 (live webinar), Sponsor: FFA - approved for CLE (pending CPE), Co-Presenter
- "Consideration of Fraud Risks Associated with the New Revenue Recognition Standards," 13th Annual Fraud Summit Benefitting the IAEP Program at UT Dallas, March 23, 2018, Co-Presenter
- "Knowing the Red Flags: Protecting Corporate Assets from External and Internal Fraud," Oklahoma State Society of CPAs, November 16, 2017
- "How to Spot Fraud and Mitigate Fraudulent Activities: For Government Entities and Nonprofit Organizations," Association of Government Accountants Oklahoma City Chapter, November 15, 2017, Co-Presenter
- "Post-Closing Disputes and the Underlying Potential for Fraud," 12th Annual Fraud Summit Benefitting the IAEP Program at UT Dallas, March 31, 2017, Co-Presenter
- "Daubert Challenges: Key Issues, Recent Trends and Preparing Damages Experts," Thompson Coburn LLP, April 29, 2014, Co-Presenter
- "Understanding Financial Statements: Risks and Red Flags," Friedman & Feiger LLP, June 12, 2012, Co-Presenter

## Professional affiliations and credentials

- Certified Public Accountant (CPA) in Texas, Arizona and Colorado
- Certified in Financial Forensics (CFF)
- American Institute of Certified Public Accountants (AICPA)

**Bruce V. Bush, CPA, CFF**
Fox Forensic Accounting, LLC

## <u>Education</u>

- Master in Business Administration, minor in Economics, Texas A&M University–Commerce
- Bachelor of Science, Accounting, Metropolitan State College of Denver

**Attachment C**
**Partner Reinsurance Company, Ltd v. RPM Mortgage, Inc. et al**
**Mr. Imburgia Damage Calculation (Cash Portion)**

| | RPM | Radian | Difference | |
|---|---|---|---|---|
| **Base Price** | $13,125,000 | $ 7,310,573 | $ 5,814,427 | **A** |
| **Cash Purchase Price Adjustment Amount** | (1,103,232) | - | (1,103,232) | **B** |
| **Estimated Cash Purchase Price** | 12,021,768 | 7,310,573 | 4,711,195 | **C=A-B** |
| | | | | |
| **Indemnification Escrow (1)** | (1,000,000) | 33,237 | (1,033,237) | **D** |
| | 11,021,768 | 7,343,810 | 3,677,958 | |
| | | | | |
| **Indebtedness - Related Party** | (1,971,384) | (5,207,694) | 3,236,310 | **E=sum(E1 to E7)** |
| *Bridge Notes PartnerRe (Principal) (2)* | *(1,500,000)* | *(3,425,000)* | *1,925,000* | **E1** |
| *Bridge Notes - Zicklin (Principal)* | *-* | *(400,000)* | *400,000* | **E2** |
| *Bridge Notes - Sulam (Principal)* | *-* | *(150,000)* | *150,000* | **E3** |
| *Bridge Note - Palmer (Principal)* | *-* | *(250,000)* | *250,000* | **E4** |
| *Accrued Interest on Bridge Notes* | *(213,556)* | *(522,441)* | *308,885* | **E5** |
| *Minimum Repayment on Bridge Notes* | *-* | *(77,823)* | *77,823* | **E6** |
| *Partner Re Board Fees* | *(257,828)* | *(292,448)* | *34,620* | **E7** |
| *Broken Deal Legal Costs* | *-* | *(89,982)* | *89,982* | **E8** |
| **Transaction Expenses** | (1,086,915) | (272,753) | (814,162) | **F=F1+F2** |
| *Estimated Legal Costs* | *(510,006)* | *(272,753)* | *(237,253)* | **F1** |
| *Employee Transaction Bonus* | *(576,909)* | *-* | *(576,909)* | **F2** |
| **Stockholder Representative Expense - Related Party** | (250,000) | (100,000) | (150,000) | **G** |
| **Sub-total** | (4,308,299) | (5,547,210) | 1,238,911 | **H=D+E+F+G** |
| | | | | |
| **Cash Consideration** | **$ 7,713,469** | **$ 1,763,363** | **$ 5,950,106** | **I=C-H** |

(1) PR00022494, "Consideration Spreadsheet" tab; shows -950,374.55, however, Mr. Imburgia's report states he has been asked by Counsel to assume the full amount of the indemnification escrow of $983,611.49, a $33,237 difference.

