UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
                             :

PARTNER REINSURANCE COMPANY LTD.,        :
                             :

                   Plaintiff,      :
                             :               18 Civ. 5831 (PAE)
           -v-                  :
                             :             OPINION & ORDER
RPM MORTGAGE, INC. ET AL,              :
                             :

                  Defendants.    :
                             :

------------------------------------------------------------------------X

PAUL A. ENGELMAYER, District Judge:

      This decision sets out the Court's findings of fact and conclusions of law pursuant to

Federal Rule of Civil Procedure 52 following an eight-day bench trial in this case, which entails

reciprocal claims of contract breach in the wake of an unconsummated merger within the

insurance industry.

      Pursuant to a merger agreement, defendant RPM Mortgage, Inc. ("RPM"), a family-

owned and California-based mortgage bank, was to have acquired a majority share in Entitle

Direct Group, Inc. ("Entitle"), an Ohio-based title insurance company, in a cash and equity

transaction.  RPM, however, did not show up at the June 2017 closing.  RPM blamed purported

breaches by Entitle of its obligations, while attempting to re-negotiate the transaction on

materially more favorable terms.

      Plaintiff Partner Reinsurance Company Ltd. ("PartnerRe"), a principal owner of Entitle

which has been assigned the right to bring claims on Entitle's behalf, here brings a breach of

contract claim against RPM's successor in interest, LendUS, LLC ("LendUS").[1]  PartnerRe also

brings claims under a theory of alter ego liability against RPM's chief executive Robert Hirt

("Hirt"), its former president Tracey Hirt ("Ms. Hirt"), and the Robert Hirt and Tracey Najarian

Hirt Revocable Living Trust (the "Trust").  RPM's counterclaim is based on Entitle's ostensible

breaches of its pre-closing obligations.

Trial was held between December 9 and 17, 2021, with closing arguments heard on

January 18, 2022.  Trial dominantly focused on the three-month period between May and July

2017, during which the circumstances giving rise to the parties' respective claims of breach

occurred or crystallized.

The Court heard testimony from 11 live witnesses.  PartnerRe called Mary Jo Hudson

("Hudson"), Entitle's regulatory counsel; Liberatore ("Lee") Iannarone ("Iannarone"), a former

director of Entitle and the current general counsel and chief compliance officer for the Bermuda

office of PartnerRe; Steven Palmer ("Palmer"), Entitle's former CEO; Joshua Fisher ("Fisher"),

Esq., Entitle's transaction counsel for the RPM transaction; Alan Berliner ("Berliner"), Esq., an

expert on the Ohio Department of Insurance ("ODI"); and Basil Imburgia ("Imburgia"), a

damages expert.  RPM called five live witnesses: Hirt; Ava Noack ("Noack"), RPM's CFO;

Timothy Dwyer ("Dwyer"), a member of Entitle's board and transaction committee; Anthony

Spina ("Spina"), Esq., a rebuttal expert to Berliner regarding ODI; and Bruce Bush ("Bush"), a

rebuttal damages expert to Imburgia.  For all witnesses but Hudson and Dwyer, whose testimony

in its entirety was received live, direct testimony was received in the form of a sworn

---

[1] Because during the events at issue the relevant entity was RPM, the Court throughout refers to
that entity as "RPM."

affirmation, with the witness subject to live cross- and redirect examination.[2]  The Court also

received testimony, in the form of excerpts of deposition testimony, from an additional eight

witnesses.[3]  The Court also received hundreds of exhibits, to whose authenticity and admission

the parties, helpfully, jointly stipulated.[4]

    The findings of fact that follow are based on the Court's review of the entire trial record.

Where based in whole or in part on a witness's testimony, the Court's findings reflect credibility

determinations based on the Court's assessment of, *inter alia*, the relevant witness or witnesses'

experience, knowledge, and demeanor.

    For the reasons set forth below, on the contract breach claims, the Court holds, firmly,

with PartnerRe.  RPM, the Court holds, willfully breached its obligations under the Merger

Agreement.  To avoid a binding agreement that its chief executive, Hirt, had come to regret but

had no valid basis to avoid, RPM, in the period spanning the closing date, articulated a shifting

---

[2] The affidavits of each of these witnesses may be found on the docket of this case. *See* Dkts. 165-1 ("Berliner Aff."); 165-2 ("Imburgia Aff."); 165-3 ("Fisher Aff."); 165-4 ("Iannarone Aff."); 165-5 ("Palmer Aff."); 172 ("Noack Aff."); 173 ("Bush Aff."); 174 ("Hirt Aff."); 175 ("Spina Aff."); 181 ("Imburgia Supp. Aff."); 188 ("Iannarone Supp. Aff.").

[3] These were Lee Baskey ("Baskey"), Entitle's former president; Lawrence Hamilton ("Hamilton"), Esq., RPM's regulatory lawyer; Ms. Hirt; Holly Kons ("Kons"), an RPM employee who performed due diligence in the transaction; Harold Lee ("Lee"), an RPM financial analyst; LendUS LLC, via its Rule 30(b)(6) representative Noack; Fred Matera ("Matera"), RPM's former chief operating officer and chief investment officer; Marvin Pestcoe ("Pestcoe"), PartnerRe's former chief risk officer; and Tracy Snow ("Snow"), ODI's chief examiner/analyst.

[4] Citations herein to "JX" refer to a joint exhibit; "Tr.," to the trial transcript; and "Dep." to deposition designations of the person indicated.  The Court has carefully reviewed and benefitted from the parties' impressive and thorough pretrial briefs, *see* Dkts. 169 ("Pl. Memo"); 170 ("Def. Memo"); 184 ("Pl. Opp. Memo"); 179 ("Def. Opp. Memo"); proposed findings of fact and conclusions of law, *see* Dkts. 165 ("Pl. PF"); 171 ("Def. PF"); and letters, *see* Dkts. 195, 197. Unless otherwise indicated, where the Court cites testimony here, it has credited that testimony.

series of baseless rationalizations for claiming breach by Entitle, which did not, in any respect, breach.

The Court accordingly enters judgment for PartnerRe on its claim and on RPM's counterclaim. As to damages, the Court awards PartnerRe $10,886,955, plus pre- and post-judgment interest to be tabulated by the standards set forth herein.

The Court, however, does not find alter ego liability on behalf of Hirt, Ms. Hirt, or the Trust. The Court enters judgment for those defendants on those claims.

## I.    Findings of Fact: The Parties and Chronology of Events

### A.    Introduction

The Court here sets out the chronology of pertinent events surrounding the agreement under which RPM was to have acquired a majority share in Entitle. These events fall into three phases: a negotiation and an extended due diligence period, lasting from December 2015 to February 2017, when the merger agreement was signed; a pre-closing period, between February 2017 and June 9, 2017, when—pursuant to the agreement and a later extension—closing was to occur; and a post-closing-date period, from June 9, 2017, when the parties engaged in unsuccessful discussions about salvaging the transaction.

### B.    The Parties

Non-party Entitle Direct Group, Inc. ("EDG") was a Delaware corporation with its principal place of business in Connecticut. Pl. PF ¶ 1. Non-party Entitle Insurance Company ("EIC," and together with EDG, "Entitle") was a Delaware corporation with its principal place of business in Ohio. *Id.* EIC was a wholly owned subsidiary of EDG.[5] *Id.* Entitle was a title

---

[5] For the balance of this decision, the Court does not distinguish between EDG and EIC, and refers to "Entitle" throughout.

insurance underwriter that sold title insurance direct to consumers. Baskey Dep. at 18, 22–23. On March 27, 2018, after its merger agreement with RPM failed to consummate and this lawsuit had been filed, Entitle merged with and into a subsidiary of Radian Title Services, Inc. ("Radian"). JX-170; JX-174.

Plaintiff PartnerRe is a Bermuda-based limited company with its principal place of business in Bermuda. Pl. PF ¶ 2. PartnerRe's core business is selling reinsurance for insurance companies. Tr. at 215–16 (Iannarone). In 2012, PartnerRe invested approximately $20 million in Entitle, becoming the majority shareholder of Series B Preferred Stock in the company. JX-5; Tr. at 216 (Iannarone), 476 (Palmer). In August 2017, PartnerRe acquired an additional stake in Entitle, *see* Iannarone Aff. ¶ 47; JX-169, which it retained until Radian's acquisition of Entitle in March 2018, *see* Iannarone Aff. ¶ 50; JX-170; JX-175.

Defendant RPM was a California corporation with its principal place of business in Alamo, California. Hirt. Aff. ¶ 1; Dkts. 121 ¶ 17; 128 ¶ 17. RPM was a mortgage origination company. Hirt Aff. ¶ 1.

Defendant LendUS is a Delaware limited liability company with its principal place of business in Alamo, California. *Id.* ¶ 4. LendUS is the successor entity to RPM. Its members are JAN (Lend USA) Holdings, Inc., Ava Noack, the Markwardt Trust, and Lamp2 Associates, Inc., each California citizens. Dkts. 121 ¶ 18; 128 ¶ 18.

Defendant Robert Hirt is the CEO of LendUS. Hirt Aff. ¶¶ 1–2. During the relevant time period, Hirt was the CEO of RPM. *Id.* ¶ 2. Defendant Tracey Hirt is the current chief operating officer and director of mortgage operations of LendUS. T. Hirt Dep. at 13–16. During the relevant time period, Ms. Hirt was the president of RPM and director of banking operations. *Id.* at 13, 15; JX-93.

5

Defendant The Robert Hirt and Tracey Najarian Hirt Revocable Living Trust is a trust organized under the laws of California for the benefit of Hirt and Ms. Hirt. Dkt. 121 ¶ 22. During the relevant period, Hirt was the sole trustee. JX-77. Hirt and Ms. Hirt formed the Trust as an estate-planning mechanism to preserve wealth for their family. Hirt Aff. ¶ 7. Hirt testified that he periodically alters the Trust's structure based on advice from advisors. *Id.*

C.   **Events Leading to the February 16, 2017 Merger Agreement**

1.   **December 2015–September 2016: PartnerRe and RPM Explore a Merger and Sign Two Letters of Intent**

By 2015, three years after PartnerRe's initial investment in the company, Entitle was experiencing financial setbacks. Iannarone Aff. ¶ 5; *see also* Palmer Aff. ¶ 7 ("I knew [in 2015] that Entitle was not performing as well as it had the potential to, and that it was not meeting investors' expectations."); Tr. at 239 (Iannarone), 476 (Palmer); JX-5. A principal reason it was losing money was that its strategy of seeking customers via direct marketing was not yielding sufficient title insurance work. Iannarone Aff. ¶¶ 5–6; JX-5. In late 2015, PartnerRe formed a transaction committee, tasked with exploring a sale of Entitle. Iannarone Dep. at 82–83; Tr. at 477 (Palmer).

Entitle's targeted sale price was approximately $30 million. Baskey Dep. at 69. It received interest from several potential buyers, including Ocwen, Lennar, Freedom Mortgage, and RPM. The first three made offers to buy Entitle for $30 million, $15 million, and $8 million, respectively. Entitle rejected each. Iannarone Aff. ¶ 7; JX-47; Tr. at 404–05, 414–15.

By December 2015, RPM and Entitle had begun discussing a potential transaction. JX-2. From Hirt's perspective, Entitle offered a vertical integration opportunity. RPM envisioned referring its mortgage customers, when in need of title insurance, to its affiliated title insurance

company. And, by RPM's steering its existing mortgage customers to it, Entitle would gain the toehold it had been lacking in the mortgage process. Hirt Aff. ¶¶ 8–9; Tr. at 993–95 (Hirt). On December 23, 2015, Hirt told Palmer, Entitle's CEO, that partnering RPM and Entitle would achieve "a strategic fit," and boost Entitle's title insurance volume. JX-2.

RPM knew Entitle was in weak financial condition and factored that into its negotiating position. RPM, Hirt testified, knew it was "buying a company under financial stress." Tr. at 976, 1158. In a February 4, 2016 email, Hirt told Palmer that RPM was "trying to get" its "finance group to allow" it "to work with Entitle," whose "bond rating was a negative because of financial losses for the last few years." JX-4. On May 28, 2016, Noack, RPM's CFO, suggested to Hirt that any merger agreement between the companies take into account the potential that Entitle's losses would increase by incorporating a "purchase price adjustment" provision or otherwise requiring Entitle to "fund the shortage in cash." JX-12. A version of Noack's proposal, under which Entitle's pre-closing operating losses, to the extent exceeding projections, would reduce the purchase price RPM was to pay for Entitle, was included in the final Merger Agreement, signed on February 16, 2017. *See* JX-57. The parties referred to this as the "lock box approach." JX-25; Tr. at 1022–23.

Notwithstanding Entitle's struggles, RPM and its chief executive, Hirt, saw synergies between the two companies. The referrals to Entitle that would flow from affiliation with RPM, Hirt believed, would improve Entitle's revenues and eventually turn it profitable. *See* Hirt. Aff. ¶ 12 ("We at RPM saw the potential to realize synergies between Entitle and RPM . . . that could make it profitable."). Hirt also believed that, although Entitle's business model was flawed, Entitle had "great technology" and had "obviously spent time, consideration, and money trying to solve the tech problems" that historically had affected the paper-intensive mortgage industry.

7

Tr. at 997; *see also* Pestcoe Dep. at 91–93 (testifying that although Entitle's business model based on directly marketing title insurance services to consumers was not viable, Entitle had good infrastructure, technology, and valuable licenses, and would be profitable if joined with a entity like RPM to whose mortgage customers it gained access). He believed it realistic to assume that RPM would refer 25% of its refinance business for title insurance work to Entitle in the first year after the acquisition. JX-37; *see also* Tr. at 709–711 (Noack). Early in their negotiations, RPM sought financial projections from Entitle based on that premise. For example, on March 5, 2016, RPM's Noack asked Entitle's Palmer: "What would be [sic] your net income look like if RPM were to channel 25%, 50%, 75% or 100% of its refi and purchase business to you?" JX-7. After Palmer responded that he would need estimates of RPM's refinance volume to create "projections for Entitle inclusive of RPM's current and projected future refi volumes," Noack sent him such projections. JX-8. The same day, Hirt told one of RPM's lenders that "RPM's refi business will automatically make Entitle a profitable company." JX-6; *see also* JX-92 (Hirt to Iannarone and a potential third-party investor: "If Entitle Direct received only 25% of that production it would create a fiercely profitable title insurance business.").

RPM also recognized that Entitle owned valuable intangible assets, such as state title insurance licenses. On December 8, 2016, Noack explained to Hirt and Matera that the cost of "build[ing] a title insurer and settlement agent from scratch" would be "at least $2.5mm," and would include "software, IT, hiring the staff and management, buying title plans and access to title plans and obtaining all the state licenses." JX-39. As to Entitle, Noack thus concluded:

8

"Even if we pay $2.5mm above book value with quarantined reps and warranty risks, we have a phenomenal deal." *Id.*[6]

On May 31, 2016, RPM executed a nonbinding letter of intent (the "June 2016 LOI") with Entitle. It contemplated RPM's acquiring all of Entitle for $19.4 million. *See* JX-13. The next day, Entitle countersigned the LOI. *Id.*; JX-14.

Under the terms of the June 2016 LOI, Entitle shareholders would receive 25% of Entitle's net profits in perpetuity, with an option to RPM to redeem that perpetuity. JX-13. The June 2016 LOI also gave RPM a 60-day "exclusive right" to negotiate with Entitle about the proposed transaction. *Id.* Under the June 2016 LOI, due diligence on Entitle and its assets was to commence promptly, with a focus of confirmatory due diligence anticipated to be Entitle's tangible book value at present and its projected tangible book value through closing. *Id.*

After the execution of the June LOI, RPM and Entitle continued to negotiate and revise terms of the proposed transaction, in part because of Entitle's worsening financial condition. JX-25. Entitle's losses were sufficiently significant that Bob Eick ("Eick"), an executive at Waterfall Asset Management ("Waterfall" or "WAM"), one of RPM's lenders, called Entitle a "turd" in a June 16, 2016 email to Hirt. JX-17. RPM re-negotiated the transaction terms three times before the second letter of intent encapsulating the deal, which ultimately formed the basis of the Merger Agreement, was executed. Tr. at 948–50 (Dwyer).

---

[6] Hirt did not, however, view CEO Palmer as among Entitle's strengths. According to Dwyer, a member of the transaction committee and Entitle's founder and former CEO, in March 2016, during the negotiation process, Hirt called Palmer "a lackey," and a "figure head" for PartnerRe. Dwyer, who himself had "scathing" views about Palmer's management abilities, agreed, telling. He told Hirt,: "You have good instincts." Tr. at 941–42.

That second nonbinding letter of intent (the "September LOI") was executed September 30, 2016. JX-26; *see also* JX-25. It contemplated RPM's acquiring 67% of Entitle's equity for $13 million, with Entitle's shareholders retaining a 33% stake; it eliminated the June LOI's earnout provision; and it incorporated Noack's "lock box" idea, under which the purchase price RPM would pay would be reduced by one-third of the amount by which Entitle's operating losses between the September LOI and closing exceeded its projected operating losses for that period. JX-26. This adjustment mechanism implemented a concept Hirt and Iannarone had discussed—under which, as partners, PartnerRe and RPM would share in any downside ratably with their ownership percentage. *See* Iannarone Aff. ¶ 13. The September LOI also anticipated a 45-day due diligence period after its execution, during which RPM would have exclusivity as a possible acquiror of Entitle. JX-26.

Entitle's Dwyer, who interacted often with Hirt as a member of Entitle's transaction committee, formed a negative impression of Hirt during the process in which the transaction was re-negotiated. Having had substantial experience with mergers in the insurance field, Dwyer found the number of "retrades" instigated by Hirt over this period—five—unusual. He came to view Hirt as a "weasel," who was "superficial, flighty, and not sincere." Tr. at 948–50.

### 2.    2016: RPM's Other Acquisition Opportunities—and Limitations

During the period it negotiated with Entitle, RPM considered many other acquisitions in the insurance industry. Hirt considered such acquisitions to be the future of RPM, and "key to very large returns." JX-21. On July 16, 2016, Hirt emailed RPM employees, including Noack:

"My hope is to close out having purchased four companies in '16 . . . Corridor Mortgage - $ 400 mm[;] American Eagle - $ 800 mm[;] MFI - $600 mm[;] AFN $ 3 billion." *See id.*

By late 2016, however, RPM internally recognized that it could not afford to close on all the acquisitions it was considering, because its cash available for these purposes was finite. *See* Tr. at 721 (Noack). On November 20, 2016, Noack wrote Hirt and Matera: "In order for us to close all the deals we have [in] front of us, Corridor, GMH, AFN and EnTitle, without totally cash drain [sic] ourselves we need approximately $60mm plus the annual payout to the boutiques is coming up in April, which depending on how we close November and December could add up to another $7.5mm plus we still have to pay off Waterfall ($15mm)." JX-220. In an email dated September 22, 2016, Ms. Hirt voiced expressed similar skepticism that RPM could close all the transactions it was considering: "I just do[n']t understand HOW we are buying these companies. With what funds." JX-24.

On November 30, 2016, Hirt wrote Noack and Matera that unless RPM could "come to terms with either WAM for the additional $25mm or with Fortress for their investment," RPM would have to "[d]raw" $15 million from Waterfall, "[c]lose on Corridor," and "[e]xit Entitle deal." JX-34. Noack agreed: "I do understand the capital shortage issue and agree that if we don't have sufficient cash to execute on EnTitle and the other boutiques, Entitle will have to be let go first." JX-35; *see also* LendUS Dep. at 288–89. Hirt understood Noack's email to mean that Entitle was the weakest of the other mortgage operations that RPM was looking at acquiring at the time, as the financials of the others were, on balance, stronger than Entitle's. Tr. at 1009.

11

### 3.    October 2016–February 2017: RPM's Due Diligence, Including as to Entitle's Financial Outlook and Regulatory Supervision

RPM's diligence into Entitle began after execution of the September LOI.  On October 13, 2016, Noack notified her colleagues that "[t]he due diligence process has begun on Entitle," and that RPM had hired the investment banking firm Sandler O'Neill to assist it in the diligence process, including reviewing Entitle's financial data and business practices.  JX-29.  Entitle's Dwyer, a former banker with two decades' experience in the insurance industry, described the diligence process as the "longest" and—due to RPM's repeated attempts to modify the deal terms during diligence—the "most bizarre" one in which he had participated in his career.  Tr. at 938.  Nonetheless, by both sides' accounts, the diligence process was cooperative.  A few weeks into the diligence period, Noack reported to Entitle executives that RPM was "making good progress" in diligence and on schedule, and that Entitle had been "providing the requested documentation quickly."  JX-31; *see also* Tr. at 625.  During the diligence period, RPM interacted with Palmer multiple times per day.  Tr. at 938 (Dwyer).

During the months of diligence, RPM and Sandler O'Neill extensively reviewed Entitle's financials, including its projections. *See, e.g.*, JX-20; JX-29.  Sandler O'Neill advised RPM to complete most of its due diligence before signing a definitive agreement because, thereafter, "we won't have a due diligence 'out'" under the terms envisioned in the LOI, unless a material adverse effect were shown.  JX-27.  Sandler O'Neill explained that this was because Entitle "wants to protect against [RPM's] ability to walk away after signing a definitive agreement for something we could have known prior to signing." *Id.*

During diligence, RPM concluded that Entitle's financial projections were unduly optimistic.  On December 6, 2016, Sandler O'Neill provided an analysis of these projections

based on Entitle's data, in which it termed Entitle's assumptions about its revenue growth after a merger with RPM "aggressive." JX-38; *see also* Noack Dep. at 130–31 (testifying she found Palmer's projections "not conservative"). Hirt, too, assessed Entitle's projections as "highly aggressive." JX-19; *see also* JX-32; Tr. at 621 (Noack).

Throughout fall 2016, as diligence was ongoing, the parties continued to negotiate and revise the terms set out in the September LOI. In December 2016, RPM told Entitle and PartnerRe that it wanted to pause the deal, due to several concerns it had based on the due diligence reports, but the parties remained in contact into 2017. JX-465.

Meanwhile, during late 2016 and early 2017, Entitle's financial condition continued to decline. In November 2016, Entitle learned that ODI had recommended that Entitle's shareholders consider a capital injection, ideally by year end. JX-33. On January 5, 2017, PartnerRe executive Pestcoe notified Entitle's board that management "recommended an immediate $1 million capital infusion into Entitle." JX-387. Pestcoe further acknowledged that there was "a good chance that additional infusions" would later be needed to avoid "regulatory action." *Id.* In a January 9, 2017 draft of an email to a shareholder, which Pestcoe forwarded to Iannarone, Pestcoe wrote that "there is a very good chance that if PRe does not continue to pour money into this company, Entitle will fail before the end of the year." JX-347.

Entitle disclosed its declining performance to RPM. In June 2016, Entitle informed RPM that one of Entitle's key clients, Cardinal Financial, had "recently significantly reduced its order flow." JX-15. Hirt reported this update to Eick of Waterfall, RPM's lender. JX-17. In response, Eick warned that Cardinal's reduced order flow "[could] go to zero in no time." *Id.* In response, Hirt wrote, "Yes, I am assuming that they have lost the account." *Id.* On January 12, 2017, Palmer provided RPM a presentation titled "Summary of 2017 Budget," which stated that

13

Entitle expected "a dramatic reduction of the refinance market in 2017 and beyond," planned "to make staff reductions in January," and forecast that "refinance originations" would "fall by 75% in 2017," such that Entitle's "volume in the first and likely second quarters will be extremely low." JX-42. The presentation included refreshed projections for 2017, which anticipated a loss of approximately $742,000 in the first quarter of 2017, but "modest profitability in the second half of the year," such that the company would experience a net loss of $515,000 for 2017. *Id.* The presentation explained that "[m]arket analysts and most market participants are expecting mortgage rates to continue to risk leading to a dramatic reduction of the refinance market in 2017 and beyond." *Id.* But, Palmer's projections noted, Entitle intended to implement changes which it "believe[s] will generate a notable uptick in purchase business." *Id.*

On February 10, 2017, Noack circulated a completed due diligence report to RPM's lender, Waterfall. JX-49. RPM identified Entitle's "[l]ack of profitability" as a risk were RPM to purchase Entitle, noting that Entitle had lost as much as $352,000 per month. *Id.*

On February 11, 2017, Entitle notified RPM that the total losses it projected for the period between August 2016 and March 2017 had grown from $208,000 to approximately $1.5 million. JX-54; JX-233. On February 12, 2017, Noack emailed Hirt: "FYI . . . Entitle estimates to lose $1.5mm between 8/1/16 and 6/1/17 . . . Cash need at close is estimated to be $12.7mm." JX-233. Although Hirt testified at trial that, through late May 2017, he had believed that Entitle's projection of its losses during this period had remained at $208,000, Tr. at 1062, he thus was privy—more than three months earlier, and before signing the Merger Agreement—to Entitle's revised $1.5 million loss projection. *Id.*

During the diligence period, Entitle also alerted RPM that it was subject to heightened scrutiny by its regulator, ODI. Since 2014, Entitle had been under periodic surveillance by ODI,

14

because its financial condition had put it in breach of a hazardous financial condition ("HFC")

standard specifying the permissible ratio of losses to surplus.  Iannarone Aff. ¶ 15; Tr. at 86–87

(Hudson); *see also* Berliner Aff. ¶ 62; Tr. at 221 (Iannarone), 1210–11 (Berliner).  As a result, at

various periods, Entitle was required to submit a corrective action plan stating how it intended to

bring this ratio into compliance.  Tr. at 87 (Hudson).  Entitle was also required to submit

monthly, rather than quarterly, reports of its financial condition to ODI.  *Id.*  In November 2016,

ODI notified Entitle that it was again in breach of the above ratio.  *Id.*; JX-33.  It advised Entitle

that its shareholders "should consider some amount of a capital injection, ideally before the end

of the year."  JX-33.  ODI's surveillance and these specific communications, including as to

potential capital contributions, were disclosed to RPM in the diligence process.  *See, e.g.*, JX-57;

Tr. at 89 (Hudson) (explaining that certain provisions of the Merger Agreement indicated that

Entitle had disclosed to RPM that it had triggered a hazardous financial condition standard), 560

(Palmer).  On February 5, 2017, Noack noted in an internal email that there was some urgency to

getting the Merger Agreement signed, as "[ODI] is looking for a cash infusion or at least a

commitment to infuse additional cash into [Entitle] by February 10."  JX-49; *see also* Tr. at 627–

28 (Noack).  Entitle's Palmer also reviewed with Noack and members of her team the statutory

ratio that had caused Entitle to be subject to monthly surveillance.  Palmer Aff. ¶ 31; *see also* Tr.

at 86–87 (Hudson).  Based on such disclosures, RPM was aware, before entering into the Merger

Agreement, that ODI might demand that capital infusions be made into Entitle.  Tr. at 627

(Noack) ("We did discuss [in February] that there could be some potential capital we need to put into Entitle.").[7]

Notwithstanding the disclosures of Entitle's worsening financial outlook and heightened regulatory scrutiny, RPM chose to proceed to execute a definitive merger agreement, albeit on revised terms more favorable to it. RPM's Matera, who with Noack oversaw diligence and the negotiation of the Merger Agreement, *see* Tr. at 1013–14, explained that RPM had known all along of Entitle's financial problems, *see* Matera Dep. at 62; *see also* JX-126 (reminding Hirt that "[w]e knew Entitle was struggling financially and that the increase in rates would require additional capital, as well as strategic re-positioning"). But RPM viewed the lock box provision in the September LOI as cushioning RPM against increased operating losses by Entitle prior to closing. JX-12, JX-25; *see also* JX-233 (Hirt confirming with Noack that due to the lock box provision, "the more [Entitle] lose[s] between now and June the cheaper the price?"). Hirt in particular believed through June 2017, that RPM would "turn Entitle profitable" and yield RPM a favorable return on its investment. Tr. at 1001, 1149.

Throughout the LOI and diligence process, RPM's top executives continued to weigh the pros and cons of executing a merger agreement with Entitle—and these discussions continued even after the Merger Agreement had been signed on February 16, 2017. Noack testified that she and Hirt discussed the pros and cons of whether to proceed with the Entitle transaction on an almost daily basis, or at least once a week. Tr. at 792–93. Noack recalled the "pros" that she and Hirt identified included the synergies Entitle offered, its potential for profitability, and its

---

[7] Consistent with this, Entitle, in the Merger Agreement, disclosed that "[ODI] has requested that [EIC] provide it with monthly financial reports for its surveillance purposes." JX-157 (Schedule 3.9(c)(i)); Tr. at 89 (Hudson).

affiliation with PartnerRe. *Id.* at 794–97. The "cons" included RPM's limited cash reserves for transactions and the prospect of a culture clash between RPM and Entitle. *Id.* at 797–99. The pros and cons the two identified, Noack testified, remained the same both before and after executing the Merger Agreement. *Id.* at 803.

Strikingly—and a point to which the Court returns, *infra*—Noack testified that, even after the Merger Agreement had been signed, she and Hirt, in their regular discussions about whether to close on the transaction, never discussed whether RPM was contractually obligated to do so or would be in breach if it refused to close. *Id.* at 803–05 (Noack, testifying that the possibility of RPM's being found in breach for walking away from the Merger Agreement after its signing never crossed her mind); *see also id.* at 1011, 1399 (Hirt, testifying that his conversations with Noack about whether to go ahead with the transaction continued after the Merger Agreement was signed and after regulatory "Form A" approval of the transaction by ODI had been obtained in May 2017, but that he did not recall whether he and Noack had ever discussed the possible legal ramifications of walking away from the signed agreement).

### D.   February 16, 2017:  The Merger Agreement

On February 16, 2017, the parties executed the Merger Agreement. Under it, RPM was to acquire a majority stake in Entitle for a purchase price of approximately $13 million. *See* JX-57 ("Merger Agreement"); JX-65. The agreement contemplated that Entitle would be merged into Entitle Direct Merger Sub, Inc., a wholly-owned subsidiary of Entitle Direct Holdco, Inc. ("Parent"), itself a wholly-owned subsidiary of RPM. *See* Merger Agreement § 2.1.

Many Merger Agreement provisions that are relevant to this litigation, the parties agree, were standard or customary. These include those governing access to books and records, mandating each side's cooperation with respect to closing, and giving buyer RPM a right to exit

the deal before closing in the event of a Material Adverse Effect, as defined. Tr. at 982, 984, 989 (Fisher). Other provisions were bespoke to this transaction. These—elaborated upon below— included ones implementing the "lock box" concept, giving RPM an option compel a loan from PartnerRe, and allowing RPM to exit the transaction in the event a regulator such as ODI imposed a "Burdensome Condition" as a condition for approval. Tr. at 984 (Fisher). RPM sought these protections, Hirt explained, to guard its interests in the event that Entitle's performance proved "worse than anticipated." Hirt Aff. ¶¶ 24–26.

The following were among the key provisions of the Merger Agreement.

### 1.    Sections 1.01 and 5.11:  Purchase Price and Closing Equity Merger Consideration

Section 1.01 encompassed the "lock box" concept to tabulating RPM's purchase price, which had both a cash and an equity component. As to cash, § 1.01 defined the "Estimated Cash Purchase Price" as $13,125,000, "less, if any, the Estimated Cash Purchase Price Adjustment Amount." It defined the latter as "one third (1/3) of the amount by which the Net Pre-Closing Loss exceeds $208,000." It defined the "Net Pre-Closing Loss" as the amount by which Entitle's net losses between August 1, 2016 and the closing exceeded $208,000. As to equity, it defined the "Closing Equity Merger Consideration" as 3,300,000 shares of stock in the new "Parent" company, which would represent 33% of the issued and outstanding capital stock in that entity immediately post-closing.

Section 5.11, in turn, provided that PartnerRe would furnish a $1 million loan to Entitle on execution of the Merger Agreement. This sum was to be converted into equity based upon a defined exchange ratio keyed to the purchase price. This stood to increase PartnerRe's equity stake in the Parent above the 33% figure after closing.

18

### 2.    Section 2.9:  Closing Date

Section 2.9 provided that the closing "shall take place" at 9:00 a.m. "no later than five (5) Business Days after the last of the conditions to Closing set forth in Article VIII" of the Merger Agreement had been satisfied or waived, "other than conditions which, by their nature, are to be satisfied on the Closing Date."  The closing was to occur at the offices of Bryan Cave LLP in Manhattan.  Under § 9.1(b), Entitle "may extend" the Closing Date up to three months past May 31, 2017, if "all conditions to closing set forth in Article VIII are satisfied other than the conditions set forth in Section 8.1(c)"—*i.e.*, ODI's approval of the transaction—and the parties "are still actively seeking in good faith the Ohio Department's approval of the Ohio Form A."

### 3.    Section 2.13(a)(ii):  Loan from PartnerRe

Section 2.13(a)(ii) provided that, at closing, RPM would be given an option to compel a $1.5 million loan from PartnerRe, within six months of closing, with a specified interest rate and maturity.  This provision was included in anticipation of the possibility that ODI would require a capital contribution be made to Entitle.  Tr. at 351 (Iannarone).