(2) The RPM-Entitle Merger Agreement called for a payoff of $1,500,000 of PartnerRe Bridge Notes. An additional $1,000,000 of PartnerRe Bridge Notes existed; however, rather than being paid off, the Merger Agreement called for conversion of the debt to equity. As such, the additional $1,000,000 of notes is not listed in this attachment.

Sources: PR00022494, "Consideration Spreadsheet" and "Payoff Letters" tabs; Expert Report of Basil Imburgia, pages 7-8.

**Attachment E-1**
**Partner Reinsurance Company, Ltd v. RPM Mortgage, Inc. et al**
**Entitle Direct Group Yearly Financial Data Filed**

| For the period ending | December 31, | | | June 30, | | March 31, | |
|---|---|---|---|---|---|---|---|
| | 2015 | 2016 | 2017 | 2016 | 2017 | 2016 | 2017 |
| **Revenues** | | | | | | | |
| Agent premiums | $ 4,422,035 | $ 4,845,711 | $ 5,356,543 | $ 2,169,003 | $ 2,386,455 | $ 793,032 | $ 912,770 |
| Direct premiums | 7,831,745 | 6,963,563 | 4,094,047 | 3,166,092 | 1,945,887 | 1,506,453 | 908,921 |
| Escrow and settlement services | 5,299,274 | 3,760,325 | 2,137,520 | 1,865,793 | 1,008,729 | 926,825 | 509,268 |
| | 17,553,054 | 15,569,599 | 11,588,110 | 7,200,888 | 5,341,071 | 3,226,310 | 2,330,959 |
| Year Over Year Decline in Revenue | | (11.3)% | (25.6)% | | (25.8)% | | (27.8)% |
| | | | | | | | |
| **Operating Expenses** | | | | | | | |
| Losses and loss adjustment expenses | (364,493) | 884,481 | 1,019,043 | 444,163 | 420,431 | 233,867 | 126,679 |
| Agent commissions | 3,587,969 | 3,961,198 | 4,315,227 | 1,757,836 | 1,929,361 | 655,256 | 752,127 |
| Search and settlement fees | 3,497,662 | 2,664,128 | 1,533,496 | 1,252,046 | 736,040 | 572,233 | 366,891 |
| State license and permit fees | 102,639 | 104,105 | 89,881 | 68,459 | 63,394 | 45,674 | 40,950 |
| Premium taxes | 328,008 | 337,875 | 240,817 | 157,933 | 112,079 | 72,463 | 49,075 |
| Salaries and employee benefits | 6,105,712 | 5,860,742 | 5,437,775 | 2,976,589 | 2,553,988 | 1,543,065 | 1,339,654 |
| Consulting fees | 446,939 | 648,558 | 403,241 | 355,897 | 197,124 | 172,219 | 98,252 |
| Marketing and advertising | 491,880 | 319,697 | 296,575 | 171,345 | 157,774 | 84,879 | 60,306 |
| Professional fees | 355,839 | 445,962 | 464,719 | 45,882 | 297,540 | 63,227 | 194,789 |
| Bank fees | 284,546 | 236,701 | 209,211 | 114,687 | 99,921 | 52,279 | 50,927 |
| Rent and facilities expense | 616,544 | 631,175 | 753,026 | 317,473 | 306,822 | 163,904 | 151,057 |
| Depreciation and amortization | 124,117 | 197,517 | 239,827 | 105,637 | 88,842 | 48,471 | 42,500 |
| General, administrative and other | 1,835,945 | 1,951,048 | 2,031,701 | 937,045 | 894,358 | 401,747 | 389,326 |
| | 17,413,307 | 18,243,187 | 17,034,539 | 8,704,992 | 7,857,674 | 4,109,284 | 3,662,533 |
| | | | | | | | |
| **Net Operating Income (Loss)** | 139,747 | (2,673,588) | (5,446,429) | (1,504,104) | (2,516,603) | (882,974) | (1,331,574) |
| Year Over Year Decline in Net Operating Income (Loss) | | (2013.2)% | 103.7% | | 67.3% | | 50.8% |
| | | | | | | | |
| **Net Investment Income (Expense)** | 7,675 | (92,611) | 43,194 | 6,600 | 14,123 | 3,218 | 3,131 |
| | | | | | | | |
| **Deferred Income Tax Expense** | (4,473,000) | - | - | | - | | |
| | | | | | | | |
| **Net Income (Loss)** | $ (4,325,578) | $ (2,766,199) | $ (5,403,235) | $ (1,497,504) | $ (2,502,480) | $ (879,756) | $ (1,328,443) |
| | | | | | | | |
| *Source:* | *ENT00231589* | *ENT00231589* | *PRO0022494* | *PRO0022494* | *PRO0022494* | *PRO0022494* | *PRO0022494* |