### 4.    Section 5.3(a):  Books and Records

Section 5.3(a) provided that, beginning on the date of the Merger Agreement, Entitle "shall afford to representatives of RPM reasonable access to the books and records . . . during normal business hours consistent with applicable Law, upon reasonable notice and in accordance with the procedures established by the Company[.]"

### 5.    Section 5.4(a):  Best Efforts

Section 5.4(a) required the parties to use their "best efforts" to secure governmental approval of the proposed merger.  It provided that:

Subject to the terms and conditions herein provided, the Parties shall, and each of them shall cause their respective Affiliates to, use reasonable best efforts to promptly take, or cause to be taken (including by their respective officers and directors), all actions and to do, or cause to be done, all things necessary, proper or advisable under this Agreement and applicable Laws to consummate and make effective as promptly as practicable after the date hereof the transactions contemplated by this Agreement, including (i) preparing (and filing or delivering, as the case may be) as promptly as practicable (and, in respect of the Ohio Form A, no later than fifteen (15) Business Days from the date of this Agreement) all necessary applications, notices, petitions, filings, ruling requests, and other documents and to obtain as promptly as practicable all consents, waivers, licenses, orders, registrations, approvals, permits, rulings, authorizations and clearances necessary or advisable to be obtained from any Governmental Entity for, by or on behalf of any Person in order to consummate the transactions contemplated by this Agreement (collectively, the "Governmental Approvals") and (ii) as promptly as practicable taking all other steps as may be necessary to obtain all such Governmental Approvals (including, without limitation, promptly, truthfully and fully responding to requests for information and other inquiries of Governmental Entities and other third parties). No Party shall take or omit to take, or permit or cause an Affiliate of such Party to take or omit to take, any action that the Person taking such action or making such omission should be reasonably aware would have the effect of delaying, impairing or impeding the receipt of any Governmental Approval.

## 6.    Section 5.4(b):  Cooperation

Section 5.4(b) required the parties to:

(i) cooperate in all respects with each other in connection with any communication, filing or submission relating to the receipt of any Governmental Approval; (ii) keep the other Parties and/or their respective outside counsel promptly informed of material communications relating to the receipt of any Governmental Approval; (iii) consult with each other in advance of any meeting or conference with any Governmental Entity; and (iv) permit outside counsel for the other Parties to review in advance any submission, filing or communication (and documents submitted therewith) intended to be given by it to any Governmental Entity and consider in good faith the views of the other Parties in connection with any proposed communication with any Governmental Entity.

## 7.    Section 8.2(a):  Material Adverse Effect

Section 8.2(a) excused RPM from its obligation to close in the event of a Material Adverse Effect ("MAE"). As relevant here, an MAE was defined as "an event, circumstance,

20

development, change or effect that . . . is materially adverse to [Entitle] or [its] financial condition." Entitle, for its part, was required to represent that as of the Closing Date, the company had not experienced an MAE. Merger Agreement § 3.7. The agreement excluded from the definition of an MAE "any failure by the Acquired Companies to meet any projections or forecasts or estimates of revenue or earnings for any period"; it further provided that an MAE "shall be measured only against the past performance of the Acquired Companies (taken as a whole) and not against any forward-looking statements, financial projections or forecasts of the Acquired Companies." *Id.* § 1.1.

### 8.   Section 5.4(d): Burdensome Condition

Section 5.4(d) provided that RPM was not obligated to agree to any "Burdensome Condition" in order to obtain regulatory approval for the deal. It defined a Burdensome Condition, in relevant part, as any "limitation, requirement or condition" that would "require any material capital contribution, capital support arrangement or guarantee for the benefit" of Entitle.

### E.   March 20–May 2017: RPM's Submission of a Form A Application to ODI, and ODI's Ensuing Review

In connection with the merger, RPM was required to submit a "Form A" application to ODI. Spina Aff. ¶ 14. ODI's approval of the Form A application was required for the merger to close. Iannarone Aff. ¶ 21. Because RPM was wholly owned by a holding company, which was in turn wholly owned by the Trust, its Form A application was made on behalf of the Trust. Hirt Aff. ¶ 28. It was prepared by RPM's regulatory counsel, the law firm of Mayer Brown, LLP, by lawyers Larry Hamilton and David Heales. Tr. at 89–90 (Hudson).

A Form A contains detailed information about the potential buyer of an Ohio insurance company. Iannarone Aff. ¶ 21; JX-177. First, the applicant must declare any contemplated or

actual plans or proposals which may cause it to declare dividends, liquidate or dissolve the insurer, sell any asset of the insurer, enter into any rental, leasing service or financial, or other arrangements with the insurer, or merge/reorganize the insurer with any person or persons. JX-177. Second, the applicant must provide its plan of operation for the insurer for three years after consummation of the transaction. *Id.* Third, the applicant must describe all changes it intends as to the insurer's board of directors or executive officers. *Id.* The applicant must also set out the sum of premiums written by the insurer, the applicant, and all affiliates for each line of business transacted in Ohio. *Id.*

Significant here, a Form A application must include pro forma financial projections for the target company for after the merger. *Id.* The financial statements submitted in connection with the Form A are formulated at a higher level than audited financial statements or the monthly statements that insurers such as Entitle, which are subject to heightened surveillance, file with ODI. These instead are intended to broadly reflect the acquirer's business plan for the insurer post-merger. Tr. at 84 (Hudson); *see also* Snow Dep. at 162–63 (testifying that ODI is "looking at the [Form A] applicant as a standalone entity and its ability to control the domestic insurer").

On March 10, 2017, RPM filed its Form A with ODI. Iannarone Aff. ¶ 22; Palmer Aff. ¶ 35. Its pro forma projection for 2017 included the $1.5 million loan that RPM had the option to call from PartnerRe under § 2.13(a)(ii) of the Merger Agreement. JX-74; JX-225. RPM projected a loss for 2017 by Entitle of $1,019,000. JX-402; Hirt Aff. ¶ 35. Hirt signed the application. At trial, he testified that, before signing, he "probably" had not read it at all. Tr. at 1031–32; *see also id.* at 741 (Noack, RPM's CFO, testifying she never saw the Form A before it was submitted).

The ODI examiner in charge of reviewing the Form A was Rick Clayton, who was also the examiner primarily in charge of reviewing Entitle's monthly surveillance submissions. It was typical for the same examiner in charge of an insurer's monthly or quarterly surveillance to review a Form A application for its acquisition; such assists ODI to evaluate the proposed acquisition in the light of the company's overall history. Tr. at 92–94 (Hudson); *id.* at 1237–38 (Berliner); Hudson Dep. at 120–21 (explaining that ODI's Risk Assessment unit is responsible for both surveillance and Form A approval). About one month after RPM submitted the Form A, line responsibility within ODI for examining the Entitle acquisition switched to Jennifer Turner, after Clayton was promoted, although Clayton remained involved in the approval process. Tr. at 106 (Hudson); JX-71. Other ODI staff participated in Entitle's surveillance and its Form A approval process, including Michele Sheets.[8]

ODI's Form A review, as ably explained at trial by Hudson, is thorough and involves approval by six officials. First, two examiners ensure that the application is complete, and pose initial questions and comments to the applicant. Tr. at 98 (Hudson); JX-64. Second, the assistant chief examiner and chief examiner conduct a "deep dive" into the completed Form A. Tr. at 98 (Hudson); JX-64. Third, if the application is satisfactory, ODI's assistant director conducts an independent review, and makes a recommendation to the Director. Finally, ODI's Director reviews the Form A and decides whether ODI will formally approve it. Tr. at 98 (Hudson); JX-64. ODI's focus in undertaking this review is on the qualifications and plans of

---

[8] Sheets, for example, was copied on Turner's May 24, 2017 email to Palmer warning about the need for an additional capital contribution, and was listed as an analyst who had reviewed and approved the Form A. *See* JX-199 (May 24 email from Palmer to Turner copying Sheets); JX-405 (approved Form A with ODI examiner initials "SRS"); Tr. at 1237 (Berliner identifying "SRS" as financial analyst supervisor Michele "Shelly" Sheets).

the applicant-acquiror, not the financial health of the target-insurer. That is because, in general, ODI receives sufficient information about its regulated insurer from the insurer's regular (monthly or quarterly) surveillance submissions. Tr. at 93, 157–58 (Hudson). The Form A approval process, therefore, seeks to give ODI insight as to the business intentions of the acquiror: its plans, its capitalization, and the background of its principals. *Id.* at 164 (Hudson). To the extent the application requires high-level pro forma projections from the target-insurer, these bear on ODI's assessment of the applicant-acquiror's plans; ODI does not use them to gauge the solvency of the target-insurer, as such is instead gauged by the insurer's surveillance submissions. *Id.* at 158, 164–65 (Hudson); *see also id.* at 944 (Dwyer) (describing Form A process as an "in-depth research into the background of the buyer").

On April 24, 2017, Clayton emailed Hamilton and Heales with several questions about RPM's Form A. JX-72. Heales asked Hudson, Entitle's ODI counsel, to address two items. *Id.* One involved making non-substantive revisions to the pro formas, including to its headers. *Id.* Clayton also asked about RPM's pro forma projections for Entitle, which, as noted, anticipated a $1.5 million capital contribution in 2017, deriving from a loan in that amount from PartnerRe; Clayton asked what the source of the $1.5 million capital contribution would be. *Id.* On April 25, 2017, Hudson provided Heales a draft response: "Per the terms of the Merger Agreement, Partner Re provided $1,500,000 in loan funding to EnTitle Direct Holdco, Inc. These funds were then contributed to EnTitle Insurance Company via a capital contribution." JX-73. Hudson forwarded her response to Palmer that day, noting "FYI." *Id.* That evening, Hudson provided Hamilton with a small correction to her earlier draft response, changing the tense of a verb, so as now to state that the $1.5 million funding "will be" provided at closing, *i.e.*, to make clear that PartnerRe had not, in fact, yet made the loan. JX-176. On April 26, 2017, Hamilton sent a

response to Clayton, incorporating Hudson's revised answer.  JX-181.  Hamilton wrote: "As

contemplated by Section 2.13(a)(ii) of the Merger Agreement, Partner Re will provide $1.5

million in loan funding to EnTitle Direct Holdco, Inc. at the closing of the merger.  These funds

will then be contributed by EnTitle Direct Holdco, Inc. to the Domestic Insurer via a capital

contribution."  *Id.*  Heales also attached the revised financial statements, with the headers

corrected.  *Id.*  On April 28, 2017, Heales forwarded to Hudson an email from Clayton, which

noted that headers still had formatting problems.  JX-227.  On May 2, 2017, Entitle submitted to

ODI revised financial projections as part of RPM's Form A application.  Tr. at 116–17 (Hudson).

The financials in that submission were substantively the same as in the March 10, 2017 filing;

the only revisions were the formatting changes ODI had requested.  *Id.*

While the Form A application was pending with ODI, Entitle continued to make regular

filings with ODI.  Salient here, on May 1, 2017, Palmer submitted, via email, to ODI's Clayton a

document—a monthly discussion and analysis—that reflected that Entitle's operating losses

through March had already reached $1,022,000.  JX-76.  This submission was made in

connection with a statement Entitle was required to submit, for the quarter ending March 31,

2017, to ODI's Office of Risk Assessment.  Bush Aff. ¶ 43(f).  In that submission, Palmer

explained these results: "The first quarter was a very difficult one for the company.  We faced

stiff industry headwinds due to refinance application volumes falling over 40% from the

previous year."  JX-76.  Palmer added: "[Entitle is] working closely with RPM to significantly

increase our capture rate of their originations.  We believe that RPM will represent a significant

source of volume going forward."  *Id.*  Palmer credibly testified that he knew this report would

be reviewed by ODI personnel involved in the Form A review, specifically Clayton, who was

copied on Palmer's email.  Palmer Aff. ¶ 46.

F.    **May 24 and 25, 2017:  Communications with ODI and New Financial Results from Entitle**

1.    **May 24: Hudson's Call with ODI and Turner's Email About the Possible Need for a Capital Contribution**

On May 24, 2017, Hudson spoke by telephone with Tracy Snow, ODI's chief analyst and examiner, about the status of ODI's Form A review and the agency's need for additional time to complete that review. JX-90; Tr. at 125 (Hudson).  No representative of RPM was on that call, but Hamilton had agreed ahead of time that Hudson should call Snow to gauge how long regulatory approval might take.  Tr. at 125 (Hudson).  Snow raised with Hudson that the outside closing date, under the Merger Agreement, was May 31, 2017.  *Id.* at 126.  Given the proximity to the closing date and the upcoming Memorial Day weekend holiday, Snow asked whether the date could be extended, estimating that ODI needed about two more weeks for its review.  *Id.* at 126–27.  On May 25, 2017, Hudson emailed Hamilton and Heales to discuss Snow's request for an extension.  *See* JX-83; Tr. at 127 (Hudson).

Also on May 24, 2017, Turner, ODI's surveillance analyst assigned to Entitle, told Palmer by email that, based on Entitle's financial performance during the first quarter of 2017, Entitle's ratio of capital surplus to losses had triggered Hazardous Financial Condition failures for the preceding 6-, 9-, and 12-month periods.  JX-124.[9]  Turner added that it thus "may be time to start considering the need for another capital contribution before June 30, 2017 to prevent further HFC failures."  *Id.*  In response, Palmer emailed Turner:  "Per the pending Merger Agreement, RPM has the right to compel PartnerRe to fund $1.5 million of its proceeds at

---

[9] As Turner explained, Entitle's loss as a percentage of surplus was 23% for the 6-month period, 27% for the 9-month period, and 35% for the 12-month period, which exceed the 20% threshold set by OAC 3901-3-04(C)(1)(g).  JX-124.

closing into a note at EDG," and "[m]anagement will be strongly recommending to RPM that it compel PartnerRe to make this $1.5M infusion into the company at closing." *Id.*[10]

As of May 24, the closing on RPM's acquisition of Entitle was scheduled for May 31, 2017. That day, after communicating with ODI, Palmer—wary that RPM might seek to back out of the transaction—texted Iannarone: "I would hold off on calling [Hirt]. Even if they are having second thoughts let's give ODI more time to approve. Once that happens it's harder for them to escape." JX-436. Iannarone, however, testified that upon receiving Palmer's text message, he called Palmer, told Palmer his proposal was "not appropriate," and told Palmer immediately to call RPM to report the conversation with Turner. Tr. at 266. Palmer then spoke to Noack by phone and reviewed with her ODI's email and his response. *Id.* at 513–16 (Palmer). On May 25, 2017, Noack wrote Palmer and thanked him for forwarding "the most recent communication from the [ODI] with respect to the additional capital contribution request." JX-82.[11]

---

[10] An issue at trial was whether this communication was irregular insofar as RPM was not copied on it. Defendants' ODI expert, Anthony Spina, testified that omitting RPM was not unusual because pre-closing, RPM remained a third party to Entitle's surveillance relationship with its regulator. Tr. at 1264.

[11] Notwithstanding the text of Noack's email, no email forwarding this communication to Noack was offered at trial, and neither Iannarone nor Palmer specifically recalled forwarding the Palmer-Turner email exchange to anyone at RPM. This point, however, is not of consequence, because Palmer and Iannarone both credibly testified reviewing the email telephonically with Noack, as is reflected in Noack's May 25 email to Palmer. *See* Tr. at 272 (Iannarone);516 (Palmer); JX-82. Iannarone also credibly testified that, on May 25 or 26, 2017, he personally followed up with Hirt regarding the exchange with Turner. Tr. at 267. Iannarone testified that, during the preceding year, he had had "half dozen or plus conversations" with Hirt to the effect that ODI might insist on a capital contribution to fortify Entitle. *Id.* at 271. Additionally, although not raised at trial, the record includes a June 8 letter from RPM transaction counsel Johansson acknowledging that Palmer had told Noack on or about May 24, 2017 that ODI had identified the need for a capital contribution and that on or about May 25, 2017, Hudson had informed Hamilton that Palmer had explained to ODI that Entitle could, after closing, draw upon PartnerRe's commitment to provide an up-to $1.5 million loan. JX-115.

2.    **May 25:  Entitle's Updated Financial Information Projecting Increases Losses**

On May 25, 2017, Palmer also forwarded to Noack Entitle's latest financial results and an updated "draft consideration spreadsheet." JX-440.  The latter was used, in conjunction with the lock box formula, to tabulate the closing price RPM would owe at closing.  Hirt Aff. ¶ 40; JX-331.  The spreadsheet now projected a Net Pre-Closing Loss of more than $2.3 million between August 2016 and closing.  JX-204.  That marked an increase above the previous projection, at the time the Merger Agreement was signed on February 16, 2017, of a loss of $1,485,000.  JX-331.

The same day, Palmer emailed Noack updated financials showing Entitle's actual results through the end of April.  JX-81.  It showed that Entitle had lost more than $250,000 in April alone, and that its operating loss through the first four months of 2017 was more than $1.2 million—more than the $1.019 million operating loss Entitle had earlier projected in the Form A for the full year.  *Id.*; JX-402.  Palmer's email stated that several factors had contributed to the "difficult" month, including "the bad refinance environment" and various one-time costs.  JX-81.[12]  Around this time, Palmer tried to call Noack to discuss these financials, and also emailed

---

[12] At trial, Iannarone attributed the higher-than-expected losses to heightened interest rates, which resulted in fewer mortgage refinancings and less title insurance work.  Entitle was vulnerable to interest rate increases because some 80% of its business at the time came from refinancing transactions.  Tr. at 294–95.  Secondarily, Iannarone testified, some increase in losses was due to one-time expenses, including ones associated with restructuring in preparation for the merger and approved by RPM.  *Id.* at 295.  Palmer agreed that the heightened losses were largely due to the drop in refinancings, and also to costs incurred in preparation for the merger, including hiring additional staff in Ohio.  *Id.* at 525–26.  Palmer's May 25 email to Noack identified other one-time costs, including legal costs associated with a legal claim; hiring a new head of escrow; and paying fees to a vendor, Mortgage Connect.  JX-81.

her to arrange a time to speak.  Palmer Aff. ¶ 45; *see also* JX-86.  Noack did not return his call.
Palmer Aff. ¶ 45.

> ### G.     May 25, 2017 to the New Closing Date of June 9, 2017:  Fractious Communications and RPM's Refusal to Close

The 16 days between May 25 and June 9, 2017 were eventful.  In this period, (1) RPM
demanded additional information about Entitle's financial condition to which it claimed it was
entitled, faulted Entitle for having contact with ODI, and asserted a desire to contact ODI
directly and to modify the pending Form A application; (2) Entitle provided some but not all
information demanded by RPM, and resisted RPM's proposed outreach to ODI, viewing RPM's
demands as pretextual attempts to blow up the transaction; (3) ODI approved the Form A
application, resulting in a revised closing date of June 9, 2017; and (4) Entitle, but not RPM,
appeared for the closing.  The following reviews the central events during this period.

> #### 1.     May 25–30, 2017:  RPM Makes Demands With Potential to Delay or Avoid Closing

On May 25, 2017, Noack emailed Palmer identifying two "next steps"—one related to
ODI's statement about a possible capital contribution, and the other related to possibly amending
RPM's pending Form A application to reflect changes in the Hirt family trust.  As to the first,
Noack wrote, RPM needed "to understand how much is [sic] the commissioner has in mind, and
with what conditions."  As to the second: "Mayer Brown advised us *yesterday* that once Rob
restructure [sic] his trust, which apparently we need the commissioner to agree, the trust's

financials will be made a public record. *This is something new* and we need to work through."

JX-82 (emphases added).[13]

On a May 25, 2017, phone call, set up by Hudson to recap her call with Snow, *see* JX-83;

Tr. at 127 (Hudson), Hamilton asked Hudson for her views on whether RPM should restate the

pro forma projections for Entitle in the Form A Application, given Entitle's worse-than-expected

performance to date in 2017. JX-90. Hudson responded that restating the pro formas at this

stage would not be a good idea, because ODI had not asked for revised projections, and

resubmitting the pro formas would force the entire approval process to restart. Tr. at 128

(Hudson). Hamilton also told Hudson that RPM was concerned about ODI's indication that it

might ask RPM to make a capital contribution after closing. *Id.* Hudson responded that, based

on her experience, if ODI had already decided to do so, it would have already indicated its

intention, and that ODI "would not surprise [RPM] with that type of demand after closing,

especially in a Form A situation." *Id.*

On May 28, 2017, Hudson followed up with Hamilton by email, stating that Entitle had

"determined it is not necessary at this time" to restate the Form A projections to ODI. JX-90; Tr.

at 132 (Hudson). Hudson noted that ODI was receiving monthly financial statements from

Entitle pursuant to the heightened surveillance regime, and would take those statements into

account in reviewing the Form A. Therefore, from Entitle's perspective, ODI had current

---

[13] Noack's second statement contradicted a statement RPM's regulatory lawyer, Hamilton, had made six days earlier to ODI. On May 19, 2017, Hamilton had taken the issue of restructuring the Hirt family trust "off the table" at the Hirts' instruction, after realizing that such would significantly delay ODI's Form A approval and threatened to make Trust information public. Hamilton Dep. at 115–16; JX-77. Hamilton's email to ODI that day stated: "Any change in ultimate ownership of the Applicant [referring to the change in Trust ownership], if it happens at all, will be the subject of a separate application to the Department following the hoped-for completion of the acquisition." JX-77.

financial data to fully evaluate the pro formas. And, Hudson stated, "should the [ODI] request a restatement of the pro formas, EIC would be happy to work with RPM to put them together." JX-90. Hamilton found Hudson's explanation persuasive and agreed not to update the pro formas absent an ODI request to do so. *See* Hamilton Dep. at 190 ("[W]hen [Hudson] said don't talk to them about that yet, I'd advise not doing that, it would send the wrong message, I respected that advice and thought at the time yes."). Hudson, following up on her May 24 phone call with Snow, again broached extending the outside date for closing, then still May 31, 2017, on account of the fact that ODI had yet to approve the Form A. JX-90. Although the extension would be for the maximum length of time (90 days) that the agreement permitted, Entitle intended to schedule closing promptly after ODI's approval of the transaction, which ODI had indicated was forthcoming. *Id.*; Tr. at 191–92 (Hudson). RPM did not respond to Hudson's inquiry. Tr. at 133–34 (Hudson).

On May 28, 2017, Hirt, by phone, asked Iannarone for updated financial projections from Entitle. Palmer Aff. ¶ 44; JX-186. That day, in response, Iannarone asked Palmer to provide him with the projections submitted in the Form A compared to "actual to date and revised projections." JX-390. The latter projections did not independently exist. *See* Tr. at 313, 317 (Iannarone) ("I asked to do this at the request of RPM[.]"). Later that same day, Palmer provided the data comparison to Iannarone.[14]   JX-390.

---

[14] Palmer provided an explanation for the increase in losses in his email to Iannarone: Entitle was not vertically integrated, as the projections had assumed and the refinancing volumes from RPM and other sources of revenue were less than had been assumed. JX-390. Palmer anticipated that costs would come down in the second quarter of 2017 as Entitle downsized and closed its Connecticut office. *Id.* Palmer also cautioned Iannarone to consider that "[t]itle losses are . . . correlated with premiums and since premiums are lower so are title losses." *Id.*

Based on these new questions and requests from RPM, Entitle by now believed that RPM was laying groundwork to back out of the deal. In a May 28, 2017 email to other PartnerRe personnel, Iannarone wrote, "I believe RPM is getting cold feet (or is about to try a retrade) as they are throwing up roadblocks." JX-88; *see also* Iannarone Aff. ¶ 31 (explaining that the transaction committee suspected that RPM would use the projections as an excuse to further delay closing); Tr. at 557 (Palmer) (saying the same), 558–59 (Palmer) ("My sense was that RPM was interested in sowing seeds of doubt in the mind of our regulator which concerned me greatly.").

Entitle was right. Internally, RPM was explicitly considering avoiding closing—or at least delaying it. On May 29, 2017, in an email to Noack, Hirt set out a series of "[r]easons to stall" the merger, which largely set forth RPM's blueprint for renegotiating the terms of the Merger Agreement. JX-91. The reasons to stall that Hirt identified included: the risk that the Trust's financial information could publicly be disclosed as part of the Form A approval process; that ODI's audit of Entitle was ongoing; that he did not know whether ODI was aware of Entitle's current financial position; that the Form A projections potentially should be refreshed; and that he wished to understand how much ODI would require in its next capital contribution call. *Id.* Hirt also took note of the "option[] at our disposal," which was to agree to the 90-day extension of the outside closing date that Entitle had proposed, while insisting that RPM submit a new Form A containing refreshed financial projections and inserting the new Hirt family Trust as the buyer. *Id.* Hirt's email set out the benefit to RPM of this plan. The delay, he stated, would give RPM time to "entice Impac Mortgage to join the investment" and permit RPM to have a better understanding of the capital contribution that might be required. *Id.* If there was a capital contribution, Hirt wrote, RPM would "negotiate with PartnerRe to give Entitle a loan." Hirt also

noted that RPM's cash position would be stronger in 90 days. *Id.* The Merger Agreement had not contemplated either the participation in the acquisition by Impac Mortgage or the new loan from PartnerRe that Hirt broached.

On May 30, 2017, in response to a draft email to Iannarone that Hirt sent to his wife for her feedback, Ms. Hirt asked Hirt: "What does Lars [Johansson, RPM's counsel,] say about them forcing you to buy Entitle.  Can they do this?  It seems we should also look at getting turned down by the commissioner is that a possibility?" JX-93.

### 2. May 30, 2017:  Hirt Emails Entitle Identifying New "Deal Points" as Pre-Conditions to Close

On May 30, 2017, Hirt emailed Iannarone, setting out a series of "deal points" that needed to be resolved for RPM to agree to the 90-day extension and to close.  JX-94.  A number of these went beyond ensuring that the preconditions for closing in the Merger Agreement had been satisfied.  Specifically, Hirt stated that: (1) a revised Form A should be submitted, identifying Hirt's new family Trust as the owner, and containing refreshed projections of Entitle's losses for 2017; (2) ODI should give a clear indication as to the amount of a capital infusion into Entitle that it would require, based on the updated financial statements; (3) the purchase price should be revisited based on Entitle's current financial condition; (4) potentially, a new party, Impac Mortgage, should be brought into the deal; and (5) RPM's lender, Waterfall, needed to sign off on the transaction again.  Hirt explained that Entitle was "in far worse financial shape than when we negotiated the transaction" and that RPM needs "to understand the true financial picture of Entitle both current and projected."  JX-94.  In the same email, Hirt wrote that "[m]y legal counsel says the financial deterioration of Entitle is material and that we

33

have no reason to believe a loan of $1.5 million . . . will be sufficient short term or long term to address Entitle's capital needs."[15]  *Id.*

At trial, Hirt admitted that, by this point, he had concluded that the deal he had negotiated with Entitle had become "a turd." Tr. at 1051–52. For the reasons set out more fully *infra* § II.C, the Court, based on the full trial record, finds that Hirt, so viewing the deal, had by this point resolved not to close the transaction as formulated in the Merger Agreement, and that the concerns and demands he set out in his May 30 email were gambits to avoid being held to the terms of that agreement, which he was eager to revise, or in his words, "re-trade."

### 3. May 30–June 2, 2017: The Parties Spar Over Hirt's Demands, and ODI Approves the Transaction

Hirt's May 30, 2017 email was perceived—outside and within Entitle—as signaling RPM's intention to avoid closing the transaction as negotiated, or to avoid closing altogether. After Hirt forwarded that email to Eick, an executive of RPM's lender Waterfall, Eick forwarded the email to a colleague, stating: "Looks like they are going to flake on Entitle[.]" JX-95. Entitle similarly perceived the May 30 email. Tr. at 948 (Dwyer), 340–41 (Iannarone). From Entitle's perspective, with ODI approval likely close, Hirt's proposal to resubmit a modified Form A stood to restart the regulatory approval process. And adding a new party—Impac Mortgage—would require not only a new Form A application, but a new merger agreement. *Id.* at 945–46 (Dwyer), 340–41 (Iannarone) (estimating adding Impac would have added another six to nine months to the closing timeline).

---

[15] Notwithstanding this email, PartnerRe did not argue that RPM had waived attorney-client privilege. As a result, the record is silent as to whether Hirt's representation was accurate as to the advice he claimed to have received from his counsel.

On May 30, 2017, Iannarone responded to Hirt's email to clarify that, under the Merger Agreement, Entitle was unilaterally authorized to extend the closing deadline past May 31, and did not require RPM's assent to do so.[16] JX-94.

On May 31, 2017, Iannarone wrote to Dwyer that he believed that Hirt was using his demand for updated projections as a pretext to "delay things." JX-100. He wrote that, although Entitle "has what Hirt is looking for," "we (as a Transaction Committee) agreed not to send the financials to RPM at this time." *Id.* Iannarone explained that he did not view the Merger Agreement to require Entitle to provide the updated projections Hirt sought; he believed that Hirt was requesting them for disingenuous reasons. Tr. at 313. Despite not being required to do so, Iannarone explained that, at various points throughout that week, the Transaction Committee debated giving Hirt the projections. *Id.* at 328–30. Even as its members debated, throughout that week, the Transaction Committee worked to finalize the draft, and ultimately decided to share the finalized version with Hirt. *Id.*; *see also* JX-186; JX-187; Tr. at 538–39 (Palmer), 551–53 (Palmer), 318 (Iannarone), 329 (Iannarone).

On May 31, 2017, Iannarone followed up by email to Hirt's May 30 email. He wrote that, in Entitle's view, there was no reason either to refile the Form A or to reach out to ODI other than in response to an inquiry from it. JX-97. With respect to Hirt's stated concern that Palmer had refused to tell Hirt the amount of the capital contribution that ODI would likely

---

[16] Entitle's authority to unilaterally extend the closing date derived from § 9.1(b)(i) of the Merger Agreement: "[T]he Company [defined as Entitle] may extend the Outside Date [of May 31] for up to three (3) additional months if (x) all conditions to closing set forth in Article VIII are satisfied other than the condition set forth in Section 8.1(c) and (y) the Parties are still actively seeking in good faith the Ohio Department's approval of the Ohio Form A without the imposition of any Burdensome Condition." RPM does not now claim that the Merger Agreement required its assent to an extension.

require, Iannarone explained that ODI had not provided a number, and that asking it to do so

risked encouraging ODI to demand a capital contribution and might result in a demand for a

higher such contribution. Tr. at 268; *see also id.* at 540 (Palmer) ("I'm not sure how I, as CEO,

could tell him what ODI was going to require."). When asked at trial why he did not simply

forward Turner's May 24, 2017 email exchange with Palmer to Hirt in response to Hirt's May

30, 2017 email, Iannarone explained that he and Hirt had discussed this topic thoroughly by

phone. *Id.* at 268.[17] In an internal email exchange that day with Pestcoe, Iannarone commented

on Hirt's proposal to refile the Form A: "I think [Hirt] is either getting bad/overly conservative

advice or he is using his lawyers as a shield to delay the process (to eventually be in a position to

walk away or retrade)." JX-102.

   On May 31, 2017, having not received a response from Hamilton and Heales as to RPM's

views on the extension of the closing deadline that ODI had requested, Hudson emailed ODI's

Snow, stating that Entitle had extended the May 31 deadline for closing on the merger. JX-99;

*see also* JX-96. Based on what Snow had communicated to Hudson—including that members of

ODI were planning to attend a conference and anticipating delays due to the upcoming Memorial

Day holiday—ODI would not approve the transaction until sometime mid-June. *See* JX-87; JX-

89; Tr. at 188 (Hudson); *see also id.* at 126–28 (Hudson). Although Hudson did not copy any

representative of RPM on the email to ODI, that day, she forwarded it to RPM's regulatory

counsel. JX-90. Hudson testified that Entitle had unilaterally extended the outside date for

---

[17] Iannarone testified that did not recall consciously deciding not to forward the Turner-Palmer
email exchange to Hirt. He testified that he believed it to have been sufficient to recount the
exchange to Hirt. Tr. at 284–85; *see also id.* at 276–77 (on the Turner-Palmer exchange in
particular, "there was nothing else for us to say. We [told] them exactly what ODI said. We told
them exactly what [Palmer] said in response. And [Hirt] also asked my personal opinion, as far
as what I thought ODI was going to require.").

closing, because, having not heard back from Hamilton and Heales, she wanted to ensure the extension was processed before the May 31, 2017 outside date for closing in the Merger Agreement passed. Tr. at 136 (explaining that the Merger Agreement authorized Entitle unilaterally to extend the closing date); *id.* at 126–27 (Hudson testifying that Snow had told her the extension was necessary under the Merger Agreement).