**Attachment E-2**

**Partner Reinsurance Company, Ltd v. RPM Mortgage, Inc. et al**

**Analysis of Entitle Insurance Company Financial Data File with the Ohio Department of Insurance**

| For the period ending | March 31, | | June 30, | | December 31, | | |
|---|---|---|---|---|---|---|---|
| **Line # Description** | 2016 | 2017 | 2016 | 2017 | 2015 | 2016 | 2017 |
| **Operating Income** | | | | | | | |
| 1.1 Title Insurance Premiums earned | $ 2,239,891 | $ 1,820,477 | $ 5,174,510 | $ 4,284,406 | $ 11,660,426 | $ 11,414,429 | $ 9,276,849 |
| 1.2 Escrow settlement services | 754,305 | 382,548 | 1,520,658 | 763,888 | 4,028,288 | 3,029,489 | 1,612,516 |
| 1.3 Other title fees and services | 193,111 | 149,912 | 394,310 | 298,119 | 1,405,002 | 865,651 | 655,423 |
| 2 Other operating income | - | - | - | - | - | - | - |
| 3 Total operating income | 3,187,307 | 2,352,937 | 7,089,478 | 5,346,413 | 17,093,716 | 15,309,569 | 11,544,788 |
| *Year Over Year Decline* | | *(26.2)%* | | *(24.6)%* | | *(10.4)%* | *(24.6)%* |
| **Expenses** | | | | | | | |
| 4 Losses and loss adjustment expense | 159,879 | 70,389 | 296,188 | 307,550 | (185,938) | 733,223 | 792,982 |
| 5 Operating expenses incurred | 3,823,254 | 3,305,399 | 8,164,913 | 6,990,582 | 17,591,766 | 16,919,249 | 14,992,288 |
| 7 Total operating expenses | 3,983,133 | 3,375,788 | 8,461,101 | 7,298,132 | 17,405,828 | 17,652,472 | 15,785,270 |
| 8 Net operating gain or (loss) | (795,826) | (1,022,851) | (1,371,623) | (1,951,719) | (312,112) | (2,342,903) | (4,240,482) |
| *Year Over Year Decline* | | *28.5%* | | *42.3%* | | *650.7%* | *81.0%* |
| **Investment Income** | | | | | | | |
| 9 Net investment income earned | 3,194 | 3,114 | 6,549 | 14,074 | 7,612 | 15,271 | 43,145 |
| | 3,194 | 3,114 | 6,549 | 14,074 | 7,612 | 15,271 | 43,145 |
| 11 Net investment gain(loss) | $ (792,632) | $ (1,019,737) | $ (1,365,074) | $ (1,937,645) | $ (304,500) | $ (2,327,632) | $ (4,197,337) |
| **Capital and Surplus Account** | | | | | | | |
| Surplus as regards policyholders | | | | | | | |
| 16 December 31 prior year | 9,377,208 | 8,509,955 | 9,377,208 | 8,509,955 | 10,050,762 | 9,377,208 | 8,509,955 |
| 17 Net income | (792,632) | (1,019,737) | (1,365,074) | (1,937,645) | (304,500) | (2,327,632) | (4,197,337) |
| Change in net unrealized capital gains | | | | | | | |
| 18 or losses | (1,148) | 1,703 | (1,531) | 1,733 | 125 | 429 | 1,600 |
| 20 Change in deferred taxes | - | - | - | - | (4,341,968) | (339,898) | - |
| 21 Change in nonadmitted assets | 34,018 | 157,398 | 131,541 | 151,136 | 2,972,789 | 299,848 | 36,712 |
| 26.1 Capital Changes: Paid in | - | - | 500,000 | - | 1,000,000 | 1,500,000 | 1,000,000 |
| Change in surplus as regards | | | | | | | |
| 31 policyholders | (759,762) | (860,636) | (735,064) | (1,784,776) | (673,554) | (867,253) | (3,159,025) |
| Surplus as regards policyholders | | | | | | | |
| 32 December 31 current year | $ 8,617,446 | $ 7,649,319 | $ 8,642,144 | $ 6,725,179 | $ 9,377,208 | $ 8,509,955 | $ 5,350,930 |
| *Source:* | *ENT00003294* | *ENT00008912* | *ENT00004286* | *ENT00031402* | *ENT00041079* | *ENT00041079* | *ENT00035098* |