On June 1, 2017, Hirt again emailed Iannarone and Palmer, asking that the parties submit an updated Form A application to ODI. Hirt stated that, based on the losses it had experienced in the first quarter of 2017, he believed that Entitle stood to lose approximately $2.2 million for the first half of 2017, which he characterized a "material change in events." JX-101. Hirt stated that he believed he was obliged to give ODI clarity as to Entitle's current financial condition, adding: "[I]f I give a false interpretation of the Form A, I can be held liable not only for civil penalties, but criminal penalties." *Id.* RPM's regulatory counsel, however, did not share this view. Hamilton Dep. at 179–80 (testifying that it was unlikely that anyone, including ODI, would have regarded the earlier Form A as false on account of Entitle's later financial results). Hirt also asked Iannarone for additional financial information from Entitle, including the additional costs that Entitle was agreeing to pay for PartnerRe's involvement and the legal bills "that seem to be piling up." *Id.* Hirt noted that he had requested updated projections three days earlier but had not received them. JX-101.

On June 2, 2017, ODI unconditionally approved the Form A application. JX-104. ODI sent notice of the approval directly to Hudson, which she forwarded to RPM. JX-105. ODI's was a "clean" approval, in that ODI had not attached any conditions to it—including a requirement of additional capital. Tr. at 139 (Hudson).

The same day, Entitle's transactional attorney, Joshua Fisher, notified RPM's transactional attorneys from K&L Gates that, with ODI's approval in hand, Entitle expected closing to occur—as provided in the Merger Agreement, seven days later, *i.e.*, on or before Friday, June 9. JX-103.

Also on June 2, 2017, Entitle sent its most up-to-date financial projections to RPM. These responded to Hirt's May 28, 2017 telephonic request for such information. JX-125. In the email attaching those projections, Palmer offered: "I'd be happy to walk you through these at your convenience." JX-125. The up-to-date projections reflected projected losses for 2017 of $2.1 million, down from the $2.3 million in the May 28 draft. *Compare* JX-186 *with* JX-107 (attachment).[18] Before furnishing these to RPM, Entitle had submitted its draft projections to its board for review before being made final, consistent with its customary practice. Iannarone Aff. ¶ 32.

### 4.      June 2–9, 2017:  RPM Fails to Close

Under the Merger Agreement, RPM was legally obligated to close on the transaction following Form A approval, as Hirt acknowledged at trial. Tr. at 1397. It chose not to do so, Hirt explained, because RPM believed there had not been "transparent disclosure" to ODI about Entitle's financial deterioration. *Id.* at 1398. In the week before the scheduled closing, the parties principally communicated through transactional counsel, and increasingly through

---

[18] Notwithstanding Entitle's provision of this information to RPM, RPM's regulatory attorney, Hamilton, believed that the unconditional approval of the Form A had made "moot" Hirt's proposal to update ODI as to RPM's pro forma projections for Entitle. Hamilton Dep. at 145–46.

litigation counsel. In its communications with Entitle during this week, RPM set out other justifications for its refusal to close, and Entitle responded.

On June 5, 2017, RPM's transactional counsel, Johansson, emailed Entitle's counsel. RPM, Johansson stated, would not close on the transaction until it received the "actual financials for May and meaningful projections for 2017" in order to get a good understanding of Entitle's current financial condition. JX-109. Johansson speculated that an MAE might have occurred, based on Entitle's financial condition. *Id.* Separately, Johansson accused Hudson of engaging in improper backroom dealing to obtain ODI's approval. He demanded that PartnerRe and Entitle share what transpired and was said between Hudson and ODI. *Id.* Johansson theorized that when Hudson called ODI on May 31—without, Johansson alleged, notice to or participation by RPM's regulatory counsel—Entitle had breached a key covenant in the Merger Agreement.[19] JX-109. Johansson stated that unless RPM gained comfort with respect to how ODI's approval had been obtained, RPM would arrange a meeting to discuss the matter with ODI in the coming week. *Id.* Johansson also disputed that Entitle had the ability unilaterally to extend the May 31, 2017 closing deadline. *Id.*

On June 5, 2017, Hirt emailed Iannarone with a new list of demands as conditions for RPM's participating in a closing. JX-110. These included reaching out to ODI to discuss the Hirt family's Trust and means of keeping its financial information private; providing RPM with new financial projections about Entitle, which he posited could reflect $4 million in projected losses through December 2017; and ascertaining any additional capitalization requirements that ODI might require. *Id.* Hirt also asked that Impac Mortgage be integrated into the transaction

---

[19] In fact, Hudson had inquired multiple times as to whether Hamilton and Heales assented to the extension, and never received a response. *See, e.g.*, JX-89.

and that it participate in a simultaneous closing alongside RPM, and that RPM receive an additional $6 million loan to be secured by the assets of Entitle. *Id.*

On June 6, 2017, Fisher, Entitle's counsel, replied to Johansson's email. Describing RPM's stated concerns as "plain pretext," Fisher stated that there was no legitimate reason for RPM to initiate contact with ODI. JX-112. Fisher added that the most recent financial projections that Entitle had furnished RPM at Hirt's request had been prepared on an informal, *ad hoc* basis, and that supplying these to ODI would be "disingenuous" and "entirely inappropriate." *Id.* Fisher noted that ODI had known of Entitle's then-current financial condition and had taken it into account when approving the Form A. *Id.* ("Entitle is already furnishing [ODI] with its monthly statutory financial data. In light of [ODI's] access to these reports and its close knowledge of Entitle's historical operations and performance, [ODI's] approval of the transaction speaks for itself on the matter of Entitle's financial condition.").

On June 7, 2017, Iannarone emailed Hirt a response to his June 5 email. RPM's stated desire to contact ODI, he wrote, had an "obviously disingenuous motivation." JX-113. With respect to Hirt's plan to provide the new pro forma projections to ODI, Iannarone noted, these had been created on an informal, ad hoc basis. He added: "I want to specifically caution you not to provide ODI with knowingly inaccurate projections." JX-113. Iannarone also unequivocally shot down Hirt's request for an additional $6 million lifeline loan. Funding in excess of the contracted-for $1.5 million loan, he reminded Hirt, was not a closing condition. *Id.*

On June 8, 2017, the day before closing was scheduled, Johansson emailed Fisher, asserting that closing could not proceed because Entitle was not being transparent and was denying RPM a full understanding of its financials, which RPM believed had materially worsened since execution of the Merger Agreement. JX-115. Johansson sought access to the

40

factual basis for Entitle's most recent projections and an explanation for the decline in Entitle's performance. *Id.* Johansson reiterated RPM's concern that the financial projections it had submitted to ODI with the Form A application be correct. *Id.* As to RPM's obligation to close, Johansson claimed that because all conditions to closing had not been satisfied or waived by June 2, the five-day closing period had not yet commenced. *Id.* His email did not, however, identify which condition(s) had not been satisfied, apart from asserting that an MAE might have occurred, based on Entitle's increased losses.

On June 8, 2017, in a response to Johansson's email, Amos Friedland, litigation counsel for PartnerRe and Entitle, wrote: "Under the terms of the Agreement, the merger must close tomorrow, Friday, June 9, 2017, at 9:00 a.m. Eastern time, at the offices of Bryan Cave LLP." He noted that RPM had not identified any closing condition that was unfulfilled. JX-116. Friedland accused RPM of engaging in a "pretextual effort to frustrate, delay, impair or impede the Closing" through "unfair, deceptive, oppressive, and unscrupulous" actions. *Id.* As to Johansson's assertion of a possible MAE, Friedland stated that Entitle had been open with RPM about its financial circumstances and projections, and that its recent projections could not be used to establish an MAE, because, under the Merger Agreement, any failure by Entitle to meet projections or forecasts or estimates of revenues or earnings for any period was specifically excluded from the definition of an MAE. *Id.* (citing Merger Agreement § 1.1). As to Johansson's accusations of misconduct by Hudson, Friedland noted that Hudson had copied

41

RPM's regulatory counsel on communications with ODI and that contacting ODI at that point could only cause confusion.[20]  JX-116.

On June 9, 2017, Entitle appeared at Bryan Cave's New York City office for the closing, but RPM did not.  JX-119.

### H.    June 10–19, 2017: RPM Demands—and Receives—Additional Financial Information and ODI Communications

On June 10, 2017, counsel for Entitle and RPM held a conference call and discussed their obligations under the Merger Agreement.  *Id.*  RPM did not identify any closing condition that was unsatisfied as of June 2.  *Id.*  It stated during the call that it would not close until Entitle had given it additional financial information.  *Id.*

On June 11, 2017, Entitle, through counsel, wrote RPM, stating that by failing to appear for the closing, RPM had materially breached the Agreement.  *Id.*

On June 13, 2017, Iannarone and Hirt had an in-person dinner meeting, at which Hirt broached revised deal terms, including adding Impac as a party.  Iannarone Supp. Aff. ¶ 2. Iannarone responded that any plan to include Impac should be discussed after the parties had closed on the merger between Entitle and RPM, and that if RPM did not close, the dispute would

---

[20] Berliner, PartnerRe's regulatory expert, persuasively attested that, based on the record, Hudson and Entitle had "kept Mr. Hamilton and RPM promptly informed of communications with ODI related to the Form A" and that their conduct "was reasonable and consistent with the practices customary in Ohio for sellers and their insurance regulatory attorneys in handling Form A applications filed with ODI."  Berliner Aff. ¶ 102.  Notably, RPM's regulatory expert, Spina, also testified that Entitle's communications with ODI were "customary and typical."  Tr. at 1240; *see also* Hamilton Dep. at 190 (relatively sure Hudson was acting in good faith).  Hamilton, RPM's regulatory counsel, attested that he did not always copy Hudson on communications with ODI; that he would instead forward Hudson such communications; that this mode of sharing information with his deal counterparty was appropriate; and that cc'ng the counterparty's counsel was not required.  Hamilton Dep. at 65–69; *see also* Tr. at 764–65 (Noack).  Hamilton or Heales had not told Hudson that they expected to be included on all communications between Entitle and ODI while the Form A approval process was underway.  *See* Tr. at 97 (Hudson).

end in litigation. *Id.* He noted that revising the deal to add a third party would entail months of due diligence, deal negotiations, and two new Form A applications (one for Impac, and a new one for RPM), and was uncertain whether a new deal could reach fruition. *Id.* Hirt assured Iannarone that a deal would "get done," while stating that the terms would need to be revised and the closing deferred to an unspecified date. *Id.* Iannarone responded that renegotiation was not an option, that RPM was obliged to close under the Merger Agreement, and that PartnerRe would sue RPM if it failed to do so. *Id.*

On June 13, 2017, Noack sent another request to Palmer seeking "May's complete financials," to include: "EDG based on GAAP and EIC based on statutory—balance sheet, P&L, and P&L trend from 01/16 through 05/17"; "Balance sheet account reconciliations for both EDG and EIC"; "Refreshed pro forma[s] for 2017; 2018; and 2019"; "Monthly orders and closing separated by clients for 2016 and 2017"; "Agreement and information that relates to any termination of material contracts, termination of employees, etc."; "All 2017 correspondence with regulators." JX-323.

As to these requests, on June 14, 2017, Friedland, Entitle's counsel, wrote RPM's Johansson that the Merger Agreement provision granting RPM access to Entitle's books and records did not oblige Entitle to provide "explanations" or create new documents for RPM. JX-456. And on June 16, 2017, Palmer responded to Noack that Entitle would not provide refreshed pro formas or all of Entitle's 2017 correspondence with ODI, viewing the time and effort that would go into generating such documents as unreasonable at this stage in the transaction. JX-182. Entitle, however, later confirmed that the projections it had created two weeks earlier remained current. JX-135. And Palmer agreed to respond to Noack's requests for "May's complete financials," including unaudited EIC and EDG income statements and balance sheets

43

for May 2017, balance sheet account reconciliations for both EDG and EIC, monthly orders and closings separated by clients for 2016 and 2017, and agreements and information that relates to any termination of material contracts, termination of employees. JX-131; JX-182.  Palmer proposed that Noack email him any questions she had about the materials he had sent.  JX-182.

On June 16, 2017, RPM's litigation counsel, Steven L. Caponi, notified Entitle litigation counsel Friedland that it would not close until Entitle had provided it with all communications with ODI relating to Entitle's capital adequacy.  JX-133.

On June 18, 2017, Entitle provided RPM with the May financials.  JX-132.  It also agreed to provide RPM with Entitle's 2017 communications with ODI relating to the Form A approval, including those related to Entitle's capitalization.  Id. [21]

On June 19, 2017, Entitle provided these communications to RPM, JX-135, including the May 24, 2017 email exchange between Turner and Palmer.  Tr. at 287 (Iannarone).  Noack and Hirt, however, did not review these materials, notwithstanding their repeated requests for them, including to determine whether an MAE had occurred.  See Tr. at 758–60 (Noack); Noack Dep. at 85–86; Tr. at 1376–77 (Hirt).

---

[21] Although RPM initially sought communications between RPM and ODI to test its claim that that Hudson had engaged in improper dealing to secure ODI approval, see JX-109, RPM ceased by mid-June to make such accusations.  On a June 11, 2017 call, Hudson explained her role in obtaining Form A approval.  JX-123.  The following day, Hamilton wrote to Hudson: "I have conveyed the information you shared with me to the K&L Gates and RPM team, and we all appreciate your setting the record straight regarding your involvement in the process leading up to the Form A approval."  Id.  Johansson, RPM's transactional counsel, likewise stated: "I also appreciate your setting the record straight in connection with the Form A approval and also conveyed the information to the RPM team.  I now hope we can get to the closing soon, in a manner beneficial to everyone.  Many thanks for your help on the regulatory side, and for your long public service."  Id.  RPM, however, continued to pursue Entitle's communications with ODI, on the ground that Entitle may have made secret commitments to ODI regarding post-closing capital contributions.  See JX-133.

I.      **June 21–29, 2017:  RPM Continues to Refuse to Close Despite Receiving the Information It Requested, and Entitle Terminates the Agreement**

Despite receiving the information that RPM had claimed it needed, RPM, after June 19, 2017, continued to refuse to close.  In a June 21, 2017 email to his wife, Hirt celebrated extricating RPM from the transaction:  "It[']s been a short but important trip.  We got out of Entitle, out of Fortress and off Waterfall!  It[']s happening!"  JX-136.  Hirt testified that he was "elated" when he sent that email.  Tr. at 1153.

During this period, RPM advanced several explanations for its continued refusal to close. As reviewed *infra* § II, the Court finds each bogus and pretextual.

On June 22, 2017, RPM's counsel, Caponi, wrote Entitle's counsel, Friedland, making several claims.  Caponi claimed that "ODI does not have the correct information or good understanding of Entitle's financial predicament, and in fact may have been misled as to the merger and its impact on Entitle."  JX-137.  Caponi also claimed that on May 24, 2017, Palmer, to assuage ODI's concerns about Entitle's capital adequacy, had—without RPM's assent— offered ODI a $1.5 million loan commitment from PartnerRe.  *Id.*  Finally, Caponi claimed that Entitle had known, but concealed from RPM, "down to the dollar, what ODI expected from Entitle under ODI's requirements for capital adequacy."  *Id.*

On June 23, 2017, Entitle's counsel responded that these justifications for not closing were false and pretextual and made "clear that RPM has no intention of performing on its current obligations or curing its breach under the Agreement.  Although we are now forced to conclude that RPM has no intent to close, we continue to insist that it do so as soon as possible."  JX-138.

On June 23, 2017, ODI requested an update on the transaction. Hudson's email response for Entitle stated: "We no longer have confidence that RPM intends to close at the agreed terms, despite their continued assertions to the contrary." JX-143.

On June 28, 2017, ODI notified Palmer that it "wanted to remind you of the need for a capital contribution." JX-145.[22] ODI stated that, to fully cure Entitle's HFCs and remove it from heightened surveillance, a $5.5 million capital contribution would be needed. *Id.* ODI did not state, however, that a contribution of this size was needed for Entitle to continue normal operations, as the agency for years had permitted Entitle to operate under heightened surveillance without a capital contribution at times when its ratios of losses to capital put it in violation of HFC requirements. *See* Iannarone Aff. ¶ 45; Tr. at 867 (Bush); *but see* Bush Aff. ¶ 40 (in conducting ODI's damages analysis, construing ODI to demand a $5.5 million capital contribution).

The same day, Entitle alerted RPM of the communication from ODI. It gave RPM a "final opportunity to close the transaction," stating that if RPM did not enable the transaction to close by July 5, 2017, then Entitle would terminate the Merger Agreement. JX-144.

On June 29, 2017, RPM stated that it would not close, claiming "a material adverse effect, an alarming deterioration in Entitle's financial position and regulatory condition, and the apparent lack of candor in this regard." JX-148.

---

[22] Although repeatedly noting the possibility, ODI had not previously categorically notified Entitle of the need for a capital contribution. Its "reminder" came after it had been informed that the transaction with RPM—which stood to fortify Entitle, including by virtue of the provision in the Merger Agreement under which PartnerRe would loan money to Entitle to serve as a capital contribution—appeared dead. Entitle understood ODI's statement in this light. *See, e.g.*, Baskey Dep. at 101–03; Pestcoe Dep. at 214–16.

46

On June 29, 2017, Entitle terminated the Merger Agreement. *See* JX-208; *see also* Tr. at 360 (Iannarone).

### J.    The Radian Deal

After the RPM transaction failed to close, PartnerRe and Entitle began searching for another buyer for Entitle.  To streamline this process, PartnerRe agreed, on August 8, 2017, to purchase the equity held by Entitle's other stockholders.  Iannarone Aff. ¶ 47; JX-169.  To mitigate damages, PartnerRe also considered alternatives to selling Entitle, including placing it in run-off. *See* JX-190; JX-197 (June 28 email from Pestcoe to Iannarone boosting run-off "to stop the bleeding").

By the end of August 2017, Entitle had responded to data requests from Mortgage Connect and Impac, and spoken with other potential buyers.  JX-151.  By the end of September 2017, Entitle had held discussions with eight potential buyers.  JX-152.  To ensure that Entitle would stay afloat pending its acquisition, Entitle's owners contributed additional capital to it in the form of bridge loans, including $800,000 in November 2017 from Palmer and two others, and $925,000 in December 2017 from PartnerRe.  JX-166.

On November 1, 2017, Radian submitted a letter of intent.  JX-171.  It offered to buy 100% of Entitle at "an aggregate purchase price equivalent to the adjusted net tangible book value of the Company, as of the date of closing," which Radian estimated as approximately $9 million.  *Id.*  On December 31, 2017, PartnerRe and Entitle entered into an agreement under which Entitle would be sold to Radian.  JX-175.  This transaction, they determined, would maximize shareholder value and mitigate damages resulting from RPM's breach.  JX-152.

The agreement with Radian was largely modeled on Entitle's Merger Agreement with RPM.  However, unlike the agreement with RPM, the agreement did not include an equity

component. Instead, Radian purchased Entitle outright for its estimated book value at closing, plus an additional $125,000 per month from November 1, 2017 until closing. The purchase price was also less Entitle's outstanding debt and other expenses associated with the transaction. JX-158.

On March 27, 2018, Radian's acquisition of Entitle closed. JX-170. Using the formula in the agreement, the parties tabulated the "Target Purchase Price" as $7,310,574 and subtracted from this the following approximate amounts: the indemnification escrow amount ($950,000), Entitle's outstanding indebtedness ($5.2 million); unpaid transaction expenses ($273,000) and the stockholder representative expense ($100,000). Entitle's owners thus received, as "Closing Merger Consideration," approximately $780,000. Imburgia Aff. ¶ 35. Entitle's owners later received the entire escrow fund, then approximately $984,000. *See* JX-174. The eventual full "Merger Consideration" was therefore approximately $1,763,363. Imburgia Aff. ¶ 35.

As a result, Entitle estimated that it received $10,866,955 less from the Radian deal than the value it would have received if RPM had closed on its acquisition of Entitle on June 9, 2017. *Id.*

### K.    Entitle Assigns Its Claims Against RPM to PartnerRe

At the same time the Radian transaction closed, Entitle and PartnerRe also entered into an assignment agreement. JX-175. Under it, Entitle assigned to PartnerRe its interest in any claims against RPM and its affiliates arising from the unconsummated Merger Agreement.

## II.    Findings of Fact:  RPM and Hirt's Intentions and Motivations in Refusing to Close

This section records the Court's factual findings as to a discrete but central issue in this case: the intentions and state of mind of RPM and its chief executive, Hirt, in refusing to close on June 9, 2017, and during the surrounding weeks. These findings are germane to multiple issues.

Insofar as RPM and Hirt made statements during this period to the effect that Entitle was or might be in breach of the Merger Agreement, or articulated excuses for not closing, whether these statements were pretextual—ploys to enable RPM to escape the transaction unharmed—is germane to defendants' claim of material breach(es) by Entitle.

In addition, as explained below, the Court construes the Merger Agreement to require a party claiming breach to establish its adversary's knowing breach or reckless disregard for its obligations under the agreement. Whether RPM and Hirt fabricated bogus justifications for not closing in order to avoid an agreement they had to come to regret—as the Court emphatically finds—bears on whether defendants acted with such a state of mind.

### A.        Threshold Issue:  Witness Credibility

Important to the Court's fact-finding, and particularly as to defendants' state of mind surrounding the June 9, 2017 closing date, is its assessment of credibility. The Court carefully assessed each witness's credibility by all familiar means. These included by observing the witness's demeanor, evaluating whether his or her testimony was internally consistent, and assessing whether and to what extent it aligned with the documentary record and the testimony of others. Although not crediting every particular as accurate, in general, the Court found most of the fact witnesses credible. Most attempted in good faith to recall and recount the events at issue, which involved occurred four to five years earlier, and not all of which were inherently memorable.

The notable exception is Hirt. It would be difficult to overstate the unfavorable impression Hirt left with this factfinder. Entitle board member Dwyer testified that, based on his dealings with Hirt, he had found Hirt "weasel[y]", "superficial, flighty, and not sincere." Tr. at 948–50. On its close review of Hirt's conduct during the events at issue and his testimony and

comportment at trial, the Court is constrained to adopt Dwyer's assessment. Hirt's conduct bespoke a blasé attitude toward RPM's contractual obligations under the Merger Agreement and a dismaying willingness to deploy pretexts and fabrications as means to avoid those obligations. And at trial, the Court found Hirt's testimony all too frequently glib, non-rigorous, self-serving, and unreliable. The Court accordingly significantly discounts, and at points discredits altogether, Hirt's version of events.

**B.      February 16–May 25, 2017:  Hirt and Noack Treat RPM as Free to Abandon the Merger Agreement**

The evidence establishes that, even before RPM became aware of that Entitle's financial performance was beneath projections, its executives were internally discussing whether to abandon the Entitle acquisition, notwithstanding the binding Merger Agreement. On May 18, 2017, CEO Hirt emailed CFO Noack: "I am thinking we should reconsider closing Entitle. It may be too much right now and it's not major to our economics." JX-196. Noack responded by listing the benefits of not closing: "Pro for not proceeding: we would preserve cash, which we need until we start earning income." *Id.* Her email also acknowledged downsides: "substantial reputational harm and potentially loosing [sic] PartnerRe that could be a great ally for us." *Id.* Notably, Noack did not identify as a relevant consideration the risk—and consequences to RPM—of being in breach of contract were RPM not to close. Hirt did not do so either.

Pressed at trial on this point, Noack testified that conversations along these lines were commonplace. She testified that, on at least a weekly basis, both before and after executing the Merger Agreement on February 16, 2017, she and Hirt discussed whether to go forward with the Entitle transaction. Tr. at 791–93; *see also id.* at 1011, 1041–42 (Hirt confirming the same). Noack further testified that the pros and cons that the two identified of proceeding with the

transaction were "basically the same" before and after execution of the Merger Agreement on

February 16, 2017, and that the fact of an executed agreement had not changed their analysis. *Id.*

at 803. Indeed, in all their conversations about whether to close, Noack and Hirt never discussed

the possibility that RPM might be contractually obligated to do so, might be found liable for

failing to do so, and could face a damages award for breaching. *Id.* at 803–04 (Noack), 1043

(Hirt). Noack testified that these issues never even crossed her mind. *Id.* at 804. Pressed at trial,

however, Hirt conceded that as of mid-May 2017, he appreciated that RPM would be in breach

of the Merger Agreement if ODI unconditionally approved the deal and RPM refused to close.

*Id.* at 1392–93.

The Court accordingly finds that, even before May 25, 2017, RPM and its executives had

a casual and cavalier attitude towards their contractual obligations to Entitle. Notwithstanding a

binding agreement, Hirt and Noack operated as if RPM had the same range of motion with

respect to acquiring Entitle as it had had before entering into the Merger Agreement. Consistent

with this, as reflected above, even after February 16, 2017, Hirt regarded RPM as at liberty to

use its finite cash on alternative acquisitions if those emerged as more promising than Entitle.

As a further indication of the casual attitude RPM took towards the Merger Agreement,

Hirt and Noack wrongly assumed for months that Entitle's cash would be available to RPM to

use to fund its purchase of Entitle. *See* JX-44; Tr. at 687–88. In the same vein, too, Hirt

admitted probably not having reviewed the Form A application at all before he attested to its

accuracy and submitted it to ODI in support of the acquisition of Entitle. *See* Tr. at 1031–32; *see*

*also id.* at 741 (similar testimony from Noack).

**C.** **May 25–June 29, 2017:  RPM Articulates a Series of Baseless Excuses Not to Close on the Merger**

On May 25, 2017, RPM received the news of Entitle's higher-than-forecast operating losses for the first four months of 2017 and projected pre-closing losses, and of ODI's statement that it might require a capital contribution following the Merger.  This bad news, the Court finds, catalyzed deep buyer's remorse on Hirt's part.  Thereafter, to avoid the deal as negotiated and an in an effort to leverage Entitle to renegotiate on terms more favorable to RPM, Hirt—directly and through Noack and later his outside counsel—served up a series of excuses and rationalizations for delaying the closing or exiting the deal.  Each of these, the Court finds, was not put forward in good faith.  Instead, each was a ploy to avoid closing on negotiated terms that Hirt had come to regret.

These excuses were that: (1) Entitle was not being sufficiently transparent with RPM about its financial condition; (2) Entitle engaged in inappropriate communications with ODI; (3) RPM's pro forma projections as to Entitle's post-merger performance needed to be resubmitted to ODI; (4) the Hirts needed to delay the Form A approval process in order to update their family trust; (5) RPM required the approval of its lender, Waterfall Asset Management, to close the deal; (6) the terms of the merger should be revised, to include an additional party, Impac Mortgage, and to bring down RPM's purchase price; and (7) Entitle had suffered expected losses of a nature or scale justifying escape from closing.  In proffering these excuses during this period, Hirt often stated that RPM intended for the deal to close.  The record reflects, however, that from May 25 forward, he did not have any intention for the deal to close as negotiated, but instead, on materially revised terms, if at all. *See, e.g.*, Tr. at 1321 ("I thought the deal was going to close," but "changes might need to be made.").

The Court here reviews the series of pretextual excuses articulated by Hirt and RPM during this period, and other evidence from this period indicative of bad faith.

### 1.   Entitle's Purported Lack of Transparency with Respect to Its Financial Condition

Beginning on May 25, a frequent excuse RPM advanced for failing to close was that Entitle had not been, in some sense, "transparent" with RPM about its finances. This excuse was articulated first by Hirt and Noack. And, beginning shortly before the scheduled June 9 closing when, after RPM's communications with Entitle largely descended into heated letter writing by outside counsel, this ostensible basis for not closing was articulated by RPM's lawyers. *See, e.g.*, JX-94 (May 30 email from Hirt to Iannarone stating that RPM needs "to understand the true financial picture of Entitle both current and projected"); JX-101 (June 1 email from Hirt to Palmer again requesting updated financial projections, and speculating that Entitle's losses were a "material change in events"); JX-109 (June 5 email from RPM counsel Johansson to Entitle counsel stating that RPM would not close until it received the "actual financials for May and meaningful projections for 2017"); JX-115 (June 8 email from Johansson to Fisher claiming that, "the only reason the closing is being held up at this point is that Entitle is blocking access to a better understanding of its financials, a perceived lack of transparency, and the many indications that its financial condition has materially worsened since the execution of the Merger Agreement"); JX-323 (June 13 email from Noack to Palmer requesting financial information, including "May's complete financials"); *see also* Tr. at 1397 (Hirt explaining that RPM refused to close because "we did not feel that the information was transparent and given to us as per the agreement").

Critically, in assessing these grievances, under the Merger Agreement, Entitle's disclosure obligations to RPM were defined by the books and records provision, § 5.3(a). Under it, Entitle covenanted to give reasonable access to these to RPM's representatives. Under the agreement, Entitle did not have a freestanding duty of general "transparency" or a duty to create documents that did not independently exist. For the reasons below, the Court finds that Entitle complied with its duty to afford reasonable access under the Merger Agreement. *See infra* § III.B.2.a. Salient here, a review of the pertinent chronology underscores that RPM's claims of breach based on a lack of transparency were pretextual—ploys to gain time to delay or avoid the transaction.

After Entitle disclosed, on May 25, 2017, that it had not met its earlier projections, Hirt, on March 28, 2017, asked Palmer for updated projections. Palmer Aff. ¶ 44; JX-186. There was no existing document containing such projections; Hirt's request was implicitly for the creation of one. Tr. at 313, 317 (Iannarone).[23] In response, that day, Iannarone asked Palmer to take the projections contained in the Form A, and to update them, while setting out actual performance to date. JX-390. Palmer provided the comparison to Iannarone. *Id.* On June 2, 2017, four days after Hirt's request, Entitle sent the updated financial projections to RPM. JX-125. These projected losses for 2017 of $2.1 million, slightly below the $2.3 million Palmer had projected in

---

[23] As discussed in the Court's Conclusions of Law, *infra* § III, because updated projections did not exist at the time of Hirt's request, such projections were not subject to the contractual books and records obligation. To the extent Entitle eventually agreed to share updated projections, it did so to be a cooperative business partner, Tr. at 318–19, 328–30, and to avoid disharmony. Hirt, however, seemed not to appreciate the distinction between requests for documents that did not exist, and documents maintained in Entitle's ordinary course of business and thus subject to a books and records request. *See id.* at 1397 (claiming generally that Entitle's refusal to provide the requested projections was a breach of its books and records obligation).

the initial draft. *Compare* JX-107 *with* JX-186. In a cover email attaching those projections, Palmer stated: "I'd be happy to walk you through these at your convenience." JX-107.[24] RPM, however, did not take Palmer up on his offer to do so. *See* JX-119.

RPM thus received the updated projections seven days before the June 9 closing. That gave it time to determine whether an MAE had occurred. That was the pertinent question, because, although a change in Entitle's financials had the capacity to modify RPM's purchase price pursuant to the lock box provision, only a change rising to the level of an MAE could excuse RPM from closing. Such was most improbable: Based on Entitle's historical unprofitability, and the recent downturn in the refinance market, RPM likely knew—and its leaders certainly should have known—that, based on Entitle's failure to meet earlier projections, an MAE had not occurred. As reviewed *infra*, Delaware courts had (and have) found the existence of an MAE only once, emphasizing that such requires a long-term adverse change in a company's business prospects.[25] But beyond speculating that Entitle's deterioration might be "material"—*see, e.g.*, JX-94 (Hirt), JX-101 (Hirt); JX-115 (RPM counsel); JX-148 (RPM counsel)—Hirt and RPM, in 2017 and after, never explained, beyond making conclusory assertions, why that plausibly could be so.

---

[24] Below, the Court addresses and rejects defendants' argument that Entitle breached the Merger Agreement by waiting four business days to send RPM the updated projections. *See infra* § III.B.2.a.i.

[25] *See Akorn, Inc. v. Fresenius Kabi AG*, No. Civ. 2018-0300 (JTL), 2018 WL 4719347, at *53, 57 (Del. Ch. Oct. 1, 2018), *aff'd*, 198 A.3d 724 (Del. 2018) (a "buyer faces a heavy burden . . . . The important consideration therefore is whether there has been an adverse change in the target's business that is consequential to the company's *long-term earnings power over a commercially reasonable period, which one would expect to be measured in years rather than months*." (quotations omitted) (emphasis added)).

In June 2017, largely through counsel, RPM—before and after the June 9 closing date—continued to press Entitle for projections and data. These requests were for: "actual financials for May and meaningful projections for 2017," JX-109; new financial projections, fewer than three days after receiving a refreshed set, JX-110; and a "better understanding of [Entitle's] financials [and] a perceived lack of transparency." JX-115.[26] Entitle did not perceive these generalized requests as triggering a books and records obligation. *See* JX-119. Indeed, in response, on June 11, Entitle's counsel encouraged RPM to "promptly identify any existing financial or business records" for its review. *Id.* RPM has not contended that, as to any of these, Entitle had breached the books and records provision. Its claim of such a breach has been—at most—limited to the updated projections Hirt commissioned on May 28.[27] *See* Def. PF ¶¶ 35–46.