**Attachment F**
**Partner Reinsurance Company, Ltd v. RPM Mortgage, Inc. et al**
**Other Receivables Due From Hirts Transaction and Balance History**

| | | | Other Receivables Entry | | | | Journal Entry Offset to Other Receivables Debit or Credit | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| December 31, 2015 to October 31, 2017 | | | | | | | Insufficient Data | Cash (Asset) | APIC (Equity) | Distributions (Equity) | Officer Wages (Expense) | Investment in Partner (Asset) |
| Date | Reference | Description | Debit | Credit | Balance | JE Offset | | | | | | |
| 12/31/2015 | JE-051210 | Transfer - T. Hirt | 300,000.00 | - | 300,000.00 | Unknown (no GL | (300,000.00) | | | | | |
| 1/7/2016 | JE-051212 | Transfer - T. Hirt | 100,000.00 | - | 400,000.00 | Unknown (no GL | (100,000.00) | | | | | |
| 1/22/2016 | JE-051213 | Transfer - T. Hirt | 100,000.00 | - | 500,000.00 | Unknown (no GL | (100,000.00) | | | | | |
| 1/27/2016 | JE-051214 | Transfer - T. Hirt | 4,000,000.00 | - | 4,500,000.00 | Unknown (no GL | (4,000,000.00) | | | | | |
| 2/10/2016 | JE-051513 | American Express Payment | 49,276.69 | - | 4,549,276.69 | Unknown (no GL | (49,276.69) | | | | | |
| 3/17/2016 | JE-052127 | Transfer - T. Hirt | 150,000.00 | - | 4,699,276.69 | Unknown (no GL | (150,000.00) | | | | | |
| 7/25/2016 | JE-055933 | Transfer - T. Hirt | - | 5,000,000.00 | (300,723.31) | Unknown (no GL | 5,000,000.00 | | | | | |
| 8/10/2016 | JE-056258 | American Express Payment | 25,000.00 | - | (275,723.31) | Unknown (no GL | (25,000.00) | | | | | |
| 8/18/2016 | AP-034603 | The Lincoln National Life /IN: 081816 | 8,675.00 | - | (267,048.31) | Unknown (no GL | (8,675.00) | | | | | |
| 9/12/2016 | JE-056893 | American Express Payment | 50,000.00 | - | (217,048.31) | Unknown (no GL | (50,000.00) | | | | | |
| 9/26/2016 | JE-057132 | Transfer - T. Hirt | 1,200,000.00 | - | 982,951.69 | Unknown (no GL | (1,200,000.00) | | | | | |
| 10/7/2016 | JE-057444 | American Express Payment | 90,000.00 | - | 1,072,951.69 | Unknown (no GL | (90,000.00) | | | | | |
| 10/27/2016 | JE-058615 | Transfer - T. Hirt | 500,000.00 | - | 1,572,951.69 | Unknown (no GL | (500,000.00) | | | | | |
| 11/9/2016 | JE-058916 | American Express Payment | 103,793.20 | - | 1,676,744.89 | Unknown (no GL | (103,793.20) | | | | | |
| 11/15/2016 | JE-058944 | Transfer - T. Hirt | 250,000.00 | - | 1,926,744.89 | Unknown (no GL | (250,000.00) | | | | | |
| 12/8/2016 | JE-059505 | American Express Payment | 125,000.00 | - | 2,051,744.89 | Unknown (no GL | (125,000.00) | | | | | |
| 12/9/2016 | JE-059546 | Transfer - T. Hirt | 500,000.00 | - | 2,551,744.89 | Unknown (no GL | (500,000.00) | | | | | |
| 12/12/2016 | JE-059547 | Transfer - T. Hirt | 500,000.00 | - | 3,051,744.89 | Unknown (no GL | (500,000.00) | | | | | |
| 12/16/2016 | JE-059690 | Transfer - T. Hirt | 5,000.00 | - | 3,056,744.89 | Unknown (no GL | (5,000.00) | | | | | |
| 1/5/2017 | JE-060400 | Transfer - T. Hirt | 4,025,000.00 | - | 7,081,744.89 | Cash | | (4,025,000.00) | | | | |
| 1/31/2017 | JE-060928 | Transfer - T. Hirt | 2,500,000.00 | - | 9,581,744.89 | APIC | | | (2,500,000.00) | | | |
| 2/28/2017 | JE-062285 | Transfer - T. Hirt | 1,200,000.00 | - | 10,781,744.89 | APIC | | | (1,200,000.00) | | | |
| 3/31/2017 | JE-062850 | Transfer - T. Hirt | 500,000.00 | - | 11,281,744.89 | APIC | | | (500,000.00) | | | |
| 4/30/2017 | JE-064019 | Transfer - T. Hirt | 650,000.00 | - | 11,931,744.89 | APIC | | | (650,000.00) | | | |
| 5/31/2017 | JE-064455 | Transfer - T. Hirt | - | 2,200,000.00 | 9,731,744.89 | Dividend Distribution | | | | 2,200,000.00 | | |
| 6/30/2017 | JE-002698 | Transfer - T. Hirt | - | 1,500,000.00 | 8,231,744.89 | Distribution-RPM | | | | 1,500,000.00 | | |
| 6/30/2017 | JE-002702 | Transfer - T. Hirt | 300,000.00 | - | 8,531,744.89 | Distribution-RPM | | | | (300,000.00) | | |
| 7/31/2017 | JE-004262 | Transfer - T. Hirt | - | 1,200,000.00 | 7,331,744.89 | Distribution-RPM | | | | 1,200,000.00 | | |
| 8/31/2017 | JE-006808 | Reversal of payroll - R. Hirt | 271,000.00 | - | 7,602,744.89 | Salaries & Wages:Officers | | | | | (271,000.00) | |
| 10/31/2017 | JE-010170 | Investment in TRH Holdings LLC | - | 9,111,914.89 | (1,509,170.00) | Investment in Partner | | | | | | 9,111,914.89 |
| **Total** | | | **17,502,744.89** | **19,011,914.89** | **(1,509,170.00)** | | **(3,056,744.89)** | **(4,025,000.00)** | **(4,850,000.00)** | **4,600,000.00** | **(271,000.00)** | **9,111,914.89** |