Notably, in demanding information outside the scope of that required by the Merger Agreement, Hirt, rhetoric aside, did not explain—during this period or thereafter—what concrete purpose the information he demanded would serve. As noted, the closing could be avoided for financial reasons only if these established an MAE. But RPM already had all the data it needed to make that assessment. *See* Tr. at 300 (Iannarone, testifying that, after the draft consideration

---

[26] *See* JX-109 (June 5, 2017 request by RPM counsel Johansson for "actual financials for May and meaningful projections for 2017"); JX-115 (June 8, 2017 request by Johansson for "financial information and a meaningful explanation for the decline in Entitle's business"); JX-119 (June 11 letter by Friedland recapping June 10 meeting between the principals and counsel in which Entitle agreed to provide additional financial information, and asking that RPM identify existing financial or business records that it sought to review).

[27] In its pretrial memorandum but not its post-trial proposed findings of fact and conclusions of law, RPM asserted that Entitle breached its books and records covenant by failing to provide it with updated pro forma projections, pursuant to Noack's June 13 request. *See* JX-323; Def. Memo at 26 ("Noack requested refreshed pro formas . . . . Palmer refused to provide [them].").

spreadsheet and updated projections had been sent, he did not "know what more transparency you can give"). In driving RPM to make these demands, Hirt, revealingly, was unaware that only an MAE would permit RPM not to close on the basis of Entitle's financial decline—and unconcerned whether one had occurred. At trial, Hirt testified that "whether a material adverse effect had occurred" was "not a high concern" to him, *id.* at 1122, 1375; that, as late as August 2019, he did not "have any understanding as to the definition of a material adverse effect under the merger agreement," *id.* at 1025; *see also id.* at 1122 (same, as of trial); and that, in May and June 2017, he had not understood whether Entitle's failure to meet financial projections could trigger an MAE, *see id.* at 1123–24. By trial, however, Hirt admitted that had an MAE not occurred, RPM "did not have the ability to walk away" and was "bound to the deal as reflected in the merger agreement." *Id.* at 1131–32. Ultimately, during 2017, RPM never claimed that an MAE had occurred. *Id.* at 1124.

RPM thus refused to close—through and beyond June 9, 2017—notwithstanding having received all the specific financial information it had requested. Strikingly, too, despite their stated concerns about a lack of data and transparency, neither Hirt nor Noack reviewed the information Entitle provided in response to RPM's requests, including to assess whether an MAE had occurred. *See* Tr. at 759–60 (Noack); *see also* Noack Dep. at 85–86 (after receiving Entitle's updated financials, she did not consider whether an MAE had occurred); Tr. at 1376–77 (Hirt, testifying that, in June 2017, he had "no reason to" review Entitle's financials in June

2017); *id.* at 1025, 1122, 1123–24 (Hirt, testifying he had no understanding then or now whether Entitle's financial condition constituted an MAE).[28]

Under these circumstances, the Court finds RPM's requests for data and projections in the period immediately before and after closing to have been pretextual. These were delay tactics, pure and simple, instigated by Hirt as a means to avoid closing.

### 2.    Entitle's Purportedly Improper Communications with ODI

On June 5, 2017, four days before the scheduled closing, RPM began to accuse Entitle of improper communications with its state insurance regulator, ODI. These improprieties, RPM stated through counsel, justified its not closing as scheduled. RPM first claimed that Entitle's regulatory counsel, Hudson, had engaged in unspecified backroom dealing with ODI. Then, after Entitle had responded to (and refuted) that claim, RPM claimed that Entitle had concealed from it a secret notice that ODI had purportedly given it as to the capital contribution amount ODI had determined it would require after the closing. RPM also claimed that Entitle—without RPM's consent—had committed RPM to loan Entitle money. *See, e.g.*, JX-109 (June 5 email from Johansson to Fisher suggesting Hudson had engaged in backroom dealing); JX-115 (June 8 letter to Fisher stating same); JX-133 (June 19 letter from Caponi to Friedland alleging that Entitle had secretly committed the $1.5 million loan to ODI); JX-137 (June 22 letter from Caponi to Friedland alleging the same).

During June 2017, RPM's claims to this effect focused on two communications between Entitle and ODI. These were:

---

[28] On June 13, 2017, Noack requested extensive, specific financial records, which Palmer furnished three days later, on June 16, 2017. JX-323; JX-182. These did not include a second set of refreshed projections, as Noack had requested. JX-182. Entitle counsel confirmed in a later letter that the projections provided two weeks earlier remained current. JX-135.

- On May 24, 2017, Palmer exchanged emails with Jennifer Turner ("Turner") of ODI's Surveillance team related to Entitle's financial condition.  In the exchange, Turner wrote that "[d]ue to the ongoing net losses reported by Entitle there were Hazardous Financial Condition (HFC) failures for the 6 month, 9 month and 12 month period" and that it "may be time to start considering the need for another capital contribution before June 30, 2017 to prevent further HFC failures." JX-199.  Palmer responded that "[p]er the pending Merger Agreement, RPM has the right to compel PartnerRe to fund $1.5 million of its proceeds at closing into a note . . . .  Therefore, at RPM's request at closing, there will be an additional $1.5 million in Surplus at [Entitle]." *Id.*

- On May 31, Hudson emailed Snow and stated that the deadline for closing on the Merger Agreement had been extended.  JX-104.

For the reasons reviewed below in the Court's Conclusions of Law, Entitle, in these communications, did not breach the Merger Agreement, including § 5.4(b), which obliged the parties to cooperate with each other in the regulatory approval process.  *See infra* § III.B.2.c.  And RPM's dark characterizations of these communications are factually wrong.[29]  The pertinent chronology underscores the contrived quality of RPM's claims of misconduct.

RPM's first claim of impropriety was made in connection with Hudson's May 31 email to ODI.  On June 5, 2017, its counsel Johansson noted that ODI had approved the Form A days after Hudson had emailed ODI on May 31 to report that the closing deadline had been extended.  *See* JX-109.  Johansson termed this communication improper, asserting, falsely, that Entitle had lacked the authority to extend the deadline without RPM's consent, and claiming that the sequence of events indicated illicit dealing: "RPM was then surprised by the speed with which the Commissioner proceeded to approve the Form A (earlier it had noted it needed more time)

---

[29] During this litigation, RPM seized on a third communication between Entitle and ODI as a purported breach of the Merger Agreement: Hudson's May 24, 2017 telephone call with Snow in which the two discussed the status of ODI's Form A review and the need for additional time for that review to be completed.  JX-90.  In its Conclusions of Law, the Court addresses and rejects ODI's claim that this communication breached the Agreement.

and without any conditions . . . . What buyer or investor would get comfortable under these circumstances one might wonder." *Id.* Johansson reiterated this concern in a June 8 letter to Entitle's counsel, Fisher, claiming that Hudson had improperly extended the closing deadline, and terming "odd" the timing of approval so soon after Hudson's email. JX-115.

RPM's stated misgivings were obviously pretextual. As explained above, Entitle had explicit contractual authority to unilaterally extend the closing deadline. And RPM's suggestion that Entitle had connived to shut RPM out of the process of deciding whether to extend that deadline, and how to report the extension to ODI, was untrue. For days ahead of her email to Snow extending the deadline, Hudson had attempted to contact Hamilton and Heales regarding their views on the extension. She did not receive an answer. *See* Tr. at 127 (Hudson), JX-83 (May 25); JX-90 (May 28). On May 30, Entitle's counsel Fisher also notified Johansson that Entitle was exercising its contractual right to extend, consistent with a call Palmer had with Hirt notifying him of the extension. *See* JX-96. And soon after emailing ODI to notify it of the extension, Hudson forwarded that email to Hamilton and Heales. JX-99. In it, Hudson asked for a follow-up call to discuss the Form A. *Id.* There is therefore every indication—and the Court finds—that Hudson and Entitle had sought to include RPM in its communication to the ODI with respect to the extension and its ongoing review of the Form A.

Notably, after a June 11, 2017 call with Hudson, JX-122, RPM abandoned this claim of impropriety. In that call, Hudson explained her role in obtaining Form A approval. JX-123. The next day, Hamilton wrote to Hudson: "I have conveyed the information you shared with me to the K&L Gates and RPM team, and we all appreciate your setting the record straight regarding your involvement in the process leading up to the Form A approval." JX-123. Johansson likewise stated: "I also appreciate your setting the record straight in connection with the Form A

approval and also conveyed the information to the RPM team. I now hope we can get to the closing soon, in a manner beneficial to everyone. Many thanks for your help on the regulatory side, and for your long public service." *Id.*

RPM then pivoted to other claims of wrongdoing. It postulated that Entitle might have made secret commitments to ODI regarding post-closing capital contributions. *See* JX-133. After receiving Entitle's communications with ODI pursuant to Noack's request, RPM seized on the May 24, 2017 Palmer-Turner email exchange. It construed this exchange as revealing that Entitle had secretly committed RPM, without its consent, to providing a loan. JX-137. The email exchange itself, however, does not support that claim. By its terms, the email merely describes—accurately—a provision in the Merger Agreement. RPM did not have any basis to depict the email otherwise.[30]

Moreover, as PartnerRe and Entitle reminded RPM after it had alleged that Entitle had made such a commitment, RPM *itself* had repeatedly told ODI that "Partner Re will provide $1.5 million in loan funding to EnTitle Direct Holdco, Inc., at the closing of the merger." JX-74; *see also* Tr. at 263–64 (Iannarone testifying that "[t]his was something that was known to everybody, including the ODI, from your own client"); Hamilton Dep. at 129, 133–35 (stating that Palmer's email was consistent with his own previous email to ODI). Indeed, RPM had given projections to ODI that embodied that assumption. *See* JX-138; *see also* Tr. at 253, 541; *see also id.* at 776–78. And Noack had instructed Palmer in March 2017 to assume that "a new loan for $1.5mm

---

[30] Palmer credibly testified at trial that he had never told ODI that PartnerRe *would* contribute $1.5 million to Entitle at closing. Tr. at 541. He testified that he had stated only that he would recommend that RPM, whose decision it was, exercise its contractual authority to cause PartnerRe to do so. *Id.*; *see also* JX-199; Tr. at 1098 (Hirt agreeing that Palmer's email to Turner accurately described a provision of the Merger Agreement).

will be provided" at closing; Palmer did so, notwithstanding his previous "understanding" that "the commitment for a new $1.5 million loan was not necessarily going to be utilized at closing." JX-59; Tr. at 776–77; *see also* JX-62. There was nothing about the exchange between Turner and Palmer that supported RPM's claim that Entitle had made a secret pledge to ODI, let alone one beyond what RPM itself had already made.

Relatedly, as a basis for not closing, RPM claimed that Entitle had concealed from it that it "knew, down to the dollar, what ODI expected from Entitle" by way of a capital contribution so as "to avoid triggering a 'hazardous financial condition' determination under Ohio Admin. Code, rule no. 3901-3-04(C)(g)." JX-137. But RPM did not have any evidence supporting that accusation, either. *See* Tr. at 540 (Palmer) ("I'm not sure how I, as CEO, could tell him what ODI was going to require."). The May 24, 2017 Turner-Palmer email exchange did not say any such thing. And Palmer had promptly shared the substance of that exchange with Noack. *See* JX-82; Tr. at 513, 515 (Palmer); *see also* JX-115 (June 8 letter from Johansson to Fisher acknowledging that Palmer had called Noack to tell her that ODI had "identified a need for additional capital based on Entitle's March financials," and that the following day, Hudson informed Hamilton that Palmer had represented that Entitle, post-closing, could draw on PartnerRe's commitment to provide a loan of up to $1.5 million); *see also* Hamilton Dep. at 137–140 (recalling a "detailed conversation" with Hudson on May 25 regarding the Turner-Palmer email exchange, including whether the $1.5 million loan from PartnerRe would be enough to

cover the capital call from ODI, and that Hudson had said that it was possible ODI could ask for more).[31]

Finally, to the extent RPM voiced concern about the possibility noted in the Palmer-Turner email that ODI would insist upon a capital contribution to cure or redress a hazardous financial condition on Entitle's part, RPM had long been aware of that possibility. The disclosures in schedule 3.9(c)(i) to the Merger Agreement itself reflected RPM's knowledge that (1) Entitle was subject to heightened financial surveillance by ODI, (2) ODI had the authority to insist upon capital contributions to assure that Entitle maintained certain capital ratios, and (3) Entitle had suffered, and continued to suffer, financial losses. JX-138; Tr. at 89 (Hudson); JX-57.

Under these circumstances, RPM's serial accusations of misconduct by Entitle lacked a good-faith factual basis. The Court finds that these accusations were contrived—attempts to put Entitle on the defensive and to delay or scuttle the closing.

### 3.    RPM's Proposal to Submit New Projections and/or Meet With ODI

A third reason Hirt and RPM gave for not closing in June 2017 was that the projections as to Entitle's profitability included in the Form A application had become inaccurate and required updating. Entitle's regulatory counsel Hudson—a former ODI director, and the lone participant in these events with experience working at or appearing before ODI—had opined, in response to a query from RPM's counsel, that there was no need to update these projections and

---

[31] At trial, Entitle's executives credibly denied having been given such a figure. *See* Tr. at 268 (Iannarone) ("We didn't have ODI's views because ODI didn't tell us, and we wouldn't ask ODI. Because I promise you, if you put your hand up and ask ODI, maybe they are going to ask for something."); *id.* at 540 (Palmer) ("I'm not sure how I, as CEO, could tell him what ODI was going to require.").

that ODI would not expect RPM to do so.[32] But, as the closing approached, Hirt increasingly insisted upon a restatement. He even claimed that, if he did not do so, he would face criminal and civil liability. *See, e.g.*, JX-91 (May 29 email from Hirt to Noack, proposing extending closing date to enable updated Form A projections to be submitted); JX-94 (May 30 email from Hirt to Iannarone, demanding that updated Form A projections be submitted to ODI); JX-101 (June 1 email from Hirt to Iannarone and Palmer, demanding that projections to Form A be updated lest he face criminal and/or civil penalties); JX-109 (June 5 email from Johansson to Fisher, stating that RPM would contact ODI if it did not gain sufficient comfort that the financial information RPM had submitted in support of Form A approval was accurate); JX-110 (June 5 email from Hirt to Iannarone, stating that RPM intended to provide ODI with updated financial projections); JX-115 (June 8 email from Johansson to Fisher, stating that RPM was concerned that financial projections submitted in connection with the Form A had become misleading); JX-137 (June 22 letter from Caponi to Friedland, stating that "ODI does not have the correct information or good understanding of Entitle's financial predicament"); *see also* Tr. at 1185 (Hirt, stating that RPM refused to close because it "thought that the Form A group did not have true transparency as to what was really going on with Entitle. We were concerned that they were going to go ahead and ask for a lot more capital that could have created a material effect.").

In considering whether Hirt's professed belief that RPM was obliged to submit revised financial projections was pretextual or sincerely held, the Court analyzes first whether Ohio law obliged RPM to submit revised projections; and second whether RPM knew or should have

---

[32] *See, e.g.*, Tr. at 127 (May 25 phone call in which Hamilton asked Hudson for her views on restating the projections); JX-90 (May 28 email from Hudson to Hamilton following up on the phone call and explaining that resubmitting the Form A was unnecessary).

known that that Ohio law did not so require.  The Court finds that that Hirt's insistence on doing
so was strategic, insincere, and deployed as a delay tactic.

> a.      *Submission of a revised Form A was not required under Ohio law.*

The Form A application which ODI requires a prospective buyer of an insurance
company to submit includes pro forma projections by the buyer as to the merger's anticipated
impact on the target insurer.  *See* JX-417; JX-399; Snow Dep. at 162–63.  Ohio Revised Code §
3901.321(D)(2) also provides that "[i]f any material change occurs in the facts set forth in [the
Form A Application], an amendment setting forth such change, together with copies of all
documents and other material relevant to the change, shall be filed with the superintendent by
[the Applicant]."  JX-417.

The parties disagree whether Entitle's worsened financial performance between signing
of the Merger Agreement and the closing date—and the consequent likelihood that its post-
merger performance would fall short of RPM's projections—was a "material change" requiring
an amendment to RPM's Form A application, specifically, submission of an updated set of pro
forma financial projections.  At trial, the parties called competing experts on this point.  The
Court finds PartnerRe's ODI expert, Berliner, by far the more persuasive.  He credibly explained
why such an update was not required—because ODI already had all the relevant data in hand,
due to its heightened surveillance of Entitle.  And, as Berliner further credibly explained, such a
submission would predictably have set back by months the timetable for ODI's approval of the
acquisition.

As both parties to the merger knew, ODI, as a result of its heightened surveillance of
Entitle, was receiving detailed monthly financial statements from Entitle at the time it was
reviewing the Form A.  The agency therefore necessarily was up to date on Entitle's financial

condition. As such, updating RPM's future projections to take Entitle's recent performance data into account would not have supplied ODI with any hard data that it did not already have. Tr. at 1227–28 (Berliner); *see also id.* at 1259 (RPM expert Spina, agreeing that ODI was already aware of Entitle's financial condition). Critically, too, common ODI personnel reviewed the Form A and Entitle's monthly financial statements. *Id.* at 1237 (Berliner, explaining that at least four out of the six ODI personnel who approved the Form A also reviewed Entitle's monthly surveillance); *see also* Hudson Dep. at 120–21 (explaining that the Risk Assessment area of ODI is responsible for both surveillance and Form A approval). Indeed, ODI's Sheets, who was copied on Turner's May 24, 2017 email to Palmer warning of a possible need for a capital contribution, was one of the ODI analysts who reviewed and approved the Form A. JX-405; JX-199; Tr. at 1237. Thus, far from there being a wall separating ODI's surveillance and merger approval teams, the multiple personnel common to those teams assured that the latter had fresh data as to Entitle's performance.[33] That overlap is intentional: As Hudson, ODI's former director—a Cabinet-level position in Ohio—explained, in the merger approval process, "having the team that is most familiar with the target company is important . . . because then they can see the big picture." Tr. at 73.

At trial, RPM—through its expert, Spina—implausibly suggested that an Ohio Supreme Court decision, *State ex rel. The Plain Dealer v. Ohio Dep't of Ins.*, 687 N.E.2d 661 (Ohio 1997), bars an ODI analyst from considering surveillance information about an insurer in

---

[33] *See* Tr. at 1237 (Berliner) ("[I]t's not possible to have a Chinese wall within your own mind."); *id.* at 1264-65 (Spina) ("There are no Chinese walls [in the Form A approval process] as they are known normally in the industry or in practice"; "the Form A is usually led by the analyst in charge of [surveilling] the company. So he knows the financial condition of the . . . company itself.").

deciding whether to grant Form A approval, because surveillance information is confidential whereas information included in ODI's Form A approval must be made public. Tr. at 1259–60. The Court rejects that assertion. *Plain Dealer* does not so hold. And Spina's spin on that decision is not embodied in any regulation, statute, or agency guidance. Spina's thesis also was repudiated by both Hudson and Berliner, each a former ODI high-ranking official whom the Court found credible, in general and on this specific point. *Id.* at 94–95 (Hudson), 1265 (Berliner). Berliner's view that ODI did not view *Plain Dealer* as blocking it from relying on surveillance data in the Form A approval process merits particular weight, as he served as ODI's general counsel at the time *Plain Dealer* was decided. *Id.* at 1296. Spina's claim that ODI views *Plain Dealer* as barring it from considering surveillance data also does not square with the uniform testimony of the former ODI witnesses—including Spina—that the agency's practice is to staff the Form A approval team with personnel responsible for the target insurer's surveillance.[34] And there was no evidence at trial that Spina or any former ODI official had counseled RPM that the agency would have expected RPM to submit updated projections as to Entitle's post-merger performance. That idea appears to have been a brainchild of Hirt's. *See id.* at 1069 (Hirt, testifying that his basis for believing that there was a "Chinese wall" between the Form A and surveillance groups was based on his "personal views").

ODI thus did not lack any material information about the Entitle/RPM transaction in the days leading up to the scheduled closing. And an acquirer's submission of fresh projections on

---

[34] Even if Spina's thesis were correct that the ODI's public Form A approval could not recite evidence gathered during surveillance of the target insurer, he did not testify that the ODI analyst was prohibited from reaching out to the applicant for supplemental information whosehoe relevance became apparent through surveillance. The Court rejects RPM's suggestion that ODI was effectively powerless—even indirectly—to access or incorporate information first learned through surveillance into its review of a Form A application.

the eve of a closing would have been unprecedented, a point Hirt would have learned had he consulted either side's ODI expert before formulating his "personal views." Together, over their long careers, Berliner and Spina had participated in approximately 45 acquisitions of insurers requiring ODI review. *Id.* at 1236, 1300. Neither had ever submitted an update of financial projections. Neither, while at ODI, had seen an update submitted to a Form A application after it had been initially filed. *Id.* at 1236, 1300.

Finally, Berliner and other witnesses persuasively explained why RPM's proposal to submit a revised Form A, or supporting documents, or to contact ODI to discuss such an updated filing, would have badly delayed, if not scuttled, the acquisition. Hirt's threat to contact ODI to raise questions about Entitle's finances after ODI had approved the Form A on June 2—a threat made without the knowledge or involvement of RPM's regulatory counsel, *see* Hamilton Dep. at 217—was "highly irregular." Berliner Aff. ¶ 125. In his "decades of experience," Berliner could not "think of an example of a Form A applicant doing anything comparable." *Id.* Such an approach would almost certainly have raised a red flag within ODI, causing it to question RPM's suitability as an owner for Entitle and the wisdom of the transaction. *Id.* ¶ 126. A meeting in which RPM disparaged Entitle could also have harmed Entitle's relationship with ODI—its enduring regulator whether or not closing occurred. *Id.* ¶ 128. As RPM's regulatory counsel, Hamilton, acknowledged, "insurance companies never want an outsider to talk to their regulator, and you can imagine. It's your life blood. The regulators are the people who decide whether you get to come in and open the doors tomorrow and operate your business." Hamilton Dep. at 222; *see id.* at 219–22. ODI's former director Hudson, then representing Entitle, testified that when it loomed that Hirt might demand a meeting with ODI, she had been "on pins and needles." Tr. at 144–145. Hudson testified, "I thought, I'm going to get a call any time now from ODI

68

saying, there is a Rob Hirt in our lobby, or 'Rob Hirt came in.' And I was concerned." Her "overarching concern" was that, whether or not the deal closed, ODI remained Entitle's "primary regulator" and "that relationship is very important and you treat it with kid gloves and extra care." *Id.* (terming Hirt's proposal to demand a meeting with ODI in June 2017 "very disruptive to that relationship").

Accordingly, the Court finds that under Ohio law, RPM was not only not obliged to submit updated pro forma projections—to do so would have been highly irregular.

> b.    *RPM knew or should have known that an update was not required.*

The assembled evidence makes clear that Hirt's expressed concern that the projections in RPM's Form A were no longer accurate was pretextual. He seized on this as a ploy to put off— and eventually avoid altogether—the closing. He did not propose updating the projections given to ODI out of a genuine belief that restated projections were required by law, best practices, ethics, or the public interest.

For context, Hirt's newfound concern with the accuracy of RPM's Form A marked a 180-degree turn from his attitude when submitting that form itself. Asked whether he had read the Form A before signing it, Hirt testified, "[p]robably not at all." Tr. at 1031–32; *see also id.* at 741 (similar testimony from Noack). Hirt also stated that he believed, at the time the Form A was submitted, that Entitle's projected losses for 2017 had been $208,000. *See* Tr. at 1050–51; *id.* at 1062. In fact, the Form A projected those losses as $1,019,000. *See* JX-402.

Hirt's stated punctiliousness about the accuracy of his company's regulatory submissions first emerged on or around May 25, 2017. Unhappy about Entitle's performance and viewing RPM as having better places to invest its finite cash, Hirt determined then to seek to escape the Merger Agreement, whose "lockbox" provision gave RPM only limited purchase-price relief.

69

The assembled evidence—including internal RPM communications uncovered in discovery—makes clear that Hirt's deployment of the ostensible need for restated projections was instrumental.

Most blatantly, immediately before Hirt first suggested submitting updated pro formas to Entitle, he and his then-wife, Ms. Hirt, RPM's president, privately strategized about means of avoiding the deal. On May 30, 2017, Ms. Hirt wrote Hirt: "It seems we should also look at getting turned down by the commissioner. Is that a possibility?" JX-93. She did so in response to a draft email Hirt had sent her entitled "DRAFT Email to Lee w/ PRE."[35] Two hours later, Hirt emailed Entitle's Iannarone, making the demand that Entitle's revised projected losses for 2017 be submitted to ODI. *See* JX-94.

Moreover, on the trial record, Hirt did not have any sound basis to believe RPM was obliged to submit revised projections. He relied on his own say-so. Hirt declared that the Form A pro formas as RPM had earlier filed them would be viewed as false, exposing him to criminal and civil penalties. *See* JX-101. But the record is devoid of evidence that Hirt had been so advised. RPM's own regulatory counsel did not share the view that not updating earlier projections skirted the law. Hamilton Dep. at 179–80 ("I mean, filing false holding company filings is against the law. And if someone made a filing that rose to that level, that's a possibility, but . . . I don't think it's likely under this circumstance that anyone—that [ODI] would have had that interpretation of what was happening."); *id.* at 217 (describing the initiative to contact the regulator as propelled by RPM's litigation counsel, not its regulatory counsel); *see also* Matera Dep. at 206–07 (stating that he "never had that view" and that it "never would occur

---

[35] The contents of the draft email are privileged and were therefore redacted.

to him that that was the case" that ODI had inaccurate information). Moreover, Hudson—ODI's former director—had explained to RPM outside counsel Hamilton—by phone, and then email— why such an update to ODI was unnecessary. *See* Tr. at 134; JX-89 (May 26, 2017 email from Hudson to Hamilton explaining why "[ODI] has the current financial data to evaluate the pro formas fully"). Hamilton was persuaded by that. He testified: "[W]hen [Hudson] said don't talk to them about that yet, I'd advise not doing that, it would send the wrong message, I respected that advice and thought at the time yes." Hamilton Dep. at 190.

Notably, too, although claiming that a "Chinese wall" prohibited ODI's surveillance team from sharing Entitle's financial data with the Form A review team, at trial, Hirt did not recall his basis for so asserting. His continued belief to this effect, he testified, was based on his "personal views." Tr. at 1069. But Californian Hirt's "personal views" were not a serious basis on which to make an informed judgment about the flow of information within an Ohio insurance regulator.

The pretextual quality of Hirt's insistence on updating the Form A is also underscored by his and RPM's failure to update the financial information about themselves that they had submitted to ODI. During essentially the same time period, RPM's cash reserves proved significantly lower than RPM had earlier forecast. *See* Imburgia Aff. ¶ 68; Tr. at 1254 (Spina), 1361 (Hirt); *see also id.* at 1256–57 (Spina); JX-165. RPM had fallen short, by a significant margin, to meet the projections it had provided to ODI as part of the Form A application. There, in March 2017, RPM projected it would have more than $30 million in cash as of May 31, 2017; in fact, RPM proved to have less than $19 million in actual cash at that point. Imburgia Aff. ¶¶ 66, 68; Tr. at 1254 (Spina); *see also id.* at 1256–57 (Spina, testifying that had ODI learned about his client RPM's actual cash balance, it might have concluded that RPM had misled ODI to receive Form A approval). And Hirt had reported in RPM's Form A that his total liabilities were

approximately $10.5 million dollars; by June 2017, however, Hirt owed RPM an additional $12.5 million. JX-165; Tr. at 1361 (Hirt).

RPM did not, however, update ODI about its worsened financial state or about Hirt's heightened liabilities. Despite his purported fretfulness about the staleness of the information regarding Entitle, it did not, Hirt testified, occur to him that ODI might be interested in RPM's up-to-date financial condition, *see* Tr. at 1089. And Hirt did not consider refreshing these figures. *See id.* at 1090. He testified that it was for ODI to ask for any updated information, about RPM, *see id.* at 1382–83, or himself, *id.* at 1383. RPM's attorneys also believed ODI would ask for updated pro formas if they needed them, Hamilton Dep. at 91–93, and did not advise RPM to provide such an update either, *see* LendUS Dep. at 154–55.[36]

The Court accordingly finds concocted this excuse of Hirt's for failing to close.

### 4.    Hirt's Need to Restructure His Family Trust

Soon after receiving Entitle's disappointing financials on May 25, 2017, Hirt and Noack began to make noises that the Hirt family's Trust—on whose behalf the Form A application had been filed—required a change of ownership before the merger closed. *See, e.g.*, JX-82 (May 25 email from Noack to Palmer disclosing that a necessary change to the Hirt family Trust could delay the closing); JX-91 (May 29 email from Hirt to Noack discussing using need for an extension of the closing deadline to enable the new Trust to be inserted as the buyer); JX-94 (May 30 email from Hirt to Iannarone, stating that a change in the Trust's ownership was required to occur before the closing); JX-110 (June 5 email from Hirt to Iannarone, demanding

---

[36] Noack similarly testified that RPM's failure to meet the projected financial targets it gave ODI was not "a concern" of hers at the time, Tr. at 768, 771—even though the purpose of Form A approval is to determine whether the applicant "would be a suitable owner for the insurer," Berliner Aff. ¶ 9; Tr. at 163; *see also* Snow Dep. at 60, 162–65.

that a meeting with ODI be arranged to discuss a change in Trust ownership). Importantly, RPM surfaced this issue as a potential obstacle to closing only after learning on May 25 of Entitle's poor financials. The timing of this proposal, Hirt and Noack's misrepresentations about it Entitle, and the surrounding circumstances all underscored the sham quality of this supposed concern.

As context, the proposed change in the Trust's ownership would have had a substantial impact on the merger's timetable—a point as to which Hirt and Ms. Hirt had been made aware in mid-May. Hirt was the Trust's sole trustee and beneficiary; the proposal to restructure the Trust, which the Hirts had considered earlier in May, would have added Ms. Hirt as a co-trustee. JX-77. Because the Form A application had been filed on behalf of the Trust, Hirt, as sole trustee, had been identified there as Entitle's Ultimate Controlling Person ("UCP") post-merger. *Id.* As such, his assets—not the Trust's—would be publicly disclosed as part of the Form A approval. *Id.* On May 17, 2017, however, ODI explained to Hamilton, who on behalf of RPM had raised the possibility of restructuring the Trust, that were Ms. Hirt added as a co-trustee, the *Trust* would become the UCP, thus requiring *the Trust*'s finances to be publicly disclosed. Such would have necessitated a whole new Form A filing. *Id.*; Tr. at 1337–40 (Hirt).

In light of ODI's May 17 guidance to Hamilton, the proposal to restructure the Trust was dropped. The transaction was nearing Form A approval, the culmination of the lengthy review process, and the participants appreciated that changing Trust ownership at such a late stage would restart the three-month Form A approval process. *See, e.g.*, Tr. at 945–46 (Dwyer); JX-77. Dwyer likened an attempt to change ownership of the insurer's buyer at this stage of the transaction to trying to "go[] to the airport with someone else's passport." Tr. at 934. And ODI had driven the point home in its May 17, 2017 email. There, it explained that changing Trust

73

ownership would require restarting the Form A process.  On May 19, Hamilton thus reported to ODI that the Trust would *not* be restructured: "Rob and Tracey Hirt have decided to postpone making any changes to the trust ownership and take that issue 'off the table' for purposes of the Form A. . . . Any change in ultimate ownership of the Applicant, if it happens at all, will be the subject of a separate application to the Department following the hoped-for completion of the acquisition."  JX-77.

That changed on May 25, 2017.  That day, despite RPM's having taken the issue "off the table" the week before, Noack, after receiving Palmer's email containing Entitle's latest financial results, notified Entitle that the Hirts were planning to restructure the Trust before the closing. She wrote Palmer:  "Mayer Brown advised us *yesterday* that once Rob restructure [sic] his trust, which apparently we need the commissioner to agree, the trust's financials will be made a public record.  *This is something new* and we need to work through."  JX-82 (emphasis added).  That statement was misleading—indeed, it was outright false.  In fact, six days earlier, on May 19, 2017, RPM had made the considered decision to take the trust issue "off the table" with ODI upon the Hirts' instruction ("Rob and Tracey Hirt have decided . . ."), with its principals having realized that the ownership change would significantly delay Form A approval and expose confidential Trust information to the public.  Hamilton Dep. at 115–16; JX-77.  It was thus untrue to claim—as Noack did to Palmer—that RPM had first learned the day before (May 24) what the implications of a restructuring would be for the merger, or that a Trust restructuring had been under consideration on May 24.  It was untrue, too, that this subject was "something new" that the Hirts "need[ed] to work through."  JX-82.  The Hirts had been aware for days of the complications the restructuring presented, had elected to forego it, and had caused their lawyer to communicate that decision to ODI.