**Source**: LENDUS 00053543, LENDUS 00046126, LENDUS 00053390

**Attachment D**
**Partner Reinsurance Company, Ltd v. RPM Mortgage, Inc. et al**
**Minority Interest Equity Valuation**

| Valuation Date As of June 9, 2017 | June 9, 2017, to December 31, 2017 (Note 10) | For the Year Ended December 31 (in thousands of U.S. dollars), | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 | 2026 | |
| **Total Revenue:** | | | | | | | | | | | |
| Title Premium Earned | $ 7,342 | 14,254 $ | 16,764 | $ 17,484 $ | 18,236 $ | 19,020 $ | 19,838 $ | 20,691 $ | 21,581 $ | 22,509 | A1 |
| Escrow Charges | 1,538 | 3,471 | 4,461 | 4,653 | 4,853 | 5,062 | 5,280 | 5,507 | 5,744 | 5,991 | A2 |
| Other Related Income | 113 | 300 | 343 | 358 | 373 | 389 | 406 | 423 | 441 | 460 | A3 |
| Subtotal - Total Revenue | 8,992 | 18,025 | 21,568 | 22,495 | 23,462 | 24,471 | 25,524 | 26,621 | 27,766 | 28,960 | A=sum(A1 to A3) |
| Annual Growth Rate - Total Revenue | | 100.4% | 19.7% | 4.3% | 4.3% | 4.3% | 4.3% | 4.3% | 4.3% | 4.3% | B |
| **Total Losses and Operating Expenses:** | | | | | | | | | | | |
| Net Losses Incurred | 462 | 905 | 1,056 | 1,101 | 1,148 | 1,197 | 1,249 | 1,303 | 1,359 | 1,417 | C1 |
| Net Loss Adjustment Expenses Incurred | 25 | 50 | 50 | 52 | 54 | 56 | 58 | 60 | 63 | 66 | C2 |
| Direct Commissions & Brokerage | 3,383 | 5,772 | 6,349 | 6,622 | 6,907 | 7,204 | 7,514 | 7,837 | 8,174 | 8,526 | C3 |
| Other Contractual Expenses (1) | 90 | 198 | 218 | 227 | 237 | 247 | 258 | 269 | 281 | 293 | C4 |
| Other Underwriting Expenses Incurred (2) | 5,732 | 10,947 | 12,842 | 13,394 | 13,970 | 14,571 | 15,198 | 15,851 | 16,533 | 17,244 | C5 |
| Subtotal - Total Losses and Operating Expenses | 9,693 | 17,872 | 20,515 | 21,396 | 22,316 | 23,275 | 24,277 | 25,320 | 26,410 | 27,546 | C=sum(C1 to C5) |
| Income (Loss) Before Underwriting Gain (Loss) | (700) | 153 | 1,053 | 1,099 | 1,146 | 1,196 | 1,247 | 1,301 | 1,356 | 1,414 | D=A-C |
| Net Investment Income | 14 | 30 | 45 | 47 | 49 | 51 | 53 | 55 | 57 | 59 | E |
| Income (Loss) Before Income Taxes | (686) | 183 | 1,098 | 1,146 | 1,195 | 1,247 | 1,300 | 1,356 | 1,413 | 1,473 | F=D+E |
| Income (Loss) Before Income Taxes Margin | -7.6% | 1.0% | 5.1% | 5.1% | 5.1% | 5.1% | 5.1% | 5.1% | 5.1% | 5.1% | G=F/A |
| Add Back: Depreciation and Amortization (3) | - | - | - | - | - | - | - | - | - | - | |
| Back Out: Acquisition of Plant, Property and Equipment (3) | - | - | - | - | - | - | - | - | - | - | |
| Add Back: Changes in Net Working Capital (4) | - | - | - | - | - | - | - | - | - | - | |
| Add Back: Interest Expense (5) | - | - | - | - | - | - | - | - | - | - | |
| | | | | | | | | | | | H (2017 = % of year from June 9 to December 31 2017) |
| Multiply by: Pro-Rated Portion | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 | |