74

In the ensuing days, RPM continued to float restructuring the Trust, notwithstanding the Hirts' desire to avoid exposing the Trust's finances to the public. This was a transparent ploy to delay closing. On May 30, 2017, Hirt emailed Entitle's Iannarone with several "deal points." One involved changing the ownership in the Trust. Hirt wrote:

> When my regulatory counsel advised the Form A review team of an impending revision of my family trust to bring in Tracey, my wife, *as equal owner and co-trustee* of my trust, the [ODI]'s analyst suggested that I consider withdrawing the Form A and resubmitting it after the change in the trust is completed. To say the least, it is a very important issue to [Ms. Hirt] that we realign our assets and *that she have equal ownership in RPM and Lend USA*. This change has been in the planning stage for the last four months and it is very concerning to have to face a roadblock in implementing it. Waiting until after the acquisition to make the change is not a solution, because that would necessitate a whole new filing at that time. Furthermore, [ODI's] analyst mentioned that a family trust with multiple owners is treated as an 'entity,' meaning that the financial information the trust is required to file with the Form A would not be protected from disclosure to the public. This would certainly be a burdensome condition on me[37] and one that I simply cannot and will not accept.

JX-94 (emphases added).

But Hirt's May 30 account to Iannarone is inconsistent with the May 19 email in which RPM had unambiguously told ODI that restructuring the Trust was off the table. And Hirt's attempt at trial to defend his actions as made in good faith was not credible. Hirt testified that after the Hirts discovered that making Ms. Hirt a co-trustee would make the Trust's information public, they had shifted gear, intending thereafter to add Ms. Hirt as a beneficiary but not a co-trustee, so as to keep the Trust's financial information private. Hirt testified that the Hirts planned to use any extension in the closing date merely to add his wife as a *beneficiary*. Tr. at 1340–41. But Hirt's May 30 email is to the contrary—it explicitly declared that the plan was to

---

[37] This assertion is further evidence of Hirt's ignorance of what constituted a burdensome condition under the Merger Agreement. *See infra* § III.B.2.e.

make Ms. Hirt a co-trustee, the very plan the Hirts, per their regulatory counsel Hamilton, had repudiated 11 days earlier.

Hirt's May 30 account to Iannarone was inconsistent in another respect with Hamilton's May 19 email to ODI. Purporting to explain the need to change Trust ownership before the closing, Hirt asserted that waiting until after the acquisition to update ODI was "not a solution, because . . . it would necessitate a whole new filing." JX-94. But Hamilton had told ODI that, were the Trust to be restructured, such would occur after the acquisition. He wrote: "Any change in ultimate ownership of the Applicant, if it happens at all, will be the subject of a separate application to the Department following the hoped-for completion of the acquisition." JX-77.

From May 25 forward, interposing a supposed need to restructure the Trust at the 11th hour served RPM's parochial interests, insofar as it promised to buy a long delay in closing. This would have given RPM time to reassess the transaction and to attempt to restructure it—or to find a way to repudiate it. Even delaying the closing carried benefits for RPM, because, as Hirt explained in a May 29, 2017 email to Noack: "[RPM's] cash position will be far stronger in 90 days." JX-91. The assembled evidence supports that RPM, led by Hirt, used a purported change in Trust ownership as yet another ploy to scuttle the scheduled closing.

### 5. Hirt's Claim That Waterfall's Approval Was Needed

After May 25, 2017, Hirt also attempted to interpose an RPM lender, Waterfall, as an obstacle to closing. In his May 30, 2017 email to Iannarone, Hirt warned that, "WAM is not willing to give its consent to proceed until we have seen revised financials & projections and get the insurance commissioner to comment on how much more capital needs to be injected into Entitle." JX-94. This again was untrue. Waterfall had approved the transaction more than three

months earlier, on February 10. JX-53 ("We are signed off on the Entitle acquisition subject to regulatory approval and final documentation."); Tr. at 1077 (Hirt).

The next day, Hirt doubled down on this bogus claim. In a May 31, 2017 email to Iannarone, he wrote that he was obliged to debrief Waterfall on Entitle's financial position and required revised financials for that purpose. Hirt wrote: "As discussed, I need [Waterfall] to sign off on this." JX-98. Iannarone responded that day with the correct rejoinder. The Merger Agreement, he reminded Hirt, did not require WAM's consent to close once the other closing conditions had been met. *Id.* At trial, Hirt admitted the key points: that no one from Waterfall had told him that RPM could not close on the Entitle transaction until Waterfall saw updated financials, and that the Merger Agreement did not require Waterfall's consent to close. Tr. at 1077.

### 6. Hirt's Persistent Intention to "Retrade" the Transaction

Indicative, too, of Hirt's bad-faith attempts to avoid the Merger Agreement were his repeated expressions of intent—before and after May 25—to "retrade" it: to treat the Agreement as malleable and non-binding as to RPM. In fact, absent an MAE or an unfulfilled closing condition, RPM was required to close at the price and on the terms set forth in the Merger Agreement. But Hirt, long after binding himself to it, treated the agreement as up for grabs.

Even before May 25, Hirt and his CFO Noack, in their private emails, treated the Merger Agreement with Entitle if it did not bind RPM. Their communications repeatedly assessed the pros and cons of following through with the transaction, implicitly treating the Agreement as dispensable at RPM's option. *See supra* § II.B. Hirt's blasé attitude toward RPM's contractual obligations intensified after May 25. From that day forward, he pressed to fundamentally reshape the Agreement in RPM's favor, by (1) inserting lender Impac Mortgage, a new party,

into the transaction, and (2) pursuing a price discount for RPM beyond those embodied in the

lock box and loan provisions.

For example, in a May 29 email to Noack, Hirt listed "[r]easons to stall," which included

the ability for RPM to achieve these terms, and discussed ways to delay closing. These included

asserting a need resubmit the Form A with Hirt's "new Trust" as the applicant and to add to it

"refreshed Entitle Projections." JX-91.[38]

Consistent with this approach, on May 30, Hirt emailed Iannarone, listing "deal points"

on which RPM insisted as conditions to closing; these included adding Impac and revisiting the

purchase price. JX-94. Iannarone responded to Hirt's email by noting that Entitle did not

require PartnerRe's assent to extend the closing deadline. *Id.* Hirt's response, tellingly, made

clear his intention to renegotiate rather than close: "In the end its [sic] really about *what Pre and*

*I can come to* in terms of going forward with Entitle. I feel that we have *business issues* to get

around and discuss." *Id.* (emphases added).

On June 5, four days before the closing, Hirt emailed Iannarone. He stated that RPM

would "accept the 90 day extension . . . to get this deal closed" only if Entitle assented to new

deal terms, including the addition of Impac as a party which would lend Entitle a $6 million

"Lifeline Loan" post-closing, secured by Entitle's assets and earmarked "for general operating

---

[38] Consistent with his inclination to retrade, Hirt's email identified other ways RPM would
benefit by resubmitting its Form A to ODI. First, during the period in which RPM was stalling,
RPM would gain from ODI a "better view of a capital call" that the agency might require, and
RPM could "negotiate with Partner Re to give Entitle a loan." JX-91. Such a loan—which
would be above and beyond the $1.5 million loan contemplated by the Merger Agreement—
would "reduce the amount of cash that RPM would need to have available for Entitle's operation
after closing." Tr. at 1060 (Hirt). Second, Hirt anticipated, RPM's cash position would be far
stronger in 90 days. JX-91; *see also* Tr. at 1058, 1061 (Hirt).

needs of Entitle & RPM." JX-110; *see also* Tr. at 724–25 (Noack), 1100–01 (Hirt); Iannarone

Aff. ¶ 35.[39]

Finally, eight days later, on June 13, after RPM had failed to appear at the closing, Hirt

again broached to Iannarone reworking the transaction by adding Impac as a party.  Iannarone

Supp. Aff. ¶ 2.  Iannarone made clear to Hirt that any deal with Impac would be taken up only in

a post-closing discussion, and that RPM's failure to close would result in litigation.  *Id.*  Hirt

countered that the deal could "get done"—but only at a later date and on different terms.  *Id.*; *see*

*also* Tr. at 1321 (agreeing that the deal was going to close but that "changes might need to be

made").

### 7.    Hirt's Misstatements as to Entitle's Projected Losses

Final evidence of Hirt's bad faith in eluding the closing was his persistent misstatement

of the scale of the projected losses that Entitle had disclosed as of the February 16, 2017 signing

of the Merger Agreement.  After May 25, Hirt repeatedly feigned that Entitle had disclosed only

$208,000 in projected losses as of the signing.  He thereby implied that Entitle's May 25

projection of $2.1 million in losses was so dramatically higher as to be game-changing, and

perhaps to qualify as an MAE.  That pretense was an act.  It was, the Court finds, another ruse to

support RPM's not appearing at the closing.

In his May 30, 2017 email to Entitle's Iannarone, Hirt wrote that when RPM "negotiated

the definitive agreement the total projected losses by the close of the transaction were supposed

---

[39] In an email to himself the same day, Hirt wrote that, "in terms of the lifeline, PartnerRe will
need to agree to provide the loan without the commissioners['] demand for capital infusion."
JX-108; *see also* Tr. at 1100.  Iannarone declined, on PartnerRe's behalf, to provide an additional
loan. JX-113.  He stated: "I am particularly surprised that such a loan would go to fund, not just
Entitle, but also RPM as well."  *Id.*  He reminded Hirt that "any funding in excess of the $1.5
million loan that we agreed to provide is not a closing condition."  *Id.*

to be $208,000.00, now we're presented with $2.1 million in losses." JX-94. He declared that "[b]ased on the projected losses of $208K and the confidence expressed in these numbers we agreed to the purchase price formula whereby we own 2/3 of the losses on top of $208K, but if someone told me we might owe $2mm out of $3mm additional losses, it would have been a different discussion." *Id.* At trial, Hirt doubled down on his claim that he and RPM had been unaware at the time of the signing of the Merger Agreement that Entitle had projected losses exceeding $208,000. Knowing that Entitle projected higher losses, he stated, would have been important for him, then and in May 2017. Tr. at 1050–51; *id.* at 1062 (Hirt, denying that he was aware that, as of RPM's March 10 submission of the Form A application, Entitle projected losses exceeded $208,000).

That was false. In fact, on February 10, 2017, six days before execution of the Merger Agreement, Entitle had disclosed to RPM that its projected losses between August 1, 2016, and the closing would be $1.485 million. JX-54; JX-233. And Hirt and Noack, in an email exchange two days later, on February 12, 2017, had even *welcomed* this news—because, pursuant to the purchase price adjustment mechanism in the Merger Agreement, Entitle's higher-than-projected loss stood to reduce RPM's purchase price. JX-233 (Hirt, confirming with Noack, "[s]o, are you telling me that the more they lose between now and June the cheaper the price?"). And CFO Noack, at trial, exposed Hirt's lie. She testified that she had known, before execution of the agreement, that Entitle's projected losses were $1.485 million. *See* Tr. at 614–19.[40]

---

[40] Consistent with such projections, the Form A, filed on March 10, 2017, projected losses for all of 2017 of $1.019 million. *See* JX-63; Tr. at 199 (Hudson). Hirt signed the application on behalf of RPM. *See* Tr. at 1031–32.

Hirt dissembled not only in his claim of surprise to Iannarone that Entitle projected losses above $208,000, but also in his trial testimony on this point, in which he again denied knowing this before May 25, 2017. *Id.* at 1050–51; *id.* at 1062. This testimony, the Court finds, was knowingly false. The record also repudiated Hirt's broader claim that RPM in general had been kept in the dark about Entitle's financial condition. It demonstrated that RPM had promptly received Entitle's financial information upon request. *See, e.g.*, JX-131; JX-135; JX-182; *see also supra* § II.C.1. Hirt's claim that Entitle had hidden important financial information about itself was all the more unconvincing given his admission that he had chosen not to review the financial information that Entitle gave RPM in the days surrounding the closing date. *See* Tr. at 1376–77 (Hirt, testifying that he had "no reason to" review Entitle's financials in June 2017); *id.* at 1025, 1122, 1123–24 (Hirt, testifying he had no understanding then or as of trial whether Entitle's financial condition constituted an MAE); *see also id.* at 759–60 (Noack) (same); Noack Dep. at 85–86 (testifying that after receiving Entitle's updated financials, she did not review these to determine whether an MAE had occurred).

**D.     A Motive for RPM's Ducking the Closing:  Its Weakened Financial Position and Cash Crunch**

Apart from the merger's diminished appeal as a result of Entitle's disappointing financial results, RPM, the Court finds, had a separate motive to duck the closing: its own weakened cash position, and the possible adverse consequences to it from deploying scarce liquidity on buying Entitle. The evidence, summarized below, reflects that RPM's cash position tightened during the first five months of 2017, and especially after it executed the Merger Agreement on February 16, and that this, too, caused Hirt to seek to avoid closing with Entitle.

### 1.     RPM's Dwindling Cash Position

At the end of 2016, RPM had approximately $32 million in cash. Bush Dep. at 97–98. By February 16, 2017, that amount was approximately $28 million. By June 9, 2017, the closing date, RPM's cash reserves had declined to $15.9 million. *Id.* at 74–75. RPM's cash reserves were thus far out of step with RPM's earlier projections. In March 2017, RPM had projected to ODI that it would have more than $30 million in cash on hand as of May 31, 2017. Noack Dep. at 298; JX-336; Tr. at 1035 (Hirt). Had RPM had closed the Entitle deal on June 9, 2017, it would have been left with approximately $4 million cash on hand. *See* Imburgia Aff. ¶ 59; Tr. at 828 (Bush). RPM's cash reserves had never before fallen to that level. Tr. at 1037–38 (Hirt). By May 2017, Hirt admitted at trial, closing on the Entitle transaction had become a financial "stretch" for RPM. *Id.* at 1158.[41]

RPM's concerns about how acquiring Entitle would impact its cash position manifested shortly after the signing of the Merger Agreement. On March 1, 2017, Noack wrote Hirt: "After the EnTitle deal closes and we paid the $2.5mm settlement for the class action lawsuit, our cash will be tight until we start recognizing income." JX-58.

---

[41] Although the evidence did not comprehensively explore the causes of RPM's diminished cash position, it established that a contributing factor was substantial withdrawals of cash from the company by the Hirts. During 2016, the Hirts borrowed more than $7.7 million from RPM in 17 separate transactions. Imburgia Aff. ¶ 75. As of the end of 2016, the Hirts owed more than $3 million to RPM. *Id.* ¶ 84. During the first half of 2017, the Hirts withdrew significant amounts more cash from RPM. As of June 9, 2017, the closing date, the Hirts owed RPM approximately $9,730,000. *See id.* ¶ 85. An email from Noack to Hirt on June 12, 2017, three days later, stated that RPM had a "receivable of about $12.5mm" from Hirt. JX-121. "[A] couple days prior to" the scheduled closing date, RPM had "distributed to the shareholders"—*i.e.*, the Hirts—"about $2.5 million." LendUS Dep. at 219–20.

Around this time, RPM realized, too, that a belief it had held at the time it executed the Merger Agreement—that it would have immediate access to millions of dollars of Entitle's cash after the acquisition—was wrong. In April 2016, Noack had told Hirt that RPM would need only $3 million in cash to acquire Entitle at an $18.3 million purchase price, because Entitle had $10.5 million in cash on its balance sheet that RPM could apply towards expenses. *See* JX-10; *see also* Tr. at 688 (Noack). As of January 2017, Noack still assumed that RPM could use Entitle's cash to help fund its purchase. *See* JX-44; Tr. at 687–88 (Noack, testifying that she had assumed that RPM could make use of Entitle's $10.5 million in cash reserves after the closing).

After the Agreement was signed, RPM realized that it would not have immediate access to Entitle's cash. On April 4, 2017, RPM's vice president for finance Lee wrote comptroller Kons, who was performing due diligence on the transaction: "I've updated the cash forecast, BUT we need to discuss the Entitle cash." JX-68. Lee wrote that he had learned, from a conversation with Entitle's Palmer, that Entitle's cash would not be available to fund the purchase,[42] and that by his calculations, for RPM to complete the acquisition would draw its cash reserves down to approximately $3 million. *Id.* That, Lee wrote, could cause RPM to violate covenants imposed by its lenders. *Id.* Consistent with this, Noack testified that, in or before June 2017, RPM appreciated that it had been wrong to assume it could apply Entitle's cash to pay its obligations. Tr. at 732 (Noack); *see also* LendUS Dep. at 164.

---

[42] This restriction appears to have resulted from Ohio insurance law, under which a holding company or other affiliate cannot remove funds from an insurer without regulatory approval of a Form D submission so requesting. *See* Berliner Aff. ¶ 91. To merit approval, the transaction must be found "fair and reasonable." *Id.* Entitle's ODI expert, Berliner, credibly testified that this obstacle effectively would have prevented RPM from making any withdrawals from Entitle soon after closing. *Id.*

By May 2017, Hirt and Noack's internal emails reflect that, as a result of their worries about RPM's cash position, they were actively exploring ditching the Entitle transaction. On May 18, Hirt wrote Noack: "I am thinking we should reconsider closing Entitle. It may be too much right now and it's not major to our economics." JX-196. In response, Noack wrote that a "[p]ro for not proceeding" was that RPM "would preserve cash, which we need until we start earning income." *Id.*[43] At the same time, Noack recognized that failing to close could result in "substantial reputational harm" and "potentially [losing] PartnerRe that could be a great ally for us." *Id.* On May 29, 2017, Hirt emailed Noack, recommending "stall[ing]" the deal, based in part on the fact that "[RPM's] cash position will be far stronger in 90 days." JX-91. In that same email, Hirt proposed that RPM renegotiate to arrange for PartnerRe to give Entitle a loan, on the premise that RPM's cash position would be stronger in 90 days. *Id.*

Consistent with this, on June 5, 2017, with closing four days away, Hirt asked PartnerRe to provide a $6 million "Lifeline Loan," to be secured by the assets of Entitle, and which would be used for general operating needs of both Entitle & RPM. JX-110. Iannarone, on PartnerRe's behalf, promptly rejected this request. JX-113. He wrote: "I am particularly surprised that such a loan would go to fund, not just Entitle, but also RPM as well." *Id.* On June 12, 2017, after RPM failed to appear at the closing but while Entitle continued to press it to do so, Noack wrote Hirt: "if we undertake Entitle – need additional liquidity – how do we get it? Sell one of the buildings (Orinda?) or take out another loan?" JX-121; *see also* JX-129 (June 15, 2017 email from Hirt to Matera, proposing modification of purchase price as "effectively another way to get to a $3.3mm lifeline").

---

[43] In the weeks that followed, RPM did not, however, take any steps to increase its liquidity. Tr. at 1116–17 (Noack).

Critically, RPM's internal communications reflect its awareness that were it to back away from the Entitle transaction as a result of its cash crunch, that decision could later cost it money in litigation. On June 14, 2017, RPM's then-chief operating and chief investment officer, Matera, emailed Hirt: "If this transaction was a huge stretch for us financially, we should have stepped back this winter." JX-126. Matera added: "Nevertheless, having signed the Agreement, I am very concerned about the financial and reputational hit the company would take by litigating the contract." *Id.*; *see also* Matera Dep. at 73–74. At trial, Hirt admitted that Matera's email referred to the "possibility that RPM could be found in breach." Tr. at 1393–94.

## 2.     RPM's Liquidity Covenants

As Lee warned Kons in April 2017, RPM's cash crunch in spring 2017 put it at risk of violating financial covenants imposed by its lenders were it to close the Entitle transaction. As a condition of its $25 million line of credit from Waterfall, RPM was required to maintain a liquidity ratio of greater than 30% of tangible net worth, and to have $7.5 million in liquidity. JX-3; Tr. at 1038 (Hirt). And, as a condition of its $20 million line of credit from Everbank, RPM was required to maintain an adjusted tangible net worth of $30 million, a ratio of indebtedness to adjusted tangible net worth no greater than 15:1, and $10 million in liquidity. JX-461; Tr. at 1038–39 (Hirt).

Even before RPM signed the Merger Agreement, its executives had recognized that the Entitle deal would strain its ability to comply with these covenants. In September 2016, Lee wrote to a Waterfall employee, Rod Hutter, to express his concern that the company's cash to equity ratio would be less than 30% in coming months. JX-23. In early February 2017, Lee and a colleague, Johnny Yang, wrote Kons that RPM would be in violation of the covenants imposed by Waterfall and Everbank if it acquired Entitle and did not consolidate RPM's and Entitle's

85

financials. JX-51; JX-18. Kons testified that it was a "top priority" for RPM to comply with such lender covenants. Kons Dep. at 43–44; *see also* Noack Dep. at 304, 356 (RPM was always discussing loan covenant compliance).

The Court finds that although RPM's concerns about breaching these covenants were not principal drivers of its decision not to close, these likely reinforced that decision. Hirt's and Noack's internal emails from May and June 2017 do not reflect overt concern about breaching these covenants. And Noack credibly testified that it is not out of the ordinary for a company that is out of compliance with a covenant to obtain waivers from a lender, and that RPM had successfully done so in the past. Noack Aff. ¶ 48; *see also* Hirt Aff. ¶ 81 (noting possibility of obtaining a new credit line). Nonetheless, RPM's internal finance department had long flagged such a breach as a concern, and both parties' experts tabulated that closing would have left RPM with cash on hand below that required by its covenants. *See* Imburgia Aff. ¶ 59 ($4.1 million); Tr. at 828 (Bush) ($3.9 million).

### 3.    RPM's Alternative Acquisitions

In 2016, when RPM entered into a series of LOIs with Entitle, it was also contemplating other acquisitions. *See supra* § I.C.2; *see also* JX-21; JX-30; JX-36; LendUS Dep. at 173. Its executives internally recognized that it lacked the cash to close on all. On September 22, 2016, for example, RPM's president, Ms. Hirt, expressed doubt that RPM could close on all of the transactions with the cash it had on hand: "I just do[n']t understand HOW we are buying these companies. With what funds." JX-24. And on November 20, 2016, Noack emailed Hirt and Matera: "In order for us to close all the deals we have front of us, Corridor, GMH, AFN and EnTitle, without totally cash drain [sic] ourselves we need approximately $60mm plus the annual payout to the boutiques is coming up in April, which depending on how we close November and

December could add up to another $7.5mm plus we still have to pay off Waterfall ($15mm)."
JX-220. She concluded: "The bottom line is we need the entire $75mm from Fortress by the
end of the 1st quarter." *Id.*

RPM's internal emails from late May and June 2017 do not list this opportunity cost—
that closing the Entitle deal would cause RPM to forego other acquisitions—among the reasons
not to close. Nonetheless, the executives' earlier emails had identified this as a concern with the
transaction. Accordingly, the Court finds that this factor too, although not a primary driver of
Hirt's decision to bail on Entitle, likely reinforced that decision.

### E. RPM's Post-Hoc Justification for Failure to Close

In this litigation, RPM articulated a new ostensible reason for RPM's refusal to close: its
purported concern that, after closing, too large a proportion of Entitle's business in certain states
would come from RPM clients, making Entitle a "captive insurer," with adverse regulatory and
business consequences.

The Court rejects this justification as a post-hoc fabrication. The written communications
from May and June 2017 did not support that this concern animated Hirt's decision to bail on the
closing.[44] On the contrary, the contemporaneous evidence, reviewed above, convincingly
showed that RPM did not close because Hirt, for other reasons, had developed an acute case of
buyer's remorse, driven by Entitle's diminished performance and RPM's cash crunch. Notably,

---

[44] Hirt articulated the captive insurer concern in an email to Iannarone and Impac on May 29,
2017. *See* JX-92 ("One of the major issues that we all face in owning a title insurance company
is being certain that it is not viewed as a captive insurer. This is a real issue for the state of
California as well as for gaining access as a shareholder to the FHLB. In short, in order to not be
viewed as a captive insurance company, Entitle cannot receive more than 50% of its business
from its parent company's affiliates."). Although Hirt shared this concern as a reason to add
Impac, this excuse was never relied upon as a reason to avoid closing.

RPM's detailed 180-page due diligence report on the transaction—the product of a months-long diligence process—does not mention a "captive insurer" problem. *See* JX-49.

The only evidence adduced at trial in support of this theory was Hirt's testimony that he had developed such a concern. *See, e.g.*, Tr. at 1000, 1187–93, 1351–56. Hirt's affect on this point was notably shifty and evasive. And this testimony was uncorroborated, unconvincing, and at best middlingly coherent. Questioned by the Court, for example, Hirt had difficulty explaining how he had tabulated the "captive ratio" that was at the heart of his claim that Entitle would qualify as a captive insurer, and what the concrete adverse implications of such a classification would be. *See, e.g.*, Tr. at 1356 (Hirt, in response to request for clarification by Court, stating, "I'm not sure if the captive insurer ratio is based on revenue or it is based on the number of units that you would send to the title insurance company."); *id.* at 1363–64 (Hirt, changing his explanation, to now identify the problem he feared as the risk *Entitle* (not RPM) would face in becoming a captive insurer in California). The Court discredits this testimony as contrived.[45]

## III.  Conclusions of Law

### A.    Jurisdiction, Standing, and Choice of Law

In pretrial rulings, the Court has held that the parties have properly invoked the Court's subject-matter jurisdiction, and that PartnerRe has standing to pursue a breach of contract claim against defendants. *See Partner Reins. Co. Ltd. v. RPM Mortg., Inc.*, No. 18 Civ. 5831 (PAE),

---

[45] Even had Hirt's testimony on this point been coherent and credible, it is unclear that any Merger Agreement provision would have justified RPM's not closing on account of this concern. The Court was unpersuaded, for example, that Hirt's perception that Entitle might reach captive insurer status in one or more states would have justified RPM in claiming an MAE. Because the Court rejects Hirt's testimony on this point, there is no occasion to further delve into this point.

2020 WL 2904862, at *3 (S.D.N.Y. June 3, 2020); *Partner Reins. Co. Ltd. v. RPM Mortg., Inc.*,

No. 18 Civ. 5831 (PAE), 2021 WL 2716307, at *9 (S.D.N.Y. July 1, 2021).

Subject matter jurisdiction is proper under 28 U.S.C. § 1332 because there is complete

diversity between the parties and more than $75,000 in controversy on the parties' reciprocal

breach of contract claims. Dkt. 121 ¶ 34; *see also id.* ¶ 33 (citizenship of the parties); *id.* ¶ 79

("The RPM Merger Agreement had offered millions of dollars more in value than what Entitle's

shareholders ultimately received."). PartnerRe claims damages of $10.9 million and defendants

claim damages of $4.9 million (both before prejudgment interest). The Court has also ruled that

PartnerRe has standing to pursue this action based on the assignment from Entitle. *See Partner*

*Reins. Co. Ltd.*, 2021 WL 2716307, at *9 (denying defendants' motion for summary judgment).

The parties agree that, under the Merger Agreement, Delaware law applies to this dispute.

**B.      The Parties' Reciprocal Breach of Contract Claims**

**1.      Governing Legal Standards**

Under Delaware law, the elements of a common-law breach of contract claim are: (1) a

contractual obligation; (2) a breach of that obligation by the defendant; and (3) resulting damage

to the plaintiff. *WaveDivision Holdings, LLC v. Millennium Digital Media Sys., L.L.C.*, No. Civ.

A. 2993 (VCS), 2010 WL 3706624, at *13 (Del. Ch. Sept. 17, 2010) (citation omitted); *VLIW*

*Tech., LLC v. Hewlett-Packard Co.*, 840 A.2d 606, 612 (Del. 2003); *AssuredPartners of Va.,*

*LLC v. Sheehan*, 2020 WL 2789706, at *7 (Del. Super. Ct. May 29, 2020); *AB Stable VIII LLC v.*

*Maps Hotels & Resorts One LLC*, No. Civ. 2020-0310 (JTL), 2020 WL 7024929, at *47 (Del.

Ch. Nov. 30, 2020), *judgment entered,* (Del. Ch. 2021), *aff'd*, 268 A.3d 198 (Del. 2021). In

addition, a "substantial failure to live up to the material terms of a valid contract nullifies that

contract. A party may terminate or rescind a contract because of substantial nonperformance or

breach by the other party." *Matthew v. Laudamiel*, No. 5957 (VCN), 2012 WL 2580572, at *9

(Del. Ch. June 29, 2012) (citations omitted).

The Merger Agreement in this case contains provisions that add—or are argued to add—

two elements to the showing required for a breach of contract claim.

### a.     The Effect-of-Termination provision

RPM[46] argues that to establish its breach of contract claim, PartnerRe must establish that

the defendant acted with the "knowledge" or "reckless disregard" that its conduct constituted a

material breach of the Merger Agreement.  This argument is based on § 9.3 of the Merger

Agreement.  This "effect of termination" provision provides:

> In the event of termination of this Agreement pursuant to Section 9.1, this
> Agreement shall terminate and become void and have no effect, and there shall be
> no liability on the part of any Party to this Agreement, except that Section 5.2
> (Confidentiality), Section 5.7 (Public Announcements), Section 9.4 (Expenses) and
> Article XI (General Provisions) shall survive any termination of this Agreement;
> provided, however, that nothing in this Agreement shall relieve any Party hereto
> from liability for: (a) failure to perform the obligations set forth in Section 5.2
> (Confidentiality); (b) any fraud; or (c) *the taking of any action or the failure to take*
> *any action with the knowledge or reckless disregard that such act or failure to act*
> *would be a material breach of this Agreement.*

(emphasis added).  This argument, if correct, equally applies to RPM's counterclaim, as RPM

implicitly concedes.

PartnerRe disputes that the effect-of-termination provision applies to its claim.  Section

9.3, it notes, excepts certain enumerated provisions, whose breach survives termination.  One is

Article XI of the Agreement, titled "General Provisions."  One provision within that article, §

11.9, entitled "Specific Performance," provides:

---

[46] For purposes of discussing common legal arguments, the Court refers to the defendants
collectively as RPM.

The Parties hereto agree that irreparable damage, for which monetary damages (even if available) would not be an adequate remedy, would occur in the event that the Parties hereto do not perform any provision of this Agreement in accordance with its specified terms or otherwise breach such provisions. Accordingly, the Parties acknowledge and agree that, to prevent breaches or threatened breaches by the Parties . . . the Parties shall be entitled to an injunction, specific performance and other equitable relief to prevent breaches of this Agreement and to enforce specifically the terms and provisions hereof, in addition to any other remedy to which they are entitled at law or in equity.  Each of the Parties agrees that it will not oppose the granting of an injunction, specific performance and other equitable relief on the basis that any other Party has an adequate remedy at law or that any award of specific performance is not an appropriate remedy for any reason at law or in equity. . . . *The foregoing is in addition to any other remedy to which any Party is entitled at law, in equity or otherwise.*  The Parties further agree that nothing set forth in this Section 11.9 shall require any party hereto to institute any Action for (or limit any Party's right to institute any Action for) specific performance under this Section 11.9 prior to or as a condition to exercising any termination right under Article IX (and pursuing damages after such termination). . . . In the event that a court of competent jurisdiction fails to grant specific performance or other injunctive relief to the Company as a remedy for any failure to perform or breach hereunder, *or in any circumstance in which damages are recoverable by the Company hereunder*, the Parties hereby acknowledge and agree that the Company and the holders of Company Capital Stock *shall be entitled to receive the benefit of the bargain and lost profits damages as redress for such failure to perform or breach.* (emphases added)

PartnerRe argues that because § 11.9 survives termination, it retained the right to pursue "benefit of the bargain and lost profit damages" arising from RPM's "failure to perform or breach," without having to establish a knowing breach or one in reckless disregard.  Pl. Reply Memo at 6.  In effect, PartnerRe argues, the italicized language within § 9.3 creates an additional exception for a common-law breach of contract claim.

On this question, RPM has decidedly the better argument.  Were PartnerRe correct that § 11.9 exempts common-law breach of contract claims from the reach of § 9.3, § 9.3—and the heightened threshold for liability it imposes for contract-breach claims in the context of a termination—would be entirely negated.  And PartnerRe misreads § 11.9.  By its terms, it addresses the *remedies* available to a plaintiff in event of a breach.  It does not purport to identify

the causes of actions available to a plaintiff, or the standard of liability applicable to these. As relevant in this litigation, § 11.9 establishes merely that in "any circumstance in which damages are recoverable," PartnerRe is entitled to receive "the benefit of the bargain and lost profits damages." That does not negate § 9.3, which requires a plaintiff claiming breach in the event of termination to establish that its adversary breached with "the knowledge or reckless disregard that such act or failure to act would be a material breach."

The language of § 9.3 is, importantly, familiar in merger agreements governed by Delaware law. And the Delaware Chancery Court has construed similarly worded Effect-of-Termination provisions in merger agreements to require—as RPM urges—a plaintiff claiming breach to establish such scienter. *See, e.g.*, *Hexion Specialty Chems., Inc. v. Huntsman Corp.*, 965 A.2d 715, 746–47 (Del. Ch. 2008) (interpreting effect-of-termination provision in merger agreement that included both specified-provision exception and bad-conduct exception); *Yatra Online, Inc. v. Ebix, Inc.*, No. Civ. 2020-0444 (JRS), 2021 WL 3855514, at *8–9 (Del. Ch. Aug. 30, 2021), *aff'd*, No. 294, 2021, 2022 WL 1073548 (Del. Apr. 11, 2022); *AB Stable VIII LLC*, 2020 WL 7024929, at *104 (describing a "willful breach" effect-of-termination provision as "relatively standard").