| Net Income Before Tax | (686) | 183 | 1,098 | 1,146 | 1,195 | 1,247 | 1,300 | 1,356 | 1,413 | 1,473 | I=F*H |
| Estimated Depreciation and Amortization (3) | (70) | (139) | (139) | (139) | (139) | (139) | (139) | (139) | (139) | (139) | J |
| Carryover of Post-Acquisition NOL (6) | - | (44) | (712) | - | - | - | - | - | - | - | K |
| Carryover of Pre-Acquisition NOL (6) | - | - | (248) | (377) | (377) | (377) | (377) | (377) | (377) | (377) | L |
| Taxable Income (Loss) | (756) | - | (1) | 630 | 679 | 731 | 784 | 840 | 897 | 957 | M=I+J+K+L |
| Tax Rate (6) | 25% | 25% | 25% | 25% | 25% | 25% | 25% | 25% | 25% | 25% | N |
| Estimated Federal Taxes (6) | - | - | (0) | (158) | (170) | (183) | (196) | (210) | (224) | (239) | O=M*N |
| Income After Taxes | (686) | 183 | 1,098 | 988 | 1,025 | 1,064 | 1,104 | 1,146 | 1,189 | 1,234 | P=I+O |
| Less: Capital Requirement per ODI's Office of Risk Assessment ($5,500,000) (7) | - | (183) | (1,098) | (988) | (1,025) | (1,064) | (1,104) | (37) | - | - | Q |
| Net Cash Flow to Equity | (686) | - | - | - | - | - | - | 1,109 | 1,189 | 1,234 | R=P+Q |
| Number of Years Discounted (8) | 0.28219 | 1.06027 | 2.06027 | 3.06027 | 4.06027 | 5.06027 | 6.06027 | 7.06027 | 8.06027 | 9.06027 | S |
| Discount Rate (9) | 14.43% | 14.43% | 14.43% | 14.43% | 14.43% | 14.43% | 14.43% | 14.43% | 14.43% | 14.43% | T |
| Present Value Factor | 0.96268 | 0.86683 | 0.75752 | 0.66199 | 0.57851 | 0.50556 | 0.44181 | 0.38609 | 0.33741 | 0.29486 | U |
| Present Value of Net Cash Flow to Equity | $ (660) $ | - $ | - $ | - $ | - $ | - $ | - $ | 428 $ | 401 $ | 364 | V=R*U |

| | | | | | |
|---|---|---|---|---|---|
| Present Value of Cash Flows Available to Ownership (First Ten | $ 533 | Z=sum(V--2017 to 2026) | | Terminal Value - End of 2026 | $ 12,703 | W=(R*(1+B))/(T-B) |
| Terminal Value of Ownership | 3,745 | AA=Y | | Present Value Factor | 0.29486 | X=U(2026) |
| Present Value of Cash Flows Available to Ownership Plus Terminal Value | $ 4,278 | AB=Z+AA | | Present Value of Terminal Value | $ 3,745 | Y=W*X |
| **Present Value of Cash Flows Available to Minority Ownership Plus Terminal Value 36.52%** | $ 1,562 | AC=AB*36.52% | | | | |
| Less 25% for Lack of Marketability | 25.00% | AD | | | | |
| **Present Value of Cash Flows Available to Minority Ownership Plus Terminal Value, Less 25% for Lack of Marketability** | $ 1,172 | AE=AC*(1-AD) | | | | |

**Attachment D**

**Partner Reinsurance Company, Ltd v. RPM Mortgage, Inc. et al**

**Minority Interest Equity Valuation**

(1) The projections sent from Entitle to RPM fail to include 'Other Contractual Expenses' as an increase to operating expenses (formula does not include). I have included these expenses in my calculation.