The decision in *In re Anthem-Cigna Litigation*, No. Civ. 2017-0114 (JTL), 2020 WL 5106556 (Del. Ch. Aug. 31, 2020), is particularly apposite here. The merger agreement in that case provided that "[i]n the event of termination of this Agreement . . . the obligations of the parties under this Agreement shall terminate . . . and there shall be no liability on the part of any party hereto," save for liabilities arising out of "fraud" or a "Willful Breach" of any representation or covenant. *Id.* at *133. It defined a "Willful Breach" as a material breach "that

92

is the consequence of an act or omission by a party with the actual knowledge that the taking of such act or failure to take such action would be a material breach of this Agreement." *Id.*

The Delaware Chancery Court construed that provision to impose a heightened standard for establishing breach of contract. "Under the Effect-Of-Termination Provision, it is not enough for Cigna to prove the elements of a claim for breach of contract that satisfies the common law framework." *Id.* at \*134. Rather, the Court held, the plaintiff must show that defendant acted "with the actual knowledge that the taking of such act or failure to take such action would be a material breach." *Id.* It explained:

> At common law, a knowing and intentional breach occurs when a party knowingly takes an action that results in a breach. The knowledge requirement only modifies the action; the party does not also have to know that its conduct constitutes a breach. In the definition of "Willful Breach," the parties to the Merger Agreement contracted around this common law rule by providing that liability would exist only if the breaching party acted "with the actual knowledge that the taking of such act or failure to take such action would be a material breach of this Agreement."

*Id.* (internal citations omitted). The "Willful Breach" provision construed in *Anthem-Cigna* is not substantively distinguishable from the effect-of-termination provision in the Entitle-RPM Merger Agreement.

Seeking to avoid this outcome, PartnerRe relies on a Chancery Court decision construing a different effect-of-termination provision in a merger agreement. *See AB Stable VIII LLC*, 2020 WL 7024929, at \*103. The provision at issue stated that "[i]n the event of termination of this Agreement, the obligation of each party to pay its own expenses will be subject to any rights of such party arising from a breach of this Agreement by the other." *Id.* This "Breach Exception," the Court held, did not carry a knowledge requirement because its reference to "breach" is "not limited to a 'willful breach.' The Breach Exception contemplates the potential recovery of transaction expenses for any breach." *Id.* But *AB Stable* is inapposite here, because § 9.3 of the

93

Entitle-RPM Merger Agreement *does* limit the claims of breach on which recovery is available to breaches committed with knowledge or reckless disregard—and § 11.9 does not disturb that limitation in identifying the remedies available for breach.

Accordingly, to establish their reciprocal claims of contract breach, the parties in this lawsuit must show that the breaching party acted with the "knowledge" or "reckless disregard" that its conduct constituted a material breach of the Merger Agreement. As the Chancery Court explained in *Anthem-Cigna*, a Court determining whether this showing has been made must view the evidence in context, drawing on "a combination of direct evidence, indirect evidence, and circumstantial evidence." 2020 WL 5106556, at *134.

> b.      *Materiality of the breach*

The Merger Agreement also requires any breach to have been material. *See* Merger Agreement §§ 8.2; 8.3 ("The covenants and agreements of [both parties] to be performed on or before the Closing Date in accordance with this agreement shall have been performed in all material respects."). Under Delaware law, "[a] 'material breach' is a failure to do something that is so fundamental to a contract that the failure to perform that obligation defeats the essential purpose of the contract or makes it impossible for the other party to perform under the contract." *Genuine Parts Co. v. Essendant Inc.*, No. Civ. 2018-730 (JRS), 2019 WL 4257160, at *9 (Del. Ch. Sept. 9, 2019) (citing *eCommerce Indus., Inc.*, 2013 WL 5621678 at *13). "The question whether the breach is of sufficient importance to justify non-performance by the nonbreaching party is one of degree and is determined by weighing the consequences in the light of the actual custom of men in the performance of contracts similar to the one that is involved in the specific case. *BioLife Sols., Inc. v. Endocare, Inc.*, 838 A.2d 268, 278 (Del. Ch. 2003), *as revised* (Oct. 6, 2003) (internal quotation marks and citations omitted).

The question whether a breach is material entails a fact-specific inquiry guided by five factors enumerated in § 241 of the Restatement (Second) of Contracts:

> (a) the extent to which the injured party will be deprived of the benefit which he reasonably expected;
>
> (b) the extent to which the injured party can be adequately compensated for the part of that benefit of which he will be deprived;
>
> (c) the extent to which the party failing to perform or to offer to perform will suffer forfeiture;
>
> (d) the likelihood that the party failing to perform or to offer to perform will cure his failure, taking account of all the circumstances including any reasonable assurances; and
>
> (e) the extent to which the behavior of the party failing to perform or to offer to perform comports with standards of good faith and fair dealing.

*BioLife Sols., Inc.*, 838 A.2d at 278 (citing Restatement (Second) of Contracts § 241); *see also*

*Commonwealth Constr. Co. v. Cornerstone Fellowship Baptist Church, Inc.*, No. Civ. A. 04L-

10-101 (RRC), 2006 WL 2567916, at *19 (Del. Super. Ct. Aug. 31, 2006), *amended*, No. Civ. A.

04L-10-101 (RRC), 2006 WL 2901819 (Del. Super. Ct. Oct. 3, 2006) (citing same).

## 2.     Application to RPM's Failure to Close and Its Claims of Breaches by Entitle

Provided that Entitle had fully performed and that all closing conditions had been met,

RPM's refusal to close as required would be the paradigmatic breach of the Merger Agreement

and, necessarily, a material one.[47]  *See, e.g., Bardy Diagnostics, Inc. v. Hill-Rom, Inc.*, No. Civ.

---

[47] RPM does not dispute this. *See* Tr. at 1481 (RPM counsel) ("If the Court finds that the other side complied with all of its obligations, there was no material adverse effect, then my client failed to close, they could declare a breach on that point."); *see also id.* at 1392–93 (Hirt, acknowledging that after receipt of unconditional Form A approval, RPM would have been in breach of contract if it did not close the transaction); 1396–97 (Hirt, same); Matera Dep. at 73–74 (same); Hamilton Dep. at 125 (same).

2021-0175 (JRS), 2021 WL 2886188, at *17 (Del. Ch. July 9, 2021), *judgment entered*, (Del. Ch. 2021); *Hexion Specialty Chems.*, 965 A.2d at 761–62.

RPM, however, argues that, as of the closing date, Entitle had breached various of its covenants. These breaches, RPM contends, excused its obligation to close, as did the existence of purportedly unfulfilled closing conditions. Entitle's breaches, RPM argues, also give rise to contract breach liability on its part.

The Court's analysis of the reciprocal contract breach claims accordingly proceeds in two steps. First, in this section, the Court considers RPM's claims of breach by Entitle of its contractual covenants. There are five sets of such claims. The Court finds neither a breach by Entitle nor an unfulfilled requirement for closing. This requires that judgment be entered for Entitle on RPM's breach of contract counterclaim.

Second, in the ensuing section, the Court considers whether Entitle has established, as § 9.3 requires for it to prevail on its claim, that RPM acted with the knowledge or reckless disregard that its conduct constituted a material breach of the Merger Agreement. On this issue too, the Court holds with Entitle.

        *a.*     *Did Entitle deny RPM reasonable access to its books and records?*

In asserting a breach by Entitle, RPM first argues that Entitle breached its duty under § 5.3(a) to provide reasonable access to its books and records. *See* Def. PF ¶¶ 83–84. That provision states that Entitle shall "afford to representatives of RPM reasonable access to the books and records of [Entitle] during normal business hours and consistent with applicable Law, upon reasonable notice and in accordance with the procedures established by [Entitle]." Defendants argue that Entitle violated this provision by (1) withholding financial information

that RPM requested and (2) failing to disclose its communications with ODI. *Id.* The Court addresses these in turn.

i.      RPM's request for financial information

Until its post-trial submissions, RPM based its claim of a books-and-records breach on a single circumstance: Hirt's May 28, 2017 request for updated financial projections of Entitle. Entitle provided RPM with the materials responsive to this request on June 2, 2017. The Court holds that Entitle satisfied its books-and-records obligations with respect to these materials.

By phone, on May 28, 2017, Hirt requested revised projections. Palmer Aff. ¶ 47. Both Iannarone and Palmer testified that it was not Entitle's practice to revise projections or create mid-year projections. *Id.*; Iannarone Aff. ¶ 32. Accordingly, at the time of Hirt's request, Entitle did not have projections available to share, and such projections would not have existed but for Hirt's request. JX-107; Tr. at 313 (Iannarone). After receiving Hirt's request, Iannarone asked Palmer to create such projections. JX-107. Thereafter, Palmer worked over the following week (including four business days) to vet and finalize the draft projections and secure board approval of them, per Entitle's ordinary practice. Palmer Aff. ¶ 47; Iannarone Aff. ¶ 32. The vetting process resulted in reducing Entitle's projected losses to $2.1 million—$200,000 below the draft loss projections provided on May 28, 2017 to Iannarone. *Compare* JX-186 *with* JX-107 (attachment).

In claiming a books and records violation, RPM argues that Entitle deliberately delayed providing the revised pro forma projections to RPM until June 2, 2017, the day it obtained Form A approval from ODI. It contends that RPM held back because "the revised projections showed a material change from what had been originally submitted in the Form A application, and that

ODI's approval of the Form A would be in jeopardy if RPM provided the revised projections to ODI." Def. PF ¶ 44.

For several independent reasons, the Court holds, RPM is wrong.

First, the one-off projection that Entitle created as a courtesy in response to a request from RPM was not a "book" or "record" to which RPM had a contractual entitlement. Section 5.3(a) gave RPM "reasonable access to [Entitle's] books and records," "during normal business hours consistent with applicable Law, upon reasonable notice and in accordance with the procedures established by Entitle." The Merger Agreement did not define "books and records." But Article X of Entitle's bylaws, which defined the company's duties as to the books and records it was obliged to keep, does not support an affirmative duty to go beyond these to create projections on the request of an acquiror.[48] And the "applicable law" does not support RPM's claim, either, that books or records included documents that Entitle was asked to create as a courtesy by its merger partner. The parties agree that Del. Code tit. 8, § 220, which governs books and records requests from stockholders, and the Delaware Chancery Court's holdings in the context of such requests, supplies the "applicable Law." *See Ostrow v. NAMA Holdings, LLC v. World Mkt. Ctr. Venture, LLC*, 948 A.2d 411, 421 (Del. Ch. 2007), *aff'd*, 945 A.2d 594 (Del. 2008) (looking to § 220 in interpreting scope of books and records provision in LLC agreement); *Arbor Place, L.P. v. Encore Opportunity Fund, L.L.C.*, No. Civ. A. 18928, 2002 WL 205681, at *3 (Del. Ch. Jan. 29, 2002) (same, citing § 220 and noting that the phrase "'books and records,' has a common and well-understood definition" based on that statute and related

---

[48] Under Article X, adopted February 16, 2017, Entitle was required to "keep correct and complete books and records of account, stock transfer books, minutes of the proceedings of its stockholders and Board and such other records as may be necessary or advisable." JX-57.

caselaw). Del. Code tit. 8, § 220(b)(2)(a) provides that a stockholder has a right to access to "books and records, to the extent that [t]he corporation has actual possession and control of such records." But RPM has not identified any case—nor has the Court found one—holding that a company was obligated to *create* a book or record in response to a one-off request.

Second, even assuming *arguendo* that a final version of the projections Palmer created in response to Hirt's request would qualify as a book or record, there is no viable theory under which Entitle was obliged to furnish RPM a *draft* version. Under § 220, documents that have not been "formally produce[d]" in the "ordinary course of business," such as draft documents, are not books or records. *Compare Quantum Tech. Partners IV, L.P. v. Ploom, Inc.*, No. Civ. A. 9054 (ML), 2014 WL 2156622, at *10 (Del. Ch. May 14, 2014) (holding that "monthly financial statements," while they may have been "desirable or helpful" to the plaintiff, were not subject to production in a § 220 action because the plaintiff did not show that the defendant "formally produces such reports in the ordinary course of business"), *with Chammas v. Navlink, Inc.*, No. Civ. 11265 (VCN), 2016 WL 767714, at *10 (Del. Ch. Feb. 1, 2016) (noting draft meeting minutes may constitute "books and records," because they constitute official corporate business).

Third, RPM does not cite any authority that obliged Entitle to *finalize* the draft once it had been created. Palmer created the projection only in response to prompting from Iannarone, who had received a request from Hirt, whom Iannarone wished to placate. This circumstance was not, by any means, within Entitle's "ordinary course of business." As a legal matter, Entitle was at liberty to finalize and share the draft, or to drop work on it altogether. RPM is correct that there is evidence that Entitle briefly held off finalizing and sharing these projections with RPM,

99

rightly suspecting that Hirt was scheming to find a way to avoid the closing.[49]  But legally, it was within Entitle's rights to do just that, insofar as the draft projections were not "books and records" within the scope of the Merger Agreement.

Fourth, even assuming Entitle was under some obligation to share the draft projections or a final version of same, under § 5.3(a), that obligation did not require instantaneous sharing.  It required RPM to be given access within a "reasonable" timeframe.  That obligation was met here.  Entitle waited just four business days to share the document with RPM.  During this time, it sought Board approval for the projections, consistent with its normal procedures in developing projections, and revised those projections.  Objectively, Entitle cannot be found unreasonable in taking four days to provide to RPM projections that did not exist as of the time of RPM's request.  RPM seizes on the fact that Entitle shared the document on June 2, 2017—later on the day that ODI approved the merger, Def. PF ¶ 43, the implication being that Entitle had decided not to turn over the document until ODI had acted.  But RPM argues from hindsight.  Although ODI approved the merger on June 2, 2017, Entitle had had no reason to believe such approval was imminent.  On the contrary, ODI had notified Entitle that approval was likely two weeks away.  Tr. at 126–27 (Hudson).

Finally, even assuming *arguendo* a breach by Entitle of § 5.3(a), any breach was surely immaterial.  RPM imagines that had it received the revised projections sooner, it would have submitted these to ODI before it gave its "clean" approval of the merger, and that on the basis of these, ODI would have declined to approve the merger.  But that is unpersuasive conjecture, for a variety of reasons.  RPM tellingly did not provide the projections to ODI after receiving them

---

[49] *See, e.g.*, JX-100 (Entitle "has what [RPM] is looking for but we (as a Transaction Committee) agreed not to send the financials to RPM at this time.").

on June 2, 2017, presumably recognizing that their innocuous substance did not stand to disturb ODI's assessment of the acquisition as meriting approval. There is no persuasive reason to assume RPM would have acted otherwise had it received the projections from Entitle before ODI had acted. And assuming that Entitle had finalized and provided its projections in final form to RPM a day earlier, on June 1, 2017, it is highly unlikely that RPM would have furnished these to ODI before ODI gave its approval to the Form A on the morning of June 2, 2017. Before doing so, RPM would have, in all likelihood, taken up the issue internally, and raised it with Entitle and PartnerRe, which rightly had voiced concerns about Hirt's sabre-rattling threats to intervene with Entitle's regulator. That inevitable back-and-forth would have taken time, with regulatory lawyers and the principals on both sides participating, and would almost certainly have extended past the point of ODI's approval early on June 2, 2017. In any event, the chance that ODI would have altered its view of the transaction based on the revised projections is, the Court finds, asymptotic to zero. ODI, as the Court has found, was fully aware of Entitle's financial condition when it gave its approval of the merger, including based on the heightened surveillance regime that was in place. The updated pro forma financials would not have altered its evaluation. The projections would have been immaterial to ODI's decision whether to approve the Form A.

### ii.     RPM's request for communications with ODI

In its post-trial submissions, RPM added a new theory. It argued that Entitle's failure to share with it Palmer's May 24, 2017 email exchange with Turner, ODI's surveillance analyst as to Entitle, breached Entitle's books and records obligation under § 5.3(a). There, as noted, Turner wrote that "[d]ue to the ongoing net losses reported by Entitle there were Hazardous Financial Condition (HFC) failures for the 6 month, 9 month and 12 month period" and that it "may be time to start considering the need for another capital contribution before June 30, 2017

to prevent further HFC failures." JX-199.  Palmer responded that "[p]er the pending Merger Agreement, RPM has the right to compel PartnerRe to fund $1.5 million of its proceeds at closing into a note . . . . Therefore, at RPM's request at closing, there will be an additional $1.5 million in Surplus at [Entitle]."  *Id.*

For multiple reasons, Entitle did not violate § 5.3(a) by not providing this communication to RPM.  And any such breach would not have been material.

First, the exchange with Turner related to Entitle's surveillance.  It did not concern the Form A application.  As such, RPM—at least prior to the closing—did not have any rightful claim to have included in such correspondence.[50]

Second, even if the exchange qualified as a book or record to which RPM was entitled, RPM received it within a reasonable period of its request—and it did not make this request until after it breached by failing to close.  Under § 5.3(a), Entitle's duty to afford access to books and record did not come into play until RPM had requested such materials.  *See* § 5.3(a) (requiring Entitle to afford RPM reasonable access to its books and records "upon reasonable notice").  RPM did not request the communication until June 16, 2017, a week after RPM failed to appear the closing.  It did so through litigation counsel, who stated that RPM would not close until Entitle provided all of its communications with ODI relating to Entitle's "capital adequacy."  JX-

---

[50] Had ODI furnished such communications to an outsider, such might have violated the confidentiality associated with its surveillance of an insurer.  *See* Tr. at 1264 (Spina testifying that it would be inappropriate for ODI to copy RPM on communications with Entitle regarding Entitle's surveillance before closing because information conveyed as part of surveillance was confidential from third parties and the public).

133. Three days later, on June 19, 2017, PartnerRe and Entitle provided RPM the requested communications between ODI and Entitle, including the May 24 mail exchange. JX-135.[51]

Third, any breach in failing to produce the email exchange earlier was immaterial. As Palmer and Iannarone persuasively testified, they had recounted the substance of the email to RPM multiple times. *See* Tr. at 513–16 (Palmer, testifying that he reported the exchange to Noack by phone, including reading the exchange to her verbatim); *id.* at 267, 271 (Iannarone, testifying that he personally followed up with Hirt to discuss the Turner exchange and had had a "half dozen or plus conversations with [Hirt] on this topic over the year preceding"). Iannarone's and Palmer's credibility on this point is bolstered by a June 8 letter from RPM transaction counsel Johansson, in which Johansson acknowledged that on or about May 24, Noack was told about ODI's "need for additional capital" and that on or about May 25, Hudson told Hamilton that Palmer had explained to ODI that Entitle could compel a $1.5 million loan after closing. JX-115; *see also* Hamilton Dep. at 137–40 (recalling he had had a "detailed conversation" with Hudson on May 25 regarding the Turner-Palmer email exchange, including whether the $1.5 million loan from PartnerRe would be enough to cover the capital call from ODI and that Hudson had expressed that it was possible ODI could ask for more). And the Palmer-Turner exchange—which RPM darkly portrays as embodying a secret promise by Entitle that RPM would make a $1.5 million loan at closing—did not break any new ground. Entitle did

---

[51] RPM has not argued that the three-day period between request and delivery was unreasonable. It was reasonable. As Iannarone testified, after RPM's request, there was negotiation between counsel as to the scope of the materials to be produced. Tr. at 287.

not make any such promise, and Palmer's statement in the email tracked RPM's previous communications to ODI.[52]

> b.    *Did Entitle fail to update its pro forma financial projections?*

RPM next asserts that Entitle failed to alert ODI to its worsening financial condition, and thereby breached both its duty under § 5.4(a) of the Merger Agreement to use reasonable best efforts to consummate the merger and its disclosure obligations under Ohio law. Def PF ¶ 91. Relatedly, it argues that in refusing to agree to jointly send ODI updated pro forma financials, and in discouraging RPM from unilaterally doing so, Entitle breached its duty under § 5.4(b), which obliged the parties to cooperate with respect to government communications.

> i.    RPM's Section 5.4(a) claim

Section 5.4(a) of the Merger Agreement provides:

> Subject to the terms and conditions herein provided, the Parties shall, and each of them shall cause their respective Affiliates to, use reasonable best efforts to promptly take, or cause to be taken (including by their respective officers and directors), all actions and to do, or cause to be done, all things necessary, proper or advisable under this Agreement and applicable Laws to consummate and make effective as promptly as practicable after the date hereof the transactions contemplated by this Agreement, including (i) preparing (and filing or delivering, as the case may be) as promptly as practicable (and, in respect of the Ohio Form A, no later than fifteen (15) Business Days from the date of this Agreement) all necessary applications, notices, petitions, filings, ruling requests, and other documents and to obtain as promptly as practicable all consents, waivers, licenses, orders, registrations, approvals, permits, rulings, authorizations and clearances necessary or advisable to be obtained from any Governmental Entity for, by or on behalf of any Person in order to consummate the transactions contemplated by this

---

[52] As noted, RPM had previously told ODI it would be calling the $1.5 million from PartnerRe at closing. *See* JX-74; *see also* Tr. at 263–64 (Iannarone testifying that "[t]his was something that was known to everybody, including ODI, from your own client."); Hamilton Dep. at 129, 133–35 (stating that Palmer's email was consistent with his own previous email to ODI). And RPM itself had submitted projections to ODI reflecting that assumption. *See* JX-138; *see also* Tr. at 253 (Iannarone), 541 (Palmer); *see also id.* at 776–78 (Noack). Palmer's email, in any event, did not commit RPM to any such course, but stated only that he would recommend that RPM cause PartnerRe to do so. *See* JX-124; *see also* JX-199; Tr. at 1098 (Hirt), 541 (Palmer).

Agreement (collectively, the "Governmental Approvals") and (ii) as promptly as practicable taking all other steps as may be necessary to obtain all such Governmental Approvals (including, without limitation, promptly, truthfully and fully responding to requests for information and other inquiries of Governmental Entities and other third parties). No Party shall take or omit to take, or permit or cause an Affiliate of such Party to take or omit to take, any action that the Person taking such action or making such omission should be reasonably aware would have the effect of delaying, impairing or impeding the receipt of any Governmental Approval.

RPM argues that when Entitle in late May and early June resisted Hirt's proposal for RPM to update its Form A to add new forward-looking projections for Entitle for 2017, it failed to do "all things necessary, proper or advisable under . . . applicable Laws[.]" That is wrong, and it misapprehends RPM's obligations under both Ohio law and the Merger Agreement.

As reviewed above, the Form A that ODI requires a prospective buyer of an insurance company to submit includes pro forma projections of the, which are to reflect the anticipated impact of the merger on the target insurer. *See* JX-417; JX-399; Snow Dep. at 162–63. Ohio Revised Code § 3901.321(D)(2) also states that "[i]f any material change occurs in the facts set forth in [the Form A Application], an amendment setting forth such change, together with copies of all documents and other material relevant to the change, shall be filed with the superintendent by [the Applicant]." JX-417.

Here, RPM contends that Entitle's worse-than-expected financial performance between signing and closing—signaling that it would fall short of the 2017 projections contained in the Form A filed on March 10, 2017—was a "material change" requiring amendment of the Form A; specifically, the submission of updated pro forma projections for 2017. The parties' experts on Ohio insurance regulatory practice gave competing testimony on whether ODI would have expected such an update. As reviewed above, the Court found PartnerRe's expert, Berliner, persuasive and credible. He opined that an update of an acquirer's projections in general is

105

neither expected nor necessary based on changes in the performance of the insured because the data of most consequence to the ODI is the insurer's actual performance data. He opined that such a projection would not have been expected or added information of consequence here, because ODI, due to its heightened surveillance and Entitle's monthly submissions, was unusually up to date on Entitle's *actual* performance, which formed the basis of the revised projections for the post-acquisition period that Hirt proposed to submit. On these circumstances, there was no "change" of any sort that had gone unreported to ODI, let alone a material one.

The Court accordingly finds that there was no "material change" that required RPM to update the Form A. With Entitle having given Ohio its fresh actual financial performance, Ohio law did not oblige RPM to adapt its pro forma projections and submit new ones taking account of Entitle's most recent results. Circumstantial confirmation of this is supplied, too, by ODI's "clean" approval of the merger on June 2, 2017, without any request to RPM to update the Form A's pro forma projections to take into account Entitle's most recent performance data, of which ODI was well aware. And the ODI officials examining the Form A included the personnel responsible for ODI's surveillance of Entitle, and its review of Entitle's monthly financial submissions.

The Court found persuasive, too, Berliner's testimony that ODI would have viewed RPM's proposed 11th-hour submission of revised pro forma projections as unusual and irregular and signifying misgivings on the part of acquiror RPM. *See* Berliner Aff. ¶ 128; Tr. at 134

(Hudson). As such it stood—as Hirt no doubt intended—to agitate ODI, and to disrupt and delay its review and approval of the merger.[53]

Finally, even if a colorable argument could be made that Ohio law contemplated a submission of revised projections, Entitle's resistance to doing so would not have materially breached its duties under § 5.4(a). Section 5.4(a) did not incorporate by reference Ohio insurance law so as to make any breach of state law a breach of the Merger Agreement. Its command was more precise. As relevant here, it required Entitle to use reasonable best efforts to promptly take, or cause to be taken, "all actions . . . necessary, proper or advisable under this Agreement and applicable Laws to consummate and make effective as promptly as practicable after the date hereof the transactions contemplated by this Agreement." Entitle complied with that command. Even if the submission of revised post-merger projections had been required by state law, which it was not, Entitle's resistance to doing so did not breach this covenant.[54]

---

[53] At trial, RPM, seizing on the fact that it had submitted an updated Form A to ODI on May 1, 2017, separately claimed that Entitle had known by then that the pro forma projections for 2017 were inaccurate. It based this claim on the fact that RPM's Form A had projected a 2017 loss of $1,019,000, whereas, by May 1, 2017, Entitle's Palmer possessed a document reflecting that Entitle had already amassed $1,022,000 in losses. Def. PF ¶ 36 (citing JX-76, JX-402). The Court rejects this argument as misleading. The Form A, including RPM's projections, had been submitted in full on March 10, 2017. RPM's May 1, 2017 revised submission did not substantively alter the March 10 Form A. It merely made non-substantive alterations, including to the formatting of headers, as ODI had requested. Critically, the revised Form A did not purport to suggest that the projections therein had taken account of Entitle's recent performance. Nor had ODI, in seeking formatting changes, asked that the Form A's projections be updated. And, by May 1, 2017, ODI had been notified, via regulatory surveillance, of Entitle's recent losses. That day, Palmer submitted a document reflecting the $1,022,000 in losses to ODI, and specifically to Clayton, the same analyst responsible for reviewing RPM's Form A. JX-71; *see also* Bush Aff. ¶ 43(f). Palmer knew that Clayton had responsibility for reviewing RPM's Form A. Palmer Aff. ¶ 46.

[54] To the extent RPM makes this asserted breach by Entitle a basis of its counterclaim, the counterclaim fails for an independent reason: The evidence does not establish that any such

107

ii.     RPM's Section 5.4(b) claim

Under § 5.4(b), the parties were required, in relevant part, to "cooperate in all respects with each other in connection with any communication, filing or submission relating to the receipt of any Governmental Approval" and "consider in good faith the views of the other Parties in connection with any proposed communication with any Governmental Entity[.]" JX-57. RPM claims that Entitle breached this cooperation covenant in late May and early June 2017, by refusing to join in RPM's proposal to convey the revised projections to ODI, which, RPM urges, would have "ma[d]e sure that the regulator was fully informed and that the Form A was true and accurate." Def. Memo at 32; *see* JX-112; JX-116; JX-119. In the same vein, RPM faults Entitle's attorneys for discouraging RPM from contacting ODI on its own, and for taking the position that "RPM . . . **has absolutely no 'right to contact ODI directly' except in strict compliance with the Agreement.**" JX-135 (emphasis in original).

---

breach was committed knowingly or with reckless disregard, as required by § 9.3. The record is abundantly clear that Entitle's officials believed in good faith that there was no duty to update ODI. Palmer and Iannarone credibly testified that they believed ODI had up-to-date information on Entitle's financial condition as a result of the company's monthly reports and that such would be considered in the Form A approval. Palmer Aff. ¶¶ 46, 52; Iannarone Aff. ¶ 15. In emailing Entitle's April 2017, financial results to ODI, Palmer copied Sheets, one of the Form A examiners who ultimately approved the application. *See* JX-234. Both Palmer and Iannarone also credibly testified that that believed that Hirt's proposal to contact ODI with updated pro formas would be counterproductive. *See* Palmer Aff. ¶ 52; Iannarone Aff. ¶ 38. Former ODI director Hudson, who was advising Entitle as regulatory counsel, similarly did not view Ohio law to require an update to the Form A, and communicated this to RPM. *See, e.g.*, Tr. at 128, 132; JX-90. ODI, she wrote, "has current financial data to evaluate the pro formas fully," as a result of Entitle's monthly reporting. JX-90. At trial, Hudson and Berliner explained that submitting additional financial information to ODI would have likely delayed ODI's approval of the transaction and may have even agitated ODI—the regulator responsible for determining whether Entitle could even operate its business. Berliner Aff. ¶ 128; *see also* Tr. at 134 (Hudson).

Having found that RPM did not have any obligation to send updated pro formas to ODI

or to otherwise amend the Form A, the Court finds emphatically for PartnerRe on this point.

Entitle did not have any duty to join with RPM to make a discretionary submission to ODI. And

as the evidence overwhelmingly showed, Entitle's officials reasonably perceived that Hirt's

proposal to submit updated pro formas was intended as provocative, not productive. As the

witnesses familiar with ODI testified, this irregular outreach, with ODI at the final stages of

review, stood to jeopardize the Form A approval and to unsettle Entitle's relationship with its

primary regulator.[55] Both before and after the closing date, Entitle explained to RPM its basis

for resisting contacting RPM: that revised pro formas were not required or expected, that ODI

already had Entitle's recent actual financials, and that Hirt's proposed outreach would have

jeopardized timely review and approval of the merger. *See* Tr. at 128, 132; JX-90. Merely

because RPM asserted an interest in contacting ODI did not oblige Entitle to acquiesce. With the

proposed communication reasonably viewed as unnecessary and counterproductive, and Hirt by

---

[55] *See, e.g.*, Berliner Aff. ¶¶ 125–26 ("The timing for such a request for a meeting by
representatives of RPM likely would have raised a red flag and caused ODI to question RPM's
suitability as an owner for Entitle and the efficacy of the transaction."); Tr. at 144–45 (Hudson,
explaining that she was on "pins and needles" about RPM's insistence on a meeting with ODI
because the "ODI remains Entitle's primary regulator" and "that relationship is very important
and you treat it with kid gloves and extra care"); Hamilton Dep. at 222 ("In my experience,
insurance companies never want an outsider to talk to their regulator, and you can imagine. It's
your life blood. The regulators are the people who decide whether you get to come in and open
the doors tomorrow and operate your business."); Tr. at 1253–54 (Spina, agreeing that filing
revised pro formas would have caused a "complete stop" to the Form A approval process); *see
also id.* at 219–22 (Iannarone).

then having given Entitle good reason to doubt his good faith and to perceive ulterior motives, Entitle had every reason to resist Hirt's bid as an insincere stunt.[56]

This conclusion is reinforced by the Merger Agreement's structure, which underscores that the purpose of § 5.4(b), the cooperation provision, was to facilitate the merger's approval. As noted, the preceding provision, § 5.4(a), required the parties to use reasonable best efforts "to consummate . . . .the transactions contemplated by this Agreement" and prohibited them from any action or omission if reasonably aware that such "would have the effect of delaying, impairing or impeding the receipt of any Governmental Approval." Here, Hirt's proposed communication, the Court finds, had the intent and likely effect of jeopardizing the merger, and was reasonably so understood by Entitle in real time. It was therefore prohibited by § 5.4(a). RPM's suggestion that § 5.4(b) nonetheless obliged Entitle to acquiesce in Hirt's proposed outreach is untenable insofar as it reads § 5.4(b) to command an outcome forbidden by § 5.4(a). In contrast, Entitle's refusal to do so, and its warning of RPM not to so jar ODI, were consistent with its obligations under both provisions.