(2) Per a footnote in the projection files, "Excludes: Interest ib ORE debt, board fees, and Vinyl deal expenses; Includes: a lease termination payment expected to be $250K for the CT lease projected to occur in Q3 2017."

(3) The average depreciation & amortization over fiscal years 2013 to 2016 was $139k/year; the average acquisition of plant, property and equipment cost over fiscal years 2013 to 2016 was $224k/year. This would result in a net decrease to the net income before taxes per year; however, I have conservatively excluded this from my calculation.

(4) I have assumed that any growth in revenues would sufficiently finance any additional net working capital.

(5) The average interest expense over fiscal years 2013 to 2016 was $27k, with almost the entirety being in 2016 of $108k. My understanding is that all interest bearing debt would have been paid off as part of the acquisition arrangement, and therefore would not be a factor going forward in projections.

(6) I have not calculated the fair market value of EDG prior to the ownership change. For purposes of calculating the carryover of the Net Operating Loss ('NOL') subsequent to the ownership change I have utilized a conservative value of $18,033,000. Additionally, I have utilized the Long-Term Tax-Exempt Rate for ownership changes of 2.09% (Recv. Rul. 2017-12 Table 3 Rates Under Section 382 for June 2017). This equals a NOL carryover of $376,890. For purposes of the calculation of income taxes I have assumed a combined Federal and state combined rate of 25%. Additionally, I assume that depreciation expense is equal to the average of the last four years of $135,863.

(7) On June 28, 2017, ODI's Office of Risk Assessment communicated to Entitle that there was a $5.5 million capital contribution requirement. In the post-acquisition event that RPM were to have made the $5.5 million capital contribution, this amount would have logically been required as a priority to be paid back to RPM prior to dividends being paid to shareholders.

(8) Number of years discounted is based on a half-year calculation to account for the average across the entire year.

(9) Sourced from the Duff & Phelps Cost of Capital Navigator™ U.S. Cost of Capital Module, Industry: SIC 63 - Insurance Carriers, Valuation Date 6/9/2017.

The discount rate is based on the cumulation of four factors (Rf + ERP + RPi + RPs):

Rf = 3.5%, Risk-free rate sourced from the Federal Reserve Bank of St. Louis

ERP = 5.5%, Equity (market) risk premium

RPi = (0.16%), Industry risk premium

RPs = 5.59%, Size premium

(10) June 2017 actual financial details, as per PR00022494, prorated to 21 days in June, plus projected financials for 2nd half of 2017

**Attachment G – Appraiser's Certification**

1. The statements of fact expressed herein are true and correct to the best of the appraiser's knowledge and belief.

2. The reported analyses, opinions, and conclusions are limited only by the reported assumptions and limiting conditions and are the appraiser's personal, impartial, unbiased opinions, professional analyses, opinions, and conclusions.

3. Bruch Bush and the engagement team of Fox Forensic Accounting, LLC, have no present or prospective interest in the subject property; nor any personal interest with respect to the parties, nor any other interest or bias which would impair their ability to perform this assignment.

4. Neither Bruce Bush or any employee of Fox Forensic Accounting, LLC, nor any of the appraisers who contributed to this report has any present or prospective interest in the subject property; nor any personal interest with respect to the parties, nor any other interest or bias which would impair a fair and unbiased appraisal.

5. Compensation paid to the appraiser for this appraisal is independent of the value reported. It is not contingent on the development or reporting of a predetermined value or direction in value that favors the cause of the client, the amount of the value opinion, the attainment of a stipulated result, or the occurrence of a subsequent event directly related to the intended use of the appraisal.

6. The appraiser has not made a personal inspection of the subject property.

7. This appraisal has been conducted and this report issued pursuant to the Statement on Standards for Valuation Series No. 1 ("SSVS1") promulgated by the American Institute of Certified Public Accountants ("AICPA") in effect at the date this report is issued.

8. Cliff Porter, CPE, CFF; Shawn Fox, CPA, ABV, ASA, CFA; and Maria Patterson have assisted with research and analysis, but have not acted as an "appraiser." No person except the undersigned participated materially in the conclusion of this appraisal.

The valuation considerations here are contingent upon the analysis, and limiting conditions as set forth in the body of the report.

*Bruce V. Bush*

_____
Bruce Bush, CPA, CFF

**Attachment H – Assumptions and Limiting Conditions**

1. The conclusion of value (or the calculated value) arrived at herein is valid only for the stated purpose as of the date of the valuation.