Finally, to the extent RPM faults Entitle for discouraging it strongly from unilaterally contacting ODI to provide updated projections, Entitle's stance was no breach. Section 5.4(b) permitted unilateral communications by either party with ODI, provided that the party "keep[s] the other Parties . . . promptly informed," "consult[s] with [the other party] in advance of any meeting or conference," "permit[s] outside counsel for the other Parties to review in advance any submission, filing, or communication," and "consider[s] in good faith the views of the other

---

[56] For this reason, the one precedent RPM cites in support of its claimed breach of a cooperation duty is inapposite. The communication in *Anthem-Cigna* was made to impede governmental approval of a merger. *See* 2020 WL 5106556, at *5. Here, Entitle sought to deter an unnecessary communication that it viewed as apt to impede such approval.

Parties in connection with any proposed communication[.]" Entitle did not claim to RPM that it

lacked such a right, and RPM recognized at the time that the Merger Agreement gave it the right

to contact ODI on its own.[57]  Reasonably understood, Entitle's position was that the particular

communication Hirt contemplated was antithetical to the consummation of the merger, and as

such was improper under § 5.4(a).[58]

> c.     *Did Entitle have prohibited unilateral communications with ODI?*

RPM next argues that Entitle breached § 5.4(b), by unilaterally interacting with ODI on

several occasions. *See* Def. Memo at 27.  As noted, that provision required the parties to

cooperate in connection with any communication, filing or submission to ODI; keep the other

parties and their counsel "promptly informed of material communications relating to the receipt

of any government approval; consult with each other in advance of any meeting or conference

with ODI; and permit counsel for the other parties to review in advance any submission, filing or

communications intended to be given to ODI."

RPM argues that the following communications by Entitle with ODI were breaches:

- On May 24, 2017, as noted, Palmer exchanged emails with Turner, a member
of ODI's surveillance team assigned to Entitle.  Turner wrote that "[d]ue to the
ongoing net losses reported by Entitle there were Hazardous Financial
Condition (HFC) failures for the 6 month, 9 month and 12 month period" and
that it "may be time to start considering the need for another capital contribution
before June 30, 2017 to prevent further HFC failures." JX-199.  Palmer

---

[57] *See, e.g.*, JX-109 (June 5, 2017 email from RPM counsel Johansson to Entitle's counsel,
stating that "unless RPM has sufficient comfort by the end of Tuesday, it will *exercise its right
as the applicant and call the Commissioner* to set up a meeting" (emphasis added)); *see also* Tr.
at 1257 (Spina, agreeing that RPM had ability to contact ODI on its own).

[58] To the extent RPM makes this asserted breach by Entitle a basis of its counterclaim, the
counterclaim would independently fail because the evidence cannot establish that any such
breach was committedly knowing or with reckless disregard, as required by § 9.3.  As the
assembled evidence reflects, Entitle's officials believed in good faith that the communication
Hirt proposed was aimed at scuttling the transaction and improper under § 5.4(a).

responded that "[p]er the pending Merger Agreement, RPM has the right to compel PartnerRe to fund $1.5 million of its proceeds at closing into a note . . . . Therefore, at RPM's request at closing, there will be an additional $1.5 million in Surplus at [Entitle]." *Id.*

- On May 24, 2017, Hudson had a phone call with ODI's Snow and discussed the status of the Form A review and ODI's need for additional time to complete that review. JX-90.

- On May 31, 2017, Hudson emailed Snow and reported that the deadline for completing the Merger Agreement had been extended. JX-104.

Def. Memo at 27–28. PartnerRe defends Entitle's communications as permissible, consistent with its duty to cooperate, and made in good faith towards the shared goal of attaining Form A approval. It also argues that any breach was immaterial. Pl. Opp. Memo at 14.

At the threshold, the Court is unpersuaded by RPM's suggestion that unilateral contact with ODI by a party to the merger was inherently suspect in the manner of a litigant's *ex parte* contacts with a judge. RPM's regulatory counsel, Hamilton and Heales, each had such communications with ODI before the challenged contacts by Entitle. *See, e.g.*, JX-70; JX-72; JX-77. Hamilton stated that he did not always copy Hudson, his counterpart at Entitle, on communications with ODI, but instead would forward these to her; he did not expect to be included on all communications between Entitle and ODI while the Form A was pending. Tr. at 97; *see also* Hamilton Dep. at 65–69 (testifying that this approach was not "inconsistent with the protocol"; although "[t]here are some circumstances in which you might actually CC the other party's counsel on the communication, . . . that's not required."); *see also* Tr. at 764–65 (Noack, Noack Dep. at 60 (no "expectation as to whether Mayer Brown would include a representative from Entitle on all communications with ODI"). And RPM's regulatory expert, Spina, testified that Entitle's communications with ODI were "customary and typical." Tr. at 1240–44. The Court is again persuaded by the assessment of Berliner, PartnerRe's regulatory expert and a

112

former ODI general counsel.  The record, he noted, reflects that Hudson and Entitle had

promptly informed Hamilton and RPM of their communications with ODI related to the Form A.

This mode of communication, Berliner persuasively opined, "was reasonable and consistent with

the practices customary in Ohio for sellers and their insurance regulatory attorneys in handling

Form A applications filed with ODI."  Berliner Aff. ¶ 102.

 Consistent with this testimony and the practice of both sides of the merger in this case,

the Court does not read § 5.4(b), the Merger Agreement's cooperation provision, to bar unilateral

communications with ODI.  *See Glob. Energy Fin. LLC v. Peabody Energy Corp.*, No. Civ. A.

08C-10-129 (RRC), 2010 WL 4056164, at *28 (Del. Super. Ct. Oct. 14, 2010) ("[T]he actions of

the parties are 'of great weight in determining the meaning and applicability of the contract, and

lead the Court to a presumptively correct interpretation.'" (citing *Artesian Water Co. v. Dep't of

Highways & Transp.*, 330 A.2d 441, 443 (Del. 1974)); *Sun-Times Media Grp., Inc. v. Black*, 954

A.2d 380, 399 (Del. Ch. 2008) ("[A]ny course of performance accepted or acquiesced in without

objection is given great weight in the interpretation of the agreement." (citing Restatement

(Second) of Contracts § 202; cmt. G (1981)).  And, fairly analyzed, none of the specific

communications that RPM faults breached § 5.4(b), let alone materially.

 ***Palmer's May 24, 2017 email exchange with Turner***:  This exchange concerned ODI's

surveillance of Entitle, a subject distinct from the merger.  With the merger not having closed,

Entitle had no duty to include RPM in such a communication with its regulator.  *See* Tr. at 1264

(RPM regulatory expert Spina, acknowledging that it would have been improper for ODI to copy

RPM on its pre-merger communications with Entitle regarding surveillance).  To the extent

Palmer's email addressed the Merger Agreement term empowering RPM to compel a $1.5

million loan from PartnerRe, it did not go beyond what RPM had itself communicated to ODI—

that RPM intended to do so. *See* JX-74; *see also* Tr. at 263–64 (Iannarone testifying that "[t]his was something that was known to everybody, including ODI, from your own client"); Hamilton Dep. at 129, 133–35 (Palmer's email was consistent with his own previous email to ODI). RPM itself had submitted projections to ODI reflecting that assumption. *See* JX-138; *see also* Tr. at 253 (Iannarone), 541 (Palmer), 776–78 (Noack). And Palmer's email to ODI did not say that that PartnerRe *would* contribute $1.5 million to Entitle at closing, but only that he would recommend that RPM cause PartnerRe to do so. *See* JX-124; *see also* JX-199; Tr. at 541 (Palmer), 1098 (Hirt). And PartnerRe promptly reported the email exchange, verbatim, to Noack. *See* Tr. at 513–16 (Palmer, testifying that he reported the exchange to Noack by phone, including reading it verbatim); *see also id.* at 267, 271 (Iannarone, testifying that he personally followed up with Hirt to discuss the Turner exchange and had had "half dozen or plus conversations with [Hirt] on this topic over the year preceding"); *see also* Hamilton Dep. at 137–40 (recalling he had had a "detailed conversation" with Hudson on May 25 regarding the Turner-Palmer email exchange, including whether the $1.5 million loan from PartnerRe would be enough to cover the capital call from ODI and that Hudson expressed that it was possible ODI could ask for more).

***Hudson's May 24 phone call with Snow***: By its literal terms, this informal call did not fit within either § 5.4(b)(iv), which addresses only writings to ODI, which the parties must permit the others' counsel "to review in advance," or § 5.4(b)(iii), which governs a "meeting" or "conference"—more formal gatherings. This call was brief, logistical, and quotidian: As Hudson testified, she and Snow discussed how long it might take for the Form A to be approved; Snow noted that the Merger Agreement would expire on May 31, a point to which Hudson had not alerted; Snow stated that ODI's review could take two more weeks, and asked if the outside

114

date for closing could be extended, as the agreement permitted; and Hudson told Snow that she would get back to him. Tr. at 126–27. RPM has not pointed to any provision of the Merger Agreement that obliged Entitle to include RPM in the call. Even if it had, RPM forewent any such opportunity: Hudson had told RPM's regulatory counsel Hamilton that she would call Snow, and he did not ask to participate, and when the two discussed the call afterwards, Hamilton did not raise its unilateral nature as an issue. *Id.* at 125–28.

**Hudson's May 31, 2017 email to Snow**: This non-substantive email was neither a breach nor material. It reported to Entitle's regulator the fact that Entitle—exercising a contractual right which RPM no longer contests that Entitle had—unilaterally extended the closing date for the merger. And immediately after sending the email, Hudson forwarded it to RPM. JX-99. Further, RPM forewent the opportunity to join in this unremarkable communication. Hudson testified that, before sending the email, she had attempted to contact Hudson and Heales all weekend, Tr. at 133–36, having alerted them that Snow had noted the looming May 31 expiration date and sought a two-week extension to enable ODI to complete its review. *Id.* at 136. With May 31 being the last day on which Entitle could extend the deadline lest the agreement lapse, RPM's (presumably deliberate) decision not to respond can only be read as foregoing its opportunity to join Hudson in communicating the extension to ODI.

      *d.*     *Did Entitle experience a Material Adverse Effect?*

In an argument RPM did not make before the June 9 closing but preserved at trial, it contends that it was permitted to avoid closing because Entitle had experienced a "Material Adverse Effect" or "MAE."

The Merger Agreement permits a party to avoid closing based on an MAE, defined as "an event, circumstance, development, change or effect that (a) materially impairs the ability of the

115

Company to consummate the transactions contemplated by this Agreement or (b) is materially adverse to the Acquired Companies or their financial condition or results of operations, taken as a whole." However, this definition excludes "any failure by the Acquired Companies to meet any projections or forecasts or estimates of revenue or earnings for any period." JX-57. It adds: "For the avoidance of doubt, a Material Adverse Effect shall be measured only against the past performance of the Acquired Companies (taken as a whole) and not against any forward-looking statements, financial projections or forecasts of the Acquired Companies." *Id.* The Merger Agreement also excludes from the definition "changes in global or national economic, monetary, or financial conditions, including changes in prevailing interest rates," and "changes or trends in the industry in which the Acquired Companies operate." *Id.*

The MAE clause here is substantively akin to the familiar such clauses which Delaware courts have considered in lawsuits arising from failures by buyers to close on an acquisition or merger. Under Delaware law, a buyer seeking to excuse such a failure based on the claim that the target company suffered or was reasonably expected to suffer an MAE has the initial burden of proof. And the contractual carve-outs to the definition of an MAE, such as those here, further narrow this defense. *Bardy Diagnostics, Inc.*, 2021 WL 2886188, at *22.

The burden to show an MAE is notoriously difficult to meet. Despite the prevalence of such clauses, on only one occasion has a Delaware court found a buyer to have had a reasonable expectation of an MAE. The Delaware Chancery Court in that case noted that a "buyer faces a heavy burden" in establishing an MAE, as the "important consideration" is "whether there has been an adverse change in the target's business that is consequential to the company's long-term earnings power over a commercially reasonable period, which one would expect to be measured in years rather than months." *Akorn, Inc. v. Fresenius Kabi AG*, No. Civ. 2018-0300 (JTL), 2018

116

WL 4719347, at *53, 57 (Del. Ch. Oct. 1, 2018), *aff'd*, 198 A.3d 724 (Del. 2018); *see also Snow Phipps Grp., LLC v. Kcake Acquisition, Inc.*, 2021 WL 1714202, at *33 (Del. Ch. Apr. 30, 2021) ("In *Akorn*, the only case in which this court found a material adverse effect to be reasonably expected, the seller's EBITDA had grown each year from 2012 through 2016, but it fell by 55% after the merger agreement was signed in 2017."); *Hexion*, 965 A.2d at 738 (observing pre-*Akorn* that "[m]any commentators have noted that Delaware courts have never found a material adverse effect to have occurred in the context of a merger agreement" and that "this is not a coincidence"). Consistent with the MAE provision in the Merger Agreement here, "[t]he proper benchmark" in analyzing whether an MAE has occurred "is to examine each year and quarter and compare it to the prior year's equivalent period." *Hexion*, 965 A.2d at 742. As noted, pursuant to the Merger Agreement, a failure to hit forecast targets, or a downturn due to market conditions cannot be predicates to the determination of an MAE. *See* Merger Agreement § 1.1.

Measured against these standards, RPM does not come close to meeting its high burden to demonstrate an MAE.

RPM's basis for claiming an MAE is Entitle's below-expectations financial performance between the signing of the Merger Agreement on February 16, 2017 and the closing date of June 9, 2017. But the evidence at trial convincingly demonstrated that that downtick was driven dominantly by temporary market conditions—increased interest rates which reduced the number of mortgage refinancings and hence the need for title insurance work—and secondarily by one-time costs associated with the merger. Tr. at 294–95 (Iannarone), 525–28 (Palmer); *cf. id.* at 1157 (Hirt, acknowledging that increasing interest rates slowed the mortgage industry); JX-150 (July 10, 2017 email from Noack to Hirt stating that "[t]he bad news is that the first qtr. of this year was difficult in our industry"); JX-81 (May 25, 2017 email from Palmer to Noack attaching

April P&L report and explaining that "April was another very difficult [month] in the wake of a bad refinance environment"). Consistent with the agreements addressed in the above Delaware caselaw, the Merger Agreement specifically excludes the impact of market conditions and interest rates bases on which to find an MAE. JX-57. It similarly excludes a failure to meet projections or estimates as bases to find an MAE. *Id.*

And Entitle's actual reported losses for Q1 2017 were a far cry from demonstrating the sort of consequential long-term diminution—measured in years—in Entitle's earnings power needed for an MAE. *See Akorn*, 2018 WL 4719347, at \*53, \*57. On the contrary, the record reflects that Entitle, long before the Merger Agreement and well known to RPM, had performed poorly financially, due to the inability of its direct marketing efforts to attract a sufficient volume of title insurance business to enable it to capitalize on its well-regarded internal capabilities. The business rationale for the merger in fact was that RPM, with its stable of mortgage clients, could rectify this longstanding deficiency in Entitle's business model, by steering these clients to Entitle for their title insurance needs. Hirt explicitly acknowledged this. *See* Hirt Aff. ¶ 24 ("We knew that PartnerRe and other Entitle shareholders were under tremendous pressure to sell Entitle because of the historical losses that Entitle had suffered . . . . We understood that PartnerRe had invested as much as $20 million into Entitle in the preceding years only to watch Entitle's losses pile up. I was willing to risk the purchase price to see if we could turn around Entitle."); *see also* Tr. at 1127–28; JX-49 (due diligence report by RPM identifying Entitle's "[l]ack of profitability" as a risk, and observing that Entitle had lost as much as $352,000 per month). As one of RPM's lenders memorably put the point a year before the eventual closing date, RPM knew that if it purchased Entitle, it risked buying a "turd." *See* JX-17 (June 2016

118

email from Eick to Hirt, characterizing Entitle as a "turd"); *see also* Tr. at 1051–52 (Hirt, agreeing that by late May 2017, the deal with Entitle had become "a turd.").

*Akorn*, the only case in which the Delaware Chancery Court has found an MAE, is thus very far afield. The court there found it significant that the company's recent performance departed sharply from its historical trend. Over the prior five years, Akorn had grown consistently, but its EBITDA, immediately after the signing of the merger agreement, "dropped off a cliff." *See* 2018 WL 4719347, at *55. Here, in contrast, Entitle had been long been suffering losses and its increased Q1 losses were ones of degree, not kind, and were readily explained by short-term factors such as higher interest rates.

RPM, therefore, has not shown an MAE. That contractual out, too, is unavailable to excuse its failure to participate in the closing.

> e.     *Did ODI impose a "Burdensome Condition" excusing RPM from performing?*

RPM's final argument—made for the first time in its post-trial amended proposed findings of fact—is that the capital injection recommended by ODI on May 24, 2017, was a "Burdensome Condition." Def. PF ¶ 107.

Section 5.4(d) of the Merger Agreement excused RPM from closing in the event a regulator imposed a Burdensome Condition for approval. It states:

> Notwithstanding anything to the contrary contained in this Agreement, nothing in this Agreement shall obligate RPM or any of its Affiliates (including the Surviving Corporation) to agree to any limitation , requirement or *condition in order to obtain any necessary Governmental Approval*, if such obligation would, individually or in the aggregate, reasonably be expected to (i) materially impair or interfere with the ability of RPM and its Affiliates (including the Surviving Corporation) to conduct their respective businesses, taken as a whole, after the Closing substantially in the manner such businesses were conducted as of the date hereof, (ii) result in the sale, lease, license, disposal or holding separate (x) by RPM or any of its Affiliates (including the Surviving Corporation) of any capital stock after the Closing or (y)

119

by RPM or any of its Affiliates (including the Surviving Corporation) of any of their material assets, rights, product lines, licenses, categories of assets or businesses or other operations or interests therein, (iii) require any material capital contribution, capital support arrangement or guarantee for the benefit of any of the Acquired Companies, or (iv) materially and adversely affect the benefits, taken as a whole, that RPM would otherwise receive from the transactions contemplated by this Agreement (each of the foregoing, a "Burdensome Condition"). (emphasis added).

RPM argues that "[a] Burdensome Condition existed as of May 24, 2017 when ODI informed Entitle that a capital contribution would be necessary to cure the company's Hazardous Financial Condition failures." Def. PF ¶ 107. For multiple reasons, this argument fails.

First, under § 5.4(d), to qualify as a Burdensome Condition, the condition must have been imposed "*in order to obtain any necessary Governmental Approval*." Turner's May 24, 2017 email did not do that, or say anything of the sort. It read: "Due to the ongoing net losses reported by Entitle there were Hazardous Financial Condition (HFC) failures for the 6 month, 9 month and 12 month period" and that it "*may be time to start considering* the need for another capital contribution before June 30, 2017 to prevent further HFC failures." JX-199 (emphasis added). The email thus did not require a capital contribution to be made to Entitle at all, but merely stated that Entitle should consider one by June 30, 2017, to avoid the risk that its finances would qualify, under regulatory standards, as a "hazardous financial condition." And even if the email were (incorrectly) read as mandating a capital contribution, it did not make such a contribution a condition of approval of the merger. Turner's email addressing the possible need for a future capital contribution was merger-neutral. And the trial evidence did not otherwise support RPM's theory that ODI set such a condition for approval. *See, e.g.*, Tr. at 349 (Iannarone, testifying that ODI did not formally require a capital contribution), 1095 (Hirt, acknowledging that, to the best

of his knowledge, the burdensome condition provision of the Merger Agreement had not been triggered).

RPM responds that the reason that ODI (ostensibly) required the $1.5 million capital contribution as a condition of its surveillance of Entitle—rather than as a condition of approving the merger—was that Entitle had hidden its financial decline from ODI. That is wrong. As the Court has reviewed at considerable length, ODI was unusually well aware of Entitle's financial condition, as a result of its heightened surveillance of the insurer, and the ODI team responsible for Form A review and approval was privy to that information. Indeed, Turner's May 24 email itself copied her ODI colleague Sheets, who was among the ODI staff members responsible for reviewing the Form A. JX-405; JX-199; Tr. at 1237.

In any event, apart from the fact that Turner's May 24 email neither imposed a condition nor made such a requirement for merger approval, the email did not mark a consequential change of events. As the record reflects, well before Turner's email, RPM had been aware of the risk that ODI would require a capital contribution to fortify Entitle's finances. For that reason, as Iannarone testified, RPM negotiated for—and the Merger Agreement included—a provision (§ 2.13(a)(ii)) empowering RPM to compel a $1.5 million from PartnerRe to Entitle. Tr. at 351 (Iannarone); JX-57.

Accordingly, the Court rejects RPM's claim that, on May 24, 2017 or at any time prior to the closing date, ODI imposed a Burdensome Condition excusing RPM from the duty to close.

*   *   *

For the reasons above, RPM has not established a material breach by Entitle. Nor was RPM's failure to close excused by the existence of any unfulfilled conditions to closing.[59] Accordingly, whether RPM is liable for breach of contract turns on whether, as § 9.3 required, it failed to close knowing or in reckless disregard that failing to close would be a material breach.

### 3.    Application to RPM's Knowledge and Reckless Disregard That Failing to Close Would Be a Material Breach

Were PartnerRe asserting only a common law breach of contract claim, it would need to show no more than defendants' refusal to close after all closing conditions had been satisfied. As shown above, RPM refused to close on June 9, 2017, and thereafter, even though Entitle had not breached and all closing conditions had been met. But, as noted, the parties bargained for a more demanding showing. To establish a breach in the event of termination, PartnerRe must show that defendants refused to close with the "knowledge or reckless disregard that such act or failure to act would be a material breach of this Agreement." Merger Agreement § 9.3.

There is limited precedent applying such effect-of-termination provisions. As noted, the Delaware Chancery Court interpreted and applied an analogous provision in the *Anthem-Cigna* litigation. The Chancery Court found that Cigna had failed to prove that Anthem had committed a willful breach of the merger agreement, because the record demonstrated that Anthem had "acted at all times with the belief that it was complying with the Merger Agreement and using its utmost efforts to complete the Merger." *Anthem-Cigna*, 2020 WL 5106556, at *134. In

---

[59] As PartnerRe and Entitle explained to RPM on June 8, 2017, the day before closing, all closing conditions—except conditions able to be fulfilled only at closing and conditions under RPM's control—had been either fulfilled or waived by Entitle by May 31, 2017. JX-116; *see also* JX-114 (June 7 email from Fisher to Johansson, attaching a "closing checklist"); JX-112 (June 6 email from Fisher to Johansson, identifying outstanding items for closing that required RPM's signature); JX-103 (June 2 email from Fisher to Johansson, identifying outstanding items for closing and suggesting a call to walk through all closing items).

particular, the Chancery Court noted that Anthem had expended $800 million to consummate the merger, and took aggressive defensive positions in the antitrust litigation that ultimately—despite Anthem's efforts—defeated it. *Id.* at *135.

This case is a very far cry from *Anthem-Cigna*. On the assembled record, the Court does not have any difficulty finding that Hirt and RPM chose not to close fully appreciating—and also recklessly disregarded the likelihood—that in doing so, RPM would be in breach. There are multiple bases for this determination.

First, before June 9, 2017—the date of the breach—Hirt and RPM had been repeatedly and explicitly warned by counsel for PartnerRe of just this point: that a failure to close on the terms set forth in the Merger Agreement would constitute a breach. These letters warned that RPM's excuses for failure to close—substantially the ones the Court has dispatched here—were bogus and pretextual. *See, e.g.*, JX-112 (June 6 email from Fisher to Johansson, noting that RPM's "positions lack factual support and reflect an inaccurate reading of the Merger Agreement in many significant respects"); JX-116 (June 8 letter from Entitle's litigation counsel to Johansson, stating that "[u]nder the terms of the Agreement, the merger must close tomorrow, Friday, June 9, 2017, at 9:00 a.m. Eastern time, at the offices of Bryan Cave LLP," and observing that RPM had not identified a single closing condition that was unfulfilled). These warnings put Hirt and RPM on notice of the legal consequences of blowing off the closing. And, after the closing date had passed, Entitle gave RPM a renewed opportunity to close, and thus to cure the breach, while continuing to warn that RPM's failure to close was unjustified and a clear breach that would result in litigation. *See* JX-119 (June 11 letter from Entitle litigation counsel to Johansson, stating that "in failing to appear for and participate in a closing Friday, RPM has materially breached the Agreement"); JX-138 (June 23 letter from Entitle litigation counsel to

RPM litigation counsel, stating that "[y]our false assertions make it clear that RPM has no intention of performing on its current obligations or curing its breach under the Agreement. Although we are now forced to conclude that RPM has no intent to close, we continue to insist that it do so as soon as possible"); JX-144 (June 28 letter from Entitle litigation counsel to RPM litigation counsel, giving RPM a "final opportunity to close the transaction," and stating that if RPM failed to take the steps necessary to enable that the transaction to close by July 5, 2017, then Entitle would "be forced" to terminate the Merger Agreement).  Finally, at their June 13, 2017 dinner meeting, Iannarone told Hirt repeatedly to his face that if RPM failed to close, the dispute would result in litigation.  Iannarone Supp. Aff. ¶ 2.  In response, Hirt paid lip service to the parties' agreement, promising Iannarone that the deal would "get done," but cynically conditioned his willingness to do so on "re-trading" the transaction on terms more beneficial to RPM, and with the closing deferred to an unspecified date.  *Id.*  Iannarone reiterated that renegotiating terms was not an option, that RPM was contractually obliged to close, and that PartnerRe would sue RPM if it failed to do so.  *Id.*

Second, internally, Hirt received the same message—that RPM faced legal exposure for breach if it did not close—from, at a minimum, RPM's chief operating officer.  Although any guidance that Hirt received from counsel on this point is outside the trial record—as RPM did not waive attorney-client privilege—in a June 14, 2017 email, Matera warned Hirt: "If this transaction was a huge stretch for us financially, we should have stepped back this winter . . . . *Nevertheless, having signed the Agreement, I am very concerned about the financial and reputational hit the company would take by litigating the contract.*"  JX-126 (emphasis added); *see also* Matera Dep. at 73–74; *see also* JX-129 (June 15 email from Matera to Hirt) ("As you know I have been advocating getting this deal done to avoid some bad alternatives.").  At trial,

Hirt confirmed he understood Matera to be referring to the "possibility that RPM could be found in breach" for not closing. Tr. at 1393–94; *see also id.* at 1402–03 (Hirt confirming he understood the June 15 email to also refer to the risk of a reputational hit and litigation potentially resulting of being found in breach). Hirt, tellingly, responded to Matera: "It will close." JX-126. But, when pressed by the Court, Hirt stated that what he meant was "[t]hat changes might need to be made" to the deal terms for him to agree to close. Tr. at 1321.

Third, as chronicled at length above, to parry the looming closing date, RPM and Hirt interposed a shifting series of blatantly pretextual excuses. These included ploys to jangle ODI into delaying approval or restarting the regulatory approval process. These ruses stand in acute contrast to Anthem's good-faith efforts, as found in *Anthem-Cigna*, to secure required regulatory approval for the merger. *See supra* § II.C. From this extended pattern of disingenuous and bad-faith conduct, an inference arises—which the Court adopts—that Hirt and RPM knew they were subject to a binding agreement which Hirt had come to regret and from whose closing they were attempting to wriggle free via concocted guises.

Fourth, internal communications obtained in discovery confirm that the Hirts rued the Merger Agreement and privately plotted before June 9, 2017 to submarine the transaction. *See, e.g.*, JX-196 (May 18 email from Hirt to Noack stating, "I am thinking we should reconsider closing Entitle. It may be too much right now and it's not major to our economics," to which Noack responded: "Pro for not proceeding: we would preserve cash, which we need until we start earning income"); JX-91 (May 29 email from Hirt to Noack, listing "[r]easons to stall" the closing during which period Hirt planned to renegotiate the terms of the agreement to be more favorable to RPM); JX-93 (May 30 email from Ms. Hirt to Hirt: "What does Lars [Johansson, Entitle's counsel,] say about them forcing you to buy Entitle. Can they do this? It seems we

should also look at getting turned down by the commissioner.  Is that a possibility?"); JX-94 (May 30 email, sent two hours after Ms. Hirt's email above, from Hirt to Iannarone, proposing, *inter alia*, that the parties effectively restart the Form A process by resubmitting pro forma projections to reflect Entitle's worsened state).  These emails were the logical extensions of Hirt's emails and discussions with Noack, in which, long after the Merger Agreement had been signed, he explored the pros and cons of sticking with the transaction, heedless of the legal obligations that the agreement might impose.  *See* Tr. at 791–93, 1011, 1041–42.

Fifth, Hirt's statements and comportment on the witness stand bespoke evasiveness, in a manner telltale of tacit recognition that RPM had lacked a valid basis not to close.  Among other features of this testimony, Hirt repeatedly assured the Court had he had in fact intended to close. When pressed, however, he clarified that such a closing would have to have been on materially different terms than those contained in the Merger Agreement.  *See, e.g.*, Tr. at 1321; Iannarone Supp. Aff. ¶ 2.

The Court accordingly finds that RPM and Hirt knew, and recklessly disregarded, that failing to close would constitute a breach.

### C.    Damages

Having found RPM liable for breach of contract, the Court turns to the damages due to PartnerRe.  The parties agree that under Delaware law, PartnerRe is entitled, in the event of a breach, to damages based upon the reasonable expectations of the parties at the time of the Merger Agreement, to wit, the sum that "would put the promisee in the same position as if the promisor had performed the contract."  *Duncan v. Theratx, Inc.*, 775 A.2d 1019, 1022 (Del. 2001) (citing Restatement (Second) of Contracts § 347 cmt. a).  Plaintiff's expert, Imburgia,

126

calculated PartnerRe's total damages, before pre- and post-judgment interest, to be $10,886,955. Defendant's expert, Bush, calculated PartnerRe's total such damages to be $4,886,000.

Although the experts' bottom lines are far apart, they agree methodologically that there are two components to PartnerRe's compensable damages: (1) the cash consideration difference, which consists of the difference between the cash that PartnerRe would have received under the RPM transaction had it been consummated and the cash it received in the later cash-only deal under which Radian acquired it; and (2) its minority equity interest, which consists of the value of the minority ownership of Entitle that PartnerRe would have retained under the Merger Agreement. *See* Tr. at 855 (Bush). The experts' principal battleground concerns the minority equity interest, as defendants, save for a discrete point, do not take issue with Imburgia's calculation of the cash consideration difference or claim that PartnerRe failed to adequately mitigate its damages. The Court addresses these components in turn.

### 1. Cash Consideration

Under the Merger Agreement, at closing, PartnerRe would have received a cash amount, to be calculated at closing based on the contractual formula embodying Noack's "lock box" concept.

Specifically, RPM's "Estimated Cash Purchase Price" under the Merger Agreement was to be $13,125,000, less the "Cash Purchase Price Adjustment Amount." That amount was to be derived by splitting, between PartnerRe (1/3) and RPM (2/3), Entitle's net pre-closing losses exceeding $208,000. The amount corresponding to PartnerRe's share was to be subtracted from the $13,125,000. JX-57.

It is undisputed that Entitle's net pre-closing loss for the period August 1, 2016 through June 30, 2017—the relevant period for calculation—was $3,517,697. JX-166. One-third of that

127

amount in excess of $208,000 is $1,103,232—which is the Cash Purchase Price Adjustment Amount. Subtracting that sum from $13,125,000 yields an Estimated Cash Purchase Price of $12,021,768.

Imburgia, PartnerRe's damages expert, made adjustments to the Estimated Cash Purchase Price, which resulted in his calculating PartnerRe's cash consideration damages as $5,950,106. His explanation for finding this amount, which the Court adopts, is summarized below.

First, Imburgia reduced the Estimated Cash Purchase Price of $12,021,768 by (1) the Indemnification Escrow Amount ($1,000,000), (2) Entitle's outstanding Indebtedness ($1,971,384), (3) unpaid Transaction Expenses ($1,086,915), and (4) the Stockholder Representative Expense Amount ($250,000). Imburgia Aff. ¶ 26. Both parties agree that these reductions are warranted. They yield—in the language of the Merger Agreement—a "Closing Cash Merger Consideration" to EDG stockholders of $7,713,469. Id.[60]

To arrive at the final tabulation of cash damages, Imburgia subtracted from this figure the cash that Radian paid for purchasing Entitle: $1,763,363. This yielded his cash-damages bottom line: $5,950,106.

Bush, RPM's damages expert, took issue with this calculation in only one respect. He argued that Imburgia errantly did not further reduce the cash consideration by the amount of "related party debt"—that is, the amount of money that PartnerRe had loaned to Entitle in the form of bridge loans between RPM's failure to close and the Radian deal. Bush Aff. ¶ 96. Entitle's resulting $925,000 debt to Partner Re was eliminated at the time of the Radian deal. Id.

---

[60] In what he termed a conservative assumption, Imburgia assumed that, had the transaction closed, no funds in the Escrow Fund would have been left for Entitle's stockholders. Imburgia Aff. ¶ 27.

¶ 97.  Bush urged that PartnerRe should have chosen to structure its post-breach financing of Entitle so as to enhance its equity stake in Entitle, rather than its debt.  *Id.*  This, he urged, would have benefitted it upon the acquisition of Entitle by a new suitor (eventually Radian).