2. Financial statements and other related information provided by RPM Mortgage, Inc. ("RPM") and LendUS, LLC ("LendUS") or its representatives, in the course of this engagement, have been accepted without any verification as fully and correctly reflecting the enterprise's business conditions and operating results for the respective periods, except as specifically noted herein. Fox Forensic Accounting, LLC, has not audited, reviewed, or compiled the financial information provided to us and, accordingly, we express no audit opinion or any other form of assurance on this information.

3. Public information and industry and statistical information have been obtained from sources we believe to be reliable. However, we make no representation as to the accuracy or completeness of such information and have performed no procedures to corroborate the information.

4. We do not provide assurance on the achievability of the results forecasted by RPM and LendUS because events and circumstances frequently do not occur as expected; differences between actual and expected results may be material; and achievement of the forecasted results is dependent on actions, plans, and assumptions of management.

5. The conclusion of value (or the calculated value) arrived at herein is based on the assumption that the current level of management expertise and effectiveness would continue to be maintained, and that the character and integrity of the enterprise through any sale, reorganization, exchange, or diminution of the owners' participation would not be materially or significantly changed.

6. This report and the conclusion of value (or the calculated value) arrived at herein are for the exclusive use of our client for the sole and specific purposes as noted herein. They may not be used for any other purpose or by any other party for any purpose. Furthermore, the report and conclusion of value (or the calculated value) are not intended by the author and should not be construed by the reader to be investment advice in any manner whatsoever. The stated valuation represents the considered conclusion of value (or the calculated value) of Fox Forensic Accounting, LLC, based on information furnished to them by RPM and LendUS and other sources.

7. Neither all nor any part of the contents of this report (especially the conclusion of value [or the calculated value], the identity of any valuation specialist(s), or the firm with which such valuation specialists are connected or any reference to any of their professional designations) should be disseminated to the public through advertising media, public relations, news media, sales media, mail, direct transmittal, or any other means of communication without the prior written consent and approval of Fox Forensic Accounting, LLC.

8. Future services regarding the subject matter of this report, including, but not limited to testimony or attendance in court, shall not be required of Fox Forensic Accounting, LLC, unless previous arrangements have been made in writing.

9. Fox Forensic Accounting, LLC, is not an environmental consultant or auditor, and it takes no responsibility for any actual or potential environmental liabilities. Any person entitled to rely on this report, wishing to know whether such liabilities exist, or the scope and their effect on the value of the property, is encouraged to obtain a professional environmental assessment. Fox Forensic Accounting, LLC, does not conduct or provide environmental assessments and has not performed one for the subject property.

10. Fox Forensic Accounting, LLC, has not determined independently whether RPM and LendUS are subject to any present or future liability relating to environmental matters (including, but not limited to CERCLA/Superfund liability) nor the scope of any such liabilities. Fox Forensic Accounting, LLC's valuation takes no such liabilities into account, except as they have been reported to Fox Forensic Accounting, LLC, by RPM and LendUS or by an environmental consultant working for RPM and LendUS, and then only to the extent that the liability was reported to us in an actual or estimated dollar amount. Such matters, if any, are noted in the report. To the extent such information has been reported to us, Fox Forensic Accounting, LLC, has relied on it without verification and offers no warranty or representation as to its accuracy or completeness.

11. Fox Forensic Accounting, LLC, has not made a specific compliance survey or analysis of the subject property to determine whether it is subject to, or in compliance with, the American Disabilities Act of 1990, and this valuation does not consider the effect, if any, of noncompliance.

12. No change of any item in this report shall be made by anyone other than Fox Forensic Accounting, LLC, and we shall have no responsibility for any such unauthorized change.

13. Unless otherwise stated, no effort has been made to determine the possible effect, if any, on the subject business due to future Federal, state, or local legislation, including any environmental or ecological matters or interpretations thereof.

14. If prospective financial information approved by management has been used in our work, we have not examined or compiled the prospective financial information and therefore, do not express an audit opinion or any other form of assurance on the prospective financial information or the related assumptions. Events and circumstances frequently do not occur as expected and there will usually be differences between prospective financial information and actual results, and those differences may be material.

15. Except as noted, we have relied on the representations of the owners, management, and other third parties concerning the value and useful condition of all equipment, real estate, investments used in the business, and any other assets or liabilities, except as specifically stated to the contrary in this report. We have not attempted to confirm whether or not all assets of the business are free and clear of liens and encumbrances or that the entity has good title to all assets.