The Court rejects this theory.  There was nothing improper about the decision by PartnerRe, after RPM breached, to finance Entitle via loans rather than a purchase of an increased equity interest.  Bush did not point to any industry custom or legal rule that required either manner of financing.  Tr. at 858.  PartnerRe's decision to proceed as it did was economically rational, hindsight notwithstanding.  And there is no evidence that PartnerRe's decision as to how to go about funding Entitle was intended artificially to boost its eventual damages from RPM.[61]

The Court accordingly finds with Imburgia that the cash consideration component of PartnerRe's damages totals $5,950,106.

### 2.  Equity Interest

Under the Merger Agreement, at closing, there would have been 10 million shares of Entitle common stock issued and outstanding: 6.7 million were to be owned by RPM and the remaining 3.3 million were to be owned by the Entitle stockholders, including PartnerRe.  *See* JX-57.  In addition, under § 5.11 of the Merger Agreement, upon closing, PartnerRe was to acquire additional shares in Entitle, per a defined exchange ratio keyed to the purchase price.  This reflected the conversion to equity of the $1 million loan that PartnerRe had made to Entitle.

---

[61] Although not necessary to this decision, Bush's conclusion—that PartnerRe would have realized more from the Radian deal had it financed Entitle via equity rather than via a loan—also suffers from the fallacy of the predetermined outcome:  There is no guarantee that the terms of the Radian transaction would have been the same had PartnerRe had a higher equity stake in Entitle.

*Id.* It is therefore undisputed that PartnerRe would have had a 36.54% minority interest in Entitle immediately after the closing on June 9, 2017. The parties' experts differ as to how to value this aspect of PartnerRe's damages.

> a.    *Imburgia's minority equity interest calculation and alternative book-value approach*

Imburgia calculated the value of PartnerRe's minority equity interest as $4,916,849. He reached this conclusion based on the parties' valuation of Entitle at the time they executed the Merger Agreement on February 16, 2017.

A summary of Imburgia's methodology follows.

RPM was to purchase 67% of Entitle's equity for $12,021,768. From this, Imburgia extrapolated an aggregate value for Entitle of $17,942,937. Imburgia Aff. ¶ 29. PartnerRe was to maintain a 33% interest in Entitle, which would have risen by 3.54% immediately following the closing pursuant to § 5.11. Imburgia therefore calculated PartnerRe's minority interest as worth $6,555,799—*i.e.*, $17,942,937 (Entitle's aggregate value) multiplied by 36.54% (PartnerRe's minority interest).

Because PartnerRe was the minority shareholder, Imburgia then applied, to this figure, a 25% lack-of-control discount, yielding a total value of PartnerRe's equity stake of $4,916,849. Imburgia explained: "Valuation literature suggests a discount for lack of control within the range of approximately 20 to 30%"; Imburgia chose the midpoint of that range. *Id.* ¶ 31.

As an alternative means to calculate PartnerRe's minority interest, Imburgia made an asset-value calculation, based on the book value of Entitle. Imburgia calculated the total book value to be $9,769,631, with PartnerRe's share corresponding to $3,569,524.

*b.    Bush's critique of Imburgia's equity valuation*

Bush offered several critiques of Imburgia's equity interest valuation. (He did not rebut Imburgia's book value calculation.)

First, Bush asserted, Imburgia's valuation failed to account for Entitle's financial deterioration between the February 16 signing and the June 9 closing, the uncertainties whether the synergies from the Merger Agreement would have yielded a profitable business, and the uncertainties how ODI would have responded to Entitle's financial problems. *See* Bush Aff. ¶¶ 31–32, 102. Bush also faulted Imburgia for not applying a deduction for lack of marketability, and termed Imburgia's 25% discount for the lack of control discount arbitrary. *Id.* ¶ 28.

Second, Bush asserted, it is essentially impossible to value PartnerRe's minority interest in Entitle, because the negotiated-for price was outdated, there was no real market for the company, and PartnerRe, as the minority shareholder, lacked any means to compel a liquidation or sale. *See* Tr. at 863–65; Bush Aff. ¶ 102. Bush viewed any minority interest calculation as too speculative. He therefore valued PartnerRe's minority equity interest at zero. Bush Aff. ¶ 102.

Nonetheless, Bush offered a conservative discounted-cash-flow calculation of Entitle, based on its revised financial projections. This, he stated, resulted in valuing PartnerRe's interest at $1,172,000. *Id.* ¶ 103. Bush did not, however, consider whether alternative modes of analysis would have yielded a higher valuation than DCF by, for example, conducting a comparative asset-based or market-based valuation. Tr. at 875. In particular, he did not assess whether— insofar as the book value of Entitle's assets as calculated by Imburgia significantly outstripped Bush's DCF valuation—a liquidation of the company instigated by new acquiror RPM would have been rational and yielded PartnerRe more money.

*c.     Assessment*

After careful consideration, the Court adopts Imburgia's calculation of PartnerRe's

minority equity interest, which is based on the deal price negotiated by the parties and the

mechanism that it embedded to take into account deterioration in Entitle's value between the date

of the Merger Agreement and the closing.

In general, under Delaware law, the deal price negotiated by the parties is considered the

"best evidence" of an asset's value. *See Schonfeld v. Hilliard*, 218 F.3d 164, 178 (2d Cir. 2000)

(collecting cases); *see also DFC Glob. Corp. v. Muirfield Value Partners, L.P.*, 172 A.3d 346,

366 (Del. 2017) ("[T]he sale value resulting from a robust market check will often be the most

reliable evidence of fair value, and . . . second-guessing the value arrived upon by the collective

views of many sophisticated parties with a real stake in the matter is hazardous."). Delaware

courts have found that to be particularly so when the deal price resulted from a rigorous and fair

sale process. *See Dell, Inc. v. Magnetar Glob. Event Driven Master Fund Ltd.*, 177 A.3d 1, 30

(Del. 2017) (finding that the transaction price had "heavy, if not overriding" use where it

"exemplifie[d] many of the qualities that Delaware courts have found favor affording substantial,

if not exclusive, weight to deal price in the fair value analysis").

Here, it is undisputed that the process that led the Merger Agreement was arms-length

and thorough. Both parties were represented by counsel; the due diligence process was extensive

and collaborative, and RPM was assisted by a third-party investment-bank consultant, Sandler

O'Neill; Entitle entertained multiple offers from others before selecting RPM's; and before

entering into the Merger Agreement, RPM cycled through serial letters of intent. Tellingly,

Bush's critiques of Imburgia's use of the negotiated deal price as a measure of the value of

PartnerRe's minority interest do not take issue with the transaction process. He instead faults

Imburgia for not freshly assessing Entitle's financial deterioration between signing and closing, the uncertainty as to whether the synergies that RPM perceived from marrying its customer base with Entitle's title insurance capabilities would have emerged as expected, and the uncertainty as to the steps ODI might have taken to fortify its regulated insurer Entitle in light of its slippage following signing of the Merger Agreement. *See* Bush Aff. ¶¶ 26, 31–32. As noted, Bush also faults Imburgia for his application of a 25% lack-of-control discount and the absence of discount for lack of marketability.

Bush's first critique, that Imburgia did not take account of Entitle's performance after signing, is readily set aside. In shareholder appraisal cases, in which the value of shares at the time of closing is at issue, the deal price remains indicative of fair value, notwithstanding temporary swings between signing and closing. *In re PetSmart, Inc.*, No. Civ. 10782 (VCS), 2017 WL 2303599, at *31 (Del. Ch. May 26, 2017) ("Petitioners would have me conclude that the Merger Price was stale because, in the gap between signing and closing, PetSmart's fortunes took a miraculous turn for the better. . . . I am not convinced that these short-term improvements were indicative of a long-term trend. In fact, all testimony at trial was to the contrary—the Board . . . believed that the Q4 results were temporary and provided no basis to alter their view of the Company's long-term prospects.").

That assessment is particularly warranted here, for two reasons. First, Entitle's early-2017 underperformance was predominantly the product of short-term market circumstances, to wit, the increase in interest rates. It did not, the Court has found, bespeak a durable diminution in Entitle's inherent value. The thesis shared by both parties as to why Entitle stood to be profitable once in RPM's hands remained valid. *See* Tr. at 294–95 (Iannarone, attributing the higher-than-expected losses to heightened interest rates, which resulted in fewer mortgage

refinancings and less title insurance work, and one-time expenses, including ones associated with restructuring in preparation for the merger and approved by RPM); *see id.* at 525–26 (Palmer, same); *see id.* at 1001 (Hirt testifying that, as of May 2017, his view was that RPM could still make Entitle profitable); *id.* at 1016 (Hirt testifying that his view that RPM could make Entitle profitable never changed). As Imburgia persuasively explained, "in the absence of a new event with major recurring effects, three or four months of performance data would not be expected to materially change any valuation. This is particularly so when the changes are spurred by transitory conditions, such as rising interest rates at the time[.]" Imburgia Supp. Aff. ¶ 7.

Second, to the extent that Entitle had experienced outsized losses prior to the closing, the Merger Agreement—and Imburgia's method based on it of valuing PartnerRe's minority equity interest—had taken these into account. As noted, the agreement's purchase price formula had anticipated the possibility of outsized losses between August 1, 2016 and the closing, and thus reduced the cash consideration component of PartnerRe's damages. Beyond that, Imburgia's overall valuation of Entitle as of the date of closing was lower on account of Entitle's losses during this period, because that valuation (tracking the agreement) deducted the Cash Purchase Price Adjustment Amount, which itself was a function of Entitle's outsize losses in this period. That in turn reduced the value of PartnerRe's 36.54% equity stake. In light of its supple mechanisms for taking into account Entitle's post-signing performance, the Merger Agreement had not grown stale as a basis for valuing PartnerRe's equity interest.

Bush next faulted Imburgia for ignoring two uncertainties: the synergies that the merger would have yielded and the amount of ODI's future capital contribution demands. But the parties had known of the uncertainties in negotiating the deal price. Hirt admitted that it was not specifically known when Entitle would become profitable under RPM's stewardship. *See, e.g.,*

134

Tr. at 1016 (Hirt, acknowledging RPM "did not know specifically how fast [it] would make

Entitle profitable."), 1042 (Hirt, acknowledging that RPM had known that the synergies to

RPM's clients would not be realized until sometime after closing). RPM was also fully aware

that Entitle was subject to regulatory scrutiny including the prospect of additional mandatory

capital contributions. That these factors both remained "known unknowns" as of the closing date

is no basis to revisit the parties' negotiated pricing structure as an informed gauge of Entitle's

value. *See DFC Glob. Corp.*, 172 A.3d at 373 (deferring to deal price where "[t]he buyers who

were part of the sales process—and who ultimately decided not to pursue a transaction with

DFC—considered regulatory risk"). On the contrary, that the Merger Agreement gave buyer

RPM an out based on regulatory considerations only in the event of a "burdensome condition,"

which the Court has not found, counsels against any such adjustment. In any event, as of June 9,

2017—the date of RPM's breach—the parties knew only of a possible capital contribution

request from ODI. ODI only later suggested the contribution of $5.5 million to cure all HFC

violations, and it made this suggestion (on June 28, 2017) only after being told that the

transaction would not close.

The Court finds Imburgia's agreement-based calculation methodology substantially more

reliable than the two alternatives that have been identified: DCF (by Bush) and book value (by

Imburgia). DCF analyses, particularly when offered in litigation, can be unreliable. *See Merlin

Partners LP v. AutoInfo, Inc.*, No. Civ 8509 (VCN), 2015 WL 2069417, at *17 (Del. Ch. Apr.

30, 2015) ("DCF analysis is necessarily a second-best method to derive value" in comparison to

a fair deal price); *id.* (also noting the sensitivity and manipulability of DCF models); *In re

PetSmart, Inc.*, 2017 WL 2303599, at *32 (noting that Delaware courts have found DCF

projections created in anticipation of litigation unreliable). And Bush's DCF calculation is

flawed on its face. *See Dell*, 177 A.3d at 36 (finding DCF projection not credible where it was "galaxies apart" from the deal price and other party's DCF model). It yielded an equity interest valuation of $1,172,000, far below the undisputed book value of Entitle's assets, which should represent the minimum basis for valuing Entitle.

The Court carefully considered Imburgia's book-value calculation, but ultimately rejected it as less reliable than his Merger-Agreement based methodology. It would not fully compensate PartnerRe for the benefit of its bargain. *See Duncan*, 775 A.2d at 1022 ("[T]he standard remedy for breach of contract is based upon the reasonable expectations of the parties ex ante. This principle of expectation damages is measured by the amount of money that would put the promisee in the same position as if the promisor had performed the contract." (citing Restatement (Second) of Contracts § 347 cmt. a)); *AB Stable VII LLC*, 2020 WL 7024929, at *101 (same) (quoting *Duncan*, 775 A.2d at 1022). In particular, the deal terms that the parties negotiated took into account their shared assessment that the merger stood to benefit Entitle by giving it a durable source of title insurance deal flow that its direct marketing model had failed to produce. These terms reflected projections about how Entitle might fare post-closing, based on the parties' assumptions about the increase in its customers. *See* Imburgia Aff. ¶ 41. The parties also recognized the possibility of consequential cost savings from the merger, including the elimination of duplicative overhead and economies of scale. *Id.* ¶ 47. The book value approach to valuing PartnerRe's equity minority interest would not take into account these potential synergies or cost-savings.

Finally, the Court finds Imburgia's application of the 25% lack of control discount appropriate. In choosing that discount, Imburgia calculated the average discount derived from a data set of all transactions over a period of 23 years. Imburgia Supp. Aff. ¶ 4. He reasonably

chose not to rely on an insurance-only data set, because it included only eight companies, seven of which were foreign. *Id.* The Court is unpersuaded that a separate discount for Entitle's lack of marketability was necessary, substantially for the reasons cited by Imburgia. The parties were aware when they negotiated the transaction that Entitle was not a publicly traded company whose shares could readily be sold, and the terms on which RPM agreed to purchase Entitle presumably reflected this knowledge. *See* Imburgia Aff. ¶¶ 31-32; Tr. at 421–22.

### 3. Total Pre-Interest Damages

PartnerRe's total damages pre-interest, therefore, is the sum of the cash consideration difference and the equity interest as calculated above. That amount is $10,886,955 ($5,950,106 + $4,916,849 = $10,866,955).

### 4. Pre- and Post-Judgment Interest

PartnerRe is also entitled to pre- and post-judgment interest on its damages.

#### i. Prejudgment interest

Defendants do not contest that, to the extent damages are awarded, prejudgment interest should be applied. The date from which prejudgment interest runs is the date defendants breached the agreement by failing to close: June 9, 2017. The parties dispute whether such interest should be simple or compounded.

Under Delaware law, prejudgment interest is awarded as a matter of right. *CIGNEX Datamatics, Inc. v. Lam Rsch. Corp.*, No. Civ. 17-320, 2021 WL 212692, at *2 (D. Del. Jan. 21, 2021); *Brandywine Smyrna, Inc. v. Millennium Builders, LLC*, 34 A.3d 482, 486 (Del. 2011). Where, as here, the parties' contract does not set a rate, "the legal rate of interest shall be 5% over the Federal Reserve discount rate including any surcharge as of the time from which interest is due." 6 Del C. Ann. § 2301(a); *see also CIGNEX*, 2021 WL 212692, at *2.

137

As to whether prejudgment interest should be simple or compounded, the Delaware

Supreme Court has explained that, although traditionally Delaware courts have "disfavored

compound interest," it is within a court's discretion to award compounded interest if principles

of equity support doing so. *Gotham Partners, L.P. v. Hallwood Realty Partners, L.P.*, 817 A.2d

160, 173 (Del. 2002). Factors courts have considered in determining whether to award

compounding interest include whether the defendant has obtained a benefit by retaining the cash

to which plaintiff would have been entitled, *CIGNEX*, 2021 WL 212692, at *2; the sophistication

of the parties, *Edgewater Growth Cap. Partners LP v. H.I.G. Cap., Inc.*, 68 A.3d 197, 238 (Del.

Ch. 2013); whether the defendants used the litigation to avoid a payment obligation, *id.*; and the

number of breaches, *Brandin v. Gottlieb*, No. Civ. A. 14819, 2000 WL 1005954, at *29 (Del. Ch.

July 13, 2000). Compounding prejudgment interest is particularly disfavored in "a pure contract

claim." *Rexnord Indus., LLC v. RHI Holdings, Inc.*, No. 07C-10-057 (RRC), 2009 WL 377180,

at *10 (Del. Super. Ct. Feb. 13, 2009).

On assessment of these factors, the Court declines to award compounding prejudgment

interest here. "Prejudgment interest serves two purposes: first, it compensates the plaintiff for

the loss of the use of his or her money; and, second, it forces the defendant to relinquish any

benefit that it has received by retaining the plaintiff's money in the interim." *CIGNEX*, 2021 WL

212692, at *2 (quoting *Brandywine*, 34 A.3d at 486). PartnerRe has not introduced evidence

concretely reflecting the impact on it of its lack of access to the money it would have received

from the transaction had it closed. Nor, beyond the unremarkable observation that RPM was

able to use these funds to invest in its business, has PartnerRe concretely shown the benefit

conferred on RPM by refusing to close. On the trial record, the Court cannot find that

138

compounded interest is necessary to fully compensate PartnerRe.  This is a "pure contract claim," *Rexnord*, 2009 WL 377180, at *10, for which simple interest suffices.

As to whether the rate of simple interest should fluctuate, courts have interpreted language of the relevant statute, 6 Del. C. Ann. § 2301(A), to suggest that the rate should be fixed based on the time that the liability for interest begins to run: "the legal rate of interest shall be 5% over the Federal Reserve discount rate including any surcharge as of the time from which interest is due." *See CIGNEX*, 2021 WL 212692, at *2 (collecting cases).

Accordingly, prejudgment interest is awarded from the date of defendants' breach: June 9, 2017.

ii.     Post-judgment interest

Finally, PartnerRe is entitled to post-judgment interest.  In cases over which a federal court exercises diversity jurisdiction, post-judgment interest is governed by 28 U.S.C. § 1961. *See Cappiello v. ICD Publ'ns, Inc.*, 720 F.3d 109, 112 (2d Cir. 2013) ("[U]nder § 1961, federal district courts must apply the federal rate of post-judgment interest to judgments rendered in diversity actions."), *cert. denied*, 571 U.S. 1071 (2013).  Awards of post-judgment interest under § 1961 are mandatory. *Trs. of the N.Y. City Dist. Council of Carpenters Pension Fund, Welfare Fund, Annuity Fund v. Installations of Am., Inc.*, No. 15 Civ. 8316 (PAE), 2017 WL 384694, at *4 (S.D.N.Y. Jan. 27, 2017); 28 U.S.C. § 1961(a) ("Interest shall be allowed on any money judgment in a civil case recovered in a district court.").

Consistent with § 1961(a), the rate of post-judgment interest is the weekly average one-year constant maturity Treasury yield for the week preceding entry of judgment.  Post-judgment interest is compounded annually.  28 U.S.C. § 1961(b).

The Court therefore also awards interest to accrue from the date judgment enters until payment is made.

### D.  Alter Ego Liability

#### 1.  Applicable Legal Standards

PartnerRe also seeks to hold the Hirts and the Trust liable for its damages through alter ego liability.

As the Court reviewed in its pretrial ruling permitting such claims to go forward, *see Partner Reins. Co. Ltd.*, 2020 WL 6690659, under Delaware law, a plaintiff seeking to impose alter ego liability on the owners of a corporate entity must show (1) that "the entit[y] in question operated as a single economic entity" with its owners; and (2) "an overall element of injustice or unfairness." *A.V.E.L.A., Inc. v. Estate of Marilyn Monroe ("A.V.E.L.A. II"), LLC*, 241 F. Supp. 3d 461, 475 (S.D.N.Y. 2017) (quoting *NetJets Aviation, Inc. v. LHC Commc'ns, LLC*, 537 F.3d 168, 177 (2d Cir. 2008)).  A plaintiff faces a "heavy burden" to establish such a claim, as "Delaware courts . . . take the corporate form very seriously and will disregard it only in the exceptional case." *Nat'l Gear & Piston, Inc. v. Cummins Power Sys., LLC*, 975 F. Supp. 2d 392, 401–02 (S.D.N.Y. 2013) (quoting *Soroof Trading Dev. Co. v. GE Microgen, Inc.*, 283 F.R.D. 142, 150 (S.D.N.Y. 2012)); *see NetJets*, 537 F.3d at 176 (plaintiffs face a "difficult task"); *Cohen v. Schroeder*, 248 F. Supp. 3d 511, 518 (S.D.N.Y. 2017) (veil piercing an "extraordinary equitable remedy" (quoting *Base Optics Inc. v. Liu*, No. Civ. 9803 (VCG), 2015 WL 3491495, at *23 (Del. Ch. May 29, 2015)), *aff'd*, 724 F. App'x 45 (2d Cir. 2018) (summary order).

#### 2.  Analysis

##### a.  *Single economic entity*

"Factors relevant to the first, 'single economic entity' showing include the following":

140

(1) "[w]hether the corporation was adequately capitalized for the corporate undertaking"; (2) "whether the corporation was solvent"; (3) "whether dividends were paid, corporate records kept, officers and directors functioned properly, and other corporate formalities were observed"; (4) "whether the dominant shareholder siphoned corporate funds"; and (5) "whether, in general, the corporation simply functioned as a façade for the dominant shareholder." *Partner Reins. Co. Ltd.*, 2020 WL 6690659, at *8 (quoting *Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1458 (2d Cir. 1995)). The "list of factors is not exhaustive and no single factor is dispositive." *Blair v. Infineon Techs. AG*, 720 F. Supp. 2d 462, 471 (D. Del. 2010); *see In re Autobacs Strauss, Inc.*, 473 B.R. 525, 556 (Bankr. D. Del. 2012) (same); *In re Opus E., LLC*, 528 B.R. 30, 58 (Bankr. D. Del. 2015), *aff'd*, No. 09-12261, 2016 WL 1298965 (D. Del. Mar. 31, 2016), *aff'd*, 698 F. App'x 711 (3d Cir. 2017) (summary order) ("Courts value each of these factors differently and decisions are fact-intensive."). Ultimately, "[t]o pierce a corporate veil under Delaware law, a plaintiff must show that the individual has complete domination and control over the entity such that it no longer has legal or independent significance of its own." *Carotek, Inc. v. Kobayashi Ventures, LLC*, 875 F. Supp. 2d 313, 350 (S.D.N.Y. 2012) (cleaned up) (applying Delaware law); *see also Nat'l Gear & Piston,* , 975 F. Supp. 2d at 402–03 (collecting Delaware cases stating same).

By way of overview, although the Court serially evaluates each factor in the interest of thoroughness, the record makes abundantly clear that RPM was not a sham entity that existed merely to shield the Hirts from creditors. RPM operated for well over 20 years as a legitimate mortgage lender, before being merged into LendUS. Hirt Aff. ¶ 5. As of trial, LendUS had 93 offices in 24 states, and employed 900 people across the country. *Id.* As for LendUS, last year, it issued approximately 20,000 mortgages with an approximate aggregate value of $8.2 billion.

141

*Id.* LendUS claims, without refutation, to comply with all applicable laws; and its numerous regulators include Fannie Mae, Freddie Mac, the Consumer Financial Protection Bureau, and the Department of Housing and Urban Development. Noack Aff. ¶ 40. These facts, none of which PartnerRe disputes, are inconsistent with the claim RPM or its successor entity exists only as a "vehicle for fraud" and a "sham" to provide cover from creditors. *In re Broadstripe, LLC*, 444 B.R. 51, 104 (Bankr. D. Del. 2010) (finding company an "independent economic entity" where it could demonstrate that it employed hundreds of employees, operated in numerous states, earned significant revenue, had a CFO, paid taxes, and issued audited financial statements).

Notably, too, ODI closely examined RPM's Form A application. As part of it, RPM was required to submit extensive information about itself, including audited financial statements, organization charts, and information about key executives including Hirt and Noack. *See* JX-165 (Form A application). That application was then reviewed and approved by six ODI examiners. *Id.* This, too, weighs against the claim that RPM was a sham.

### iii.    RPM was adequately capitalized and solvent

PartnerRe argues that RPM was inadequately capitalized at closing. That is wrong.

"The inquiry into corporate capitalization is most relevant for the inference it provides into whether the corporation was established to defraud its creditors or other improper purpose such as avoiding the risks known to be attendant to a type of business." *In re Opus E., LLC*, 528 B.R. at 59–60 (quoting *Trs. of Nat'l Elevator Indus. Pension, Health Benefit & Educ. Funds v. Lutyk*, 332 F.3d 188, 195 (3d Cir. 2003)); *see also Charter Servs., Inc. v. DL Air, LLC*, 711 F. Supp. 2d 1298, 1308 (S.D. Ala. 2010) (applying Delaware law); *EBG Holdings LLC v. Vredezicht's Gravenhage 109 B.V.*, No. Civ. A. 3184 (VCP), 2008 WL 4057745, at *13 (Del.

Ch. Sept. 2, 2008) (to satisfy this factor, requiring showing that defendant's "capitalization was so minimal as to prove that it was a sham entity").

Although RPM was in a tight cash position, on June 9, 2017, it had the cash to close. *See* Imburgia Dep. at 47 ("I agree . . . that [RPM] had the cash to close."). That day, RPM's cash reserves were at $15.9 million. Bush Dep. at 74–75. Had RPM closed on Entitle, it would have had approximately $4 million left. *See* Imburgia Aff. ¶ 59; Tr. at 828. And although RPM's cash position was lower than it anticipated when it submitted its Form A application, and it risked violating certain covenants with its lenders without a waiver, PartnerRe has not shown that RPM's cash reserves were so minimal as to support that RPM was a sham entity. *See* Noack Aff. ¶¶ 41, 48 (explaining that RPM could have obtained additional financing or obtained a waiver from its lender). Further, at the end of each month between January 2017 and July 2017, RPM had a cash balance of at least $16,280,030. Bush Aff. ¶ 74. And RPM's auditors approved RPM's financial statements each year, finding they complied with generally accepted accounting standards in the United States. *See* JX-460.

More important, PartnerRe has not established that RPM was inadequately capitalized *for the purpose of defrauding its creditors* generally or to avoid its obligation to close on the merger with Entitle. Even assuming that RPM's failure to close here was motivated by its limited or even insufficient cash reserves, PartnerRe has not identified any other instance in which RPM was unable to meet its ongoing financial obligations. *See* Imburgia Dep. at 83–84, 110.

iv.    RPM observed corporate formalities

This factor considers "whether corporate records were kept, officers and directors functioned properly, and other corporate formalities were observed." *In re Autobacs Strauss, Inc.*, 473 B.R. at 556; *see also In re Opus E., LLC*, 528 B.R. at 63.

143

RPM generally observed corporate formalities.  It had a board of directors which held meetings to approve company transactions.  *See, e.g.*, JX-56 (RPM board resolutions approving Merger Agreement).  All transactions were recorded in RPM's general ledger, which was produced in this litigation.  Noack Aff. ¶ 46; JX-216.  And, as noted, the consolidated financial statements of RPM and LendUS were approved each year without qualification by independent auditors.

v.      RPM did not siphon funds

Siphoning suggests "the improper taking of funds that the owner was not legally entitled to receive."  *In re Autobacs Strauss, Inc.*, 473 B.R. at 557.  *See also Tr. of Nat'l Elevator Indus. Pension Health Benefit & Educ. Funds v. Lutyk*, 140 F. Supp. 2d 447, 458 (E.D. Pa. 2001), *aff'd*, 332 F.3d 188  (payment of dividends, repayment of loans from shareholders, or other diversion of corporate assets at time when company's finances are in trouble may indicate siphoning); *NetJets*, 537 F.3d at 182 (finding siphoning where corporate owner withdrew funds and incorrectly characterized them as loans).

Although there are numerous examples of the Hirts withdrawing funds from RPM, including for personal reasons, PartnerRe and its expert have not shown that these withdrawals were wrongful.  Each such transaction was recorded in RPM's accounting books and records and subject to independent audits.  *See* Bush Aff. ¶ 85.  For example, RPM issued a promissory note to Hirt to memorialize certain loans it made to him; he later repaid that note.  JX-41; LendUS Dep. at 309.

PartnerRe has also not demonstrated that the timing of the Hirts' withdrawals suggest that they were made to avoid payments to creditors.  And, as noted, there is no evidence that creditors

144

were defrauded or that the Hirts were consistently unable to pay their obligations due to their frequent withdrawals.

As to this particular transaction, the evidence, at best, supports an inference that the Hirts' personal cash position may have influenced Hirt's decision not to close. It does not support the inference that the Hirts redirected funds to themselves in order to avoid RPM's obligation to close.

### vi.    RPM was not merely a "façade" for the Hirts

Finally, PartnerRe has not demonstrated that RPM "was created only as a façade" for the Hirts. On the contrary, the Court finds that RPM "was created for a legitimate business purpose and acted independently" of the Hirts. *In re Opus E., LLC*, 528 B.R. at 60.

PartnerRe notes that the Hirts owned approximately 96% of RPM and occupied key positions, and that Hirt was RPM's "ultimate decision maker." Pl. Memo at 22. But that RPM was closely held is not inconsistent with RPM's being a legitimate business. As noted, RPM operated for well over 20 years as a mortgage lender, before being merged into LendUS, had numerous offices across the country, and employed numerous people. Hirt Aff. ¶ 5. Last year, LendUS issued approximately 20,000 mortgages with an approximate aggregate value of $8.2 billion. *Id.* And, as noted, to the extent the Hirts took withdrawals from RPM, these were recorded, and major decisions were approved by RPM's board. Noack Aff. ¶ 46; JX-216; JX-41; JX-56.

Every indication is that RPM was a functional business—not merely a piggybank for the Hirts.

a.      *Injustice or Unfairness*

To pierce the corporate veil, PartnerRe must also show "an overall element of injustice or unfairness." *NetJets*, 537 F.3d at 177.  To show this, "a plaintiff need not prove that there was actual fraud." *Id.* at 176; *see Mobil Oil Corp. v. Linear Films, Inc.*, 718 F. Supp. 260, 268 (D. Del. 1989) ("[F]raud, strictly speaking, is not the only basis for finding an alter ego relationship and piercing the corporate veil.").  Nor must it prove that "the corporation was created with fraud or unfairness in mind." *NetJets*, 537 F.3d at 177.  It must show only that it was "so used." *Id.* The fraud or injustice to which a plaintiff points must be more than the "underlying claim" for which it seeks to hold the corporate owner liable. *EBG Holdings*, 2008 WL 4057745, *12. "Any breach of contract and any tort . . . is, in some sense, an injustice.  Obviously, this type of 'injustice' is not what is contemplated" by the alter-ego doctrine. *Mobil Oil*, 718 F. Supp. at 268. Rather, the corporate structure itself must have been used to further the fraud or injustice or "as a shield for" unjust acts. *NetJets*, 537 F.3d at 177 (quoting *Martin v. D.B. Martin Co.*, 88 A. 612, 615 (Del. Ch. 1913)).  In other words, "courts 'look behind the corporate curtain' generally 'where the facts indicate that the corporate entity has been or is being used by those in control of it to perpetrate a fraud' or to 'promote injustice.'" *Id.* (quoting *Sonne v. Sacks*, No. Civ. A. 4416, 1979 WL 178497, at *2 (Del. Ch. June 12, 1979)).

PartnerRe has not so shown.  It has established a clear and knowing breach of contract by RPM, for which it is entitled to compensation in the form of expectation damages.  But it has not adduced any proof that RPM was used as a shield to perpetrate unjust acts against creditors.  Nor has it identified other creditors harmed or obligations avoided by RPM.

Accordingly, the Court does not find any basis on which to hold the Hirts personally liable for the breach of contract claim against RPM.

146

## CONCLUSION

For the reasons above, the Court finds defendant RPM—now LendUS—liable to plaintiff PartnerRe for breach of contract.  The Court does not find PartnerRe liable to RPM for breach of contract.

The Court awards PartnerRe damages of $10,886,955 on its breach of contract claim. The Court further awards pre- and post-judgment interest on that amount.  Pre-judgment interest—simple not compounded—is awarded from the date of breach, June 9, 2017, pursuant to 6 Del. C. Ann. § 2301(A).  The legal rate of interest shall be 5% over the Federal Reserve discount rate including any surcharge as of the time from which interest is due.  That rate should be calculated as fixed from June 9, 2017.  The Court further awards post-judgment interest pursuant to 28 U.S.C. § 1961.

The Court does not find defendants Robert Hirt, Tracey Hirt, or the Robert Hirt and Tracey Najarian Hirt Revocable Living Trust personally liable for breach of contract under a theory of alter ego liability.

The Court respectfully directs the Clerk of the Court to close the case.

SO ORDERED.

*Paul A. Engelmayer*
PAUL A. ENGELMAYER
United States District Judge

Dated: May 25, 2022
    New York, New York

147